IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

(Charlottesville Division)

_____

| | |
|---|---|
| DAMIAN STINNIE, <br> DEMETRICE MOORE, <br> ROBERT TAYLOR, and <br> NEIL RUSSO, <br><br> Individually, and on behalf of all others <br> similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD D. HOLCOMB, <br> in his official capacity as the Commissioner <br> of the VIRGINIA DEPARTMENT OF <br> MOTOR VEHICLES <br><br> Defendant. | Civ. No: __3:16CV00044__ |

_____

## CLASS ACTION COMPLAINT

### Preliminary Statement

1.      The Plaintiffs in this lawsuit are indigent Virginia residents who have suffered indefinite suspension of their driver's licenses for failure to pay court costs and fines that they could not afford.

2.      The Commonwealth of Virginia relies upon driver's license suspension to coerce payment of money owed to the courts.

3.      Those who can afford to pay, generally do.

4.      For those who cannot pay, suspension of their driver's licenses is automatic and mandatory upon default, without inquiry into the reasons for nonpayment, or consideration of the debtor's financial circumstances.

5.      Hundreds of thousands of people have lost their licenses simply because they are too poor to pay, effectively depriving them of reliable, lawful transportation necessary to get to and from work, take children to school, keep medical appointments, care for ill or disabled family members, or, paradoxically, to meet their financial obligations to the courts.

6.      The named Plaintiffs, Damian Stinnie, Demetrice Moore, Robert Taylor, and Neil Russo (collectively, "the Plaintiffs"), for themselves individually and on behalf of a class of additional unnamed plaintiffs similarly situated ("Class" or "Class Members"), submit this Complaint seeking declaratory and injunctive relief against Defendant Richard D. Holcomb, in his official capacity as Commissioner of the Virginia Department of Motor Vehicles (DMV), to address and remedy the systemic, pervasive, and ongoing failure of the Commonwealth to provide basic protections afforded by the Due Process and Equal Protection Clauses of the United States Constitution before taking the harsh enforcement measure of suspending driver's licenses against indigent people whose poverty prevents them from paying debts owed to courts.

7.      The Plaintiffs seek relief from the Commonwealth's unconstitutional scheme that unfairly punishes them for being poor.

## Jurisdiction and Venue

8.      The named Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. §

Case 3:16-cv-00044-NKM-JCH   Document 1   Filed 07/06/16   Page 2 of 55   Pageid#: 2

1343(a)(3), because it seeks to redress the deprivation, under color of State law, of rights, privileges, and immunities secured to the named Plaintiffs and Class Members by the Constitution and laws of the United States.

10.     This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the named Plaintiffs' claims occurred in this judicial district, or a substantial part of the property that is the subject this action (namely, Plaintiffs' driver's licenses) is situated in this judicial district.

## Parties

**Plaintiffs**

12.     Plaintiff Damian Stinnie is a 24-year-old African American man who lives in Charlottesville, Virginia.

13.     Mr. Stinnie is indigent within the meaning of Va. Code § 19.2-159.

14.     Plaintiff Demetrice Moore is a 33-year-old African American woman who lives in Richmond, Virginia.

15.     Ms. Moore is indigent within the meaning of Va. Code § 19.2-159.

16.     Plaintiff Robert Taylor is a 28-year-old African American man who lives in Richmond, Virginia.

17.     Mr. Taylor is indigent within the meaning of Va. Code § 19.2-159.

18.     Plaintiff Neil Russo is a 61-year-old white man who lives in Fluvanna County, Virginia.

19.      Mr. Russo is indigent within the meaning of Va. Code § 19.2-159.

**Defendant**

20.      Defendant Richard D. Holcomb is the Commissioner of the Virginia Department of Motor Vehicles ("the DMV").

21.      Mr. Holcomb is sued in his official capacity as Commissioner of the DMV.

22.      The DMV is the entity responsible for the issuance, suspension, and revocation of driver's licenses.

23.      As Commissioner of the DMV, Mr. Holcomb is the chief executive officer responsible for the supervision and management of the DMV and has authority to do all acts necessary or convenient to carry out the powers and duties of the DMV.  Va. Code Ann. §§ 46.2-200-224.

24.      At all times relevant to the events, acts, and/or omissions alleged in this Complaint, Mr. Holcomb has acted under color of State law, pursuant to his authority and responsibility as an official of the Commonwealth of Virginia.

**Facts**

**Introduction**

25.      In order to fund its basic operations, the Commonwealth has steadily increased the amounts that may be taxed as costs against convicted criminal and traffic defendants and tacked on various additional fees.

26.      Assessments against criminal and traffic court defendants have risen from $281.5 million in fiscal year 1998 to $618.8 million in 2014.  Compensation Board, *FY 2014 Fines & Fees Report* 2 (2015),

http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/RD1792016/$file/RD179.pdf.

27. Indigent defendants who, because of their inability to afford a lawyer, are appointed an attorney to represent them, are required to reimburse the state for their lawyer's fees, which can easily run into thousands of dollars.

28. In addition to these and other costs, convicted defendants may also be assessed fines, restitution, and other penalties.

29. Pursuant to § 46.2-395 of the Code of Virginia, the failure of a person to pay fines, costs, forfeitures, restitution, or penalties (collectively, "court debt") assessed against him or her in a criminal or traffic proceeding automatically results in the indefinite suspension of the person's driver's license. *See* H.J. 69, 2016 Gen. Assembly, Reg. Sess. (Va. 2016).

30. The possession of a valid driver's license is often essential for people to secure and maintain employment, and the loss of a driver's license often results in hardship for individuals and their families. *Id.*

31. Research has consistently found that having a driver's license can be crucial to an individual's ability to maintain a job, pursue educational opportunities, and care for family. *See* "Letter to Colleague" from Vanita Gupta & Lisa Foster, U.S. Department of Justice (Mar. 14, 2016), https://www.justice.gov/crt/file/832461/download.

32. Each year since fiscal year 2010, the Virginia DMV issued more than 360,000 orders of suspension for failure to pay court costs and fines.

33. Currently, more than 940,000 people have a suspended license for nonpayment of court costs and fines.

34. Suspended licenses can trap the poor in an impossible situation: inability to reinstate their licenses without gainful employment, yet inability to work without a license.

35.     Paying off court debt is particularly hard for the nearly one million people living below the federal poverty threshold in Virginia and the many thousands of others living just above it.

36.     Suspending licenses as a means of debt collection also puts public safety at risk, because law enforcement resources are devoted to stopping, investigating, and prosecuting suspended drivers who do not present a danger behind the wheel instead of pursuing individuals who do present a danger behind the wheel.

37.     Public safety also is put at risk when formerly incarcerated persons leave prison or jails with licenses that are suspended due to court debt, and who therefore often have no source of legal, reliable transportation for finding and maintaining a job.

**The Named Plaintiffs' Debts**

38.     Each of the named Plaintiffs is currently suffering under the indefinite suspension of his or her driver's license for failure to pay money owed to the Commonwealth's courts.

39.     The Plaintiffs' licenses were suspended by the Defendant immediately upon their default, without any inquiry into their individual financial circumstances, or the reasons underlying their failure to pay.

40.     The Defendant will not reinstate the Plaintiffs' licenses until they satisfy their court debt entirely, or obtain payment plans from each court to which they are indebted.

41.     The Plaintiffs are not able to enter into or maintain payment plans with each court in which they owe because they cannot afford the one-size-fits-all terms that do not take into account their individual financial circumstances.

42.     The Plaintiffs were not offered community service, or any other alternatives that would enable them to reinstate their licenses, and are not eligible for restricted licenses.

43.     Should the Plaintiffs ever become eligible to reinstate their licenses, they would first have to pay to the Defendant a reinstatement fee of at least $145.

44.     The Plaintiffs would pay their debts and reinstate their licenses if they could afford to do so, but have been unable to acquire the resources to pay and have suffered considerable hardship as a result.

45.     The Plaintiffs' debts continue to increase daily, as interest accrues at an annual rate of 6%.

*Damian Stinnie*

46.     Plaintiff Damian Stinnie is 24 years old.

47.     Along with his twin brother, Mr. Stinnie grew up in the foster care system in Virginia.

48.     Mr. Stinnie graduated from high school with a 3.9 GPA.

49.     Mr. Stinnie and his twin have lived together since they both aged out of foster care in 2010.

50.     In 2012, Mr. Stinnie was working nearly full-time at Walmart as a retail sales clerk.

51.     Mr. Stinnie earned close to minimum wage with no benefits.

52.     Mr. Stinnie lost this job in December 2012.

53.     During the time he was searching for new employment, Mr. Stinnie received four traffic citations: two in Henrico General District Court ("GDC") and two in Goochland GDC.

54.     In April 2013, after four months of job-searching, Mr. Stinnie found a job as a retail sales clerk at the clothing store Abercrombie & Fitch.

55.     Mr. Stinnie's hours varied, but he consistently worked less than full time and always earned minimum wage.

56.     At most, Mr. Stinnie earned approximately $300 per week.

57.     At three separate hearings on different dates between April 2013 and July 2013, Mr. Stinnie was convicted on three of the four traffic citations.

58.     The courts did not give Mr. Stinnie any jail time as a result of these convictions.

59.     However, the convictions did result in $314 in fines and $187 in costs owed to Henrico GDC and $400 in fines and $101 in costs owed to Goochland GDC.

60.     In Goochland, the Goochland GDC found Mr. Stinnie in compliance on one of the two charges, but nevertheless ordered him to pay $10 in costs.

61.     All told, the four traffic charges resulted in obligations to pay $1,002.00 in costs and fines, equaling nearly three weeks or more of wages at Mr. Stinnie's new job, depending on how many hours he was given.

62.     At the time these fines and costs were assessed, no court inquired into his ability to pay or took into account the debts he owed to the other court.

63.     Mr. Stinnie was not able to pay any of these costs and fines within thirty days.

64.     Neither court informed Mr. Stinnie of any alternative options for payment, such as installment or deferred payment plans or community service.

65.     Upon information and belief, the Goochland County GDC notified the Defendant of Mr. Stinnie's default.

66.     On May 20, 2013, the Defendant suspended his driver's license for nonpayment of the $501.00 in costs and fines imposed on April 15, 2013.

67. The Defendant did not offer Mr. Stinnie an opportunity to demonstrate that he was unable to pay either before or after suspending his license.

68. On May 27, 2013, Mr. Stinnie was stopped by police and cited for violating Va. Code § 46.2-301, driving with a suspended license.

69. At the time, Mr. Stinnie did not know his license was suspended.

70. Mr. Stinnie received a summons to appear in Chesterfield GDC on September 19, 2013.

71. On September 11, 2013, Mr. Stinnie was diagnosed with lymphoma.

72. Mr. Stinnie began receiving treatment immediately, including chemotherapy.

73. On September 19, 2013, and while Mr. Stinnie was in the hospital, the Chesterfield GDC found him guilty in absentia of driving with a suspended license.

74. The court ordered Mr. Stinnie to pay costs of $117.00, including a $35 trial in absence fee, and a fine of $150.00.

75. Upon information and belief, the court did not assess Mr. Stinnie's ability to pay.

76. In November 2013, Mr. Stinnie left the hospital and moved in with his former foster parents in Louisa County.

77. From November 2013 through the present, Mr. Stinnie has undergone numerous medical treatments, including chemotherapy and radiation and a stem cell transplant during the summer of 2014.

78. Following the stem cell transplant, Mr. Stinnie's health improved but remained fragile.

Case 3:16-cv-00044-NKM-JCH   Document 1   Filed 07/06/16   Page 9 of 55   Pageid#: 9

79.     Mr. Stinnie and his brother moved in with his great aunt in Charlottesville to be closer to UVA Hospital, until they secured charitable donations to get temporary housing of their own in the Charlottesville area.

80.     However, between April and June 2015 the brothers were not able to find housing, even with this assistance.

81.     While they were looking for somewhere to stay permanently, they bounced around among the homes of friends and family members.

82.     During this time, the brothers lacked a way to travel from bed to bed because they had no access to a vehicle of their own.

83.     The brothers pooled their resources to enter into a financing agreement to purchase a used car, which they used to travel between temporary places of residence and medical appointments.

84.     Mr. Stinnie's brother used the car to travel to and from the limited work he was able to find, mostly doing odd jobs.

85.     Occasionally, the brothers had to sleep in the car when they were unable to find another place to stay for the night.

86.     In July 2015, Mr. Stinnie and his brother entered a housing assistance program with The Haven, a homelessness services agency in Charlottesville.

87.     Due to Mr. Stinnie's still fragile health and homelessness, he received a slot in a program that guaranteed housing assistance for a year.

88.     Mr. Stinnie and his brother have used that program to rent an apartment in Charlottesville from July 2015 until the present.

89.     On January 1, 2016, Mr. Stinnie was pulled over at 5:00 AM for speeding on Interstate 64.

90.     Mr. Stinnie was driving home after visiting friends and family for the holiday with his brother.

91.     The officer cited Mr. Stinnie for reckless driving and driving with a suspended license.

92.     On January 8, 2016, the Albemarle County GDC found Mr. Stinnie to be indigent under Va. Code § 19.2-159 and appointed a lawyer to represent him on the charge of driving with a suspended license, which is a class 1 misdemeanor and carries the possibility of incarceration for up to a year.

93.     On January 19, 2016, Mr. Stinnie pled guilty to reckless driving and driving while suspended.

94.     For the driving while suspended conviction, the court ordered: (1) a period of incarceration for 30 days, with 26 days suspended; (2) a period of driver's license suspension for 90 days; and (3) payment of $151.00 in costs.

95.     The court did not order any fines.

96.     For the reckless driving conviction, the court ordered $96.00 in fines and $10 in costs, but no jail time.

97.     The court ordered Mr. Stinnie to pay these costs and fines—totaling over $250.00—even though it had already determined he was indigent and too poor to pay for a lawyer to defend him.

98.     As is standard practice in this court anytime it orders a defendant who appears in court to pay costs and fines, the court gave Mr. Stinnie 90 days to pay in full.

99. Mr. Stinnie did not receive any information about alternative payment arrangements.

100. As a result of his conviction, Mr. Stinnie served a weekend in the regional jail.

101. Mr. Stinnie was not able to timely pay the costs and fines he owed from the convictions in Albemarle.

102. Upon information and belief, the Albemarle County GDC notified the Defendant of Mr. Stinnie's default.

103. On April 19, 2016, the Defendant suspended Mr. Stinnie's driver's license for nonpayment of the $257 in costs and fines imposed on January 19, 2016.

104. The Defendant did not offer Mr. Stinnie an opportunity to demonstrate that he was unable to pay either before or after suspending his license.

105. For the past several years, Mr. Stinnie's only sources of income have been food stamps and Supplemental Security Income ("SSI"), a federal program intended to help people with serious disabilities who have little or no income to meet their basic needs of food, clothing, and shelter.

106. At most, Mr. Stinnie's SSI payment has reached approximately $750 per month, but at times he has received half this amount to account for housing assistance.

107. Currently, Mr. Stinnie's housing assistance does not include utility subsidies, and so a portion of his limited income must go towards paying for electricity.

108. In addition, except for the $16 in food stamps he receives monthly, Mr. Stinnie must also cover all of his food and other expenses associated with daily living.

109. Mr. Stinnie also owes approximately $5,000 on the used car.

110.    Mr. Stinnie frequently misses his monthly car payments of $250, but knows that he may have to use it for shelter should he be unable to find housing once his current placement ends in July 2016.

111.    As of the filing of this Complaint, Mr. Stinnie owes at least $1,531 in fines and costs to GDCs in Albemarle, Chesterfield, Goochland and Henrico.

112.    Mr. Stinnie has been and still is unable to get on a payment plan in any of these courts because they each have highly restrictive payment plan policies that prevent his entry.

113.    Goochland GDC does not allow payment plans for debts as old as his.

114.    Henrico GDC requires him to pay 20% of the total amount he owes in order to receive a 60-day payment extension, subject to another 60-day extension if he is able to pay another 20% of the total.

115.    Additionally, Mr. Stinnie's debts in Henrico have been sent to a collection agency, and collection agencies have no authority to certify the debtor's eligibility for license reinstatement to DMV.

116.    Chesterfield GDC requires 10% down to receive an additional 90 days to pay, which is based not on his ability to pay but instead on the size of his debt.

117.    Albemarle GDC requires a $10 fee to get a six-month extension on payment, subject to court approval.

118.    Mr. Stinnie is not eligible for a restricted license because he is not employed, a prerequisite for obtaining a restricted license.

*Demetrice Moore*

119.    Plaintiff Demetrice Moore is 33 years old and a resident of Richmond, Virginia.

120.    Ms. Moore is the mother of two children, who are both minors, reside with her, and depend upon her for support.

121.    Ms. Moore was convicted in 2002 in Chesterfield County Circuit Court of grand larceny, and later in 2002 of a show cause associated with this same conviction.

122.    She served the jail time to which she was ordered.

123.    As a result of the 2002 conviction, Ms. Moore was not ordered to pay any restitution or fines, but she was assessed court costs.

124.    The biggest component of court costs was reimbursement for the cost of the lawyers that were appointed to represent her because she was indigent.

125.    At sentencing, the court did not assess Ms. Moore's ability to pay these costs.

126.    In or around 2004, Ms. Moore relocated from Virginia to New York, and then returned to Virginia in or around 2010.

127.    Ms. Moore held a valid New York driver's license.

128.    Once she returned to Virginia, Ms. Moore requested and obtained a compliance summary from the Defendant so that she could learn what she needed to do to obtain a Virginia driver's license.

129.    The compliance summary stated that Ms. Moore was ineligible to drive in Virginia. Upon information and belief, the Defendant suspended Ms. Moore's eligibility to drive due to Ms. Moore's inability to pay the 2002 court debt.

130.    Upon information and belief, the Defendant did not assess Ms. Moore's ability to pay before or after suspending her license.

131.    Since returning to Virginia, Ms. Moore has attempted to maintain employment in support of her family.

132. Her employment has included work as a sales associate (clerk) at 7-11, and, more recently, as an in-home certified nursing assistant (CNA) providing care for elderly or disabled people in their homes.

133. Ms. Moore's most recent placement as an in-home CNA was 30 hours per week for $8 per hour.

134. Ms. Moore's work as an in-home CNA required her to drive extensively throughout Chesterfield County, Virginia, to private residences.

135. Public transportation is limited in Chesterfield County.

136. Ms. Moore has been convicted several times of driving on a suspended license.

137. Each of these convictions – rooted in Ms. Moore's suspension for inability to pay court debt – has placed additional court debt on Ms. Moore.

138. When she has faced jail time on driving while suspended charges, Ms. Moore has regularly qualified for court-appointed counsel on the basis of her limited income; yet, no court took her indigence into account when assessing costs and fines or before notifying the Defendant that she had defaulted.

139. When she inquired at Chesterfield County Circuit Courts about payment options, a representative at the court clerk's office told her that they maintained a one-size-fits-all payment plan of at least $100 per month.

140. Ms. Moore cannot afford the Chesterfield County Circuit Court plan.

141. Ms. Moore filled out a CC-1379 form in Chesterfield County Circuit Court on January 8, 2016, which set up a payment plan of $100 per month effective on that date.

142. No consideration of Ms. Moore's ability to pay was made, either at the time of setting up this payment plan or otherwise in conjunction with establishing it.

143.     She has since defaulted, due to her inability to keep up with these payments.

144.     The notice ("Deferred Payment or Installment Payment Plan Order Conditions") that the Chesterfield Circuit Court provided to her states that, if she defaults, "[her] license will be suspended and [her] license will not be reinstated until [her] entire fines, costs, forfeitures, restitution and/or penalties are paid in full."

145.     In Chesterfield County General District Court, Ms. Moore was told that a payment plan would require payment of at least $100 per month for that court.

146.     Ms. Moore is unable to make such payments.

147.     Ms. Moore is currently saddled with substantial debt, in addition to her debt related to unpaid court costs.

148.     Ms. Moore accrued $35,000 in student loan debt that she borrowed in pursuit of a medical assistant degree, and additional debt to obtain a vehicle to make her employment-related travel possible.

149.     As of the date of filing this complaint, and in addition to this debt, Ms. Moore owes approximately $4,467.08 in costs and fines (and associated interest) to various Virginia courts, including Chesterfield County GDC, Chesterfield County Circuit Court, Hanover County GDC, and Richmond City GDC.

150.     Ms. Moore's most recent conviction for driving on a suspended license was from Chesterfield County GDC on April 7, 2016.

151.     Upon information and belief, Chesterfield County General District Court notified the Defendant of Ms. Moore's default.

152.     On or about May 6, 2016, the Defendant suspended Ms. Moore's driver's license for nonpayment of the $232 in costs imposed on April 7, 2016.

153.     The Defendant did not offer Ms. Moore an opportunity to demonstrate that she was unable to pay either before or after suspending her license.

154.     Ms. Moore was incarcerated for 23 days as a result of this conviction.

155.     After she was released from jail, she stopped driving, as she does not want to risk even more incarceration and additional costs and fines for driving while suspended.

156.     Ms. Moore does not currently have a job.

157.     Ms. Moore cannot take in-home CNA placements in Chesterfield County, because she cannot get to the clients' homes anymore based on her decision not to drive and be convicted again for driving on a suspended license, rooted in her inability to pay.

158.     Ms. Moore's family's sole sources of income now are her daughter's SSI check (roughly $731 per month) and a monthly allocation of food stamps.

*Robert Taylor*

159.     Plaintiff Robert Taylor is 28 years old, a resident of Richmond, Virginia, and a veteran who enlisted with the National Guard in 2008 at age twenty.

160.     In 2011, Mr. Taylor left the National Guard.

161.     Mr. Taylor worked for a temporary work agency from January 2012 through May 2013, and then attended classes at Virginia Commonwealth University ("VCU") from fall 2013 through May 2014 in pursuit of his bachelor's degree.

162.     In 2014, Mr. Taylor encountered problems with coordinating financial aid to continue his schooling.

163.     Mr. Taylor dropped out of school and sought employment so that he could continue paying his rent.

164. In 2014, Mr. Taylor secured a new part-time job as a customer service representative with T-Mobile.

165. As part of his part-time job with T-Mobile, he was given 18 to 34 hours per week and was paid $9.62 per hour, and later (and at most) $9.93 per hour.

166. On April 20, 2014, Mr. Taylor was pulled over and cited for running a red light.

167. Mr. Taylor was also cited for driving on a license that was suspended for unpaid court debt related to a 2013 conviction for improper license plates.

168. On May 5, 2014, Mr. Taylor managed to have his driver's license reinstated.

169. On July 9, 2014, Mr. Taylor was found guilty of the April 20, 2014, driving on a suspended license charge.

170. This conviction triggered additional court debt, which Mr. Taylor was unable to pay, as well as a statutory license suspension period of ninety days associated with his prior inability to pay court debt (and the resulting suspension of his driver's license).

171. The court did not assess Mr. Taylor's ability to pay at sentencing.

172. When Mr. Taylor inquired about payment options, and informed the court of his limited income, the representative at the court clerk's office suggested to him that they maintained a one-size-fits-all payment plan.

173. Mr. Taylor could not afford this plan.

174. On August 8, 2014, Defendant suspended Mr. Taylor's driver's license, based on his inability to pay the July 9, 2014, court debt.

175. The Defendant did not assess Mr. Taylor's ability to pay before or after suspending his license.

176.    On October 9, 2014, Mr. Taylor was found guilty of the red light charge arising on April 20, 2014.

177.    He was not able to pay the resulting court costs and fines within 30 days and was not offered a payment plan that he could afford.

178.    Upon information and belief, the Richmond City GDC notified the Defendant of Mr. Taylor's default.

179.    On November 14, 2014, the Defendant again suspended Mr. Taylor's driver's license for nonpayment of the $192 in costs and fines imposed on October 9, 2014.

180.    The Defendant did not offer Mr. Taylor an opportunity to demonstrate that he was unable to pay either before or after suspending his license.

181.    In March 2015, Mr. Taylor finally saved enough money to pay off his debts related to the traffic ticket (October 2014) and the driving while suspended conviction (July 2014) in Richmond City GDC, and paid these debts.

182.    However, Mr. Taylor could not reinstate his license due to two additional convictions for driving on a suspended license that he received before he could pay in full.

183.    Those convictions resulted in additional court costs and fines that Mr. Taylor could not afford, causing the Defendant to log additional orders of suspension for nonpayment against Mr. Taylor's license.

184.    Mr. Taylor lost his job at T-Mobile in November 2015, due to exhaustion of a medical leave of absence.

185.    Mr. Taylor has not had a regular income since June 2015, when he first took medical leave, and has had to rely on the kindness of friends to put a roof over his head.

186. Mr. Taylor is currently saddled with substantial debt, in addition to his debt related to unpaid court debt.

187. Mr. Taylor has accumulated approximately $5,000 in medical expenses from emergency room visits and other hospitalizations during particularly debilitating episodes of mania or depression associated with bipolar disorder.

188. Additionally, he accrued $13,000 in student loan debt that he borrowed to attend VCU.

189. Mr. Taylor's entire 2015 federal tax refund was withheld for payment toward his educational debt; however, Mr. Taylor still owes nearly $10,700 on his student loans.

190. Mr. Taylor has approximately $5,000 to $6,000 of outstanding credit card debt.

191. In addition to these debts, Mr. Taylor owes approximately $4,386 in costs and fines (and associated interest) to various Virginia courts, including Arlington GDC, Chesterfield County GDC, Henrico County GDC, and Richmond City Circuit Court.

192. Mr. Taylor has been unable to get on a payment plan in the courts in which he owes because he cannot afford their one-size-fits-all terms.

193. For example, Mr. Taylor attempted to a secure a payment plan with the Henrico County GDC, but was told that he was required first to make a substantial down payment before a structured payment plan would be put in place.

194. Mr. Taylor could not afford this initial lump sum payment, and he was denied any payment scheme that he could realistically afford.

195. Similar barriers to payment plans exist in Chesterfield County GDC and Richmond City Circuit Court.

196.    Without a driver's license, Mr. Taylor has been unable to obtain employment because of difficulties getting to and from job interviews outside of Richmond and because he cannot guarantee prospective employers that he will have reliable transportation if hired.

197.    For example, in January 2016, Mr. Taylor applied for a position at an AT&T service location as a customer representative.

198.    The position would have been compensated with an annual salary and comprehensive employee benefits.

199.    However, Mr. Taylor could not find a way to travel to the interview in Colonial Heights, Virginia, and he was not hired.

200.    Mr. Taylor received a tentative job offer from CVS in or about March 2016 to work in one of its stores, but was declined after a background check revealed a pending driving while suspended case against him.

201.    Due to Mr. Taylor's lack of employment, he does not qualify for a restricted license.

202.    Mr. Taylor has qualified as indigent since at least 2014, and remains so as of the date of filing this complaint.

203.    When he has appeared in court facing the possibility of jail time on driving while suspended charges pending against him, he has qualified repeatedly in multiple jurisdictions for court-appointed counsel on the basis of his limited income.

204.    Despite finding him eligible for court-appointed counsel, multiple courts assessed costs and fines against him without taking his ability to pay into account.

205.     Each time the Defendant was notified by a court that Mr. Taylor had defaulted, the Defendant noted an additional order of suspension against Mr. Taylor's license without conducting any inquiry into the reasons for his default, including Mr. Taylor's ability to pay.

206.     In January 2016, Mr. Taylor was again convicted of driving while suspended, as well as an accompanying failure to appear.

207.     Because he had several prior convictions for driving on a suspended license (rooted in his inability to pay court debt), he faced a mandatory minimum of ten days in jail under Virginia law.

208.     Because he faced jail time and qualified as indigent, he was assigned a public defender.

209.     The judge imposed jail time on Mr. Taylor, as is required by Virginia law, which imposes a mandatory minimum term of confinement of ten days for third and subsequent convictions for driving on a suspended license.

210.      Mr. Taylor appealed his two convictions in Richmond City GDC to the Richmond City Circuit Court, lost, and was sentenced to twenty days in jail.

211.     The Richmond City Circuit Court also assessed $750 in additional costs.

212.     Without a driver's license, Mr. Taylor cannot obtain or maintain stable employment and will likely remain indigent into the foreseeable future and incapable of making payments against his court debt.

*Neil Russo*

213.     Plaintiff Neil Russo is a 61-year-old cancer survivor who suffers from Wilson's disease.

214. For Mr. Russo, Wilson's disease and its treatment has led to kidney problems, weight gain, chronic fatigue, and daily pain.

215. Mr. Russo's only income is a monthly check from the Social Security Disability Insurance program for $482.

216. Mr. Russo uses this money exclusively to buy food and pay other personal expenses, such as clothing and other items necessary for daily living.

217. In 2006, Mr. Russo was working as a chef at the National Counterterrorism Center in McLean, Virginia, when he was diagnosed with stage 3 prostate cancer.

218. This resulted in a radical prostatectomy, which was complicated by his Wilson's disease, and ongoing medical treatment that continues today.

219. By late 2006, Mr. Russo had lost his job, was struggling to pay his bills, and had accumulated over $300,000 in medical debt.

220. Mr. Russo was still contractually obligated by a lease agreement to pay $1,000 a month in rent.

221. Mr. Russo also had outstanding credit card debt of $5,000 and outstanding student loan debt of $12,000.

222. Mr. Russo also maintained private medical insurance costing $375 per month, necessary to defray some of the costs of his cancer treatment.

223. Mr. Russo had zero income and few prospects of being gainfully employed because of his ongoing serious medical condition.

224. Since late 2006, Mr. Russo has been convicted of several criminal and traffic offenses: obtaining money by false pretenses (Va. Code § 18.2.178); receiving stolen property (Va. Code § 18.2-108); issuing bad checks (Va. Code § 18.2-181); assault and battery against a

household member (Va. Code § 18.2-57.2); speeding to elude (Va. Code § 46.2-817); and driving without an operator's license (Va. Code § 46.2-300).

225.    For each offense, Mr. Russo was ordered to pay costs and fines that he could not afford.

226.    At no point did any court consider Mr. Russo's individual financial circumstances, or whether he was indigent as defined by Va. Code § 19.2-159 when assessing these costs and fines.

227.    For each outstanding debt, the Defendant suspended Mr. Russo's license indefinitely.

228.    At no point did the Defendant assess Mr. Russo's ability to pay his costs and fines before or after suspending his license.

229.    Mr. Russo was charged in Fairfax County with driving with a suspended license on July 30, 2013.

230.    Mr. Russo was represented by a court-appointed attorney in connection with this charge.

231.    On December 17, 2013, Fairfax GDC found Mr. Russo guilty under Va. Code § 46.2-300 of driving without an operator's license, a class 2 misdemeanor.

232.    The court sentenced him to pay a fine of $150, and costs totaling $202, even though the court had already determined he was indigent for purposes of eligibility for a court-appointed attorney.

233.    The costs imposed include the Fixed Misdemeanor fee ($61), Internet Crimes Against Children fee ($10), Local Training Academy fee ($1), and a Courthouse Security fee ($10).

234. The court also imposed a fee of $120 for a court-appointed attorney.

235. Additionally, the court sentenced him to jail for 90 days, which was suspended for a period of 12 months.

236. Additionally, the court suspended his driver's license for a period of 90 days.

237. The court did not inquire into Mr. Russo's ability to pay the costs and fines.

238. As of the date of filing this Complaint, Mr. Russo owes debts approaching $5,000 in costs and fines to various Virginia courts, including Arlington Circuit Court, Fairfax County Circuit Court, Fairfax County GDC, Fairfax County Juvenile and Domestic Relations Court, and Loudoun County Circuit Court.

239. A portion of this outstanding balance is derived from fines associated with driving with a suspended license.

240. The Defendant will not reinstate Mr. Russo's driver's license unless he pays his various court debts in full or convinces each separate court to enter into a payment plan, and pays the license reinstatement fee and the "multiple order" fee required by the Defendant.

241. Mr. Russo was able to obtain a payment plan with Fairfax on July 20, 2009, in which he was required to pay $50 per month.

242. Mr. Russo defaulted on this plan shortly after he entered into it, due to the relatively high monthly payment and his very limited income.

243. In 2014, Mr. Russo inquired about a monthly payment plan from Arlington Circuit Court.

244. At the time and presently, the Arlington Circuit Court payment plan policy required (and continues to require) a minimum monthly payment of $100.

245. At the time and at present, Mr. Russo was and is unable to pay $100 monthly.

Case 3:16-cv-00044-NKM-JCH   Document 1   Filed 07/06/16   Page 25 of 55   Pageid#: 25

246.     Mr. Russo pays Arlington Circuit Court $25 per month by sending a money order via certified mail to the court.

247.     Mr. Russo also attempted to create payment plans in the two other courts holding the largest debts: Fairfax Circuit Court and Loudon County Circuit Court.

248.     Mr. Russo was unable to establish a plan with Loudoun County because Loudoun required a down payment of ten percent of the balance due, or $213, to initiate a plan.

249.     The Loudoun County requirement is an amount Mr. Russo was, and is, unable to afford.

250.     Upon information and belief, the Loudoun County Circuit Court notified the Defendant of Mr. Russo's default.

251.     On July 17, 2014 the Defendant suspended Mr. Russo's driver's license for nonpayment of the $2,130 in costs imposed on July 17, 2009.  The Defendant did not offer Mr. Russo an opportunity to demonstrate that he was unable to pay either before or after suspending his license.

252.     Mr. Russo remains indigent.

253.     Mr. Russo is unable to pay the remaining balance in full, or to enter into payment plans that he can afford with each court.

254.     Accordingly, Mr. Russo has no likelihood of reinstating his driver's license in the foreseeable future.

255.     Because Mr. Russo has been unemployed since the suspension of his driver's license, he has never qualified for a restricted license.

256.     Without a driver's license, Mr. Russo has to rely on others for transportation to and from vital medical appointments.

257.    Moreover, Mr. Russo cannot seek employment that requires him to have reliable transportation to and from work.

258.    Without suitable employment and the income it would provide, Mr. Russo has no hope of ever paying his debt to the courts, much less the license reinstatement fee required by the Defendant.

## The Commonwealth's License-for-Payment Scheme

### *Assessment of Costs and Fines*

259.    Upon conviction of a criminal offense, or placement on probation pending a deferred disposition, Virginia law imposes a mandatory duty on court clerks to issue a statement of "all the expenses" incident to an individual's prosecution.  Va. Code Ann. §§ 19.2-335 and 19.2-336.

260.    Upon information and belief, the procedure described in the preceding paragraph applies equally to traffic convictions.

261.    Virginia law sets "as court costs" fixed fees for traffic, misdemeanor, drug misdemeanor, and felony offenses of $51, $61, $136, and $375, respectively, that must be paid when a person is convicted of an offense or receives a deferral of proceedings.  Va. Code Ann. §§ 16.1-69.48:1 and 17.1-275.1.

262.    Regardless of the type of offense, local courts may tack on additional fixed "add on" fees, such as $3 for a courthouse construction fee, $10 for a courthouse security fee, $5 for an electronic summons fee, $15 for an Internet Crimes Against Children fee, and other fees.

263.    Depending on the case, additional costs and fees may include witness fees; reimbursement for expenses incurred by public defenders or for the fees of, and expenses incurred by, court-appointed attorneys ($120 per misdemeanor charge; $445 per most felony

charges); reimbursement for the costs of psychological or medical testing ($400-$750); trial in absence fee ($35); jail admission fee (up to $25); and other various fees.

264. In circuit court, a convicted defendant who requested a jury must also pay $30 per day per juror, including not only members of the jury, but also prospective jurors not impaneled and alternates, and any additional costs of the jury approved by the court.

265. In 1989, courts costs for all misdemeanor or traffic violations were $20.

266. In 2015, a non-drug misdemeanor could cost as much as $99 (including local option fixed fees) and a drug misdemeanor as much as $169 (including local option fees) before adding in any charges for specific "services" such as blood withdrawal, jail admission, or a court-appointed attorney. This means that a misdemeanor conviction could easily cost at least five (non-drug) or eight (drug) times as much as it did in 1989.

267. The cost of living during the same time period has only increased by a factor of two. *See The Cost of Living Calculator*, American Inst. for Econ. Research, https://www.aier.org/cost-living-calculator (last visited June 29, 2016).

268. In each case, court clerks create a statement of costs and fees to be taxed against each defendant in accordance with uniform schedules developed by the Office of the Executive Secretary of the Supreme Court of Virginia.

269. Copies of these schedules are attached to this Complaint as Exhibits A (Circuit Court) & B (General District Court) and are incorporated herein by reference.

270. The amounts assessed do not vary in accordance with a person's financial resources, other demands on the person's financial resources, or the hardships the person or the person's family will endure if payment is required.

271.     The Circuit Court Clerk's Manual exhorts clerks to "recapture" from defendants "as much of the court-appointed attorney fee as possible" within the maximum allowable fees set by state law, but makes no mention of taking into account the defendant's ability to pay.  *See* Ex. A at B-12.

272.     The total amount assessed in the statement of costs created by the clerk operates as if the court had entered judgment "as a fine" against the defendant for that amount.  Va. Code Ann. § 19.2-336.

273.     The total amount is also docketed as a civil judgment against the defendant in favor of the Commonwealth.  Va. Code Ann. § 17.1-275.5.

274.     In addition to the costs and fees of the proceeding, courts are permitted to assess fines up to the applicable statutory cap as part of the penalty for a traffic or criminal offense.

***Driver's License Suspension***

275.     At the time of trial, the clerk is instructed to provide the debtor with Form DC-210 (General District Court) or CC-1379 (Circuit Court) indicating that nonpayment of costs and fines will result in the suspension of the person's driver's license.

276.     Copies of these forms are attached to this Complaint as Exhibits C (General District Court) & D (Circuit Court) and are incorporated herein by reference.

277.     Form DC-225 is mailed to debtors convicted on criminal or traffic cases in absentia, and indicates that nonpayment of costs and fines will result in the suspension of the person's driver's license.

278.     Form DC-225 contains no reference to the possibility of obtaining a payment plan or other alternatives in lieu of payment; it indicates that the total must be paid in full before a

listed suspension date, and indicates that the failure to do so will lead to a suspended license, the possibility of jail time and a further fine, and further enforcement activity.

279. A person owing costs, fees, fines, or restitution must pay the balance in full within thirty days of the entry of judgment, or otherwise enter into a deferred or installment payment plan, or community service plan, offered and approved by the court to pay the balance in full. Va. Code § 19.2-354.

280. On the forty-first (41st) day after entry of judgment, interest begins accruing at a rate of 6% and continues accruing on unpaid amounts related to any charges for which the person is not incarcerated or on a payment plan. Va. Code Ann. § 19.2-353.5.

281. Prior to July 1, 2016, the law prohibited interest from accruing only on court debt associated with the reason for a person's present incarceration; interest on all other court debt continued to accrue during incarceration.

282. In 2016, the General Assembly amended the law, effective July 1, 2016, to allow for waiver of any interest accruing on any and all of a person's court debt during a period in which he or she is incarcerated. 2016 Va. Acts, Ch. 282, http://lis.virginia.gov/cgi-bin/legp604.exe?161+ful+CHAP0282+pdf .

283. Interest otherwise cannot be waived or compromised. Va. Code Ann. § 19.2-353.5.

284. Upon failure or refusal of a person to make "immediate payment in full" of all debts owed to the court, or a person's default on a payment plan, the statute provides that the person's driver's license shall be suspended. Va. Code Ann. § 46.2-395.

285. The suspension is automatic, and no inquiry is made into the reasons for the person's default.

286. The court transmits a person's record of nonpayment to the DMV electronically via the Court Automated Interface System (CAIS) or manually via an amended abstract of conviction.

287. For individuals who owe in courts using the CAIS, the system defaults to suspending the license whenever a payment is due and no payment is entered.

288. In other words, the court clerk must enter payment before the due date in order to prevent the system from telling DMV to suspend the individual's license.

289. When the suspension is "received" from the court, the DMV employee follows data entry protocols to issue the order of suspension.

290. Virginia law does not require the DMV to give any notice prior to suspending a person's license for nonpayment. *See* Va. Code Ann. § 46.2-395.

291. Typically, the only information that the person receives is through Forms DC-210, DC-225, or CC-1379 indicating, at the time of trial, that nonpayment would result in automatic suspension.

292. The information given at the time of trial is generic and prospective.

293. It does not advise the defendant of a pending suspension of his or her driver's license for nonpayment of court debt, or the right to have indigency or the reasons for nonpayment considered in determining whether or not his or her license should be suspended for nonpayment; under current statutory law, these rights do not exist.

294. The Defendant does not conduct a review of a person's financial condition prior to—or indeed at any point related to—suspending a person's license for failure to pay, or otherwise inquire as to the reasons for the default.

295. Upon information and belief, the Defendant employs hearing officers who conduct informal fact-finding proceedings when taking adverse action against a driver's license holder for reasons other than court debt, such as when a license is suspended or revoked due to medical impairments.

### Reinstatement

296. In order to remove a license suspension, a person must either pay monies owed to the court in full (including any interest that has accrued) or establish a payment plan acceptable to the court. Va. Code Ann. § 19.2-354.

297. The person must also pay to DMV a reinstatement fee of $145, with an additional $5 per order if the person has multiple orders of suspension.

298. If a person owes court debt to multiple courts, each court's judgment must be satisfied, or each court must agree to the establishment of a payment plan on terms it finds acceptable, to remove each individual order of a license suspension. Va. Code Ann. § 46.2-395.

299. Similarly, in order to obtain a restricted license, a debtor must obtain permission from each court to which he is indebted.

300. A restricted license is only valid for six months, making it nearly impossible for those who owe in multiple jurisdictions to qualify by stringing together enough overlapping periods of approval from each court.

301. Moreover, a restricted license is not available at all to those who are unemployed, including job-seekers, people whose disabilities prevent them from working, and people who are home caring for young children. Va. Code Ann. § 46.2-395.

*One-Size-Fits-All Payment Plans*

302.     Each of the Commonwealth's cities and counties has its own circuit court, general district court, and juvenile and domestic relations court, and each such court has the authority to adopt its own payment plan policies.

303.     Effective July 1, 2016, payment agreements are supposed to be consistent with the Rules of the Supreme Court of Virginia; however, no such Rules have been promulgated as of the filing of this complaint.

304.     When a person is unable to pay court costs and fines in full within thirty days, courts sometimes require them to fill out the DC-210 form.

305.     The DC-210 form asks only for employer name and "monthly income."  The DC-210 form fails to capture other pertinent information such as expenses, other court-ordered financial obligations, and household size.

306.     On information and belief, courts often disregard the financial information reported by the debtor on the DC-210 form, and instead impose the court's standard payment plan, despite the debtor's inability to pay.

307.     In many jurisdictions, payment schedules are driven by the total amount owed or provide for a fixed number of months to pay (*e.g.,* six months), and do not consider the debtor's financial circumstances.

308.     Often, plans require down payments and/or set a standard periodic payment amount unrelated to the person's financial condition.

309.     If the debtor defaults on the payment plan, some policies do not allow the debtor to establish a new payment plan, and many other policies require substantial down payments in order to reinstate the payment plan.

310.    According to Virginia's Auditor of Public Accounts, from 2008-2012, 55% of all court cases resulted in on-time payment without a payment plan, and only 4% resulted in a payment plan.

311.    Thus, 41% of all cases resulted in default—and automatic license suspension— without ever entering into a payment plan.

312.    Very few payment plan policies consider the debtor's financial obligations in other courts when setting payment plans, which serves both as a barrier to entry and as a recipe for failure.

313.    When payment plans do not take into account an individual's ability to pay, they often become unrealistic and unsustainable.

314.    Approximately 66% of the small number of payment plans established by all Virginia courts in fiscal years 2008-2012 resulted in default.

315.    By law, courts are required to establish a program of community service to allow debtors to discharge all or part of their court debt, but they are not required to offer it.  Va. Code § 19.2-354.

316.    Upon information and belief, many courts do not have the resources to supervise a community service program and therefore do not offer it as an option.

317.    Where programs have been established, many debtors are never told that community service is an option.

318.    Other debtors cannot meet the requirements due to lack of transportation, disability, inability to find child care, or other reasons.

319.    Most low-income debtors are offered no meaningful alternatives to fulfill their financial obligations to the court before their licenses are suspended.

**The Harsh Realities of a Suspended License**

*One in Six Virginia Drivers Suspended for Nonpayment*

320.     Originally, the license-for-payment system applied only to unpaid court debt related to motor vehicle infractions.

321.     In 1987, an interagency team from the Virginia Department of Planning and Budget, Virginia Department of Criminal Justice Services, and Office of the Executive Secretary of the Supreme Court of Virginia released a report on "Unpaid Fines, Court Costs, and Restitution in District and Circuit Courts of the Commonwealth," recommending, *inter alia*, expanding driver's license suspension as a means of improving collection of court debt, unless the defendant is "truly indigent and/or unable to make necessary payments."  Dep't of Planning and Budget, *Unpaid Fines, Court Costs, and Restitution in District and Circuit Courts of the Commonwealth* IV-11 (1987).

322.     In 1993, the Office of the Executive Secretary of the Supreme Court of Virginia transmitted a report to the General Assembly rejecting a proposal to extend amnesty to defendants with unpaid court debt and recommending expansion of the use of driver's license suspension for failure to pay outstanding fines and costs related to criminal convictions.  Office of the Exec. Sec'y, *Assessing the Need for a Fines Amnesty Program for Virginia's District and Circuit Courts*, House Doc. No. 39 (1993), http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/HD391993/$file/HD39_1993.pdf.

323.     The Report also found that "[m]any offenders are poor and without obvious means to satisfy court judgments."  *Id.* at 3.

324.     In 1994, after requesting a study on amnesty, the General Assembly enacted legislation expanding the license-for-payment system to apply to all kinds of unpaid court debt

with full knowledge that the impact would fall on many defendants who are too poor to pay their debts.

325. The 1994 legislation also removed language from the existing Virginia Code requiring the Commonwealth's Attorney to investigate the reasons for nonpayment of court debt and authorizing the Commonwealth's Attorney to proceed with collection efforts only if it appears from that investigation that the debtor may be able to pay.

326. The combined effect of removing the ability-to-pay examination and expanding automatic license suspension has impacted hundreds of thousands of Virginians who are too poor to pay and have lost their ability to drive as a result.

327. In 2015, DMV ran a report showing that the licenses of 914,450 individual DMV customers were suspended for nonpayment of court costs and fines related to criminal and traffic convictions.

328. In that snapshot in time, approximately one in six Virginia drivers was unable to legally drive a car to and from work, to buy groceries, attend medical appointments, or go anywhere else the needs of their families required.

329. Many individuals carry multiple orders of suspension.

330. As of September 2015, there were nearly 2.6 million orders of suspension due to unpaid court costs and fines in effect in Virginia.

331. In every fiscal year between 2010 and 2015, the Defendant processed at least 360,000 orders of driver's license suspension due to unpaid court costs or fines, with a high of 423,100 suspension orders in fiscal year 2011.

332.     In fiscal year 2015, the Defendant issued 366,773 orders of driver's license suspension due to unpaid court costs and fines; roughly 38% of these suspension orders (140,252) were due to unpaid court costs or fines related to non-motor vehicle convictions.

333.     As of September 2015, 65% of all outstanding suspension and revocation orders were for failure to pay court debt, rather than for any other reason or for being dangerous behind the wheel.

***Hardship on Low-Income Individuals and Their Families***

334.     Given their inability to pay monetary penalties, low-income drivers are likely to be over-represented in the pool of suspended drivers when compared to their representation in the larger population of licensed drivers.

335.     The Commonwealth's license-for-payment system imposes significant hardship on individual debtors and their families, often forcing them to choose between paying for survival resources such as food, shelter, health care, and clothing, or paying their court costs and fines.

336.     The possession of a valid driver's license is often essential for persons to secure and maintain employment, get to and from medical and other appointments, and otherwise provide for themselves and their families.

337.     Without the ability to drive, most jobs are inaccessible to people living in rural areas of Virginia.

338.     Even in urban areas, getting to and from work without the ability to drive is extremely challenging and time-consuming, if even possible at all.

339.     For example, in the Richmond area, transportation experts estimate that only 27% of all jobs are accessible by public transportation within 90 minutes of travel time. Metropolitan

Policy Program, *Missed Opportunity: Transit and Jobs in Metropolitan America, Richmond, VA Metro Area*, Brookings Inst., http://www.brookings.edu/~/media/Series/jobs-and-transit/RichmondVA.PDF (last visited June 29, 2016).

340.    In Virginia Beach-Norfolk-Newport News, only 15% of all jobs are accessible by public transportation within 90 minutes of travel time.  Metropolitan Policy Program, *Missed Opportunity: Transit and Jobs in Metropolitan America, Virginia Beach-Norfolk-Newport News, VA-NC Metro Area*, Brookings Inst., http://www.brookings.edu/~/media/Series/jobs-and-transit/VirginiaBeachVA.PDF (last visited June 29, 2016).

341.    In many cases, the Commonwealth's license-for-payment system forces suspended drivers to choose between driving illegally and losing their jobs.

342.    Indeed, a rigorous study of New Jersey drivers found that 42% of drivers lost their jobs after their driving privileges were suspended.  Jon A. Carnegie, Ian M. Voorhees Transportation Center, Rutgers, The State University of New Jersey, *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007), http://www.nj.gov/transportation/refdata/research/reports/FHWA-NJ-2007-020-V1.pdf (last visited June 29, 2016).

343.    Of those drivers, 45% were unable to find new employment.  *Id.*

344.    Of those that were able to find another job, 88% reported a decrease in income.  *Id.*

345.    In Virginia, driving on a suspended license is a criminal offense carrying up to twelve months of imprisonment and a $2,500 fine.

346.    A third or subsequent offense of driving while suspended carries a mandatory minimum term of imprisonment for ten days, regardless of the reason for the underlying suspension.  Va. Code Ann. § 46.2-301.

347.    In summary, the loss of a driver's license often results in personal and familial hardship, such as reduced employment and educational opportunities, reduced capacity to care for one's family, increased barriers to successful reentry after a criminal offense, and increased indebtedness as interest on costs and fines accumulates.

348.    The high cost to one's family of losing a driver's license inevitably results in a terrible dilemma:  drive—and risk being charged with driving while suspended, which itself can lead to additional costs, fines, and periods of incarceration; or refrain from driving—and lose access to gainful employment and medical care.

### Unsafe and Counterproductive

349.    The Defendant is the Chairman of the American Association of Motor Vehicle Administrators (AAMVA), an organization which was founded in 1933 to represent state and provincial officials from the United States and Canada who administer and enforce motor vehicle laws.

350.    The AAMVA develops model programs in motor vehicle administration, law enforcement, and highway safety, and serves as both information clearinghouse and institutional voice for those issues.

351.    In a 2013 report, Best Practices Guide to Reducing Suspended Drivers, the AAMVA concluded that suspending driver's licenses for reasons unrelated to traffic safety increases the threat to public safety by diverting law enforcement officer time from more important activities like responding to 911 calls, investigating crashes, and investigating more

serious crimes.  http://www.aamva.org/workarea/DownloadAsset.aspx?id=3723 (last visited June 29, 2016).

352.    A 2012 study cited by the AAMVA in its 2013 report found that drivers suspended for traffic safety-related reasons are three times more likely to be involved in a crash than drivers suspended for social non-conformance reasons like nonpayment of costs and fines. *Id.* at 2.

353.    Drivers suspended for non-driving reasons also have fewer moving violations and crashes while their licenses are suspended, compared to drivers whose licenses are suspended for driving reasons.

354.    Studies also indicate that the safety records of drivers whose licenses are suspended for non-driving reasons may not differ significantly from the average driver.

355.    The AAMVA further noted that drivers whose licenses are suspended for non-traffic related reasons "are often trapped within the system" because their inability to afford to pay the original fines causes them to lose their ability to legally get to and from work, which results in increased financial obligations such as reinstatement fees, court costs related to driving while suspended, and other penalties.  *Id.* at 6.

356.    All of these conditions make it even less likely that a debtor whose license is suspended will be able to ever pay off his or her court debts.

357.    The AAMVA cited a 2011 study of 114,626 driver records finding that despite the serious consequences of driving on a suspended license, 75% of suspended drivers continue to do so.  *Id.* at 4-5.

358.    The AAMVA concluded that driver's license suspension does not provide effective, sustainable motivation to encourage individuals to comply with court-ordered or legislative mandates in order to avoid suspension.

359.    Accordingly, the AAMVA recommends the repeal of laws requiring the suspension of driving privileges for non-traffic safety related reasons.

360.    In 2013, AAMVA released an educational video summarizing its position. The video found at https://www.youtube.com/watch?v=qUSKhQUW2do was created by AAMVA. *Best Practices for Reducing Suspended and Revoked Drivers*, AAMVA Communications (Mar. 27, 2013), https://www.youtube.com/watch?v=qUSKhQUW2do.

361.    The video found at https://www.youtube.com/watch?v=qUSKhQUW2do is a true and authentic copy of AAMVA's educational video.

362.    The statements made in the video found at https://www.youtube.com/watch?v=qUSKhQUW2do are true and accurate.

363.    The video found at https://www.youtube.com/watch?v=qUSKhQUW2do is a policy statement of AAMVA.

364.    Recently, in April 2016, AAMVA issued a policy statement reiterating its position on license suspension for non-traffic safety reasons.

365.    In Virginia, courts collected just over half of the approximately $350 million in court costs and fines they assessed each year from 2008 to 2012.

366.    In 2012, approximately 60% of the orders of suspension issued for unpaid court debt remained in place twelve months later, suggesting that suspension does not operate as an effective incentive to elicit payments from drivers without the ability to pay.

367.    Ironically, in Virginia, drivers suspended for safety reasons can often reinstate their licenses faster than those suspended for nonpayment.

368.    For example, a person convicted of reckless driving risks no more than a six-month suspension of his or her license.  Va. Code Ann. § 46.2-393.

369.    If a person is killed as a result of another person's reckless driving, the driver's license may be suspended for up to twelve months.  Va. Code Ann. § 46.2-396.

370.    In contrast, failure to pay court costs and fines requires the Defendant to suspend a debtor's license indefinitely, and it is common for such suspensions to last for years.

## Class Action Allegations

371.    The named Plaintiffs bring this action for themselves individually and on behalf of all others similarly situated, pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

372.    A class action is the only practicable means by which Plaintiffs and unknown Class Members can challenge the Commonwealth's unlawful court debt collection scheme.

373.    The named Plaintiffs seek to represent a class consisting of all persons whose Virginia driver's licenses are suspended due to unpaid court debt and who, at the time of the suspension, were not able to pay due to their financial circumstances.

374.    The named Plaintiffs seek certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure in order to represent a class of persons requesting declaratory and injunctive relief to terminate the ongoing course of conduct on the part of the Defendant that is depriving the named Plaintiffs and the Class Members of their constitutional rights to Due Process and Equal Protection, and to enjoin the Defendant from issuing orders of driver's license

suspension against the Plaintiffs and the Class Members until such time as the Commonwealth implements a system that complies with the United States Constitution.

375.    The Defendant has acted, or failed and/or refused to act, on grounds that apply generally to the proposed Class, such that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

376.    As set forth more fully in the following paragraphs, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23.

*Numerosity*

377.    In 2015, DMV reported that the licenses of 914,450 individual DMV customers were suspended for nonpayment of court costs and fines related to criminal and traffic convictions.

378.    Upon information and belief, well over 100 of those individuals holding suspended licenses would be too poor to pay their court debt without imposing manifest hardship on themselves and their families.

379.    Virginia issues over 360,000 orders suspending driver's licenses for nonpayment of court costs and fines each year, affecting thousands of individual debtors.

380.    Approximately 60% of those orders remain in place twelve months later, suggesting that a large percentage of suspension orders were issued to people without the means to pay to get the suspension removed.

381.    Based on data collected by the Supreme Court of Virginia over a thirteen-month period between November 2013 and December 2014, there were 87,937 misdemeanor convictions in which the person convicted met the definition of indigency under § 19.2-159 of the Virginia Code and was appointed an attorney.

382.     All 87,937 convictions would have resulted in costs (including court-appointed attorney fees) and likely also would have resulted in fines.

383.     This number does not include felony convictions, nor does it include convictions that did not carry jail time and thus would not have entitled the defendant to a court-appointed attorney.

384.     Accordingly, the proposed class is so numerous that the joinder of all Class Members is impracticable.

***Commonality***

385.     All persons comprising the proposed Class are equally subject to the provisions of Va. Code §§ 16.1-69.48:1, 19.2-335, 19.2-336, and 46.2-395, which together operate to deprive indigent Virginia debtors of their driver's licenses for non-compliance caused by their indigence.

386.     Thus, common questions of law and fact exist as to all Class Members.

387.     Among the most important, but not the only, common questions of fact are:

- Whether the Commonwealth has a policy and practice of punishing poor people more harshly than wealthy people for failing to pay court debt;
- Whether the Commonwealth, acting by and through the Defendant, has a policy and practice of suspending driver's licenses without conducting meaningful inquiries into the ability of a person to pay before taking such action; and
- Whether the Commonwealth, acting by and through the Defendant, exploits its governmental status to avail itself of forms of enforcement in the collection of court debts not available to most private civil creditors.

388.     Among the most important, but not the only, common questions of law are:

- Whether fundamental principles of due process and equal protection require the Commonwealth to take into account the ability of a person to pay court costs and fines;
- Whether suspending a person's driver's license solely because she or he cannot afford to make a monetary payment toward court costs and fines previously imposed, is lawful;
- Whether a person is entitled to notice and a meaningful inquiry into his or her present ability to pay court costs and fines previously imposed, before the Commonwealth suspends his or her license for nonpayment; and

- Whether depriving persons encumbered with court debt of the protections afforded other Virginia debtors when taking the harsh action of suspending their driver's licenses for nonpayment, violates the Equal Protection Clause.

*Typicality*

389. The named Plaintiffs' claims are typical of the claims of the proposed Class as a whole.

390. As summarized in Paragraphs 38 through 45, each of them suffered injuries from the failure of the Commonwealth to comply with the basic constitutional provisions detailed below.

391. The answer to whether the Commonwealth's license-for-payment scheme is unconstitutional will determine the claims of the named Plaintiffs and every other Class Member.

392. The named Plaintiffs and Class Members have suffered direct injuries, and will continue to be directly injured, due to the Defendant's unlawful and unconstitutional pattern and practice of suspending driver's licenses without due process and without consideration of the hardship imposed on people who cannot afford to pay.

*Adequacy*

393. The named Plaintiffs will fairly and adequately represent the interests of the proposed Class.

394. The named Plaintiffs have no interests separate from or in conflict with those of the Class as a whole and seek no relief other than the declaratory and injunctive relief, which is sought on behalf of the entire Class.

395. The named Plaintiffs are represented by competent legal counsel with substantial experience in complex civil rights litigation matters, including class actions.

396. Plaintiffs' counsel have devoted enormous time and resources to becoming intimately familiar with the Commonwealth's court debt scheme and with all of the relevant state and federal laws and procedures that govern it.

397. Counsel has also developed relationships with many of the individuals and families victimized by the Commonwealth's practices.

398. Accordingly, the interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

## Claims for Relief

### Count I:  Violation of Due Process (Fundamental Fairness)

399. The Plaintiffs incorporate the allegations in Paragraphs 1-398 above with the same force and effect as if herein set forth.

400. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

401. The Due Process Clause prohibits the state from subjecting individuals to processes and penalties that fail to comport with principles of due process and fundamental fairness.

402. The United States Supreme Court has repeatedly held that punishing a person solely for his or her inability to pay, rather than willful refusal to pay or make bona fide efforts to acquire the resources to pay, violates principles of due process and fundamental fairness.

403. The Commonwealth's court debt payment system automatically and mandatorily requires all convicted criminal and traffic defendants to pay the costs of their prosecutions without regard to their individual financial circumstances.

404.    The statutory scheme also automatically and mandatorily requires courts to transmit to Defendant Holcomb a record of any person's "*failure* or refusal to pay all or part" of any fines or costs owed to the court, or a record of default on a payment plan, without inquiry into the reasons for nonpayment, or consideration of whether the requirement to repay will exact manifest hardship on that person or the person's family.  *See* Va. Code Ann § 46.2-395(C) (emphasis added).

405.    Acting through Defendant, the Virginia license-for-payment scheme automatically and mandatorily, (without consideration of financial circumstances, the total amount owed to one or more courts, or any alternatives) suspends the driver's license of any person whose failure to comply is owing to his or her inability to pay court costs and fines, rather than a willful refusal to pay.

406.    In this regard, the Virginia license-for-payment scheme inevitably results in individuals being punished for their inability to pay.

407.    Punishing an individual solely for his or her inability to pay violates principles of due process and fundamental fairness.

408.    Accordingly, the Commonwealth's license-for-payment system violates the Due Process Clause of the U.S. Constitution.

**Count II:  Violation of Procedural Due Process (Lack of Ability-to-Pay Hearing)**

409.    The Plaintiffs incorporate the allegations in Paragraphs 1-408 above with the same force and effect as if herein set forth.

410.    A person's driver's license and its attendant government-sanctioned ability to drive is widely recognized as a property interest that may not be taken away without due process of law.

411.    Due process requires the Commonwealth to conduct ability-to-pay inquiries at each stage in a case, including the point at which it proposes to take coercive action to punish nonpayment.

412.    As described above, the Commonwealth's license-for-payment system automatically and mandatorily imposes costs without consideration of ability to pay, and automatically and mandatorily requires Defendant Holcomb to suspend a person's driver's license upon receipt from the court of a record of default, all without taking ability to pay into account.

413.    It is common for a person's financial circumstances to fluctuate throughout his or her lifetime, and a person who is not indigent at the time of trial may become indigent prior to satisfying all financial obligations to various courts.

414.    Prior to executing an order suspending a debtor's driver's license, the Defendant provides no notice, oral or written, to the debtor of his or her right to an ability-to-pay determination evaluating his or her present financial condition.

415.    Moreover, the Defendant conducts no independent review of the debtor's ability to pay, including the amounts owed to all courts in the Commonwealth and the debtor's present financial condition, prior to—or indeed, after—taking the harsh enforcement action of suspending the debtor's driver's license.

416.    The purpose of the Commonwealth's license-for-payment system is to coerce payment, and not to protect public safety on the roads; therefore, Plaintiffs are entitled to pre-deprivation notice and a hearing prior to license suspension.

417.    In the absence of notice and hearing, which do not presently exist under Virginia law in relation to driver's license suspension for unpaid court debt, the risk is very high that an

indigent debtor will be deprived of his or her driver's license for reasons attributable to his or her poverty.

418. The high risk of deprivation created by the Defendant's automatic, one-size-fits-all driver's license suspension system violates the Due Process Clause of the United States Constitution.

## Count III: Violation of Equal Protection Clause (Equal Justice and Punishing Poverty)

419. The Plaintiffs incorporate the allegations in Paragraphs 1-418 above with the same force and effect as if herein set forth.

420. The United States Supreme Court has repeatedly endorsed the principle that punishing a person solely for his or her poverty, rather than willful refusal to pay or to make bona fide efforts to acquire the resources to pay, violates principles of fundamental fairness embedded in the Fifth and Fourteenth Amendments of the United States Constitution.

421. State recoupment laws, notwithstanding the state interests they may serve, may not blight the hopes of indigent people for self-sufficiency and self-respect.

422. Acting through Defendant Holcomb, the Virginia license-for-payment scheme automatically and mandatorily (without consideration of financial circumstances, the total amount owed to one or more courts, or any alternatives) suspends the driver's licenses of indigent persons whose failure to comply is owing to their inability to pay court costs and fines, rather than a willful refusal to pay.

423. The resulting cascade of hardship—job loss, mounting interest, convictions for driving while suspended, additional costs and fines, and even jail time—keeps low-income people in a perpetual state of disadvantage, a state that people with means can avoid simply by paying in full.

424. In this way, the Commonwealth takes coercive action against people whose poverty makes it impossible for them to comply.

425. The fundamental principle of "equal justice" requires states to consider the differential impact of harsh enforcement action on people who are impoverished.

426. The Commonwealth's scheme inevitably results in enforcing financial obligations on people who lack the foreseeable ability to meet them.

427. Indeed, the modern version of the Commonwealth's license-for-payment system was enacted with full knowledge that many defendants are too poor to pay their debts to the court.

428. Accordingly, the Commonwealth's license-for-payment system violates the Equal Protection Clause of the U.S. Constitution.

**Count IV: Violation of Due Process Clause (No Rational Basis)**

429. The Plaintiffs incorporate the allegations in Paragraphs 1-428 above with the same force and effect as if herein set forth.

430. The Due Process Clause protects against arbitrary and capricious government action even when the decision to take action follows adequate procedures.

431. A person has protected property and liberty interests in a driver's license and its attendant government-sanctioned ability to drive.

432. The Commonwealth's license-for-payment scheme is not rationally related to any legitimate governmental objective because suspending driver's licenses for nonpayment of court debt makes highways less safe, impedes reentry of convicted persons, and is counterproductive as applied to people who need a driver's license to obtain or maintain employment in order to meet their financial obligations to the court.

433.    A driver's license is often essential in the pursuit of a livelihood, and its suspension threatens important interests of the people who hold them.

434.    The purpose of licensing drivers is to promote safety on Virginia's roads and highways by keeping drivers off the roads who present a danger behind the wheel.

435.    Suspending licenses for non-driving reasons produces no traffic safety benefit, and distracts law enforcement resources from investigating criminal and traffic violations that present true threats to public safety.

436.    For people returning to their communities from jails and prisons, lack of a driver's license threatens their successful reentry when they cannot obtain or maintain stable employment.

437.    For low-income debtors, avoidance of driver's license suspension does not operate as an incentive to pay when they must choose between paying the court and paying rent, buying medications, putting food on the table, and meeting other necessary expenses.

438.    Indeed, as to people who lack the ability to pay court debt, a suspended license is not only not rational, but instead fundamentally irrational and counterproductive; suspension not only fails as an incentive (because such people are unable to avoid suspension under current law), but also makes it less likely – rather that more likely – that they will be able to pay court debt.

439.    The loss of a license often means the loss of reliable transportation to and from work, which makes debtors less likely to be able to meet their financial obligations to the court.

440.    The Commonwealth's license-for-payment system violates the Due Process Clause of the U.S. Constitution because it causes substantial hardship to low-income drivers and bears no rational relationship to any important or legitimate governmental objective.

**Count V:  Violation of the Equal Protection Clause (Extraordinary Collection Efforts)**

441.    The Plaintiffs incorporate the allegations in Paragraphs 1-440 above with the same force and effect as if herein set forth.

442.    The United States Supreme Court has held that, when governments seek to recoup the costs of prosecution from indigent defendants, they may not take advantage of their position to utilize unduly harsh methods of debt collection solely because the debt is owed to the government and not to a private creditor.

443.    Unlike fines, which are imposed as a penalty for unlawful behavior, or restitution, which is imposed to compensate a victim, court costs assessed to subsidize the court proceedings (such as, *e.g.*, court-appointed attorney fee reimbursement) are no different in character than ordinary private consumer debts incurred for services rendered.

444.    When a private creditor seeks to enforce a judgment against a debtor via garnishment or lien, the law provides procedural and substantive protections for poor debtors against being deprived of certain basic necessities and the ability to maintain a livelihood.

445.     The private creditor may coerce payment only to the extent permitted by those protections. The Commonwealth's license-for-payment system does not treat indigent defendants, to the extent that they owe court costs, like other judgment debtors.

446.    The Commonwealth's license-for-payment system provides for suspension of the debtor's driver's license and the possibility of imprisonment.

447.    When the Commonwealth, acting through Defendant Holcomb, takes advantage of its position at the controls of the machinery of government to peremptorily strip debtors of their driver's licenses, it executes a form of coercion not available to private creditors for debts unrelated to driving.

448.     When the Commonwealth, acting through Defendant Holcomb, takes advantage of its position at the controls of the machinery of government to peremptorily strip debtors of their driver's licenses, it denies court debtors owing court costs the procedural and substantive statutory protections that other Virginia debtors may invoke against a private creditor in ordinary debt collection proceedings.

449.     Despite knowledge that many defendants are too poor to pay their debts to the court, the Commonwealth's license-for-payment system fails to offer poor debtors even a modicum of the substantive and procedural protections it deems necessary to prevent private creditors from stripping the debtor of the ability to maintain a livelihood and meet his or her basic needs.

450.     The Commonwealth's severe and coercive collection policies and practices constitute invidious discrimination and violate the fundamental principle of equal protection of the laws embedded in the United States Constitution.

## Requested Relief

Wherefore, the Plaintiffs respectfully request that this Court provide the following relief:

a.   Issue an order certifying this action to proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2);

b.   Approve the undersigned to serve as class counsel pursuant to Fed. R. Civ. P. 23(a)(4) and 23(g);

c.   Issue a judgment declaring that the Defendant's policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiffs' and Class Members' rights under the Constitution and laws of the United States;

d. Preliminarily and permanently enjoin the Defendant, his subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with him or on his behalf from issuing or processing orders of driver's license suspension for unpaid court debt against the Plaintiffs and Class Members, until such time as the Commonwealth implements a system that complies with the United States Constitution;

e. Preliminarily and permanently issue an injunction ordering the Defendant to reinstate the Plaintiffs' and Class Members' driver's licenses (insofar as they are suspended based on unpaid court debt and/or on driving on licenses suspended due to unpaid court debt) and enjoining the Defendant from requiring the Plaintiffs and Class Members to pay the DMV reinstatement fees as a condition of such reinstatement;

f. Award Plaintiffs their reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 and other applicable law; and

g. Grant all such other and further relief as this Court may deem necessary and/or appropriate in the interests of justice.

DATED: July 6, 2016

Respectfully submitted,

 /s/ Jonathan T. Blank
Jonathan T. Blank (VSB No.: 38487)
MCGUIREWOODS LLP
Court Square Building
310 Fourth Street NE, Suite 300
Post Office Box 1288

Charlottesville, Virginia 22902
Ph: (434) 977-2509
Fax: (434) 980-2258
*jblank@mcguirewoods.com*

Mary Bauer (VSB No.: 31388)
Angela A. Ciolfi (VSB No.: 65337)
Pat Levy-Lavelle (VSB No.: 71190)
Mario Salas (VSB No.: 87974)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Ph: (434) 529-1810
Fax: (434) 977-0558
*angela@justice4all.org*

David P. Baugh (VSB No.: 22528)
DAVID P. BAUGH, ESQ., PLC
2025 E. Main Street, Suite 114
Richmond, VA 23223
Ph: (804) 743-8111
Fax: (804) 225-8035
*dpbaugh@dpbaugh.com*

Leslie Kendrick (VSB No.: 90104)
580 Massie Rd.
Charlottesville, VA 22903
Ph: (434) 243-8633
Fax: (434) 924-7536
*kendrick@virginia.edu*