**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
(Charlottesville Division)**

| | | |
|---|---|---|
| **DAMIAN STINNIE, et al.,** | ) | |
| | ) | Case No.:  3:16-CV-00044 |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD D. HOLCOMB,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**STATEMENT OF INTEREST OF THE UNITED STATES**

A driver's license is often essential to a person's well-being, including a person's ability to maintain a job, pursue educational opportunities, or care for children or other family. Accordingly, the Supreme Court has recognized a driver's license as a constitutionally protected interest.  Plaintiffs allege that Virginia officials unconstitutionally deprive people of this important interest by automatically suspending the driver's licenses of those who fail to pay court fines or fees, without providing adequate process and without assessing whether the failure to pay was willful or the result of a defendant's inability to pay.

The United States files this Statement of Interest to assist the Court in considering the important constitutional questions presented.  It is the position of the United States that the suspension of a person's driver's license in response to the failure to pay court debt without providing a person with adequate notice and a meaningful opportunity to be heard prior to the suspension constitutes a deprivation of a protected interest without due process in violation of the Fourteenth Amendment.  Further, suspending the driver's licenses of those who fail to pay fines or fees without inquiring into whether that failure to pay was willful or instead the result of an

1

inability to pay may result in penalizing indigent individuals solely because of their poverty, in violation of the due process and equal protection clauses of the Fourteenth Amendment.

## INTEREST OF THE UNITED STATES

The United States has authority to file this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in federal court.  The United States has a strong interest in ensuring that state and local criminal justice systems operate in a manner that is consistent with constitutional requirements.  The United States enforces the law enforcement misconduct provisions of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, which authorizes the Attorney General to file lawsuits seeking declaratory and injunctive relief to reform law enforcement conduct that deprives individuals of rights protected by the Constitution or federal law.  Pursuant to this statute, the United States has conducted investigations and secured injunctive relief in civil cases to ensure that local justice systems respect the due process and equal protection rights of those charged with offenses.  *See, e.g.*, Dep't of Justice, Civil Rights Division, Investigation of the Ferguson Police Department (2015) at 50-51, 101 (specifically identifying harms of imposing driver's license suspensions in response to nonpayment of fines and fees); Consent Decree, *United States v. City of Ferguson, Mo.*, 16-cv-180 (E.D. Mo. filed Feb. 10, 2016) [ECF No. 41] at ¶¶ 351-52 (setting forth requirements regarding driver's license suspensions).

The United States has also taken other action to address the specific problem of inequality in the imposition and enforcement of court fines and fees.  In December 2015, the Department's Office for Access to Justice, Civil Rights Division, and Office of Justice Programs convened a meeting of policymakers, judges, prosecutors, defense attorneys, and advocates to

discuss how certain practices with respect to the imposition and enforcement of criminal justice

fines and fees—including the use of license suspensions as a means of coercing the payment of

criminal justice fines and fees—can result in unlawful and harmful conduct.  In September 2016,

the Department held a second convening on these issues in order to highlight positive measures

that have been implemented and identify continuing areas of concern.

Additionally, in March 2016, the Department provided a package of resources, including

a grant solicitation, to state and local courts to support the ongoing work of state judges, court

administrators, policymakers, and advocates to ensure equal justice for all, regardless of a

person's financial circumstances.  Together with the announcement of the grant program and

other support, the Department also issued a guidance letter for state and local courts to clarify the

legal framework that governs the enforcement of court fines and fees.  Within that guidance, the

Department raised concerns regarding using driver's license suspensions as a debt collection

tool, and made clear that "[i]f a Defendant's driver's license is suspended because of failure to

pay a fine, such a suspension may be unlawful if the defendant was deprived of his due process

right to establish inability to pay."[1]

## BACKGROUND

Some jurisdictions in the United States authorize the suspension of driver's licenses not

only in situations in which a driver poses a risk to public safety, but also as a consequence for

failing to pay court debt.[2]  In California, for instance, reports show that over a recent eight-year

period more than 4.2 million individuals, or 17 percent of California's driving population, have

---

[1]     Principal Deputy Assistant Attorney General of the Civil Rights Division Vanita Gupta and Director of the Office of Access to Justice Lisa Foster, *Dear Colleague Letter* (Mar. 14, 2016) (hereinafter "March 14, 2016 Dear Colleague Letter"), *available at* https://www.justice.gov/crt/file/832461/download.

[2]     For clarity and consistency with the terminology used in the Complaint, the United States uses the term "court debt" herein to refer to all "fines, costs, forfeitures, restitution, or penalties" assessed by a court against a person resulting from a traffic or criminal proceeding.  Complaint at ¶ 29.

had their driver's licenses suspended as a result of a failure to appear or pay fines and fees.[3]  In Virginia, the Department of Motor Vehicles reported that as of 2015, the driver's licenses of approximately 900,000 individuals, or one in six licensed drivers, were under suspension for nonpayment of fines and court costs.  *See* Complaint [ECF No. 1] at ¶¶ 327-28.[4]

While driver's license suspensions vary in both process and scope across different jurisdictions, using driver's license suspensions to compel the payment of outstanding court debt, and the resulting punishment of people who cannot afford to pay, has received significant attention in recent years.  As the Department noted in its March 14, 2016 Dear Colleague Letter, researchers have raised concerns regarding the substantial harm this practice imposes on individuals, as well as its efficacy—including that it undermines public safety interests and inhibits a person's ability to pay owed fines and fees.[5]  Some jurisdictions have enacted, or are actively considering, legislation or other measures to limit the circumstances in which a driver's license may be suspended.  *See, e.g.*, Mo. Ann. Stat. § 302.341 (limiting scope of Missouri's practice of suspending driver's licenses for nonpayment to cases involving non-minor moving violations); Wash. Rev. Code Ann. § 46.20.289 (ending Washington's practice of suspending licenses for nonpayment in cases involving non-moving traffic violations).  And specific license

---

[3]      Lawyers' Committee for Civil Rights, Not Just a Ferguson Problem:  How Traffic Courts Drive Inequality in California 13-14 (2015), *available at* http://www.lccr.com/not-just-ferguson-problem-how-traffic-courts-drive-inequality-in-california/.

[4]      "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The United States therefore assumes the facts presented in the Plaintiffs' Complaint to be true for purposes of this Statement of Interest.

[5]      *See* March 14, 2016 Dear Colleague Letter, *supra* note 1, at 6-7, n.7 (citing Am Ass'n of Motor Veh. Adm'rs., Best Practices Guide to Reducing Suspended Drivers 3 (2013)) (recommending that "legislatures repeal state laws requiring the suspension of driving privileges for non-highway safety related violations" and citing research supporting view that fewer driver suspensions for non-compliance with court requirements would increase public safety); Shaila Dewan, *Driver's License Suspensions Create Cycle of Debt*, N.Y. Times, April 14, 2015, *available at* http://www.nytimes.com/2015/04/15/us/with-drivers-license-suspensions-a-cycle-of-debt.html (comparing driver's license suspension practices and detailing impact of those practices).

suspension practices have been challenged on the grounds that they violate state or federal law.
*See, e.g.*, *Hernandez v. California Dep't of Motor Vehicles*, No. RG16836460 (Super. Ct. of Alameda Cnty., filed Oct. 25, 2016); *Rubicon Programs v. Solano County Superior Court*, No. FCS047212 (Super. Ct. of Solano Cnty., filed June 15, 2016).

Plaintiffs, four individuals whose driver's licenses have been suspended due to their failure to pay fines, fees, or costs assessed by Virginia courts, filed a Complaint in July 2016 against Richard D. Holcomb in his official capacity as the Commissioner of the Virginia Department of Motor Vehicles (hereinafter, "Defendant"), alleging that the specific practices Virginia employs to suspend the driver's licenses of those who fail to pay fines or fees violates the Constitution. *See generally* Complaint. In part, Plaintiffs allege that Defendant automatically suspends the driver's licenses of those who miss court payments (regardless of whether those payments are related to a traffic or non-traffic offense) without providing an adequate opportunity to be heard, and without any inquiry into whether the missed payment was the result of an inability to pay. *Id.* at ¶¶ 409-28. Plaintiffs seek declaratory relief, as well as injunctive relief prohibiting Defendant from suspending driver's licenses due to nonpayment of fines and fees until Virginia can do so in a constitutional manner. Complaint at 54-55.

On October 3, 2016, Defendant moved to dismiss Plaintiffs' Complaint. Motion to Dismiss [ECF No. 9]. In addition to arguing that Plaintiffs' Complaint is procedurally barred, Defendant also argues that Plaintiffs' due process and equal protection claims fail to state a claim upon which relief can be granted. Memorandum in Support of Defendant's Motion to Dismiss [ECF No. 10] (hereinafter, "Defendant's Memorandum") at 30-40.[6]

---

[6]     The United States does not take any position on Defendant's claim that the Complaint is procedurally barred, or any other issue in this litigation not addressed herein.

**DISCUSSION**

A.     **The Fourteenth Amendment Guarantee of Procedural Due Process Prohibits the Automatic Suspension of a Driver's License for Failure to Pay Court Debt Absent Notice and a Meaningful Opportunity to be Heard**

The cornerstone of due process is that when the deprivation of a protected property interest is at stake, the state must provide notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Fuentes v. Shevin*, 407 U.S. 67, 80-82 (1972); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-315 (1950) ("An elementary and fundamental requirement of due process in any proceeding . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (citations omitted).

A driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1972) (citations omitted).  As with all deprivations of protected interests, the specific process that must be afforded in suspending a person's driver's license varies depending on what "the particular situation demands." *Mathews*, 424 U.S. at 334 (internal quotation marks and citation omitted).  The Supreme Court has articulated a three-part inquiry for evaluating the constitutional sufficiency of the process provided when a protected interest is affected:  (1) the nature of the private interest that will be affected by the governmental action; (2) the risk of erroneous deprivation and the probable value of requiring additional procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens that additional procedural safeguards would entail. *Id.* at 335 (citations omitted).

Applying these factors in cases involving driver's license suspensions, the Supreme Court has found varying degrees of process due depending on the nature and circumstances of the

suspension.[7]  In *Bell*, the Court considered a challenge to a statutory scheme requiring the

suspension of the driver's license of any uninsured driver who failed to post security following

an accident, regardless of whether that driver was at fault for the accident.  *Bell*, 402 U.S. at 535-

37.  The Court held that, in light of the fact that there was no emergency circumstance requiring

the immediate suspension of the driver's license, due process required the driver to be provided

with a meaningful opportunity to be heard (though not necessarily a full evidentiary hearing)

before the license suspension occurred.[8]  *Id.* at 540-42.  In other circumstances where

suspensions are more directly related to a state's interest in maintaining public safety on its roads

and highways, the Court has found that a post-suspension hearing is sufficient.  In *Dixon v. Love*,

431 U.S. 105, 113-15 (1977), for instance, the Court upheld a statute requiring the suspension or

revocation of a driver's license if a driver is repeatedly involved in accidents or convicted of

traffic offenses.  *Id.*  In those circumstances, the Court held, the statute's provision of a full

evidentiary hearing as soon as practicable was sufficient.  *Id.* at 114-15.  In *Mackey v. Montrym*,

443 U.S. 1, 13-17 (1979), the Court upheld the suspension of a driver's license after an

individual was arrested for driving under the influence and refused to take a breath-analysis test,

because suspension "substantially served" the government's interest in public safety.

 Whereas *Bell*, *Dixon*, and *Mackey* involved challenges to the timing or scope of the

opportunity to be heard regarding a driver's license suspension, here Plaintiffs allege that

---

[7]      Citing to *Davis v. Williams* (4th Cir. Va. Apr. 3 1996) (unpublished), Defendant argues that the driver's license suspension statute at issue in this litigation has already been found to comport with procedural due process requirements.  *See* Defendant's Memorandum at 32.  However, the unpublished, four-paragraph decision in *Davis* relies on the fact that the claims were procedurally barred and does not address the procedural due process claims at issue in this case.

[8]      While the Supreme Court decided *Bell* four years before it decided *Mathews*, the Court's analysis in these cases was grounded in similar considerations.  *Compare Bell*, 402 U.S. at 539-40 (weighing individual interest, sufficiency of existing process, and government interest), *with Mathews*, 424 U.S. at 335 (instructing that courts consider individual interest, risk of erroneous deprivation and benefits of additional process, and government interest).

Defendant suspends the driver's licenses of those who miss required court payments without providing an opportunity to be heard *at all*.  Complaint at ¶ 39.  Rather, Plaintiffs allege that individuals are only provided with basic notice of the license suspension and no means to challenge that suspension.  Complaint at ¶¶ 275, 277.  Specifically, Plaintiffs allege that after fines, costs, and fees are assessed, courts provide individuals with a form to acknowledge that the failure to pay the identified amount will result in the automatic suspension of the person's driver's license.  *Id.*  Plaintiffs further allege that the form provided does not notify people of any availability of a hearing regarding the suspension, nor is a hearing available in fact.  *Id.* at ¶¶ 291-93.  If, after 30 days, payment has not been received, Plaintiffs allege that the court automatically transmits a record of nonpayment to the Virginia Department of Motor Vehicles (DMV).  *Id.* at ¶¶ 279, 284, 286.  According to Plaintiffs, upon receipt of such a record, the DMV immediately suspends the individual's driver's license without any further notice and without conducting any separate inquiry into the reason for the default or the appropriateness of the suspension.  *Id.* at ¶¶ 285-90.  Plaintiffs state that suspensions remain in effect until all outstanding court debt is paid in full, or a payment plan is secured.  *Id.* at ¶ 296.  Finally, Plaintiffs allege that a reinstatement fee of at least $145 must also be paid before the suspension is lifted.  *Id.* at ¶ 297.

Assuming these allegations to be true, as required at the motion to dismiss stage, and based upon relevant precedent and consideration of the *Mathews* factors, the driver's license suspension practices employed by Defendant fail to comport with due process requirements.  Turning to the first *Mathews* factor, a person's interest in continuing to hold a valid driver's license "is a substantial one."  *Mackey*, 443 U.S. at 11; *see also Dixon*, 431 U.S. at 113; *Bell*, 402 U.S. at 539.  License suspensions can impose significant harm on the well-being of individuals

and their families.  *Bell*, 402 U.S. at 539.  Depriving individuals of the use of their vehicle can imperil their ability to earn a living, pursue educational opportunities, and care for family.[9] These harms may be particularly acute in rural areas of Virginia where there is limited public transportation and where essential services, such as health care and schools, may well be long distances from people's homes.  A driver's license suspension is thus a significant interest, the deprivation of which can impose substantial harm.  *Cf. Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) (noting that utility service "is a necessity of modern life" and that the discontinuance of service "for even short periods of time may threaten health and safety" in holding that due process required greater procedural protections than were afforded); *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (citations omitted) (noting that welfare benefits provided "the means to obtain essential food, clothing, housing, and medical care" in holding that due process required hearing before termination of benefits).

The Supreme Court has also instructed that the duration of any potentially wrongful deprivation is an important part of assessing "the impact of official action on the private interest involved."  *Mackey*, 443 U.S. at 12 (citation omitted); *Mathews,* 424 U.S. at 341.  Here, Plaintiffs allege that under Virginia's statutory scheme a driver's license suspension for a missed payment remains in effect until the debt triggering the suspension is paid in full (along with a

---

[9]        *See, e.g.*, Robert Cervero, et al., *Transportation as a Stimulus of Welfare-to-Work: Private versus Public Mobility*, 22 J. PLAN. EDUC. & RES. 50 (2002); Alan M. Voorhees, et al., *Motor Vehicles Affordability and Fairness Task Force: Final Report*, at xii (2006), *available at* http://www.state.nj.us/mvc/pdf/About/AFTF_final_02.pdf (a study of suspended drivers in New Jersey, which found that 42 percent of people lost their jobs as a result of the driver's license suspension, that 45 percent could not find another job, and that this had the greatest impact on seniors and low-income individuals).  *Cf.* Pew Research Center, The Fading Glory of The Television and Telephone 1 (2014), http://assets.pewresearch.org/wp-content/uploads/sites/3/2011/01/Final-TV-and-Telephone.pdf  (last accessed October 17, 2016) (noting 2010 study showing that 86 percent of Americans believe that a car is a necessity).

reinstatement fee), which may result in a prolonged deprivation, particularly for indigent defendants.  Complaint at ¶¶ 296-97.[10]

With respect to the second *Mathews* factor, there is a significant risk that the alleged practices will result in erroneous deprivations of driver's licenses.  Plaintiffs allege that driver's licenses are automatically suspended on the basis of determinations by court clerks that are susceptible to clerical errors that may result in wrongful revocation, Complaint at ¶¶ 286-89—e.g., because the license suspension was requested against the wrong person or because fines and fees were actually paid but improperly recorded.  Additionally, there are a number of situations where a person may not have paid the fine, but revocation may nonetheless be inappropriate—e.g., if a person never received notice of the payment due, if a person was hospitalized or otherwise incapacitated for the duration of the time period during which payment could be made, or because financial circumstances made it impossible to pay, *see infra* at 14-19.  Indeed, Plaintiffs allege that several of these things happened in their cases.  Complaint at 12-13, 15, 19, 24-25.

Virginia's existing procedures are insufficient to protect against these erroneous deprivations and do not serve as an adequate substitute for a meaningful pre-deprivation hearing and appropriate notice of that hearing.  Defendant argues that the "due process that is provided in connection with these Plaintiffs' underlying criminal and traffic convictions afford them all the process that is due."  Defendant's Memorandum at 33.  Yet the process provided during the adjudication of individuals' underlying offenses is targeted at ensuring that they have notice of

---

[10]     Defendant's reliance on the availability of a "restricted license" for those who have had their licenses suspended as evidence that these individuals may secure the ability to drive is misplaced. Defendant's Memorandum at 11.  According to the Complaint, none of the named plaintiffs were in fact eligible for this restricted license, in part because they are not currently employed.  Complaint at ¶¶ 42, 118.  Further, even for those eligible and able to secure a restricted license, such licenses are only valid for six months.  Va. Code § 46.2-395(E).  Restricted licenses are thus unavailable in many cases and an inadequate protection against wrongful driver's license suspensions.

the charges against them and a meaningful opportunity to be heard *with respect to those charges*. That process does not provide any opportunity to be heard regarding the event that triggers the driver's license suspension—namely, a person's failure to pay the court debt that stems from the underlying conviction.  Indeed, courts do not assess fines or fees until the end of the process provided in connection with the underlying traffic or criminal offense; a person's failure to pay those fines or fees thus necessarily occurs after the conclusion of that process.  The circumstances here are therefore distinct from those in *Dixon*, 431 U.S. at 113-14.  While the *Dixon* Court concluded that the risk of erroneous deprivation was low in part because due process was afforded in the underlying convictions, there the convictions themselves—and not any other event, like a person's failure to pay—automatically triggered the driver's license suspension.  *Id*.[11]

By not providing any forum for individuals facing the suspension of their licenses to be heard, any errors that do occur are likely to persist, with compounding collateral consequences. As the Supreme Court has recognized, erroneous deprivations of driver's licenses are particularly troubling because the state "will not be able to make a driver whole for any personal inconvenience and economic hardship suffered by reason of any delay in redressing an erroneous

---

[11]     Similarly, the availability of appellate review of a defendant's underlying conviction does not satisfy the Commonwealth's obligation to provide a hearing regarding the defendant's failure to pay fines and costs that resulted from that conviction.  Defendant's Memorandum at 32.  Plaintiffs do not seek to re-litigate the facts related to the underlying conviction, but rather the appropriateness of the license suspension itself.  *See Warner v. Trombetta*, 348 F. Supp. 1068, 1071 (M.D. Pa. 1972) (requiring administrative hearing for license suspension that resulted from guilty plea because even if the underlying conviction cannot be contested, there still remains the possibility of error, including misidentification of licensee, miscalculation of fine by the court, or errors on the report of conviction form), *aff'd*, 410 U.S. 919 (1973).
     Defendant also points to the availability of a post-conviction "show cause" hearing to challenge outstanding fines and fees.  Defendant's Memorandum at 32-33.  However, these show-cause hearings can be convened only by the court or a prosecuting attorney and are not required by statute.  Va. Code Ann. § 19.2-358(A).  Nor does it appear any show-cause hearing was provided to any Plaintiff.  *See generally* Complaint.  Additionally, the hearings address defaults of deferred payments or installment plans, not erroneous deprivations of driver's licenses.  *See* Va. Code Ann. § 19.2-358(A).

suspension through post-suspension review procedures." *Mackey*, 443 U.S. at 11.  To be clear, due process does not require that the process afforded to individuals is entirely free of error.  *See id.* at 13; *Mathews*, 424 U.S. at 344.  Nonetheless, absent basic procedural protections—including a meaningful pre-deprivation hearing that includes an assessment of the reason for nonpayment—the risk of error under the circumstances alleged by Plaintiffs is substantial and not easily redressed.

Turning to the third *Mathews* factor, the Commonwealth's relevant interests and the fiscal and administrative burdens of additional or substitute procedural requirements do not outweigh the importance of providing more substantial procedural protections.  Courts have recognized that states have a strong interest in using driver's license suspensions as a way to protect public safety by preventing drivers with habitually unsafe driving records from continuing to drive.  *See Dixon*, 431 U.S. at 113-14; *Mackey*, 443 U.S. at 13-17.  Here, however, license suspensions are not imposed in response to an identified threat to public safety, but rather in response to missed payments and in order "to compel future compliance with a court order." Defendant's Memorandum at 36.  Indeed, research shows that suspending driver's licenses for nonpayment of fines and fees actually *undermines* public safety by diverting law enforcement resources away from traffic violations that do pose a risk to the public and by leading to more unlicensed and uninsured drivers on the roads.  *See supra* note 5.

To be sure, the state has an interest in ensuring that offending drivers comply with court orders and bear responsibility for any offense of which they are convicted.  But courts have found that this interest is not on par with the state's interest in protecting public safety, and thus does not provide as strong a justification for failing to provide basic procedural protections.  *See, e.g.*, *Dixon*, 431 U.S. at 113-14 (finding that "the important public interest in safety on the roads

12

and highways, and in the prompt removal of a safety hazard . . . . fully distinguishes" the case

from *Bell v. Burson*, where the purpose "was to obtain security from which to pay any judgments

against the licensee") (citations and internal quotation marks omitted); *Mackey*, 443 U.S. at 13-

17 (1979) (noting that "the paramount interest the Commonwealth has in preserving the safety of

its public highways, standing alone, fully distinguishes this case from *Bell*," as courts have

"accorded the states great leeway in adopting summary procedures to protect public health and

safety") (citations omitted); *cf. Tomai-Minogue v. State Farm Mut. Aut. Ins. Co.*, 770 F.2d 1228,

1235 (4th Cir. 1985) (finding post-deprivation hearing to be adequate where statute required

driver's license suspensions against those who failed to satisfy automobile accident

judgments).[12]

 Further, automatic driver's license suspensions do not further the Commonwealth's

interest in ensuring compliance with court orders—particularly with respect to indigent

defendants, who remain unable to pay court-ordered fines and fees after their driver's license

suspension and may become less able to pay in light of the adverse impact of the suspension on

their employment and their lives.  Nor would the Commonwealth's interest in compelling the

payment of outstanding court debt be substantially compromised by providing individuals at risk

of having their licenses suspended with a meaningful pre-deprivation opportunity to be heard.

---

[12] Although the Commonwealth's interest in *Tomai-Minogue*, as here, focused on the collection of money, the court's analysis makes clear that a license suspension for failure to pay a traffic accident judgment is directly related to public safety because it ensures that drivers can be held responsible, and injured parties made whole, for harms occurring on roadways, which in turn deters reckless driving.  *See Tomai-Minogue*, 770 F.2d at 1235 (acknowledging that public safety concerns heighten the state's interest in swift suspension of a driver's license, as the interest in ensuring that motorists satisfy judgments "is anything but trivial when accidents involve loss of human life, injury to other motorists, and extensive property damage.").  No such heightened interest exists in the present case, where license suspensions are used to compel the payment of court debts regardless of whether those debts are connected in any way to road safety.  Further, the court's determination that a post-deprivation hearing satisfied due process in *Tomai-Minogue* was also influenced by the particular procedural posture of that case, namely the administrative complexities of requiring a pre-deprivation forum to challenge personal jurisdiction as the plaintiff sought.  *Id*. at 1236.

*Cf. Mackey*, 443 U.S. at 18 (finding that "[t]he summary and automatic character of the suspension sanction available under the statute is critical to attainment of [the statutory] objectives" because a "pre-suspension hearing would substantially undermine the state interest in public safety by giving drivers significant incentive to refuse the breath-analysis test").

Given the importance of driver's licenses to those who possess them, the significant risk of erroneous suspensions due to the lack of a meaningful opportunity for individuals to be heard regarding the facts giving rise to a driver's license suspension, and the nature of the Commonwealth's interest as well as the impact additional procedural protections would have on that interest, Defendant's driver's license suspension practices fail to comport with procedural due process requirements.

**B.      Automatically Suspending an Individual's Driver's License for Failure to Pay Court Debt Without Any Assessment of the Individual's Ability to Pay or Alternative Means of Securing the Government's Interest Violates the Fourteenth Amendment**

The Fourteenth Amendment prohibits "punishing a person for his poverty." *Bearden v. Georgia*, 461 U.S. 660, 671 (1983). Here, Defendant's practice of automatically suspending the driver's license of any person who fails to pay outstanding court debt—without inquiring into ability to pay—violates that constitutional principle. Its result is that indigent defendants who cannot afford their fines and fees have their driver's licenses suspended, while defendants who can afford to pay do not.

In a long line of cases beginning with *Griffin v. Illinois*, 351 U.S. 12, 16 (1956), the Supreme Court has made clear that conditioning access or outcomes in the justice system solely on a person's ability to pay violates the Fourteenth Amendment. In *Griffin*, the Supreme Court held that a criminal appellant could not be denied the right to appeal based on an inability to pay a fee, finding that "[i]f [the state] has a general policy of allowing criminal appeals, it cannot

make lack of means an effective bar to the exercise of this opportunity." *Id.* at 24 (Frankfurter, J., concurring).  In *Williams v. Illinois*, 399 U.S. 235 (1970), the Court found that a state could not incarcerate an indigent individual beyond the statutory maximum term on account of missed fine and fee payments, because if that incarceration "results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay." *Id.* at 240-41.  And in *Tate v. Short*, 401 U.S. 395 (1971), the Court found that a state could not convert a defendant's unpaid fine for a fine-only offense to incarceration because that would subject him "to imprisonment solely because of his indigency." *Id.* at 397-98.

In *Bearden*, the Court elaborated on this principle in holding that the Fourteenth Amendment prohibits a state from revoking an indigent defendant's probation for failure to pay a fine and restitution without first "inquir[ing] into the reasons for the failure to pay." *Bearden*, 461 U.S. at 672.  The Court also concluded that, for defendants who could not afford to pay fines or fees imposed for the purposes of punishment, "it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available." *Bearden*, 461 U.S. at 668-69.

While *Griffin*, *Williams*, *Tate,* and *Bearden* were cases in which a criminal defendant's liberty interest was directly implicated, "*Griffin's* principle has not been confined to cases in which imprisonment is at stake." *M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996).  Rather, the constitutional principle reaffirmed by these cases prohibits the imposition of adverse consequences against indigent defendants solely because of their financial circumstances, regardless of whether those adverse consequences take the form of incarceration, reduced access to court procedures, or some other burden.  The Supreme Court has, for instance, held that an

indigent defendant convicted of nonfelony offenses could not be denied an appellate record even though his convictions resulted in fines, not incarceration.  *See Mayer v. Chicago*, 404 U.S. 189, 197 (1971) (noting that the "invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed").  The Supreme Court has also applied this principle in cases arising in entirely non-criminal contexts.  *See, e.g.*, *M.L.B.*, 519 U.S. at 124 (indigent person could not be denied appeal of decision terminating parental rights due to inability to pay court costs); *Boddie v. Connecticut*, 401 U.S. 371, 382-83 (1971) (a married couple's divorce could not be denied based on inability to pay court costs).

Despite the clearly established constitutional principle of equal access to justice articulated in *Bearden* and other cases, Defendant argues that even if its practices resulted in indigent defendants having their driver's licenses suspended because they could not afford to pay outstanding court debt, this practice would fall outside of the Fourteenth Amendment's prohibition on disparate treatment.  *See* Defendant's Memorandum at 36-40.  Specifically, Defendant asserts that Plaintiffs have failed to allege either discriminatory effect or discriminatory intent as required by equal protection clause doctrine.  *Id.*  This argument is misplaced.  In *Bearden*, the Supreme Court explained that because "[d]ue process and equal protection principles converge in the Court's analysis in these cases," the traditional equal protection framework does not apply.  *Bearden*, 461 U.S. at 665.  Given that "indigency in this context is a relative term rather than a classification, fitting the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished."  *Id.* at 666 n.8 (citation and internal quotation marks omitted); *see also M.L.B.*, 519 U.S. at 127 (explicitly declining to apply traditional equal protection clause framework in holding Constitution requires

16

availability of appellate review of the termination of parental rights).  Instead, in determining whether a particular practice violates the constitutional prohibition on "punishing a person for his poverty," courts must assess "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose."  *Bearden*, 461 U.S. at 666-67 (citation omitted; brackets in original).

Applying these factors here, and assuming the facts alleged in the Complaint, Defendant's practice of automatically suspending the driver's license of a defendant who fails to pay owed court debt without any inquiry into the defendant's financial circumstances—i.e., whether the nonpayment was willful or the result of an inability to pay—violates the Fourteenth Amendment.

The individual interest in maintaining possession of a driver's license "is a substantial one," *Mackey*, 443 U.S. at 11, and the practices at issue significantly impair that interest.  As set forth in detail *supra* at 8-10, driver's licenses are often crucial to a person's well-being.  Indeed, the interest in a driver's license may be even greater for indigent persons without means to secure alternate methods to provide care for themselves or their families.[13]  *See Mayer*, 404 U.S. at 197 (noting that penalty other than incarceration "may bear as heavily on an indigent accused as forced confinement[,]" and stressing that "[t]he collateral consequences of conviction may be even more serious").  Further, suspending a person's driver's license entirely deprives that person of the lawful ability to drive, as every state prohibits driving without a license or with a suspended license.  Additionally, Virginia is one of 41 states, as well as the District of Columbia, where a first conviction for driving with a suspended license may carry a sentence of

---

[13]     *See, e.g.*, Mikayla Bouchard, Transportation Emerges as Crucial to Escaping Poverty, N.Y. Times, May 7, 2015, http://www.nytimes.com/2015/05/07/upshot/transportation-emerges-as-crucial-to-escaping-poverty.html.

incarceration.  *See* Va. Code Ann. §§ 46.2-301, 18.2-11; *see also Driving While Revoked, Suspended, or Otherwise Unlicensed: Penalties By State*, National Conference of State Legislatures, http://www.ncsl.org/research/transportation/driving-while-revoked-suspended-or-otherwise-unli.aspx (last accessed October 31, 2016).  This risk is all too real for people who have no other option but to drive unlawfully in order to work, care for their children, or attend crucial medical appointments.

Further, the automatic suspension of driver's licenses for failure to pay fines or fees does not advance a state's inherent interest in promoting public safety, *see supra* at 12-13, nor is it an effective means of achieving the identified purpose of this practice, *see supra* at 13-14—namely compelling "future compliance with a court order."  Defendant's Memorandum at 36.  This is particularly true with respect to defendants who have failed to pay fines or fees because they could not afford to do so; they will not have any greater ability to pay after their license is suspended.  *See Bearden*, 461 U.S. at 670 ("Revoking the probation of someone who through no fault of his own is unable to make restitution will not make restitution suddenly forthcoming.").  Indeed, in light of the impact a driver's license suspension can have on a person's ability to maintain employment, *see supra* at 9, in many cases suspending a person's license may impair that person's ability to satisfy outstanding court debt and thus frustrate, rather than advance, the interest identified here.[14]

Further, as the Court made clear in *Bearden*, there are alternative means, other than attempting to compel the payment of fines or fees through driver's license suspensions, for

---

[14]      *See* Arthur W. Pepin, Conference of State Court Administrators, 2015-2016 Policy Paper, The End of Debtors' Prisons: Effective Court Policies for Successful Compliance with Legal Financial Obligations 5 (2016), citing Alicia Bannon, Mitali Nagrecha and Rebekah Diller, *Criminal Justice Debt: A Barrier to Reentry* 19 (2010) ("Because of the detrimental effects suspensions have on the employment prospects of indigent people and because debt-related suspensions have no relation to driver safety, the practice of suspending licenses for failure to pay fees is completely lacking in rehabilitative or deterrent value.").

securing the Commonwealth's underlying interest in punishing crimes and traffic violations of indigent defendants.  These alternatives include reducing fines or fees to a manageable amount in accordance with a person's ability to pay, offering community service programs, or requiring the completion of coursework, such as traffic safety classes.[15]  *See Bearden*, 461 U.S. at 672 (noting that "[t]he State is not powerless to enforce judgments against those financially unable to pay a fine" and highlighting alternative mechanisms available to states, such as community service) (citation and internal quotation marks omitted; alteration in original).  Absent the use of these alternative mechanisms, indigent defendants who are unable to pay the fines and fees they owe face the suspension of their driver's license, while defendants who can afford to pay do not.  This disparity is "wholly contingent on one's ability to pay" in violation of constitutional requirements.  *M.L.B.*, 519 U.S. at 127 (citing *Williams*, 399 U.S. at 242) (internal quotation marks omitted).

    In light of these factors and Plaintiffs' factual allegations, the practice of automatically suspending an indigent person's driver's license for failure to pay money owed to a court without adequate consideration of the person's ability to pay violates the Fourteenth Amendment.

## CONCLUSION

    For the foregoing reasons, the United States respectfully requests that the Court conclude that Plaintiffs have set forth a plausible claim for relief that the alleged driver's license

---

[15]     As the Department of Justice has recognized, in certain circumstances payment plans may be one appropriate alternative for individuals who cannot afford to pay the entire amount owed during the required time period.  *See* Dear Colleague Letter, *supra* note 1, at 4.  Defendant asserts that courts in Virginia provide the opportunity for people to enter "deferred payment schemes" in order to avoid automatic license suspension upon default.  Defendant's Memorandum at 33.  However, if, as Plaintiffs allege, there are conditions restricting access to payment plans, including criminal history requirements, inflexible minimum payments, or substantial down payments, payment plans may be insufficient to adequately alleviate impairment of ineligible individuals' constitutional rights.  Additionally, some individuals may lack the ability to pay any money for the foreseeable future.  For these persons, states must consider alternative options that do not require monetary payment.

suspension practices violate the Fourteenth Amendment by failing to (1) comport with

procedural due process requirements and (2) consider defendants' ability to pay.

Respectfully submitted,

JOHN P. FISHWICK, JR.
United States Attorney
Western District of Virginia

/s/ Anthony P. Giorno
ANTHONY P. GIORNO (VA 15830)
Assistant United States Attorney
Western District of Virginia
Post Office Box 1709
Roanoke, Virginia  24008-1709
Telephone: (540) 857-2906
anthony.giorno@usdoj.gov

LISA FOSTER (CA 122178)
Director
Office for Access to Justice
Telephone: (202) 514-7073
lisa.foster3@usdoj.gov

KAREN LASH (CA 132133)
Deputy Director
Office for Access to Justice
Telephone: (202) 307-3573
karen.lash@usdoj.gov

ROBERT B. BULLOCK (CA 219942)
Senior Counsel
Office for Access to Justice
Telephone: (202) 514-5324
bob.bullock@usdoj.gov

PAUL KILLEBREW (LA 32176)
Office for Access to Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 514-7086

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

ROBERT MOOSSY
Deputy Assistant Attorney General
Civil Rights Division

CHIRAAG BAINS
Senior Counsel to the Assistant Attorney
General
Civil Rights Division

STEVEN H. ROSENBAUM
Section Chief
Civil Rights Division
Special Litigation Section

JUDE VOLEK (NY 10041483N)
Special Counsel
Civil Rights Division
Special Litigation Section
Telephone: (202) 353-1077
jude.volek@usdoj.gov

/s/ Maureen Johnston
MAUREEN JOHNSTON (WA 50037)
Trial Attorney
Civil Rights Division
Special Litigation Section
Telephone: (202) 353-1146
maureen.johnston@usdoj.gov

/s/ Seth Wayne
SETH WAYNE (LA 34144)
Trial Attorney

paul.killebrew2@usdoj.gov

Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 353-3539
seth.wayne@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.  All participants in the case are CM/ECF users,

and the CM/ECF system will provide electronic service.

/s/ Anthony P. Giorno
ANTHONY P. GIORNO (VA 15830)
Assistant United States Attorney
Western District of Virginia
Post Office Box 1709
Roanoke, Virginia  24008-1709
Telephone: (540) 857-2906
anthony.giorno@usdoj.gov