**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 17-1740**

———————————

DAMIAN STINNIE, Individually, and on behalf of all others similarly situated;
DEMETRICE MOORE, Individually, and on behalf of all others similarly
situated; ROBERT TAYLOR, Individually, and on behalf of all others similarly
situated; NEIL RUSSO, Individually, and on behalf of all others similarly situated,

Plaintiffs - Appellants,

v.

RICHARD D. HOLCOMB, in his official capacity as the Commissioner of the
Virginia Department of Motor Vehicles,

Defendant - Appellee.

-------------------------------

THE INSTITUTE FOR JUSTICE; LAW PROFESSORS; VIRGINIA STATE
CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE; ALABAMA APPLESEED
CENTER FOR LAW AND JUSTICE; AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA; CENTER FOR CIVIL JUSTICE; CENTER FOR
JUSTICE; COLORADO CENTER ON LAW AND POLICY; EQUAL JUSTICE
UNDER LAW; FLORIDA LEGAL SERVICES, INC.; KANSAS APPLESEED
CENTER FOR LAW AND JUSTICE; LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW; MISSISSIPPI CENTER FOR JUSTICE; NATIONAL
CENTER FOR LAW AND ECONOMIC JUSTICE; NORTH CAROLINA
JUSTICE CENTER; PUBLIC JUSTICE CENTER; SOUTH CAROLINA
APPLESEED CENTER FOR LAW AND JUSTICE; TEXAS APPLESEED;
TZEDEK DC; WASHINGTON LAWYERS' COMMITTEE OF CIVIL RIGHTS
AND URBAN AFFAIRS; WESTERN CENTER OR LAW & POVERTY,

Amici Supporting Appellant.

———————————

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville.  Norman K. Moon,  Senior U.S. District Judge.  (3:16-cv-00044-NKM-JCH)

———————————

Argued:  January 23, 2018                                      Decided:  May 23, 2018

———————————

Before GREGORY, Chief Judge, and DUNCAN and FLOYD, Circuit Judges.

———————————

Dismissed and remanded by unpublished opinion.  Judge Floyd wrote the majority opinion, in which Judge Duncan joined.  Chief Judge Gregory wrote a dissenting opinion.

———————————

**ARGUED:** Tennille Jo Checkovich, MCGUIREWOODS LLP, Richmond, Virginia, for Appellants.  Trevor Stephen Cox, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:** Jonathan T. Blank, MCGUIREWOODS LLP, Charlottesville, Virginia; Angela A. Ciolfi, Patrick S. Levy-Lavelle, Mario D. Salas, LEGAL AID JUSTICE CENTER, Charlottesville, Virginia; Leslie Kendrick, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellants.  Mark R. Herring, Attorney General, Matthew R. McGuire, Acting Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  William R. Maurer, Bellevue, Washington, Jeffrey Redfern, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Amicus The Institute for Justice.  Frederick Liu, HOGAN LOVELLS US LLP, Washington, D.C., for Amici Law Professors.  Cynthia Cook Robertson, Robert C.K. Boyd, Washington, D.C., Thomas V. Loran III, PILLSBURY WINTHROP SHAW PITTMAN LLP, San Francisco, California, for Amici The Virginia State Conference of the National Association for the Advancement of Colored People, Alabama Appleseed Center for Law and Justice, American Civil Liberties Union Foundation of Virginia, Center for Civil Justice, Center for Justice, Colorado Center on Law and Policy, Equal Justice Under Law, Florida Legal Services, Inc., Kansas Appleseed Center for Law and Justice, Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, National Center for Law and Economic Justice, North Carolina Justice Center, Public Justice Center, South Carolina Appleseed Center for Law and Justice, Texas Appleseed Center for Law and Justice, Tzedek DC, Washington Lawyers' Committee for Civil Rights and Urban Affairs, and Western Center on Law & Poverty.

———————————

Unpublished opinions are not binding precedent in this circuit.

2

FLOYD, Circuit Judge:

This case arises out of a constitutional challenge to Virginia Code § 46.2-395, pursuant to which anyone who fails to pay court costs or fines imposed after a conviction is subject to suspension of his or her driver's license. Plaintiffs Damian Stinnie, Demetrice Moore, Robert Taylor, and Neil Russo owe court debts and, because of their inability to pay, have had their licenses suspended. They allege that the statute violates the Equal Protection and Due Process clauses of the Constitution. The district court dismissed Plaintiffs' case without prejudice. Plaintiffs timely appealed. For the following reasons, we dismiss the appeal for lack of jurisdiction and remand the case to the district court with instructions to allow Plaintiffs to amend their complaint.

## I.

Virginia Code § 46.2-395 provides, in relevant part:

(B) . . . [W]hen any person is convicted of any violation of the law of the Commonwealth or of the United States or of any valid local ordinance and fails or refuses to provide for immediate payment in full of any fine, costs, forfeitures, restitution, or penalty lawfully assessed against him, or fails to make deferred payments or installment payments as ordered by the court, the court shall forthwith suspend the person's privilege to drive a motor vehicle on the highways in the Commonwealth. . . .

(C) Before transmitting to the Commissioner a record of the person's failure or refusal to pay all or part of any fine, costs, forfeiture, restitution, or penalty . . . , the clerk of the court that convicted the person shall provide or cause to be sent to the person written notice of the suspension of his license or privilege to drive a motor vehicle in Virginia, effective 30 days from the date of conviction, if the fine, costs, forfeiture, restitution, or penalty is not paid prior to the effective date of the suspension as stated on the notice. . . .

3

In their complaint, Plaintiffs alleged that they are indigent Virginia residents who have had their driver's licenses suspended for failure to pay court costs and fines imposed following their convictions. Plaintiffs filed suit individually and on behalf of a class of additional unnamed plaintiffs similarly situated against Virginia Department of Motor Vehicles ("DMV") Commissioner Richard Holcomb ("the Commissioner") seeking declaratory and injunctive relief. Notwithstanding the language of Virginia Code § 46.2-395(B)—providing that the "court shall forthwith suspend" the driver's licenses—Plaintiffs alleged that it is the DMV, not the state court, that actually implements and issues the orders of suspension. Further, Plaintiffs alleged that to remove the license suspensions, they have to pay the amount owed to the court or establish an acceptable payment plan, and pay a reinstatement fee to the DMV. Accordingly, Plaintiffs claimed that Virginia Code § 46.2-395 violates the Due Process and Equal Protection clauses, U.S. Const. amend. XIV, § 1. They asserted that it "unfairly punishes them for being poor," J.A. 11 ¶ 7, and traps them in a catch-22: because Plaintiffs do not have money to pay court costs, they do not have driver's licenses, and because they do not have driver's licenses, they are unable to obtain employment which would allow them to pay the court costs.

The Commissioner filed a motion to dismiss the complaint, and the district court granted his motion without prejudice. It concluded that it lacked jurisdiction over the claims against the Commissioner because the claims were barred by the *Rooker-Feldman*

doctrine,* the Commissioner was entitled to Eleventh Amendment immunity, and Plaintiffs lacked standing.  In granting the motion to dismiss, the district court was careful to note that "it may be possible to reconstitute [Plaintiffs' claims] in a form and against a defendant such that a lower federal court would have jurisdiction."  J.A. 608.  Plaintiffs then filed a Rule 59 and Rule 60 motion for reconsideration, along with several supporting exhibits purporting to demonstrate the court's jurisdiction.  The Commissioner opposed this motion, and filed a motion to strike the exhibits.  The district court denied the motion for reconsideration and granted the motion to strike.  This appeal followed.

## II.

The Commissioner argues that this Court lacks jurisdiction to consider Plaintiffs' appeal because the district court's dismissal without prejudice was not a final order.  We agree.

28 U.S.C. § 1291 provides that the courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."  The finality requirement of § 1291 "advances the important interest of avoiding piecemeal

---

* The *Rooker-Feldman* doctrine holds that "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Thana v. Bd. of License Comm'rs*, 827 F.3d 314, 319 (4th Cir. 2016) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006) (per curiam)); *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923).  Here, the district court concluded that Plaintiffs were challenging a state court judgment because it was the state court that actually suspended the licenses.

review of ongoing district court proceedings." *MDK, Inc. v. Mike's Train House, Inc.*, 27 F.3d 116, 119 (4th Cir. 1994). We recently had the opportunity to examine at length the circumstances in which a dismissal without prejudice is considered a final judgment for purposes of appeal. *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619 (4th Cir. 2015). In *Goode*, we held that "[a]n order dismissing a complaint without prejudice is not an appealable final order under § 1291 if 'the plaintiff could save his action by merely amending his complaint.' " *Id.* at 623 (quoting *Domino Sugar Corp. v. Sugar Workers Local Union 392 of United Food & Commercial Workers Int'l Union*, 10 F.3d 1064, 1066–67 (4th Cir. 1993)). If " 'the grounds of the dismissal make clear that no amendment could cure the defects in the plaintiff's case, the order dismissing the complaint is final in fact' and therefore appealable," but a " 'plaintiff may not appeal the dismissal of his complaint without prejudice unless the grounds for dismissal clearly indicate that no amendment [in the complaint] could cure the defects in the plaintiff's case.' " *Id.* (quoting *Domino Sugar*, 10 F.3d at 1066–67) (alterations in original).

We also noted that dismissals are generally final and appealable "in cases in which the district court granted a motion to dismiss on procedural grounds that no amendment to the pleadings could cure," but that dismissals without prejudice are not final "in cases in which the district court granted a motion to dismiss for failure to plead sufficient facts in the complaint . . . ." *Id.* at 624. This approach "requires us to examine the appealability of a dismissal without prejudice based on the specific facts of the case in order to guard against piecemeal litigation and repetitive appeals." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 345 (4th Cir. 2005).

The district court here determined that the complaint did not sufficiently allege subject matter jurisdiction. Based on the facts of this case and the district court's grounds for dismissal, we agree with the district court that it "may be possible to reconstitute [Plaintiffs' claims] in a form and against a defendant such that a lower federal court would have jurisdiction." J.A. 608; *see also* J.A. 574 (granting motion to dismiss "[b]ecause jurisdiction is absent from the *current iteration* of this lawsuit . . .") (emphasis added). The grounds for dismissal do not "clearly indicate that no amendment [in the complaint] could cure the defects in the plaintiff's case," *Goode*, 807 F.3d at 623 (internal quotation marks omitted), and thus appellate jurisdiction is lacking.

Plaintiffs argue that the district court's dismissal was a final order because it dismissed their "case" without prejudice rather than merely dismissing their "complaint." Reply Br. 20. We have noted that there is a "difference between an order dismissing an *action* without prejudice and one dismissing a *complaint* without prejudice," *Chao*, 415 F.3d at 345, and that "courts have generally considered the former, but not the latter, appealable," *Goode*, 807 F.3d at 624. But we followed that statement by noting that whether the district court merely dismissed the complaint or dismissed the action as a whole "is essentially one way of determining whether 'the grounds of the dismissal make clear that no amendment could cure the defects in the plaintiff's case, [such that] the order dismissing the complaint is final in fact and [appellate jurisdiction exists].' " *Id.* (quoting *Domino Sugar*, 10 F.3d at 1066–67) (alterations in original).

Thus, the district court's dismissal of the "case" without prejudice is not dispositive of our inquiry. Indeed, the district court in *Goode* also specifically dismissed

the plaintiff's "case" without prejudice—not simply his complaint. *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, No. 3:14cv281-HEH, 2014 WL 3945870, at *7 (E.D. Va. Aug. 12, 2014) ("Accordingly, Defendant's Motion to Dismiss is granted and the case is dismissed without prejudice."). This Court nevertheless concluded that the dismissal without prejudice was not a final, appealable judgment because the plaintiff "could have amended his complaint to cure the pleading deficiencies that the district court identified." *Goode*, 807 F.3d at 624. There, like here, the grounds for dismissal did not make clear that "no amendment could cure the defects in the plaintiff's case," and therefore the order dismissing the case was not a final order. *Id.* at 625 (quoting *Domino Sugar*, 10 F.3d at 1066).

Finally, we make clear that here, like in *Goode*, we "assume without deciding that the district court applied the correct legal standards in assessing the motion to dismiss," and our discussion "should not be read to indicate that we would hold that the district court's analysis was free from error were we to consider [the appeal] on the merits." *Id.* at 625 n.5. Although the parties disagree as to whether the district court erred in its legal analysis in granting the Commissioner's motion to dismiss, "allowing appellate jurisdiction to rest on an argument that the district court had applied an improper [legal analysis] would paradoxically require this Court to assess the merits of the district court's decision in order to determine whether we have jurisdiction to do so—putting the cart before the horse." *Id.* at 625–26. Therefore, we express no opinion as to the correctness of the district court's decision.

Because we conclude that Plaintiffs may be able to cure the deficiencies identified by the district court by amending their complaint, we conclude that the district court's dismissal without prejudice was not a final, appealable order and that we lack appellate jurisdiction.

III.

For the foregoing reasons, Plaintiffs' appeal is

*DISMISSED AND REMANDED.*

GREGORY, Chief Judge, dissenting:

I respectfully dissent because I would conclude that the district court's dismissal of Plaintiffs' case for lack of jurisdiction is an appealable final order. The district court's grounds for dismissal do not rest on the sufficiency of the plaintiffs' factual pleadings; they instead rest on, in the court's words, the "text and structure" of Va. Code Ann. § 46.2-395(B). *See Stinnie v. Holcomb*, No. 16-44, 2017 WL 963234, at *12–13 (W.D. Va. Mar. 13, 2017). Because no factual allegation is going to alter the text and structure of the state statute, no amendment to the complaint can cure the perceived jurisdictional defects. Therefore, I would conclude that the dismissal is an appealable final order over which this Court has appellate jurisdiction and, unlike the majority, decide whether the dismissal was proper. As to the district court's grounds for dismissal, I would reverse and remand because the court erred on *Rooker-Feldman*, standing, and sovereign immunity.

I.

A.

Each year, the Commonwealth of Virginia imposes approximately half a billion dollars' worth of fees and fines in traffic and criminal court. J.A. 13. The number and amount of these fees have grown over time and now fund a wide range of basic government operations and services. These fees include reimbursing the state for the appointment of counsel for indigent defense, as well as courthouse construction fees, courthouse security fees, criminal justice academy training fees, fixed misdemeanor fees,

electronic summons fees, more-time-to-pay fees, and jail admissions fees, among a host of others.  J.A. 14, 103–47.  The stacking of these fees, along with interest, on top of offense-specific penalties, means that even a minor traffic violation could spiral out of control, to the tune of hundreds, or eventually thousands, of dollars.  State courts do not appear to consider defendants' poverty as they impose fines and fees.  J.A. 17.

To incentivize payment, the state punishes each and every individual who defaults by automatically suspending his or her driver's license, regardless of the reason for the default.  When a scheduled payment is not received by the due date, the state court's monitoring system automatically transmits an electronic notice to the Department of Motor Vehicles (DMV), indicating that the individual's driver's license has been suspended for failure to pay court debt.  Va. Code Ann. §§ 46.2-395(B), (C).  The DMV then updates its license database in accordance with the notice, thereby effectuating the suspension for all practical purposes, including for law enforcement.  No notice of default is given to the driver, and no process exists for the driver to explain or contest the late payment before the DMV records the suspension.  The DMV does not reinstate any suspended license until all debts owed to all state courts are current and the driver has paid a reinstatement fee of at least $145 to the DMV.  J.A. 41.

This license-for-payment scheme, therefore, does not differentiate between those *unable* to pay from those *unwilling* to pay.  By suspending the licenses of those who cannot pay for reasons outside of their control, the state traps thousands of Virginians in a nightmarish spiral for which there is no apparent exit.  The license suspensions make it difficult, or even impossible, to maintain employment.  For instance, in the Richmond

11

area, only 27% of all jobs are accessible within 90 minutes of travel on public transportation. J.A. 46. For less urbanized areas, the share of accessible jobs is of course even lower. The inability to secure employment further undermines any ability to pay off court debt, which leads to the perpetual accrual of interest. J.A. 16. Then, when individuals drive on suspended licenses out of ignorance[1] or desperation, they receive additional penalties and spiral further into insolvency.

The four named plaintiffs exemplify this phenomenon.

Mr. Robert Taylor is a 28-year-old veteran of the National Guard who attended classes at Virginia Commonwealth University until he was forced to drop out for financial reasons. J.A. 26. He began working part-time for T-Mobile, earning $9 an hour. His license was suspended for failure to pay court debt stemming from a license-plate violation. He was then convicted of driving with a suspended license, triggering additional debt. Mr. Taylor managed to pay the debt from the license plates, which allowed his license to be reinstated. However, Mr. Taylor could not afford to pay the fees for the suspended license citation, and his license was suspended again. Mr. Taylor partially paid off that debt before he had to take medical leave and ultimately lost his job at T-Mobile for health reasons. He then received additional citations for driving on a suspended license before he stopped driving altogether to avoid more citations and fees.

---

[1] Neither the court nor the DMV sends any notice of default or suspension to the driver when a payment becomes overdue and the suspension takes effect. Instead, the state court only informs the driver prospectively, when the fine is first imposed, that her license will be suspended if payment is not made in full.

Since then, Mr. Taylor's inability to drive has prevented him from getting a job on several occasions, as he could not drive to an interview out-of-town or have reliable transportation to work. He was also rejected by an employer after a background check revealed pending charges for driving while suspended. Mr. Taylor now has no income and is saddled with $5,000 in medical expenses and $10,000 in student loans. He currently owes approximately $4,400 in court debt; and although he inquired about payment plans, he could not afford the initial down payment that was required by the only available plan. Neither the state court nor the DMV ever assessed his ability to pay when assessing fees, suspending his license, or determining a payment plan.

Mr. Neil Russo is a 61-year-old cancer survivor who also suffers from Wilson's disease, a rare genetic disorder that causes kidney and liver problems and chronic pain. J.A. 31. In 2006, Mr. Russo was diagnosed with prostate cancer, lost his job at the National Counterterrorism Center, and accrued over $300,000 in medical debt. His sole source of income thereafter has been a monthly Social Security Disability check for $482. After losing his job, Mr. Russo was fined for issuing bad checks and speeding, among other violations. The state courts did not consider whether Mr. Russo was indigent before assessing the court costs and fines, which he could not afford to pay because his illnesses prevented him from working. The state automatically suspended Mr. Russo's driver's license when he defaulted. Mr. Russo continued to drive, in part because he needed transportation to his medical appointments. He was then cited for driving with a suspended license and was assessed an additional $150 fine and $202 in various add-on fees. In total, Mr. Russo now owes nearly $5,000 in court debt. He has proactively

requested payment plans, which were unavailable or required prohibitively high monthly or down payments. Now, Mr. Russo is unable to drive to his medical appointments and cannot obtain any employment that requires driving.

Ms. Demetrice Moore, a 33-year-old single mother of two, was convicted of grand larceny in 2002, for which she has completed her sentence but has not yet paid the cost of her court-appointed counsel. J.A. 23. Despite having concluded that she was indigent, the court did not consider Ms. Moore's ability to pay when setting court fees. After completing her sentence, Ms. Moore moved to New York for six years before returning to Virginia with a New York driver's license. When she tried to switch to a Virginia license, the DMV determined that Ms. Moore was not eligible to drive in Virginia, due to her outstanding court debt. However, Ms. Moore's job as an in-home certified nursing assistant, which paid her $8 an hour, required her to drive to work. Ms. Moore continued to drive, receiving several citations for driving on a suspended license. As a result, her court debt has ballooned to $4,467. Not wanting to accrue more citations, Ms. Moore no longer drives and cannot work as an in-home nursing assistant. Her family's only source of income now is her daughter's Supplemental Security Income (SSI) check and food stamps. The state court did not take Moore's indigence into account while determining payment options, and she cannot afford the only payment plan available, which requires a minimum payment of $100 per month.

Mr. Damian Stinnie was earning approximately $300 per week at minimum wage jobs when a state court imposed a total of $1,002 for three traffic infractions. J.A. 16–17. The total had to be paid in full within thirty days, and the courts did not inform Mr.

14

Stinnie of any other option, such as community service or a payment plan. At no point did the state consider Mr. Stinnie's financial circumstances before either assessing the fees or suspending his license. In 2013, Mr. Stinnie, unaware that the system had automatically suspended his license, received a citation for driving while suspended. A week after Mr. Stinnie was diagnosed with lymphoma, the court imposed $150 in fines and $117 in fees for the citation.

For the next two years, Mr. Stinnie and his twin brother were homeless and regularly lived out of a jointly-owned used car because no other housing options were available. J.A. 19. In 2016, Mr. Stinnie was again cited for driving with a suspended license. The court did not set a fine but imposed $151 in court fees, even though the court recognized his indigent status when it appointed counsel. Mr. Stinnie could not afford to pay those fees and has now accrued over $1,500 in court debt to four different state courts, each of which has ordered a suspension of his license. Mr. Stinnie's only source of income is food stamps and SSI of $750 a month, which he uses for food, clothing, and shelter. None of the four state courts have a payment plan or alternative that Mr. Stinnie is able to afford.

## B.

Alleging violations of their due process and equal protection rights under the Fourteenth Amendment, Plaintiffs filed a putative class action complaint against DMV Commissioner Richard Holcomb, in his official capacity. J.A. 55–62. Plaintiffs claim that the Commissioner, in implementing Va. Code Ann. § 46.2-395, unlawfully punishes

their poverty by effectuating suspensions without distinguishing between those unwilling to pay and those unable to pay.

Plaintiffs seek numerous remedies: (1) a judgment declaring that the suspension scheme is unlawful, (2) an injunction ordering the Commissioner to stop processing further suspensions under the unlawful scheme, (3) an injunction reinstating licenses that have been suspended based on unpaid court debt, and (4) an injunction directing the Commissioner to waive reinstatement fees. J.A. 62–63.

The district court indicated that the lawsuit may well have merit but dismissed it on three jurisdictional grounds that are now on appeal. *Stinnie*, 2017 WL 963234, at *1. First, the district court held that it did not have subject matter jurisdiction because the *Rooker-Feldman* doctrine prevents the lower federal courts from reviewing state court judgments. Second, the district court held that Plaintiffs did not have standing because their injuries are not fairly traceable to or redressible by the Commissioner because state courts are responsible for suspending Plaintiffs' licenses under Virginia law, not the DMV. Third, the district court held that the Commissioner is entitled to sovereign immunity under the Eleventh Amendment because he lacks a sufficient connection to the challenged state action. The district court noted that the dismissal was without prejudice and that an amendment might cure the jurisdictional defects.

Plaintiffs argue on appeal that the district court erred on all three jurisdictional grounds. The Commissioner argues that this Court lacks appellate jurisdiction because the district court's ruling was not an appealable final order. Response Br. at 26. The

Commissioner also argues in the alternative that the district court was correct to dismiss the case on all three grounds.

## II.

Like the majority, I first address this Court's appellate jurisdiction before considering the district court's grounds for dismissal.  The majority is of course correct that "[a]n order dismissing a complaint without prejudice is not an appealable final order under [28 U.S.C.] § 1291 if 'the plaintiff could save his action by merely amending his complaint.'"  *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 623 (4th Cir. 2015).  To determine whether a dismissal is appealable, this Court asks whether "the grounds of the dismissal make clear that no amendment could cure the [perceived] defects in the plaintiff's case."  *Id.* (quoting *Domino Sugar Corp. v. Sugar Workers Local Union 392*, 10 F.3d 1064, 1066 (4th Cir. 1993)).  In this case, any amendment to the complaint would clearly be futile because the district court's grounds for dismissal do not turn on factual allegations.  Therefore, unlike the majority, I would conclude that the dismissal is a final order and that this Court has jurisdiction under § 1291.

The district court's grounds for dismissal are animated by two primary concerns.  First, the district court noted that Plaintiffs seek relief from the suspension of their licenses.  Second, the court concluded that the text of the state statute authorizes state courts, not the DMV, to issue such suspensions.  *See* Va. Code Ann. § 46.2-395(B) ("[T]he court shall forthwith suspend the person's privilege to drive a motor vehicle on the highways in the Commonwealth.").

In the district court's view, those two considerations combine to create three fatal jurisdictional flaws.  First, they indicate that Plaintiffs are functionally appealing state court judgments to a federal district court, rather than to state appellate courts and eventually to the Supreme Court.  *Stinnie*, 2017 WL 963234, at \*11.  For the district court to usurp the Supreme Court's jurisdiction over state court judgments would violate the *Rooker-Feldman* doctrine.  *See generally D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923).  Second, because it is the state courts that issue suspensions under § 46.2-395, the Commissioner of the DMV did not cause Plaintiffs' injuries and cannot redress them.  *Stinnie*, 2017 WL 963234, at \*15.  Under that rationale, Plaintiffs would lack standing to sue the Commissioner.  Finally, the district court concluded that the DMV Commissioner was immune from suit because he lacks a sufficient connection to the suspension to be sued under the *Ex parte Young* exception to sovereign immunity.  *Stinnie*, 2017 WL 963234, at \*19; *see Ex parte Young*, 209 U.S. 123, 159–60 (1908); *McBurney v. Cuccinelli*, 616 F.3d 393, 396 (4th Cir. 2010).

No amendment to the pleadings can mitigate the two concerns driving the district court's analysis.  First, as to seeking relief from the license suspensions, that is Plaintiffs' entire case.  Clearly, no case or controversy would remain if the amended complaint somehow dropped that central premise.  Second, no change in factual pleadings will alter the plain text of § 46.2-395, which specifically authorizes state courts to issue suspensions.  Under the standards that the district court has imposed, there is simply no way for Plaintiffs to survive a motion to dismiss for lack of jurisdiction.

The district court's analysis seems to suggest that perhaps the state court, rather than the DMV Commissioner, is the proper party to sue. However, that suggestion is a red herring at best.

First, even if Plaintiffs were to amend their complaint to add the state court, the district court's application of the *Rooker-Feldman* doctrine would be unaffected. Indeed, *Feldman* itself involved a suit against a state court and its individual judges. *See* 460 U.S. at 473, n.8. Under the district court's rationale, the state court would still be the entity responsible for the suspensions, and Plaintiffs would still be challenging the suspensions outside of the vertical appellate process. The identity of the defendant is simply immaterial to the district court's *Rooker-Feldman* analysis, which asks only whether a state court ordered the suspensions.

Second, suing the state court would not help Plaintiffs establish standing under the district court's standard. Under Virginia law, the Commissioner of the DMV is the sole entity responsible for the act of reinstating Plaintiffs' licenses. *See* Va. Code Ann. § 46.2-395(B), (D). If Plaintiffs were to sue the state court, they would fail to demonstrate redressability under the district court's standard because the statute authorizes the Commissioner, not the state court, to collect reinstatement fees, aggregate payment notices from all state courts, and reinstate licenses. Va. Code Ann. § 46.2-395(B), (C), (D). In other words, the district court has created an anomalous situation where the Commissioner cannot be sued because he is not responsible for suspensions and the state courts cannot be sued because they are not responsible for reinstatements. Either way, the district court's rationale results in a lack of standing and a dismissal.

19

Similarly, suing the state court also would not allow Plaintiffs to surmount the district court's sovereign immunity hurdle.  Under the district court's rationale, the Commissioner is immune because the statute authorizes the state court to issue suspensions, and the Commissioner therefore lacks a sufficient connection to the challenged action.  However, were Plaintiffs to sue the state court, the state court would have immunity from any suit seeking the reinstatement of licenses because the Commissioner is responsible for reinstatement, and the state court accordingly lacks the requisite relationship.  As with standing, the district court has trapped Plaintiffs in a catch-22.

Neither the majority, nor the district court, nor the parties have identified exactly how Plaintiffs could plausibly "reconstitute" their complaint in a form that would cure the perceived jurisdictional defects.  I likewise fail to see how Plaintiffs could survive a motion to dismiss under the district court's legal standards.  *See Stinnie*, 2017 WL 963234, at *20; *cf. Goode* 807 F.3d at 625–28 (addressing each ground for dismissal and noting how each defect may be cured).  Because no amendment to Plaintiffs' complaint can cure the perceived jurisdictional defects, I would conclude that the dismissal is an appealable final order and that this Court has jurisdiction to review it.

III.

I now address each of the three jurisdictional grounds on which the district court dismissed the case:  *Rooker*-*Feldman*, standing, and Eleventh Amendment sovereign

immunity.  For the reasons below, I would reverse on all three grounds and hold that the district court does have jurisdiction over Plaintiffs' claims.

A.

*Rooker-Feldman* is an exceedingly narrow doctrine that has no relevance to the facts of this case.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) ("The *Rooker-Feldman* doctrine . . . is confined to cases of the kind from which the doctrine acquired its name[.]").  The doctrine stands for the basic principle that the U.S. Supreme Court is the only federal court with appellate jurisdiction over state court decisions absent statutory authorization to the contrary.[2]  *Rooker*, 263 U.S. at 415–16.  Thus, even when state courts err on questions of federal law, the proper jurisdictional channel for review is to appeal to the state's higher courts, if any, and eventually to the U.S. Supreme Court.  *See* 28 U.S.C. § 1257.  In other words, *Rooker-Feldman* bars district courts from entertaining a claim that is functionally a direct appeal seeking reversal or modification of a state-court judgment.  *See Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994); *Rooker*, 263 U.S. at 416.  But here, no state court has heard or rendered a decision on Plaintiffs' constitutional claims—and so, the district court cannot possibly supplant the role of state appellate courts or the Supreme Court by exercising jurisdiction over such independent claims.

---

[2]  In contrast, federal district courts are courts of original and concurrent jurisdiction that ordinarily cannot review state court decisions for legal error.  Federal habeas review is an example of an exception to this rule because Congress has expressly granted such jurisdiction.  *Thana v. Bd. of License Commissioners for Charles Cty., Md.*, 827 F.3d 314, 319 (4th Cir. 2016).

21

The Supreme Court has only upheld applications of the *Rooker-Feldman* doctrine in the two eponymous cases. *See Exxon*, 544 U.S. at 287. In *Rooker*, the Supreme Court held that a federal district court did not have jurisdiction to declare a state court judgment null and void on the ground that the state court erred in applying federal precedent. 263 U.S. at 415–16. In *Feldman*, the Supreme Court held that a federal district court could not review the D.C. Court of Appeals' decision to deny bar admission to an applicant. 460 U.S. at 463. However, *Feldman* also concluded that bar applicants could challenge the constitutionality of the rule that the D.C. Court of Appeals was applying to deny admission. *Id.* at 482–83.

Since *Feldman*, the Supreme Court has sharply curtailed lower courts' overzealous application of the doctrine. In *Exxon*, the Supreme Court held that the doctrine should be cabined to the facts of its two namesake cases because a more expansive interpretation undercuts the concurrent jurisdiction of the lower federal courts. 544 U.S. at 283–84. Indeed, the Supreme Court so dramatically narrowed the doctrine's application that Justice Stevens described *Exxon* as having "finally interred the so-called *Rooker-Feldman* doctrine," which "ha[d] produced nothing but mischief for 23 years." *Lance v. Dennis*, 546 U.S. 459, 468 (2006) (Stevens, J., dissenting on other grounds).

Under *Exxon*, *Rooker-Feldman* simply precludes parties who lose in state court from commencing a lawsuit in federal district court and seeking reversal of the state decision. 544 U.S. at 284, 287 n.2. Because the doctrine guards against district courts serving a forbidden appellate function, it cannot preclude jurisdiction over issues and claims which have never been ruled on by a state court. *See Skinner v. Switzer*, 562 U.S.

22

521, 532 (2011). Such cases simply lack a relevant state decision subject to reversal. *Dell Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 872 (4th Cir. 2016) ("[T]he Petition does not challenge the state court decision. Rather, it disputes . . . questions that were never litigated in the state court.").

Furthermore, the simple fact that a federal plaintiff's suit would undermine the correctness of a state court decision or otherwise frustrate its enforcement does not, by itself, trigger *Rooker-Feldman*. *Thana v. Bd. of License Commissioners for Charles Cty., Md.*, 827 F.3d 314, 322 (4th Cir. 2016) (rejecting argument that district court could not rule in plaintiff's favor without finding error by state court). As the Supreme Court held in *Exxon*, "[i]f a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction." 544 U.S. at 293 (internal quotation marks and citation omitted). "[T]he test is not whether the relief sought in the federal suit 'would certainly upset' the enforcement of a state court decree, but rather whether the relief would 'reverse or modify' the state court decree." *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006) (quoting *Exxon*, 544 U.S. at 284).

Indeed, the Supreme Court has held that district courts have jurisdiction over "independent claims," including those that challenge the validity of "statute[s] or rule[s] governing the [state court] decision" or the constitutionality of the process by which a state court judgment is reached. *Skinner*, 562 U.S. at 532; *see also Exxon*, 544 U.S. at 288 ("The 'so-called *Rooker-Feldman* doctrine' does not deprive the Court of jurisdiction to decide [plaintiff's equal protection and due process] challenge to the [state's]

23

procedures." (quoting *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 18 (1987) (Scalia, J., concurring))). In *Skinner*, a state court twice denied a convicted defendant the right to DNA testing, applying a state statute that limited such post-conviction relief. 562 U.S. at 527–29. The criminal defendant then sought injunctive relief in federal court under 42 U.S.C. § 1983, arguing for the first time that the state's statutory restrictions on DNA testing violated his Fourteenth Amendment due process rights. *Id.* at 529, 532. The Supreme Court reversed the lower courts and held that *Rooker-Feldman* did not apply to the defendant's claim because he was not challenging the state court's adverse application of the statute but rather the constitutionality of the statute itself—an issue that was not addressed by the state court. *Id.* at 532–33.

Plaintiffs' constitutional challenges to Virginia's license-for-payment scheme are indistinguishable from the independent claim at issue in *Skinner*. Here, Plaintiffs are also not challenging the state court decisions themselves. They do not contest their convictions, the applicability of the assessed fines and fees, or their failure to make the required payments. Rather, they challenge the statutory scheme, and the process it provides, as violating their due process and equal protection rights. As in *Skinner*, there is no state court judgment as to the claims brought in federal court. The absence of a reviewable state judgment, by definition, means *Rooker-Feldman* cannot apply, for it precludes only appellate review by district courts.

The district court's conclusion to the contrary rests on two legal errors, the first of which is relying on Fourth Circuit precedent that predated *Exxon*. *See Stinnie*, 2017 WL 963234, at *12 (citing *Jordahl v. Democratic Party of Virginia*, 122 F.3d 192 (4th Cir.

24

1997)).  Those pre-*Exxon* cases are of questionable validity because the Fourth Circuit, like other courts, had taken an overly expansive view of the doctrine before being corrected by the Supreme Court.  *See Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 717–18 (4th Cir. 2006) (discussing impact of *Exxon* on circuit precedent).  Citing such precedent, the district court erroneously construed *Rooker-Feldman* as barring all federal claims that undermine any action taken by a state court.  After concluding that state courts suspend driver's licenses under Va. Code Ann. § 46.2-395, the district court summarily concluded that the suspensions must necessarily be judicial acts and that Plaintiffs must necessarily be seeking reversal of state court judgments.  *See Stinnie*, 2017 WL 963234, at *12.  However, this ignores the Supreme Court's specific admonishment that the "character of the body" behind the challenged action is not dispositive of the *Rooker-Feldman* question.[3]  *See, e.g.*, *Feldman*, 460 U.S. at 477.  As such, the district court failed to consider whether ruling in favor of Plaintiffs' constitutional claims actually amounts to a reversal of a state court judgment.

Second, the district court improperly viewed *Rooker-Feldman* through the lens of abstention and preclusion principles.  Far from illustrating *Rooker-Feldman*'s

---

[3] The Supreme Court has held that courts must look to the nature of the state action, rather than the identity of the actor, in determining whether the challenged action is of a "judicial" nature.  *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002); *Feldman*, 460 U.S. at 482–83; *see also Thana*, 827 F.3d at 320–21.  Notably, a court may nonetheless be engaged in non-judicial actions.  *Feldman*, 460 U.S. at 486.  Here, the Court need not decide whether the state court's automatic transmission of a suspension order to the DMV upon a defaulted payment constitutes a judicial action because, as discussed above, Plaintiffs are bringing independent claims.

"underlying principles and functions," *Stinnie*, 2017 WL 963234, at *13, the possibility that state courts could hear or could have heard Plaintiffs' constitutional claims is irrelevant. Indeed, that is precisely the mistake that the Supreme Court sought to correct in *Exxon*. There, the Supreme Court held that *Rooker-Feldman* should not be used to undermine the federal district court's role as a court of concurrent jurisdiction. 544 U.S. at 284. Accordingly, the fact that a state court is an alternative forum does not deprive federal courts of jurisdiction. *Id.* at 292 (distinguishing *Rooker-Feldman* from comity and abstention doctrines). Similarly, the possibility that Plaintiffs could have raised their claims during their previous state proceedings is irrelevant because *Rooker-Feldman* is also analytically distinct from preclusion, which is not a jurisdictional concept. *Exxon*, 544 U.S. at 293. Because preclusion principles do not determine the scope of *Rooker-Feldman*, the fact that a plaintiff could have raised his federal claim in a state proceeding also does not deprive lower federal courts of jurisdiction. *See Skinner*, 562 U.S. at 533 n. 11 ("Even if [plaintiff could have raised federal claim in state court], '*Rooker-Feldman* is not simply preclusion by another name.'" (quoting *Lance*, 546 U.S. at 466)). While a district court may ultimately be bound by the preclusive effects of a state-court judgment, it nonetheless retains jurisdiction over the claim. Thus, whether Plaintiffs could have raised their constitutional challenges in a state court before or after the suspension of their licenses is immaterial for jurisdictional purposes.

In sum, *Rooker-Feldman* is a narrow doctrine that the district court improperly used to abrogate its own concurrent jurisdiction. Accordingly, I would hold that the district court erred in dismissing the case on this ground.

Appeal: 17-1660

B.

The district court also erred in dismissing Plaintiffs' case for lack of standing, specifically for failure to demonstrate traceability (or causation) and redressability. Here, the Commissioner is at least in part responsible for causing Plaintiffs' alleged injuries, and granting Plaintiffs' their requested relief would eliminate most if not all of the harms caused by Virginia's license-for-payment scheme.

1.

To establish standing, Plaintiffs must show that their injuries are "fairly traceable" to the Defendant. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). That is, the challenged action by the defendant must be "at least in part responsible for frustrating [the plaintiff's] attempt to fully assert" his or her rights, "notwithstanding the presence of another proximate cause." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). Thus, causation may be established even when there are multiple contributory or independent causes of injury. *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). Standing also does not require that a defendant's actions be a proximate cause. *Id.* at 315–16.

Consistent with those principles, the Fourth Circuit has held that a plaintiff has standing to sue individuals or entities involved in the implementation of an unlawful scheme, notwithstanding any third party's role in creating the scheme and setting it in motion. *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 757 (4th Cir. 2013). In *Doe*, the plaintiff asserted a due process challenge against the listing of her name on a sex-offender registry. *Id.* at 750–52. This Court held that she had standing to sue the police

superintendent whose only role was to maintain the offender registry—even though the police department merely received offender data and did not make any classification decisions. *Id.* at 757–58.

Here, the role of the DMV Commissioner is no different from that of the police superintendent in *Doe*. Like the superintendent who maintained the registry, the Commissioner maintains a database of individual driver profiles and updates their statuses based on information received from state courts. Neither the police superintendent in *Doe* nor the DMV Commissioner here has any discretion to decide which individuals should be listed as an offender or debtor, respectively. And in both cases, the database manager effectuates the harmful consequences of court-determined designations by making the information available and accessible to the public or to law enforcement. As the district court correctly acknowledged, without the database, Plaintiffs would not have been penalized or incarcerated for continuing to drive and would still have the ability to drive to their work or to their medical appointments without being cited. *See Stinnie*, 2017 WL 963234, at *16 (citing *Barden v. Virginia*, 64 Va. App. 700, 702 (Ct. App. 2015) (noting that law enforcement officers use DMV's database to ascertain validity of licenses)); Va. Code Ann. § 46.2-301(C) (providing for mandatory minimum jail term of 10 days for repeat offenders). The fact that a third party makes the initial suspension decision does not undermine the Commissioner's own role in responding to and acting on that decision.

In addition to maintaining the DMV database, the Commissioner has sole responsibility for reinstating licenses and for collecting related reinstatement fees. Va.

Code Ann. § 46.2-395(B). The fee is at least $145 and is not imposed by the state courts. For individuals who have little to no income, the reinstatement fee alone deprives them of their ability to drive as a consequence of their poverty. *See Judd*, 718 F.3d at 316 (holding that residency requirement caused injury to plaintiff's First Amendment rights even if other obstacles to plaintiff's exercise of his rights remain). Accordingly, the district court's conclusion that Plaintiffs' injuries are solely caused by third-party action is clearly untenable.

Quite simply, Plaintiffs' injuries are traceable to the DMV Commissioner because, without his actions, Plaintiffs would be able to drive without paying a reinstatement fee and without fear of being cited, fined, and possibly incarcerated for driving on a suspended license.

2.

Plaintiffs must also show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181. For purposes of redressability, it is enough that the relief being sought "would abat[e] current violations and prevent[] future ones," such as by deterring future violations. *Id.* at 188. Additionally, the plaintiff need "not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 242–43 & n.15 (1982); *accord Regents of Univ. of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978). Instead, "[t]he redressability requirement ensures that a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (en banc). Here, the

29

requested relief would functionally reinstate Plaintiffs' driving privileges and prevent future suspensions or, at minimum, remove an obstacle to the restoration of their licenses. Accordingly, I would reverse the district court's conclusion that a favorable ruling would not redress Plaintiffs' injuries.

As the Supreme Court and this Court have held, an injury is redressible if a favorable court ruling would frustrate the implementation of the challenged statute or action. *See Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–65 (1991); *Cooksey v. Futrell*, 721 F.3d 226, 238 (4th Cir. 2013). In *Metropolitan Washington*, plaintiffs sought redress from an airport authority's proposed plan that would increase noise and pollution related to air traffic. 501 U.S. at 264–65. The airport authority's ability to implement the proposed plan was contingent on a separate body, the Board of Review, retaining veto power over any such plans. *Id.* at 261. The Court held that the plaintiffs had standing to challenge the constitutionality of the Board's veto power because invalidating the veto would "prevent the enactment of the [proposed] plan" and "is likely to redress their alleged injury," even though the source of the injury was neither the Board nor the veto power. *See id.* Similarly, in *Cooksey*, a plaintiff sued a state agency for enforcing a law that restricted his ability to post dietary advice on his website. 721 F.3d at 233. As to standing, this Court held that a favorable decision either enjoining the enforcement of the challenged law or declaring the law unconstitutional would fully redress the plaintiff's injuries because his ability to engage in the prohibited activity "would be restored without fear of penalty." 721 F.3d at 238.

Here, Plaintiffs similarly seek to prevent the Commissioner from implementing Va. Code Ann. § 46.2-395, which would restore their ability to drive without fear of punishment. They seek a declaration that the suspension process is unconstitutional, an order directing the Commissioner of the DMV to reinstate Plaintiffs' driver's licenses without requiring any reinstatement fees, and an order to cease the processing of any further suspension orders issued under the allegedly unconstitutional scheme. Granting the requested relief would dismantle the system responsible for trapping Plaintiffs in a vicious cycle of fines and unemployment. As the district court acknowledged, Plaintiffs would no longer be stopped, charged, and convicted of driving on a suspended license and would not incur additional fines and fees for driving. *Stinnie*, 2017 WL 963234, at *17. Plaintiffs, for all practical purposes, would be able to drive and use their licenses again without fear of penalty or incarceration—a tangible benefit sufficient to establish redressability.[4] *See Cooksey*, 721 F.3d at 238; *Gaston*, 204 F.3d at 162.

Indeed, the removal of reinstatement fees alone satisfies the redressability requirement. As the Supreme Court has held, the removal of even one significant obstacle to the restoration of a plaintiff's rights suffices to show redressability. *See Larson*, 456 U.S. at 242–43 & n.15 (holding that plaintiffs had standing to challenge one

---

[4] An injunction would also deter future constitutional violations. Enjoining the Commissioner from enforcing the current scheme would prevent the state from continuing to use suspensions to coerce payment—at least until new procedures are created to distinguish those unable to pay from those unwilling to pay. Since Virginia uses suspensions to generate revenue, any reduction in revenue incentivizes reform. Thus, the remedy against the DMV is also likely to redress any procedural injury that Plaintiffs may have suffered.

part of state law requiring registration under charitable solicitation statute, even if plaintiffs might ultimately be required to register for different reasons).

The district court held that Plaintiffs' injuries are not redressible because, even with the requested injunctive relief, their licenses would still be suspended in the technical, legal sense, because the state court orders remain intact. This conclusion is problematic for several reasons. First, redressability does not require the remediation of every injury. *Larson*, 456 U.S. at 242–43 & n.15. Even if Plaintiffs' licenses were to remain suspended in some abstract sense, it does not follow that the mitigation of the real-world, negative consequences of such suspensions would not redress at least some of their injuries. Furthermore, for the court to grant such injunctive relief, it would have to have decided that the suspensions were effectuated pursuant to an unconstitutional process. And, having been obtained through unlawful means, the suspensions would no longer be valid or enforceable. Therefore, even in a technical, legal sense, Plaintiffs' licenses would no longer be suspended.

Because the relief sought would enable Plaintiffs to drive again, or at minimum remove one roadblock to their doing so, I would hold that the alleged injuries are redressible.

## C.

The district court also erred in dismissing the case on sovereign immunity grounds. Specifically, it held that the *Ex parte Young* exception to Eleventh Amendment immunity does not apply to this case because the DMV Commissioner lacks a "special relation" with the challenged statute or action. *Stinnie*, 2017 WL 963234, at *18–19

(citing *Ex parte Young*, 209 U.S. at 159–60). However, because the Commissioner has specific enforcement obligations under Va. Code Ann. § 46.2-395 pertaining to the suspension and reinstatement of licenses, he clearly has the "special relationship" that *Ex parte Young* requires.

*Ex parte Young* permits suits challenging the unconstitutional actions of state officers acting in their official capacity, notwithstanding states' Eleventh Amendment immunity. 209 U.S. at 159–60. The exception applies to "officers of the state [who] are clothed with some duty in regard to the enforcement of the laws of the state." *Id.* at 155–56. However, the doctrine does not apply to officers who have only a general obligation to enforce all laws of the state and who lack a "special relation" to the specific law or action being challenged. *Id.* at 157. The "special relation" requirement therefore protects officials like state governors and attorneys general, who "in a general sense" are "charged with the execution of all [state] laws," absent any additional linkage between their position and the challenged laws. *Id.* at 157; *see, e.g.*, *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (holding that state attorney general did not have sufficient connection to challenged law); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (dismissing governor as party to lawsuit).

To meet this "special relation" requirement, the defendant must have both "proximity to and responsibility for the challenged state action," such that "a federal injunction will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). The requirement is not a stringent one, as the officer being sued need only "have *some* connection with the enforcement of the act."

*See Ex parte Young*, 209 U.S. at 157 (emphasis added).  Indeed, it is not even "necessary that such duty [of enforcement] be declared in the same act which is to be enforced."  *Id*.  Of course, if the challenged law does expressly confer an enforcement obligation on an officer, then the existence of the requisite connection becomes especially clear.  *Ex parte Young*, 209 U.S. at 157.

In this case, the Commissioner, who is not a generalized law enforcement official, has express enforcement responsibilities under Va. Code Ann. § 46.2-395 to implement license suspensions and to reinstate licenses.  First, the Commissioner is the designated recipient and record-keeper of all nonpayment and suspension notices from all state courts.  Va. Code Ann. § 46.2-395(C); *see Action NC v. Strach*, 216 F. Supp. 3d 597, 624 (M.D.N.C. 2016) (holding that DMV has sufficient connection to voter registration law because it is charged with implementing registration procedures).  The Commissioner is also the entity charged with returning licenses to those who have complied with their payment obligations.  Va. Code Ann. §§ 46.2-395(B), (D).  Finally, he is responsible for collecting license reinstatement fees.  Va. Code Ann. § 46.2-395(B).  Given these specific duties pertaining to license suspensions and reinstatements, the Commissioner can fairly be said to have both "proximity to and responsibility for the challenged state action."  *See Limehouse*, 549 F.3d at 333; *cf. Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 551 (4th Cir. 2014) (holding plaintiffs cannot sue state officers to enjoin collection of pension contributions because officers have no role whatsoever in deducting contributions from wages).

In concluding otherwise, the district court again relies on the fact that the statute authorizes state courts to suspend licenses.  However, the fact that state courts have the

requisite proximity to the challenged action does not preclude the Commissioner from having the same.  At bottom, Plaintiffs seek to have their licenses restored, pending a determination that they had the ability to pay when they defaulted on court debt. Reinstatement is, of course, the ultimate flipside of suspension, and once licenses have been suspended, a state court thereafter only notifies the Commissioner that a debt is current.  The state court does not direct the reinstatement of the license itself, as other state courts may have issued additional suspension orders for other debt.  As the only state official responsible for reinstating driver's licenses, the Commissioner of the DMV cannot possibly be said to be too distant a party for this litigation.

For those reasons, I would hold that the *Ex parte Young* exception to sovereign immunity applies to the Commissioner in this case.

IV.

For the above reasons, I respectfully dissent in this case and would reverse the district court's dismissal for lack of jurisdiction.  I would also reject Plaintiffs' motion for judicial notice of material that the district court excluded from the record because it contains certain documents that are beyond what this Court ordinarily takes notice of and is unnecessary to the decision.