**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| DAMIAN STINNIE, MELISSA ADAMS, and ADRAINNE JOHNSON, individually, and on behalf of all others similarly situated; WILLIEST BANDY, and BRIANNA MORGAN, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD D. HOLCOMB, in his official capacity as the Commissioner of the VIRGINIA DEPARTMENT OF MOTOR VEHICLES <br><br> Defendant. | Civ. No: 3:16-cv-00044 |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Damian Stinnie, Melissa Adams, and Adrainne Johnson, individually and on behalf of all others similarly situated, and Williest Bandy, and Brianna Morgan individually, and on behalf of all others similarly situated (collectively, "Plaintiffs"), state as follows for their First Amended Complaint:

1.      The Plaintiffs in this lawsuit are Virginia residents who have suffered indefinite suspension of their driver's licenses for failure to pay court costs and fines ["court debt"] that they could not afford to pay.

2.      As a result of the Commonwealth's efforts to coerce payment of court debt, and its failure to distinguish between those who are *unwilling* to pay and those who are *unable* to pay, nearly one million people have lost their drivers' licenses simply

because they are too poor to pay, effectively depriving them of reliable, lawful

transportation necessary to get to and from work, take children to school, keep medical

appointments, care for ill or disabled family members, or, paradoxically, to meet their

financial obligations to the courts.

3.  From 2011-2015, people who had lost their licenses for failure to pay

court debt were sentenced to a total of 1.74 million days in jail for driving on a

suspended license.

4.  Since Plaintiffs filed their original complaint, the Defendant,

Commissioner Richard D. Holcomb, has issued hundreds of thousands of suspensions

for failure to pay court debt, and hundreds of thousands of Virginians have been

convicted for driving on a suspended license due solely to failure to pay court debt,

and/or been sentenced to serve jail time for driving on a suspended license due solely to

failure court debt.

5.  The Plaintiffs contend that, as written and as implemented by the

Commissioner,[1] Section 46.2-395 of the Virginia Code is unconstitutional on its face for

---

[1] In its Order setting a schedule for filing an amended complaint, the Court asked Plaintiffs to
clarify whether their suit presents "facial or factual challenges (or both)" to the statute. ECF Doc.
81. One of Plaintiffs' claims is a facial challenge that conforms to the highest standard imposed
by the Supreme Court on facial challenges: that the challenged law be unconstitutional in all its
applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Section 46.2-395
unconstitutionally violates procedural due process on its face by revoking driver's licenses—
constitutionally protected property interests—without notice or a hearing. In this regard, every
enforcement of the provision is unconstitutional. Plaintiffs' other claims challenge the statute as
applied to people who are unable to pay: both as written in the Code and as implemented by the
Commissioner, the statute violates equal protection and due process when applied against those
unable to pay. The Plaintiffs contend that the Commissioner is a proper defendant to challenge
the constitutionality of Va. Code § 46.2-395, both as written and as implemented, because (1)
under any construction of the statute as written, the Commissioner has a significant and special
role in enforcement and (2) regardless of the statute's terms, as it is actually implemented, the
Commissioner issues suspensions pursuant to Va. Code § 46.2-395 without regard to the

failing to provide sufficient notice or hearing to any driver before license suspension. It is additionally unconstitutional as applied to people who cannot afford to pay due to their modest financial circumstances.

6. The Plaintiffs bring this action for themselves and on behalf of all others similarly situated, seeking relief from the Commonwealth's unconstitutional law that unfairly traps them in a vicious cycle of debt, unemployment, and incarceration.

## JURISDICTION AND VENUE

7. The named Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3), because it seeks to redress the deprivation, under color of State law, of rights, privileges, and immunities secured to the named Plaintiffs and Class Members by the Constitution and laws of the United States.

9. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the named Plaintiffs' claims occurred in this judicial district, or a substantial part of the property that is the subject of this action (namely, Plaintiffs' driver's licenses) is situated in this judicial district.

---

existence or non-existence of any court document ordering said suspension.

## PARTIES

**Plaintiffs**

11.     Plaintiff Damian Stinnie is a 26-year-old African American man who lives in Charlottesville, Virginia.

12.     Mr. Stinnie is indigent within the meaning of Va. Code § 19.2-159.

13.     Plaintiff Adrainne Johnson is a 32-year-old African American woman who lives in Charlottesville, Virginia.

14.     Ms. Johnson is indigent within the meaning of Va. Code § 19.2-159.

15.     Plaintiff Melissa Adams is a 35-year-old white woman who lives in Cascade, Virginia.

16.     Ms. Adams is indigent within the meaning of Va. Code § 19.2-159.

17.     Plaintiff Williest Bandy is a 30-year-old African American man who lives in Norfolk, Virginia.

18.     Mr. Bandy is indigent within the meaning of Va. Code § 19.2-159.

19.     Plaintiff Brianna Morgan is a 32-year-old African American woman who lives in Petersburg, Virginia.

20.     Ms. Morgan is indigent within the meaning of Va. Code § 19.2-159.

**Defendant**

21.     Defendant Richard D. Holcomb is the Commissioner of the Virginia Department of Motor Vehicles ("the DMV").

22.     Mr. Holcomb is sued in his official capacity as Commissioner of the DMV.

23. The DMV is the entity responsible under Virginia law for the issuance, suspension, and revocation of driver's licenses. Va. Code §§ 46.2- 200 *et seq.*; *see also* Va. Code Ann. § 46.2-395.

24. As Commissioner of the DMV, Mr. Holcomb is the chief executive officer responsible for the supervision and management of the DMV and has authority to do all acts necessary or convenient to carry out the powers and duties of the DMV. Va. Code § 46.2- 200 *et seq.*

25. At all times relevant to the events, acts, and/or omissions alleged in this Complaint, Mr. Holcomb has acted under color of State law, pursuant to his authority and responsibility as an official of the Commonwealth of Virginia.

## FACTS

### The Necessity of a Driver's License

26. In December 2017, there were more than 970,000 individuals whose licenses were then currently suspended for failure to pay court debt pursuant to Va. Code Ann. § 46.2-395, and nearly two-thirds of those were suspended *solely* for that reason.

27. By automatically suspending the licenses of those who cannot pay for reasons outside of their control, the state traps thousands of Virginians in a nightmarish spiral from which there is no apparent exit.

28. The indefinite suspension of driver's licenses for nonpayment of fines and costs disproportionately affects low-income persons and communities of color.

29. For example, African American people make up only twenty percent (20%) of Virginia's population, but receive nearly half of the orders of suspension for unpaid court debt.

30.     In addition, African American people make up nearly sixty percent (60%) of convictions for driving with a suspended license where the reason for license suspension is unpaid court debt.

31.     The indefinite suspension of the driver's licenses of low-income Virginians erects significant barriers to their ability to pursue a livelihood and meet basic human needs.

32.     Eighty-six percent of Americans describe the use of a car as a "necessity of life," which is higher than the percentage of people who identified air conditioning, a cell phone, a computer, and other consumer items to be a life necessity.

33.     A driver's license is a very common requirement to obtain employment, including most jobs that are available to people with limited educational attainment.

34.     Nearly 87% of Virginians travel to work by car and only 4.4% travel to work by public transit.

35.     Reliable, accessible public transit remains scarce in the state, where the vast majority of counties are rural. License suspensions make it difficult, or even impossible, to maintain employment.

36.     Public transit services in urban areas of the Commonwealth also provide limited access to jobs.

37.     For instance, in the Richmond and Tidewater areas, only 27% and 15%, respectively, of all jobs are accessible within 90 minutes of travel on public transportation.

38.     For less urbanized areas, the share of accessible jobs is likely even lower.

39.     The inability to secure employment further undermines any ability to pay

off court debt, which leads to the perpetual accrual of interest.

40.    Then, when individuals drive on suspended licenses out of ignorance or desperation, they receive additional penalties and spiral further into insolvency.

**The Commonwealth's License-for-Payment Law**

41.    Each year, the Commonwealth of Virginia imposes approximately half a billion dollars' worth of costs and fines in traffic and criminal court.

42.    The number and amount of these fees have grown over time and now fund a wide range of basic government operations and services.

43.    These fees include jury fees and court-appointed counsel fees for indigent defense, as well as courthouse construction fees, courthouse security fees, criminal justice academy training fees, fixed misdemeanor fees, electronic summons fees, more-time-to-pay fees, and jail admissions fees, among a host of others.

44.    The stacking of these fees, along with interest, on top of offense-specific penalties, means that even a minor traffic violation can spiral out of control, to the tune of hundreds, or eventually thousands, of dollars.

45.    State courts impose costs according to a fee schedule that does not allow a defendant's poverty to be taken into account in setting the amounts owed.

46.    To coerce payment, the state automatically suspends the driver's license each and every individual who "fails or refuses" to pay, regardless of the reason for the default. Va. Code § 46.2-395.

47.    Suspensions are accomplished automatically pursuant to an algorithm contained within the court and DMV computer systems without any judicial determination

*or entry of an order of suspension. See generally* Ex. 1, Decl. of Llezelle Dugger.

48.     The Office of the Executive Secretary of the Supreme Court of Virginia maintains the state's Financial Management System ("FMS"), which is used by all of the General District Courts and almost all of the 120 Circuit Courts in the Commonwealth. *Id.* at ¶ 5.

49.     When a scheduled payment toward court debt is not received within thirty days, or within ten days of the due date on a payment plan, the FMS automatically transmits an electronic record to the DMV indicating that an individual's account is in default. *Id.* at ¶ 6.

50.     The DMV then updates the account holder's license status in its license database in accordance with the FMS electronic transmission, thereby issuing the suspension for all practical purposes, including for law enforcement, prosecutors, insurance companies, and other government entities.

51.     Under Virginia law, as a matter of fact, and as the Commissioner has conceded, a person's license is not suspended until the court transmits a record of non-payment to the DMV, and the DMV issues the suspension. *See Plummer v. Commonwealth*, 408 S.E.2d 765, 765-66 (Va. Ct. App. 1991); Ex. 2, "How to Pay Traffic Tickets and Other Offenses" ("Payments must be received within 30-days following your court date to prevent the suspension of your operator's/driver's license for failure to pay."); ECF Dkt. No. 55, Tr. of Hearing on Mot. to Dismiss at 15 ("There is no suspension there at all until the 30 days has lapsed and [the individual hasn't] paid.")

52.     This system does not require a judge or clerk to issue or enter an order of license suspension for failure to pay court costs or fines in order to effectuate the

suspension. Ex. 1, Decl. of Llezelle Dugger at ¶ 7.

53.     In fact, the Commissioner issued suspensions on the licenses of several of the current and former named Plaintiffs for failure to pay even when the judges entered final orders in their cases and did not check the box indicating their licenses would, in the future, be suspended upon non-payment pursuant to Va. Code § 46.2-395. *See* Ex. 3, Examples of Virginia Uniform Summons.

54.     No record is maintained in the court file reflecting that a person's license has been suspended for non-payment. Ex. 1, Decl. of Llezelle Dugger at ¶ 8.

55.     Prior to the suspension, no notice is given to debtors apprising them of an alleged default.

56.     No notice is given to debtors letting them know of their right to a hearing— or to any other remedies—to contest the validity of the resulting suspension, either before or after the suspension occurs.

57.     No such notices are given because Va. Code § 46.2-395 provides no such hearings or remedies; the only remedy is to pay money to both the courts (in full or by payment plan) and the DMV (in full), whether the debtor can afford to pay or not.

58.     Virginia has suspended driver's licenses for unpaid court debt for many decades.

59.     The modern statute Section 46.2-395 was dramatically expanded in 1994, less than one year after the legislature received a report finding that "[m]any offenders are poor and without obvious means to satisfy court judgments." Office of the Exec. Sec'y, *Assessing the Need for a Fines Amnesty Program for Virginia's District and Circuit*

*Courts*, House Doc. No. 39 (1993),

http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/HD391993/$file/HD39_1993.pdf.

60.     At the same time, the 1994 legislation also removed language from the existing Virginia Code requiring the Commonwealth's Attorney to investigate the reasons for nonpayment of court debt and authorizing the Commonwealth's Attorney to proceed with collection efforts only if it appeared from that investigation that the debtor may be able to pay.

61.     Thus, in removing all safeguards designed to differentiate those *unable* to pay from those *unwilling* to pay—and enacting Section 46.2-395 with full knowledge that the law's consequences would fall disproportionately on the poor—Virginia's legislature intentionally chose to discriminate against people on the basis of poverty.

**The Commissioner's Role in Enforcing § 46.2-395**

62.     The Commissioner supervises and manages the DMV and is responsible for "the issuance, suspension, and revocation of driver's licenses." Va. Code § 46.2-200.

63.     The Commissioner has express enforcement responsibilities under Section 46.2-395 to implement license suspensions and to reinstate licenses.

64.     The Commissioner is the designated recipient and record-keeper of all records of nonpayment from all state courts.

65.     The Commissioner maintains a database of individual driver profiles and updates their statuses based on information received from state courts.

66.     Upon receipt of information indicating that a person has failed to pay court debt, the Commissioner enforces Section 46.2-395 by automatically issuing a suspension on the person's driver's license.

67.     The Commissioner issues the automatic suspension without any order from the court.

68.     The Commissioner does not conduct a review of a person's financial condition prior to—or indeed at any point related to—suspending a person's license for failure to pay, or otherwise inquire as to the reasons for the default.

69.     The Commissioner is also the entity charged with reinstating licenses for those who have complied with their payment obligations.

70.     Once a person's license is suspended pursuant to Section 46.2-395, the DMV automatically assesses a reinstatement fee of at least $145 payable to the DMV.

71.     The DMV reinstatement fee cannot be waived or paid in installments.

72.      The DMV does not reinstate any suspended license until the driver has obtained an approved payment plan for each court in which they owe and paid the reinstatement fee in full to the DMV.

73.     Pursuant to Section 46.2-395(B), the Commissioner is solely responsible for collecting license reinstatement fees, and the DMV derives revenue from collection of those fees.

74.     The DMV reinstatement fee is at least $145 and is not imposed by the state courts.

75.     The higher the number of suspensions issued, the more money is owed to DMV in reinstatement fees.

76.     Some people have paid all of their court debt, but cannot afford the DMV reinstatement fee as a consequence of their poverty.

77.     For individuals who have little to no income, the reinstatement fee alone

Case 3:16-cv-00044-NKM-JCH   Document 84   Filed 09/11/18   Page 11 of 45   Pageid#: 1112

deprives them of their ability to drive.

78. Pursuant to legislation enacted in 2015, the Commissioner is working on a system where a debtor can walk into a DMV customer service center and pay all court debt, and DMV will reinstate her license, without any court order or involvement. *See* Ex. 4, Letter from Richard D. Holcomb and Karl R. Hade to members of the Virginia General Assembly (Dec. 1, 2015).

79. As the lead official for enforcement of §46.2-395's license suspension process and oversight of Virginia's licensing system and database, the Commissioner also effectuates the harmful consequences of automatic license suspension by making the information available and accessible (via its database) to the public and to law enforcement.

80. The Commissioner has conceded that law enforcement officers depend on the DMV database for enforcing licensing laws. *See* ECF Dkt. No. 55, Tr. of Hearing on Mot. to Dismiss at 11 ("[P]ractically speaking, when an officer pulls you over and they run your DMV and they pull up the little transcript, if that order has not been transmitted to DMV, it's not going to be reflected on the DMV thing the officer is looking at.")

81. Unlike time-limited suspensions ordered in open court, law enforcement officers have no way of knowing—independent of DMV's database—whether a person's license is suspended for failure to pay court debt because suspension and reinstatement reflect events that occur outside of court; namely, payment or non-payment of money to the courts and DMV.

82. When enforcing Virginia's laws prohibiting driving-while-suspended, prosecutors rely on the DMV transcript to prove that a person's license is, in fact, suspended.

83. Thus, without the Commissioner issuing the suspension and publishing it to its database, the Plaintiffs would not have been penalized or incarcerated for continuing to drive

and would still have the ability to drive to their work or to their medical appointments without being cited.

84. The Plaintiffs' and the putative class's injuries are traceable to the Commissioner because, without his actions, they would be able to drive without paying a reinstatement fee and without fear of being cited, fined, and possibly incarcerated for driving on a suspended license.

**The Named Plaintiffs' Debts**

85. Each of the named Plaintiffs is suffering (or will suffer) under the indefinite deprivation of their driver's licenses pursuant to Section 46.2-395 and is currently (or will be) unable to drive legally because they cannot afford to pay court debt, or to pay the DMV reinstatement fee.

86. Pursuant to Section 46.2-395, the Plaintiffs' licenses were suspended (or will be) automatically upon their default, without any inquiry—by either the courts or the DMV into their ability to pay or the reasons underlying their failure to pay.

87. The Commissioner will not reinstate the Plaintiffs' licenses until they satisfy their court debt entirely or obtain payment plans from each court to which they are indebted, and additionally pay the DMV a reinstatement fee of at least $145.

88. The Plaintiffs would pay their debts and reinstate their licenses if they could afford to do so, but have been (or will be) unable to pay and have suffered considerable additional hardship (driver's license suspension and its attendant problems) as a result.

89. At times, the Plaintiffs have sacrificed their needs and the needs of their families in order to make payments to the courts that they could not afford.

90. The Plaintiffs' debts continue to (or will) increase daily, as interest accrues at an annual rate of 6% when someone is not in good standing in an active payment plan.

91. The Plaintiffs need to drive in order to meet their basic needs.

92. The Plaintiffs are not challenging any state court decisions.

93. They are not contesting their convictions, the applicability of the fines and fees assessed in traffic or criminal court adjudications, or their failure to make the required payments.

94. Rather, they are challenging the statutory scheme, as written and implemented, and its lack of process, as violating their due process and equal protection rights and the rights of those who are similarly situated.

### Damian Stinnie

95. Plaintiff Damian Stinnie is 26 years old and lives in Charlottesville, Virginia. Mr. Stinnie and his twin brother grew up in the foster care system in Virginia.

96. Mr. Stinnie's license is currently suspended because he could not afford the costs and fines related to a driving-while-suspended conviction.

97. Mr. Stinnie has struggled to escape the grip of debt-related suspensions since 2012, when his license was first suspended due to his inability to pay over $1,000 in fines and costs imposed as a result of three traffic infractions.

98. Unaware that his license had been suspended automatically when he failed to pay within 30 days, Mr. Stinnie continued to drive and, in 2013, received a citation for driving while suspended.

99. While his court case was pending, Mr. Stinnie was hospitalized with life-

threatening lymphoma, and he missed his court date.

100. The court convicted him in his absence and imposed additional fines and fees.

101. Since 2012, Mr. Stinnie has struggled with serious illness, unemployment, and homelessness.

102. Between 2013 and 2016, while he recovered from lymphoma, Mr. Stinnie's only sources of income were food stamps and Supplemental Security Income ("SSI").

103. At times, Mr. Stinnie had no place to sleep but in his car.

104. His license has since been suspended multiple times for failure to pay court costs and fines related to traffic offenses.

105. In late 2016, Mr. Stinnie's health had improved enough that he could begin looking for employment.

106. He found a part-time job making under $12 per hour as a community service associate in December 2016, a position he still holds.

107. Despite working as many hours as his employer offered him, Mr. Stinnie never had enough money to meet all of his expenses.

108. He also applied for a loan from a new local non-profit organization that provides financial assistance to a limited number of individuals with outstanding court debt.

109. During this time, Mr. Stinnie faced the impossible choice of driving illegally to look for work, help out family members, and attend medical appointments, or not to drive and face continued unemployment, being late for work, and missing medical appointments.

110. On January 13, 2017, Mr. Stinnie received a citation for expired tags and driving on a suspended license.

111.    Due to the possibility of incarceration, the court found Mr. Stinnie to be indigent and appointed an attorney to represent him.

112.    Ultimately, the prosecutor dropped the charge for expired tags, but Mr. Stinnie was found guilty of driving on a suspended license and sentenced to 180 days in jail, of which 160 were suspended, and received additional fines and costs.

113.    Due to the length of the active sentence and his desire to avoid disrupting his newfound employment, Mr. Stinnie filed a *de novo* appeal of his conviction for driving while suspended with the state circuit court.

114.    While his appeal was pending, Mr. Stinnie's loan application was granted, and he used the money to pay all of his accrued court debt, as well as paying approximately $240 in reinstatement fees to the DMV so that his license could be reinstated.

115.    After enduring a cycle of debt, license suspension, and incarceration for nearly four years, Mr. Stinnie was finally able to overcome the substantial barriers created by the state to regaining the legal ability to drive, and he reinstated his license in December 2017.

116.    Meanwhile, Mr. Stinnie's appeal was unsuccessful.

117.    On February 23, 2018, he was convicted by the circuit court and sentenced to thirty days in jail, including a mandatory minimum of ten days, for driving on a suspended license for failure to pay his court debt.

118.    He also received a statutory ninety-day license suspension and additional fines and costs in amounts to be calculated later by the clerk's office.

119.    The court did not inquire into Mr. Stinnie's financial circumstances.

120.    The court paperwork given to Mr. Stinnie on the day of his conviction stated:

Case 3:16-cv-00044-NKM-JCH   Document 84   Filed 09/11/18   Page 16 of 45   Pageid#: 1117

"You have 30 days from today's date to make final payment or to make arrangements for a payment plan, otherwise the **Department of Motor Vehicles (DMV) will suspend** your driver's license." (Emphasis added.)

121.   In early March 2018, he learned that he owed a total amount of $2,189 in fines and costs to the court as a result of his conviction for driving on a suspended license, which, at the time, was suspended for failure to pay court debts that Mr. Stinnie had since paid off using the loan.

122.   Mr. Stinnie obtained a payment plan for $30 per month beginning May 20, 2018.

123.   Less than a month later, however, the City of Charlottesville initiated a tax lien for unpaid personal property taxes on his car.

124.   The tax lien garnished 100% of his wages for two months, and a significant portion of his check in the third month.

125.   Mr. Stinnie advised the court, prior to the due date it had set for the first installment payment, that he had no income and would not be able to make the first installment payment and needed a plan modification.

126.   The court denied his request for a modification.

127.   Mr. Stinnie also asked the nonprofit for another modest loan to help him pay the first few installments while he waited for the tax lien to end, but he was told he could not be extended additional credit until he paid off the first loan.

128.   On or about June 25, 2018, the court notified the DMV that Mr. Stinnie had defaulted on the court's payment plan, and the DMV issued a suspension of Mr. Stinnie's license effective June 21, 2018.

129.     Mr. Stinnie's circuit court file contains no court order suspending his license for failure to pay court debt.

130.     Mr. Stinnie no longer receives SSI, and his only income is from part-time employment.

131.     Mr. Stinnie is facing another personal property tax lien, and also the possibility of becoming homeless again if and when his current temporary living situation ends.

132.     In order to get his license back, he must get on an approved payment plan with the court and pay $150 to the DMV.

133.     Mr. Stinnie cannot afford to pay the amounts necessary to reinstate her license.

134.     All told, Mr. Stinnie has paid thousands of dollars to the courts in fines and costs related to driving while suspended, paid $240 to the DMV in reinstatement fees, and spent dozens of days in jail for driving while suspended.

135.     He would like to get more hours at work, but his employer requires him to have a valid driver's license in order to go full-time.

136.     If he had his license, Mr. Stinnie could go full-time at work, make more money, and possibly pay his court debt off faster.

137.     Mr. Stinnie would also be able to help out his family members and conduct day-to-day business—including getting to and from medical appointments—without fear of getting pulled over and going to jail.

*Melissa Adams*

138.     Plaintiff Melissa Adams and her twelve-year-old son live in Cascade, Virginia, a rural community west of Danville.

139.     The area where she lives is roughly twenty miles away from any public transportation.

140.     Ms. Adams's license is currently suspended because she could not and cannot afford the costs and fines related to various traffic and misdemeanor offenses, including driving on a suspended license.

141.     In January 2013, Ms. Adams was diagnosed with a rare and serious blood disorder, which required her to be hospitalized on multiple occasions during the first several months of the year and necessitated outpatient chemotherapy treatment.

142.     Prior to her illness, Ms. Adams held steady employment as a waitress.

143.     Since her hospitalization, Ms. Adams has been unable to maintain steady employment, though she has worked on and off in low-wage jobs, typically earning between $8 and $10 per hour.

144.     Shortly after Ms. Adams was released from the hospital in May 2013, she was involved in a minor accident and charged with failing to stop at the scene of an accident, operating an uninsured motor vehicle, and an expired registration.

145.     Upon conviction, the court assessed $646 in fines and costs.

146.     At the time, Ms. Adams was unemployed.

147.     Initially, Ms. Adams was able to scrape together enough funds to make modest payments, but she could not sustain those payments while supporting herself and her son on a

meager income.

148.    She was given a deferred payment agreement that required her to pay the remaining $526 in full at the end of three months.

149.    She was not able to pay that amount.

150.    On March 25, 2014, the court notified the DMV that Ms. Adams had missed the deadline for paying her debts to the court, and the DMV issued a suspension of Ms. Adams's license effective March 18, 2014.

151.    Forced to choose between losing her job and not being able to care for herself and her family, or driving on a suspended license and risking additional citations, Ms. Adams continued to drive.

152.    Ms. Adams also needed to drive to get to and from chemotherapy appointments more than forty miles away.

153.    As a result, she received multiple convictions for driving while suspended.

154.    Each conviction led to additional costs and fines, another three-month deferred payment plan that Ms. Adams could not afford, and another suspension of her license immediately upon default.

155.    At no time did either the court or the DMV inquire into Ms. Adams's financial circumstances or the reasons for her non-payment.

156.    Upon her fourth conviction for driving while suspended, in June 2015, Ms. Adams served twelve days in jail, during which time she worried about the care and supervision of her young son.

157.    Since then, Ms. Adams has refrained from driving, in order to avoid the risk of

more incarceration.

158.     Ms. Adams is trained as a CNA and has recently seen advertisements for jobs that she strongly believes she could obtain if she had her driver's license.

159.     These jobs require her to have reliable transportation to and from the patient's home, which can be many miles away from where she lives, and there is no public transportation available to transport her back and forth.

160.     Sometimes the job postings state that having a valid driver's license is a condition of employment.

161.     Currently, Ms. Adams is unemployed and has no income.

162.     She and her son receive food stamps.

163.     She owes $300 a month in rent to her mother-in-law, which she pays when she can afford it.

164.     She also pays for utilities and buys groceries and other necessities for herself and her son.

165.     Ms. Adams is the sole source of support her son. She rarely has enough money to meet her and her family's basic needs.

166.     Moreover, Ms. Adams's illness requires her to travel eighty miles away to see a specialist regularly.

167.     She must pay the specialist $125 each visit. She also has thousands of dollars in outstanding medical bills.

168.     Ms. Adams needs her license to get to medical appointments, seek and maintain employment, to go grocery shopping, and to keep appointments for her son.

169.    She currently owes $2,975 in court debt. In order to get her license back, she must get on an approved payment plan with the court and pay $260 to the DMV in reinstatement fees.

170.    Ms. Adams recently contacted both courts to which she owes money.

171.    One court told Ms. Adams that she would need to pay $25 per month, even though she currently has no income.

172.    The other told Ms. Adams that she would need to come physically to the court clerk's office and show proof of income in order to get on a payment plan.

173.    Without a driver's license, Ms. Adams cannot readily get herself to the clerk's office, and she has no income to show the court to qualify for a plan.

174.    Even if she could get on payment plans with both courts, Ms. Adams does not think she could keep up with the monthly payments, and she has no idea how she could save up enough money to pay the DMV reinstatement fee.

175.    Ms. Adams cannot afford to pay the amounts necessary to reinstate her license.

***Adrainne Johnson***

176.    Ms. Johnson is 34 years old. She lives in Charlottesville, Virginia with her fifteen-year-old daughter and twelve-year-old son.

177.    Ms. Johnson's license is currently suspended because she cannot afford the costs and fines related to various traffic and criminal offenses, including driving on a suspended license.

178.    In 2013, Ms. Johnson was working as a Certified Nursing Assistant (CNA), helping to take care of people in their homes, and earning $8.86 per hour.

179. In April of that year, Ms. Johnson was convicted of a drug-related charge.

180. Ms. Johnson did not have enough money for a lawyer, so the court found her to be indigent and appointed an attorney to represent her.

181. The court did not give Ms. Johnson active jail time or fines, but did sentence her to pay $865 in court costs, with the biggest single court cost being to pay for her court-appointed attorney.

182. The court put Ms. Johnson on a payment plan, and she tried to make the payments at first, but she could not afford to keep up with it and missed a payment.

183. On June 2, 2016, the court notified the DMV that Ms. Johnson had missed the deadline for paying her debts to the court, and the DMV issued a suspension of Ms. Johnson's license effective May 31, 2016.

184. Since that time, Ms. Johnson continued to work on and off in low-wage jobs, typically earning between $7.25 and $10 per hour.

185. Ms. Johnson tried a couple of times to establish new payment plans for the 2013 court debt, but could not afford to make every payment, and her license was re-suspended multiple times, most recently in June 2018.

186. Ms. Johnson continued to drive in order to take care of her family, to get to and from jobs, and to take her daughter to medical appointments.

187. In November 2017, Ms. Johnson was convicted of driving on a suspended license.

188. The court sentenced Ms. Johnson to a $100 fine and $139 in court costs.

189. The judge did not check the box indicating that Ms. Johnson license would be

suspended upon failure to pay. *See* Ex. 3, Virginia Uniform Summons for Case No. GT17-11266.

190.    At the time, Ms. Johnson was making minimum wage and struggling to pay for her basic living expenses.

191.    The court put Ms. Johnson on a payment plan that required her to pay her debt in full within six months, which she could not afford to do.

192.    As soon as Ms. Johnson missed a payment, her license was suspended again around May 2018.

193.    Upon information and belief, there is nothing in Ms. Johnson's court files suspending her license for failure to pay.

194.    Neither the court nor the DMV asked Ms. Johnson about her financial circumstances or the reasons for her non-payment, before or after suspending her license.

195.    After the November 2017 conviction, Ms. Johnson decided she could not take the risk of going to jail, and she stopped driving.

196.    Ms. Johnson and her children live in an overcrowded rental unit with another family, doubling-up to be able to split rent.

197.    In addition to her monthly rental payment, Ms. Johnson has to pay for food and utilities and other basic living expenses.

198.    Ms. Johnson has very little, if anything, left over each month.  She also has an outstanding child support obligation and debt to a previous landlord.

199.    If she had her license, Ms. Johnson would get a higher-paying job (which often requires a license), or take on a second job so that she could meet her expenses and pay back

her court debt.

200.    Ms. Johnson would also be able to get to the grocery and medical appointments.

201.    Ms. Johnson currently owes roughly $900 in court debt to two different courts.

202.    In order to get her license back, Ms. Johnson must get on approved payment plans with the courts and pay $150 in reinstatement fees to the DMV.

203.    Ms. Johnson recently contacted both courts where she owes money.

204.    One told Ms. Johnson that she would need to pay $35 down and $25 per month.

205.    The other told Ms. Johnson that she would need to pay $25 down and would need to travel in person to the court clerk's office (roughly 38 miles from where she lives) to determine the other terms of a possible payment plan.

206.    Without a license, Ms. Johnson does not know how and when she can get to the court to work out a payment plan.

207.    Even if she can get payment plans with both courts, she worries she will not be able to keep up with monthly payments, and she has no idea how she could save up enough money to pay the DMV's reinstatement fee.

208.    Ms. Johnson cannot afford to pay the amounts necessary to reinstate her license.

*Williest Bandy*

209.    Williest Bandy is 30 years old and lives in Norfolk, Virginia.

210.    Mr. Bandy lives with his girlfriend and their four children, ages 8, 4, 2, and 1.

211.    From 2011 to 2018, Mr. Bandy's license was suspended under 46.2-395 for failure to pay court debt.

212.	At present, there are no court debt suspensions on Mr. Bandy's license.

213.	Nonetheless, Mr. Bandy's license is in a precarious state, and will likely be suspended in the near future, due to his inability to pay outstanding court debt in accordance with a payment plan he cannot sustain.

214.	In 2011, Mr. Bandy was convicted of several traffic charges, including an expired inspection, failure to carry license, failure to appear, and speeding.

215.	As a result of those convictions, Mr. Bandy was charged a cumulative total of $1,820 in court debt.

216.	Mr. Bandy was unable to pay those amounts.

217.	When Mr. Bandy failed to pay his fines and costs, his license was suspended.

218.	Neither the court nor the DMV asked Mr. Bandy about his financial circumstances or the reasons for non-payment, before or after suspending his license.

219.	After Mr. Bandy's license was suspended, in late 2011, he tried to drive as little as possible.

220.	Not being able to drive has been a serious burden for him and his family.

221.	Not having a license meant that Mr. Bandy's employment options have been seriously limited.

222.	He couldn't have a second job, which he has wanted and would help his family financially, because he did not have enough time to travel to and from two jobs using public transportation.

223.	It has been hard to get to doctors' appointments and do other basic things, like grocery shopping.

224. Mr. Bandy currently owes well over $2,000 in court debt.

225. Mr. Bandy recently contacted the courts to which he owes court debt.

226. One court gave him a community service plan, by which he needs to complete 75 hours within the next six months.

227. Mr. Bandy works on most weekdays, but is very motivated to complete these hours and believes he can find placements to work off the hours on weekends.

228. The other courts said they will not permit community service, despite Mr. Bandy's financial situation.

229. They told him, via a collections agency that those courts jointly use, that he would need to pay $75 per month.

230. Mr. Bandy did not select that monthly installment amount, and does not believe he can sustain it.

231. Mr. Bandy started this payment plan because he was desperate to get his license back, to improve his family's financial situation.

232. After setting up plans with the courts, Mr. Bandy was able to scrounge money together to pay the DMV reinstatement fees.

233. Mr. Bandy presently has a learner's permit, and expects to have a full and active driver's license soon, after waiting out a 60-day permit period and passing driver's license tests.

234. Mr. Bandy's family's income is extremely limited.

235. Mr. Bandy's girlfriend is disabled and gets Supplemental Security Income ("SSI") of $750 per month.

236. Mr. Bandy himself works as a personal care assistant (PCA), roughly 35 to 40

hours per week at $8 per hour.

237. Mr. Bandy's family gets food stamps. His girlfriend gets a modest TANF payment (he believes of $100-200 per month), and occasionally can get a few hours of work.

238. Other than these modest amounts, which leave them well below the poverty line, Mr. Bandy's family has no other sources of income.

239. Mr. Bandy's family of six has a lot of expenses, including rent, utilities, transportation, house supplies, food, and clothes for the children.

240. Money is extremely tight for Mr. Bandy's family.

241. Mr. Bandy's family has no savings, and they struggle to pay all of their bills.

242. Mr. Bandy has struggled to make the first monthly payment of $75 to the courts.

243. Mr. Bandy had to contact the power company recently to tell them he couldn't pay his electricity bill on time, to try to hold money aside for the courts.

244. Mr. Bandy is very worried that he cannot keep up with monthly court debt payments.

245. For example, he foresees that he may not be able to pay both for his water bill and make his court debt payment, and he has determined that he needs to keep the water on at his family's apartment.

246. Mr. Bandy does not want to default on the payment plan, because he badly needs his license to support his family and try to improve their meager finances.

247. However, in reality, Mr. Bandy believes that he will soon default on the payment plan due to not having enough money to keep up with monthly payments.

248. With a full and active license, Mr. Bandy's employment options will improve.

Case 3:16-cv-00044-NKM-JCH   Document 84   Filed 09/11/18   Page 28 of 45   Pageid#: 1129

249. It will be possible to get a second job, which Mr. Bandy wants to do.

250. Moreover, Mr. Bandy will be able to pursue a wider range of jobs, such as PCA jobs that require a license as a condition of employment and potentially jobs requiring a CDL license (for which having a regular driver's license is a prerequisite).

251. However, if his license is suspended (based on his inability to keep up with court debt payments), Mr. Bandy's employment options will be much more limited, and it will be more or less impossible to get a second job.

252. In addition, it will be hard to get around, and do basic things like get to doctors' appointments and go grocery shopping.

253. Mr. Bandy's license (and the significance it holds to his family, in trying to escape poverty) is held hostage for court debt payments that he cannot afford, and he daily lives with the imminent threat of being stripped of his license due to his inability to pay.

### *Brianna Morgan*

254. Brianna Morgan is 32 years old and lives in Petersburg, Virginia.

255. Ms. Morgan is a single parent of three children, ages 4, 12, and 13.

256. All three children live with her full-time.

257. Ms. Morgan's license was suspended for several years, until just three days ago, and may soon be suspended again, because she cannot afford the costs and fines related to traffic and criminal offenses.

258. In June 2014, Ms. Morgan was convicted for operating an uninspected vehicle. The court sentenced her to pay $35 in fines and $144 in costs.

259. At the time, Ms. Morgan was in a high-risk pregnancy and living with relatives.

260. Other than food stamps, Ms. Morgan had no income.

261. The court assigned Ms. Morgan a deferred payment plan.

262. Ms. Morgan borrowed money to make a few payments, but it was not enough.

263. Ms. Morgan could not make any substantial payments to the court and also support her family.

264. When Ms. Morgan failed to pay her fines and costs, her license was suspended.

265. On or about July 17, 2015, the court notified the DMV that Ms. Morgan had defaulted on the court's payment plan, and the DMV issued a suspension of Ms. Morgan's license effective July 15, 2015.

266. Neither the court nor the DMV asked Ms. Morgan about her financial circumstances or the reasons for non-payment, before or after suspending her license.

267. After Ms. Morgan's license was suspended, she stopped driving.

268. Not being able to drive was very hard for her and her family.

269. Ms. Morgan could not regularly visit her father in a nursing home, or attend medical appointments with him to make sure he got the care he needs.

270. Ms. Morgan also had difficulty doing basic things like grocery shopping or picking her son up from school when he has issues with his asthma.

271. Ms. Morgan has gone without needed medical visits due to being unable to get to her doctors' offices.

272. Ms. Morgan has a disabling stomach condition and cannot work.

273. Ms. Morgan receives $665 in SSI benefits and $187 in TANF benefits, and food

stamps.

274.    Ms. Morgan rarely has enough money to meet her family's basic needs.

275.    Ms. Morgan recently contacted both courts where she owes money.

276.    She currently owes $452 in court debt to different courts.

277.    In order to get her license back, she had to get on approved payment plans with both courts and also pay $155 in reinstatement fees to the DMV.

278.    One court converted her debt into 44 hours of community service, to be completed by February 2019.

279.    The community service will take some time to complete because she needs to find a nonprofit willing to host and certify her work.

280.    The other court offered her a payment plan that she could not afford without giving up basic needs.

281.    She had to forgo her family's basic needs, including toilet paper, in order to pay the down payment to get on a payment plan.

282.    Luckily, Ms. Morgan borrowed $155 from a friend to pay the DMV reinstatement fee but she is expected to pay this money back, and she does not have any idea of how or when she can.

283.    Nonetheless, Ms. Morgan's license is in a precarious state, and will likely be suspended in the near future, due to her inability to pay outstanding court debt in accordance with a payment plan she cannot sustain.

284.    Ms. Morgan is very worried that she cannot keep up with monthly court debt payments.

Case 3:16-cv-00044-NKM-JCH   Document 84   Filed 09/11/18   Page 31 of 45   Pageid#: 1132

285.    Ms. Morgan typically does not have $25 left over at the end of the month, so making a payment to the Court will mean not meeting basic needs of her family.

286.    Ms. Morgan does not want to default on the payment plan, because she badly needs her license to support her family and try to improve their meager finances.

287.    However, in reality, Ms. Morgan's is one unexpected expense away from default on the payment plan.

288.    If her license is suspended (based on her inability to keep up with court debt payments), Ms. Morgan's employment options will be much more limited, and it will be more or less impossible to get a second job.

289.    In addition, it will be hard to get around, and do basic things like get to doctors' appointments and go grocery shopping.

290.    Ms. Morgan's license (and the significance it holds to her family, in trying to escape poverty) is held hostage for court debt payments that she cannot afford, and she daily lives with the imminent threat of being stripped of her license due to her inability to pay.

**The Plaintiffs' Requested Relief**

291.    The Plaintiffs seek a ruling declaring Section 46.2-395 to be unconstitutional, both as written and as implemented by the Commissioner, to enjoin the Commissioner from enforcing its terms against them and those similarly situated in the future, and to restore their licenses to the status they would be in prior to the Commissioner's unconstitutional actions against them without paying a reinstatement fee.

292.    The relief requested by the Plaintiffs would functionally restore their ability to drive without fear of punishment.

293. The Plaintiffs and putative class members would no longer be stopped, charged, and convicted of driving on a suspended license and would not incur additional fines and fees for driving.

294. The Plaintiffs and putative class members would be able to drive and use their licenses again without fear of penalty or incarceration, and without payment of the DMV reinstatement fees—a tangible benefit.

295. Thus, granting the requested relief would dismantle the system responsible for trapping the Plaintiffs and those similarly situated in a vicious cycle of fines, unemployment, and incarceration.

## CLASS ACTION ALLEGATIONS

296. The named Plaintiffs bring this action for themselves individually and on behalf of all others similarly situated, pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

297. A class action is the only practicable means by which Plaintiffs and unknown Class Members can challenge the Commonwealth's unlawful court debt collection scheme.

298. The named Plaintiffs seek to certify two classes:

a. a **Suspended Class** consisting of all persons whose drivers' licenses are currently suspended due to their failure to pay court debt pursuant to Section 46.2-395; and

b. a **Future Suspended Class** consisting of all persons whose drivers' licenses will be suspended due to their failure to pay court debt pursuant to Section 46.2-395.

299. The named Plaintiffs seek certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure in order to represent classes of persons requesting declaratory and

injunctive relief to declare Section 46.2-395 unconstitutional as applied to Plaintiffs and Class Members, to enjoin the Commissioner from enforcing Section 46.2-395 against Plaintiffs and the Future Class Members until such time as the Commonwealth implements a system that complies with the United States Constitution, and to remove any suspensions imposed pursuant to Section 46.2-395 from Plaintiffs' and Suspended Class Members' DMV records without requiring payment of DMV reinstatement fees.

300. The Commissioner has acted, or failed and/or refused to act, on grounds that apply generally to the proposed Classes, such that final injunctive and declaratory relief is appropriate with respect to the Classes as a whole.

301. As set forth more fully in the following paragraphs, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23.

**Numerosity**

302. In 2015, DMV reported that 914,450 individual DMV customers have at least one suspension on their DMV transcripts for nonpayment of court costs and fines related to criminal and traffic convictions.

303. By December 2017, there were more than 970,000 individuals whose licenses were then currently suspended for failure to pay court debt pursuant to Section 46.2-395, and nearly two-thirds of those were suspended *solely* for that reason.

304. Upon information and belief, a large proportion of those individuals holding suspended licenses are too poor to pay their court debt without imposing manifest hardship on themselves and their families.

305. The Commissioner issues over 360,000 driver's license suspensions for nonpayment of court costs and fines each year, affecting thousands of individual debtors.

306. Historically, approximately 60% of those suspensions remain in place twelve months later, suggesting that a large percentage of suspensions were issued to people without the means to pay to get the suspension removed.

307. Accordingly, the proposed class is so numerous that the joinder of all Class Members is impracticable.

**Commonality**

308. All persons comprising the proposed classes are equally subject to the provisions of Section 46.2-395, which deprives individuals of their driver's licenses for their failure to pay court debt without regard to whether such failure was willful, or instead caused by their inability to pay.

309. Thus, common questions of law and fact exist as to all Class Members.

310. Among the most important, but not the only, common questions of fact are:

- Whether Section 46.2-395 empowers the DMV to issue suspensions, and/or whether the DMV has a practice of issuing suspensions, against a license for non-payment without requiring a pre-deprivation (or post-deprivation) hearing; and

- Whether Section 46.2-395 empowers the DMV to issue suspensions, and/or whether the DMV has a practice of issuing suspensions, against a license for non-payment without requiring an inquiry into a motorist's ability to pay and determining that the motorist's non-payment was willful.

311. Among the most important, but not the only, common questions of law are:

- Whether Section 46.2-395 violates due process and fundamental fairness by punishing those who owe money to the state for sheer inability to pay;

- Whether Section 46.2-395 strips the Plaintiffs and those like them of a constitutionally protected property interest—their driver's licenses—without the guaranteed safeguards of notice and a hearing;

- Whether Section 46.2-395 violates equal protection by treating those who are willing but unable to pay more harshly than those who are willing and able to pay, when the only difference between them is their poverty;

- Whether suspending licenses for delinquent court debt pursuant to Section 46.2-395 fails even the most minimum constitutional standards, as applied to debtors who lack ability to pay, because it is not rationally related to legitimate state interests; and

- Whether Section 46.2-395 subjects the Plaintiffs and those like them to harsher collection practices than those for civil debtors, in violation of equal protection.

**Typicality**

312.     The named Plaintiffs' claims are typical of the claims of the proposed Classes as a whole.

313.     As summarized in the above allegations, Plaintiffs suffered injuries from the failure of the Commonwealth, acting by and through the Commissioner, to comply with the basic constitutional provisions detailed below.

314.     The answer to whether Section 46.2-395 is unconstitutional will determine the claims of the named Plaintiffs and every other Class Member.

315.     The named Plaintiffs and Class Members have suffered direct injuries, and will continue to be directly injured, due to the state's unlawful and unconstitutional pattern and practice of suspending driver's licenses without due process and without consideration of the hardship imposed on people who cannot afford to pay.

**Adequacy**

316.     The named Plaintiffs will fairly and adequately represent the interests of the proposed Class.

317.     The named Plaintiffs have no interests separate from or in conflict with those of the Classes as a whole and seek no relief other than the declaratory and injunctive relief, which is sought on behalf of the entire Class.

318.     The named Plaintiffs are represented by competent legal counsel with

substantial experience in complex civil rights litigation matters, including class actions.

319.    Plaintiffs' counsel have devoted enormous time and resources to becoming intimately familiar with the Commonwealth's court debt system and with all of the relevant state and federal laws and procedures that govern it.

320.    Counsel has also developed relationships with many of the individuals and families victimized by the Commonwealth's practices.

321.    Accordingly, the interests of the members of the Classes will be fairly and adequately protected by the Plaintiffs and their attorneys.

## CLAIMS FOR RELIEF

### Count I: Violation of Procedural Due Process (Lack of Ability-to-Pay Hearing)

322.    The Plaintiff incorporate the allegations in Paragraphs 1-321 above with the same force and effect as if herein set forth.

323.    A person's driver's license and its attendant government-sanctioned ability to drive has been recognized by the Supreme Court and the Fourth Circuit as a property interest that may not be taken away without due process of law.

324.    Due process requires the Commonwealth to conduct ability-to-pay inquiries at each stage in a case, including the point at which it proposes to take coercive action to punish nonpayment.

325.    Section § 46.2-395 of the Virginia Code automatically and mandatorily suspends the drivers' license of all persons who "fail[] or refuse[] to pay all or part" of any fines or costs owed to the court—without permitting any inquiry into the reasons for nonpayment or consideration of whether the requirement to repay will exact manifest hardship on a person or a person's family, and without consideration of the total amount owed to one or

more courts or any less restrictive alternatives.

326.   It is common for a person's financial circumstances to fluctuate throughout his or her lifetime, and a person who is not indigent at the time of trial may become indigent prior to satisfying all financial obligations to various courts. And even for those deemed indigent at the time of trial, Section 46.2-395 does not take indigency into account.

327.   Prior to enforcing Section 46.2-395, the Commissioner provides no notice, oral or written, to the debtor of his or her right to an ability-to-pay determination evaluating his or her present financial condition.

328.   Moreover, the Commissioner conducts no independent review of the debtor's ability to pay, including the amounts owed to all courts in the Commonwealth and the debtor's present financial condition, prior to—or indeed, after—taking the harsh enforcement action of suspending the debtor's driver's license.

329.   The purpose of the Commonwealth's license-for-payment system is to coerce payment, and not to protect public safety on the roads; therefore, Plaintiffs are entitled to pre-deprivation notice and a hearing prior to license suspension.

330.   In the absence of notice and hearing, which do not presently exist under Virginia law in relation to driver's license suspensions for unpaid court debt, the risk is very high that a debtor will be deprived of his or her driver's license for reasons attributable to his or her poverty.

331.   Thus, as written and as implemented by the Commissioner, Section 46.2-395 strips the Plaintiffs and those like them of a constitutionally protected property interest—their driver's licenses—without the guaranteed safeguards of notice and a hearing in violation of the Due Process Clause of the U.S. Constitution.

**Count II: Violation of Due Process (Fundamental Fairness)**

332.    The Plaintiff incorporate the allegations in Paragraphs 1-331 above with the same force and effect as if herein set forth.

333.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

334.    The Due Process Clause prohibits the state from subjecting individuals to processes and penalties that fail to comport with principles of due process and fundamental fairness.

335.    The United States Supreme Court has repeatedly held that punishing a person solely for his or her inability to pay, rather than willful refusal to pay or make bona fide efforts to acquire the resources to pay, violates principles of due process and fundamental fairness.

336.    Section § 46.2-395 of the Virginia Code automatically and mandatorily suspends the driver's license—a constitutionally protected interest—of all persons who "fail[] or refuse[] to pay all or part" of any fines or costs owed to the court, without permitting any inquiry into the reasons for nonpayment or consideration of whether the requirement to repay will exact manifest hardship on a person or a person's family, and without consideration of the total amount owed to one or more courts or any less restrictive alternatives.

337.    As written and as implemented by the Commissioner, Section 46.2-395 violates due process and fundamental fairness by depriving persons owing money to the state of a constitutionally protected property interest for sheer inability to pay.

338.    Accordingly, as applied to those who cannot afford to pay, the Commonwealth's license-for-payment system, as written and as implemented, violates the

Due Process Clause of the U.S. Constitution.

**Count III: Violation of Equal Protection Clause (Equal Justice and Punishing Poverty)**

339.    The Plaintiff incorporate the allegations in Paragraphs 1-338 above with the same force and effect as if herein set forth.

340.    The United States Supreme Court has held that state court debt recoupment laws, notwithstanding the state interests they may serve, may not blight the hopes of indigent people for self-sufficiency and self-respect.

341.    The fundamental principle of "equal justice" requires states to consider the differential impact of harsh enforcement action on people who are impoverished.

342.    Section § 46.2-395 of the Virginia Code automatically and mandatorily suspends the drivers' license of all persons who "fail[] or refuse[] to pay all or part" of any fines or costs owed to the court—without permitting any inquiry into the reasons for nonpayment or consideration of whether the requirement to repay will exact manifest hardship on a person or a person's family, and without consideration of the total amount owed to one or more courts or any less restrictive alternatives.

343.    Section 46.2-395 inevitably results in enforcing financial obligations against people who lack the foreseeable ability to meet them.

344.    The resulting cascade of hardship—job loss, mounting interest, convictions for driving while suspended, additional costs and fines, and even jail time—keeps low-income people in a perpetual state of disadvantage, a state that people with means can avoid simply by paying in full.

345.    Indeed, Virginia's legislature expanded and automatized the Commonwealth's license-for-payment system with full knowledge that the impact would fall most heavily on

debtors who were too poor to pay their debts to the court.

346.    Accordingly, as applied to those who cannot afford to pay, Section 46.2-395 violates the Equal Protection Clause of the United States Constitution by treating those who are willing but unable to pay more harshly than those who are willing and able to pay, when the only difference between them is their poverty.

### Count IV: Violation of Due Process Clause (No Rational Basis)

347.    The Plaintiff incorporate the allegations in Paragraphs 1-346 above with the same force and effect as if herein set forth.

348.    Section 46.2-395 is not rationally related to any legitimate governmental objective because suspending driver's licenses for nonpayment of court debt makes highways less safe, impedes reentry of convicted persons, and is counterproductive as applied to people who need a driver's license to obtain or maintain employment in order to meet their financial obligations to the court.

349.    The Due Process Clause protects against arbitrary and capricious government action even when the decision to take action follows adequate procedures.

350.    A person has protected property and liberty interests in a driver's license and its attendant government-sanctioned ability to drive.

351.    A driver's license is often essential in the pursuit of a livelihood, and its suspension threatens important interests of the people who hold them.

352.    The purpose of licensing drivers is to promote safety on Virginia's roads and highways by keeping drivers off the roads who present a danger behind the wheel.

353.    Suspending licenses for non-driving reasons produces no traffic safety benefit, and distracts law enforcement resources from investigating criminal and traffic violations that

present true threats to public safety.

354. For people returning to their communities from jails and prisons, lack of a driver's license threatens their successful reentry when they cannot obtain or maintain stable employment.

355. For low-income debtors, avoidance of driver's license suspension does not operate as an incentive to pay when they must choose between paying the court and paying rent, buying medications, putting food on the table, and meeting other necessary expenses.

356. Indeed, as to people who lack the ability to pay court debt, a suspended license is not only not rational, but instead fundamentally irrational and counterproductive; suspension not only fails as an incentive (because such people are unable to avoid suspension under current law), but also (by making it harder for people to earn money) makes it less likely— rather that more likely—that they will be able to pay court debt.

357. Thus, Section 46.2-395, as written and as implemented, fails even the most minimum constitutional standards, as applied to debtors who lack ability to pay, because it is not rationally related to legitimate state interests.

## Count V: Violation of the Equal Protection Clause (Extraordinary Collection Efforts)

358. The Plaintiff incorporate the allegations in Paragraphs 1-357 above with the same force and effect as if herein set forth.

359. The United States Supreme Court has held that, when governments seek to recoup the costs of prosecution from indigent defendants, they may not take advantage of their position to utilize unduly harsh methods of debt collection solely because the debt is owed to the government and not to a private creditor.

360. Unlike fines, which are imposed as a penalty for unlawful behavior, or

restitution, which is imposed to compensate a victim, court costs assessed to subsidize the court proceedings (such as, *e.g.*, court-appointed attorney fee reimbursement) are no different in character than ordinary private consumer debts incurred for services rendered.

361.    When a private creditor seeks to enforce a judgment against a debtor via garnishment or lien, the law provides procedural and substantive protections for poor debtors against being deprived of certain basic necessities and the ability to maintain a livelihood.

362.    The private creditor may coerce payment only to the extent permitted by those protections.

363.    Section 46.2-395 does not treat indigent defendants, to the extent that they owe court costs, like other judgment debtors because it provides for suspension of the debtor's driver's license and the possibility of imprisonment for driving on a suspended license.

364.    When the Commonwealth, acting through the Commissioner, takes advantage of its position at the controls of the machinery of government to peremptorily strip debtors of their driver's licenses, it denies court debtors owing court costs the procedural and substantive statutory protections that other Virginia debtors may invoke against a private creditor in ordinary debt collection proceedings in order to maintain a livelihood and meet his or her basic needs.

365.    The severe and coercive collection scheme enacted by Section 46.2-395, as written and implemented, constitutes invidious discrimination and violates the fundamental principle of equal protection of the laws embedded in the United States Constitution.

## REQUESTED RELIEF

Wherefore, the Plaintiffs respectfully request that this Court provide the following relief:

a. Issue an order certifying this action to proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2);

b. Approve the undersigned to serve as class counsel pursuant to Fed. R. Civ. P. 23(a)(4) and 23(g);

c. Issue a judgment declaring that, as written and as implemented, Section 46.2-395 of the Virginia Code is unconstitutional on its face and as applied to the Plaintiffs and Class Members;

d. Issue a judgment declaring that the Commissioner's policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiffs' and Class Members' rights under the Constitution and laws of the United States;

e. Preliminarily and permanently enjoin the Commissioner, his subordinates, agents, employees, representatives, and all others acting or purporting to act on his behalf from enforcing Section 46.2-395 against Plaintiffs and the Future Suspended Class until such time as the Commonwealth implements a system that complies with the United States Constitution;

f. Preliminarily and permanently issue an injunction ordering the Commissioner to remove any suspensions imposed pursuant to Section 46.2-395 from Plaintiffs' and Suspended Class members' DMV records and permit reinstatement without payment of the DMV reinstatement fees;

g. Award Plaintiffs their reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 and other applicable law; and

h. Grant all such other and further relief as this Court may deem necessary and/or appropriate in the interests of justice.

DATED:         September 11, 2018


Respectfully submitted,


By : _____*/s/Angela A. Ciolfi*_____
Jonathan T. Blank (VSB No. 38487)
MCGUIREWOODS LLP
Court Square Building
310 Fourth Street NE, Suite 300
Post Office Box 1288
Charlottesville, VA  22902
Ph: (434) 977-2509
Fax: (434) 980-2258
*jblank@mcguirewoods.com*

Angela A. Ciolfi (VSB No. 65337)
Pat Levy-Lavelle (VSB No. 71190)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Ph: (434) 529-1810
Fax: (434) 977-0558
*angela@justice4all.org*

David P. Baugh (VSB No.: 22528)
DAVID P. BAUGH, ESQ., PLC
2025 E. Main Street, Suite 114
Richmond, VA 23223
Ph: (804) 743-8111
Fax: (804) 225-8035
*dpbaugh@dpbaugh.com*

Leslie Kendrick (VSB No.: 90104)
580 Massie Rd.
Charlottesville, VA 22903
Ph: (434) 243-8633
Fax: (434) 924-7536
*kendrick@virginia.edu*

*Counsel for Plaintiffs*

107089528_5.docx