**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| DAMIAN STINNIE, MELISSA ADAMS, and ADRAINNE JOHNSON, individually, and on behalf of all others similarly situated; WILLIEST BANDY, and BRIANNA MORGAN, individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>RICHARD D. HOLCOMB, in his official capacity as the Commissioner of the VIRGINIA DEPARTMENT OF MOTOR VEHICLES,<br><br>        Defendant. | Civ. No: 3:16-cv-00044 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Damian Stinnie, Melissa Adams, Adrainne Johnson, and Williest Bandy, and Brianna Morgan, individually, and on behalf of all others similarly situated (collectively, "Plaintiffs"), submit this Memorandum of Law in Support of their Motion for Class Certification and state as follows:

## I.       INTRODUCTION

Nearly a million Virginians are currently without a driver's license because of unpaid court costs and fines. Roughly one in six drivers in the Commonwealth cannot legally drive to work, medical appointments, the grocery store—or anywhere else for that matter. Plaintiffs

Damian Stinnie, Brianna Morgan, Melissa Adams, Adrainne Johnson and Williest Bandy seek to represent classes of persons whose licenses have been or will be suspended automatically when they fail to meet payment deadlines for court-related debt.

Defendant, Commissioner Richard D. Holcomb, carries out this suspension process under Section 46.2-395 of the Virginia Code with no meaningful notice, without a hearing, and without consideration of these persons' inability to pay. Plaintiffs, and hundreds of thousands of Virginians like them, lost their licenses for the simple reason that they could not afford the costs and fines imposed on them. Punishing them for their poverty offends the Fourteenth Amendment guarantees of due process and fundamental fairness, as well as equal protection under the law.

Plaintiffs' experiences exemplify the abuses of this system. All rely on a license to pursue their livelihoods and support family. All were unable to pay fines and costs related to minor traffic and criminal offenses. And all received—or will receive—license suspensions for failure to pay.[1] Thus, Plaintiffs currently face (or will soon inevitably face) the impossible choice of driving illegally to meet their basic needs, or failing to provide for themselves and their families. The Commissioner did not provide and will not provide any Plaintiff (or any other Virginian) any sort of hearing or assessment of ability to pay at the time of the suspension.

Accordingly, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (g), Plaintiffs seek to certify two classes. Plaintiffs Damian Stinnie, Brianna Morgan, Melissa Adams, and Adrainne Johnson seek to represent the **Suspended Class**, defined as:

> All persons whose drivers' licenses are currently suspended due to their failure to pay court debt pursuant to Va. Code Ann. §46.2-395.

---

[1] Plaintiffs seek to certify two classes. First, a **Suspended Class** consisting of all persons whose driver's licenses are currently suspended for failure to pay court debt under Section 46.2-395. Second, a **Future Suspended Class** consisting of all persons whose driver's licenses will be suspended for failure to pay court debt under Section 46.2-395.

Plaintiff Williest Bandy seeks to represent the **Future Suspension Class**, defined as:

> All persons whose drivers' licenses will be suspended due to their failure to pay court debt pursuant to Va. Code Ann. §46.2-395.

As detailed below, both proposed Classes meet the certification requirements of Rule 23.

## II.  FACTUAL BACKGROUND

### A.  <u>Driver's licenses are automatically suspended for failure to pay fines and costs.</u>

"Each year, the Commonwealth of Virginia imposes approximately half a billion dollars' worth of fees and fines in traffic and criminal court. . . . The number and amount of these fees have grown over time and now fund a wide range of basic government operations and services." *Stinnie v. Holcomb*, ___ F. App'x ___, 2018 WL 2337750, at *4 (4th Cir. 2018) (Gregory, J., dissenting) (summarizing Plaintiffs' allegations). These fees include fees for constitutionally sensitive areas, such as jury fees and court-appointed counsel fees, as well as courthouse construction fees, courthouse security fees, criminal justice academy training fees, fixed misdemeanor fees, electronic summons fees, more-time-to-pay fees, and jail admissions fees, among a host of others.

"The stacking of these fees, along with interest, on top of offense-specific penalties, means that even a minor traffic violation could spiral out of control, to the tune of hundreds, or eventually thousands, of dollars." *Id.* State courts impose costs according to a fee schedule that does not consider an individual's poverty in setting the amounts owed.

To compel payment, "the state punishes each and every individual who defaults by automatically suspending his or her driver's license, regardless of the reason for the default." *Id.* License suspension is automatic and mandatory for "failure or refusal" to pay court debt within the specified period (thirty days of conviction or according to the terms of any court-ordered

payment plan). Va. Code § 46.2-395(B). Automatic suspensions occur under an algorithm within court and DMV computer systems with no judicial determination or entered order of suspension. The Virginia Supreme Court's Office of the Executive Secretary maintains the state's Financial Management System ("FMS") used by all the General District Courts and almost all the 120 Circuit Courts in the Commonwealth. *See* Ex. 1, Declaration of Llezelle Dugger, at ¶ 5. When a scheduled payment to pay a court debt is not received by the due date, the FMS automatically transmits an electronic record to the DMV stating that an individual's account is in default. *See id.* ¶ 6. The DMV then updates the account holder's license status in its license database in accordance with the record. This action effectuates the suspension for all practical purposes, including for the benefit of law enforcement, prosecutors, insurance companies, and other government entities. *See Stinnie*, 2018 WL 2337750, at *4 (Gregory, J., dissenting).

This system does not require a judge or clerk to enter an order of license suspension for failure to pay court costs or fines to effectuate the suspension. *See* Ex. 1 ¶ 7. Instead, the system defaults to suspending the license whenever a payment is due and no payment is entered. In other words, the court clerk must enter payment before the due date to prevent the system from signaling to DMV to suspend the individual's license.

Court files maintain no record reflecting the suspension of a driver's license for non-payment. *Id.* ¶ 8. The driver receives no notice of alleged default, and no process exists for the driver to explain or contest the late payment before the DMV records the suspension. The Commissioner conducts no review of a person's financial condition before—or at any point related to—suspending a person's license for failure to pay, or otherwise learn the reasons for the default. The DMV does not reinstate any suspended license until all payments owed to all state courts are current and the driver has paid a reinstatement fee of at least $145 to the DMV.

4

Because of the uniform practices implementing Section 46.2-395, hundreds of thousands of Virginians have lost their licenses simply because they lack the financial means to pay. This effectively deprives them of reliable, lawful transportation necessary to get to and from work, take children to school, keep medical appointments, care for ill or disabled family members, or, paradoxically, to meet their financial obligations to the courts.

## B. The Commonwealth's Common Practice Injured Plaintiffs and the Class by Depriving them of their Constitutional Rights.

**Damian Stinnie.**

Damian Stinnie, who grew up in the Virginia foster care system, has struggled to escape the grip of debt-related suspensions since 2012. In 2012, his license was first suspended because of his inability to pay over fines and costs imposed as a result of three traffic infractions. Ex. 2, Declaration of Damian Stinnie, at ¶ 4. His troubles compounded when he missed a court date (for driving while suspended) while hospitalized suddenly with life-threatening leukemia. He was convicted in his absence and, as a result, received additional fines and costs he could not pay, leading to additional license suspensions. *Id.* ¶¶ 5-7.

Since 2012, Mr. Stinnie has struggled with serious illness, unemployment, and homelessness—all made infinitely harder by the lack of a driver's license. *Id.* ¶¶ 7-9.

In late 2016, Mr. Stinnie's health had improved enough that he could work. *Id.* ¶ 10. He found a part-time job in December 2016, but despite working as many hours as his employer offered him, Mr. Stinnie never had enough money to meet all of his expenses. *Id.* ¶ 12. During this time, Mr. Stinnie faced the impossible choice of driving illegally to look for work, help out family members, and attend medical appointments, or not to drive and face continued unemployment, being late for work, and missing medical appointments. *Id.* ¶ 13.

After enduring a cycle of debt, license suspension, and incarceration for driving-while-suspended for nearly four years, Mr. Stinnie finally overcame the Commonwealth's substantial barriers to regaining the legal ability to drive. In December 2017, he reinstated his license only by successfully applying for a loan to pay off his court debt. *Id.* ¶¶ 18-20. Mr. Stinnie was excited about the possibility that he would qualify for full-time employment with his current employer, which required all full-time employees to have a valid driver's license. *Id.* ¶ 21.

Meanwhile, however, a year-old charge for driving while suspended became finalized, and he was assessed another $2,189 in fines and costs, in addition to spending twenty days in jail. *Id.* ¶¶ 22-23. He obtained a payment plan of $30 per month, which he thought he could pay—until the City of Charlottesville placed a tax lien on 100% of his wages, making it impossible for him to make the first installment payment. *Id.* ¶¶ 24-26. His license was suspended yet again in June 2018. *Id.* ¶ 27.

If Mr. Stinnie had his license, he could get full-time hours at his work, drive without fear of being pulled over and eventually incarcerated, help out with family responsibilities, and get to and from medical appointments, which he still has as a result of his illness. *Id.* ¶¶ 32-33.

**Melissa Adams.**

Melissa Adams lives with her twelve-year-old son in Cascade, Virginia, a rural community west of Danville. Ex. 3, Declaration of Melissa Adams, at ¶ 2. Her license is currently suspended because she cannot afford the costs and fines related to various traffic and misdemeanor offenses, including driving on a suspended license. *Id.* ¶ 3.

In 2013, when Ms. Adams' license was first suspended for failure to pay, she was unemployed and had defaulted on fines and costs owed to the courts. *Id.* ¶ 7. At first, she could scrape together enough funds to make a modest payment. Later, she could not afford the court's payment plan, which required her to pay the remaining $526 in full at the end of three

months. *Id.* When she missed a payment, her license was suspended. *Id.* ¶ 8. Neither the courts

nor the DMV ever asked her about her financial circumstances or the reasons for her non-

payment, before or after suspending her license. *Id.* ¶ 10.

Ms. Adams has a rare and serious blood disorder, which at that time required her to

drive to and from chemotherapy treatments in Greensboro, North Carolina. *Id.* ¶¶ 4, 9. She

also worked several low-wage jobs during that time. Forced to choose between driving

illegally, and losing her job and missing life-saving treatments, Ms. Adams continued to drive.

*Id.* ¶ 9. She was convicted of driving while suspended several times, with each conviction

leading to more costs and fines and additional indefinite license suspensions for failure to pay.

*Id*. In June 2015, she served twelve days in jail for driving while suspended. During that time,

she worried about how her time in jail would affect her young son. *Id.* ¶ 11.

Ms. Adams needs her license, especially given the lack of public transportation

infrastructure in the part of Virginia where she lives. She needs to be able to drive to get to

medical appointments, seek and maintain employment, go grocery shopping, and keep

appointments for her son. *Id.* ¶ 17. Yet she has stopped driving to avoid going back to jail. *Id.*

¶ 12. As a result, she is currently unemployed. She and her son receive food stamps. She owes

$300 a month in rent to her mother-in-law, which she pays when she can afford it. *Id.* ¶ 15.

She also pays for utilities and buys groceries and other necessities for her herself and her son,

for whom she is the sole source of support. *Id.*

Ms. Adams currently owes roughly $2,975 in court debt. To get her license back, she

must get on approved payment plans with the courts and pay $260 in reinstatement fees to the

DMV. *Id.* ¶ 18. She rarely has enough money to meet her family's basic needs, let alone pay

her court debt or the DMV reinstatement fee. *Id.* ¶ 15. If she got her license back, she could get

a job and also attend trainings for jobs that pay more, making it more likely that she could pay off her court debts. *Id.* ¶ 22.

**Adrainne Johnson.**

Adrainne Johnson lives in Charlottesville, Virginia. She and her two children live in an over-crowded rental unit with another family because they cannot afford their own place. Ex. 4, Declaration of Adrainne Johnson, at ¶¶ 2, 22.

Five years ago, Ms. Johnson was convicted of a drug-related charge and assessed $865 in costs, even though the court found her indigent for purposes of being appointed a lawyer. *Id.* ¶¶ 5-7. She made payments on the debt at first, but she could not afford to keep up with the payment plan and missed a payment. *Id.* ¶ 8. As soon as she missed a payment, her license was suspended. *Id.* ¶ 9.

Since then, Ms. Johnson has continued to work on and off in low-wage jobs. She has tried several times to establish a payment plan, but every time she cannot afford to make a payment, her license gets suspended. *Id.* ¶¶ 10-11. She had to keep driving to take care of her family. It was either drive and take the chance of being stopped, or lose her job and not be able to provide for her family. *Id.* ¶ 12. She also had to take her daughter to a psychiatrist every two weeks, and could not get there except by driving. In November 2017, she was convicted of driving on a suspended license, and assessed additional fines and costs. *Id.* ¶¶ 12, 13-14.

Since that November 2017 conviction, Ms. Johnson stopped driving because she could not risk going to jail. *Id.* ¶ 19. As a result, she has to rely on other people for rides. If her ride does not show up or is late, it makes her miss or be late to important appointments. *Id.* ¶ 20. Recently, her daughter missed a dentist appointment because they could not get to the dentist's office. *Id.* ¶ 26. Her daughter has other medical needs that require frequent doctors' visits, and

Ms. Johnson has much difficulty in getting her there regularly. She worries about her daughter and her ability to meet her family's needs without a driver's license. *Id.*

Ms. Johnson has seen advertisements for jobs with higher wages, or that she could take as a second job. Many are impossible to get to without a license, or the advertisements list a valid driver's license as a job requirement. *Id.* ¶ 24. She needs to be able to drive not only to get more or better-paying work, but also get to the grocery store and to medical appointments. *Id.* ¶ 25.

**Williest Bandy.**

Williest Bandy lives in Norfolk, Virginia with his girlfriend and their four children. Ex. 5, Declaration of Williest Bandy, at ¶ 2.

Mr. Bandy recently reinstated his license[2] after living without it for seven years. He lost his license in 2011 because he could not afford to pay $1,820 in court debt related to several traffic convictions, including an expired inspection, failure to carry his license, failure to appear, and speeding. *Id.* ¶ 4. Mr. Bandy tried to avoid driving as much as possible, but not having his license meant that his employment options were very limited, and the time it took to commute via public transportation made holding a second job impossible. *Id.* ¶ 8. He struggled with basic activities like getting to doctors' appointments and grocery shopping. *Id.*

Mr. Bandy and his girlfriend support a family of six on a shoestring. Mr. Bandy is employed as a personal care assistant, working 35 to 40 hours per week at $8 per hour. His girlfriend is disabled. She receives Supplemental Security Income of $750 per month, and only occasionally gets a few hours of work. The family also receives food stamps and a modest TANF payment of around $100-$200 per month. *Id.* ¶ 16. From their meager income, Mr. Bandy and

---

[2] Mr. Bandy removed all barriers to his being relicensed, including paying DMV reinstatement fees, and – save for waiting out a short permit period and passing standard DMV testing – will have a full and active license soon.

his girlfriend must pay rent, utilities, transportation, house supplies, food, and clothes for their four children. They have no savings, and struggle to pay all of their bills each month. *Id.* ¶ 17.

Mr. Bandy currently owes well over $2,000 in court debt, spread over three courts. *Id.* ¶ 9. In order to keep his license, one court requires him to complete 75 hours of community services within the next six months, which he intends to do and believes he can complete. *Id.* ¶ 11. The other two courts do not permit community service, and instead require him to pay at total of $75 each month. *Id.* ¶ 12. Given his extremely limited income, Mr. Bandy is struggling to make even the first monthly payment. He recently told the power company that his payment would be late so that he could hold money aside to make the $75 court payment. *Id.* ¶ 18.

Mr. Bandy desperately wants to keep his license. *Id.* ¶ 21. With his license he believes he can get a job that pays better—such as being a personal care assistant for someone who needs a driver—and even get a second job. *Id.* ¶ 22.

But he knows that soon the day will come when he cannot make another payment because it will mean sacrificing things like water or power. *Id.* ¶ 20-21. For Mr. Bandy, default is inevitable—and likely imminent—and he will be right back where he started: no license, no hope, and out the money he just recently paid to DMV in reinstatement fees. *Id.* ¶ 13.

**Brianna Morgan.**

Brianna Morgan lives in Petersburg, Virginia, with her three children. *See* Ex.6, Declaration of Brianna Morgan, at ¶ 2. Ms. Morgan has a disabling stomach condition that causes frequent painful spasms that prevent her from working. *Id.* ¶ 4. Her only income comes from less than $1,000 per month in public benefits.

Ms. Morgan's license was suspended for several years, until just three days ago, when she caught a lucky break and was able to get on community service and payment plans with the courts, as well as borrow $155 from a friend to pay the DMV reinstatement fee. *Id.* at ¶ 19-23.

Her license was first suspended in 2015 when she could not afford to make payments toward $179 in court costs (for operating an uninspected vehicle) while still supporting her family. *Id.* ¶¶ 5-9. She stopped driving after her license was suspended. Id. ¶ 10. Not being able to drive made life even harder for her and her family. *Id.* ¶ 11.

Ms. Morgan's father is in a nursing home, and it was tough to visit him without being able to drive. The bus system does not go near where her father lives, and so Ms. Morgan did not visit as often as she used to, and it is too unsafe to take her son and walk along the busy roads from the bus stop. *Id.* ¶ 12. Moreover, Ms. Morgan could not accompany her father to his medical appointments at the Veterans' Administration, as she used to do, for lack of transportation. She worried that her father, who suffered a stroke that affects his communication, would not get the care he needs because she could not be there to help the doctors understand what he said. *Id.* ¶ 13.

Ms. Morgan's household of four survives on less than $900 per month (other than food stamps). *Id.* ¶ 25. Even though she is desperate to keep her license, she worries that she cannot keep up with monthly payments. She typically does not have $25 left over at the end of the month, and believes she is just one unexpected expense away from losing her license again, as she often has unexpected expenses. In reality, making the payments will mean not meeting other basic needs. She worries about asking her children to make those sacrifices, and believes that losing her license again is inevitable. *Id.* ¶ 26.

Ms. Morgan needs to keep her license to take care of her family. With a license she can visit her ailing father and go with him to medical appointments. She can be more responsive to her son's school when they call because he is having an asthma attack. She can get to her own doctors' offices (rather than the emergency room by ambulance). And she can give her children

basic childhood experiences, participate in their school activities, and more easily do basic tasks like grocery shopping. *Id.* ¶ 25.

*

Plaintiffs' experiences typify the many others who have also lost—or will soon—their ability to drive because of poverty.

### C. Plaintiffs and the Proposed Class Seek Identical Relief

Contemporaneously with this Motion, Plaintiffs filed their First Amended Class Action Complaint against Defendant, Richard Holcomb, DMV's Commissioner seeking relief from the Constitutional violations resulting from Virginia's license-for-payment scheme. Plaintiffs' seek to certify two classes. Plaintiffs Damian Stinnie, Brianna Morgan, Melissa Adams, and Adrainne Johnson seek to represent the **Suspended Class**, defined as:

> All persons whose drivers' licenses are currently suspended due to their failure to pay court debt pursuant to Va. Code Ann. §46.2-395.

Plaintiff Williest Bandy seeks to represent the **Future Suspension Class**, defined as:

> All persons whose drivers' licenses will be suspended due to their failure to pay court debt pursuant to Va. Code Ann. §46.2-395.

Plaintiffs seek a declaration that Section 46.2-395 of the Virginia Code is unlawful and violates their and the Class Members' rights under the Constitution and laws of the United States. Plaintiffs also seek an injunction (1) to enjoin the Commissioner from enforcing Va. Code Ann. § 46.2-395 against Plaintiffs and members of the Future Suspended Class; (2) to remove any suspensions imposed pursuant to Va. Code Ann. § 46.2-395 from Plaintiffs' and Suspended Class members' driving records; and (3) to enjoin the Commissioner from charging a fee to reinstate Plaintiffs' and Suspended Class members' licenses if there are no other restrictions on their licenses. (Am. Compl. Requested Relief, pp. 43-44.)

### III.    ARGUMENT

The decision to certify a class must occur "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). A certified class must meet the requirements of Rule 23(a) as well as one of the three categories set forth in Rule 23(b). *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). To satisfy the prerequisites established in Rule 23(a), a plaintiff must show "(1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003) (citing Fed. R. Civ. P. 23(a)). In addition, in an action seeking certification under Rule 23(b)(2), as is the case here, the plaintiff must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"If a lawsuit meets these requirements, certification as a class action serves important public purposes," including "promoting judicial economy and efficiency" and "afford[ing] aggrieved persons a remedy" that may not be feasible through individual actions. *Gunnells*, 348 F.3d at 424 (quoting Moore's Fed. Practice § 23.02 (3d ed. 1999)). As a result, "federal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Id.* (internal quotation omitted).

Applying these standards to Plaintiffs' class claims, this action should be certified as a class.

## A. The Class Is Sufficiently Numerous[3]

To certify a class, a court must find that the number of potential plaintiffs "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action under Fed. R. Civ. P. 23; [rather], application of the rule is to be considered in light of the particular circumstances of the case[.]" *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that a class of 18 was sufficient to fulfill the numerosity requirement under circumstances); *see also Dashiell v. Van Ru Credit Corp.*, No. 1:12-cv-273, 2012 U.S. Dist. LEXIS 104043, *7 (E.D. Va. July 23, 2012) (65 class members enough to meet numerosity requirement).

Additionally, the exact size of a class is not required at the class certification stage. "Indeed, 'where general knowledge and common sense would indicate that it is large, the numerosity requirement is satisfied.'" *Harris v. Rainey*, 299 F.R.D. 486, 489 (W.D. Va. 2014) (quoting *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006) (citing 6 Conte & Newberg, *Newberg on Class Actions*, § 3:3 (4th ed. 2006)). As such, the

---

[3] Courts that have addressed the issue uniformly hold that the implicit "ascertainability" requirement for a class action does not apply to Rule 23(b)(2) class actions seeking injunctive relief. *See, e.g., Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2220 (2017) ("The precise identity of each class member need not be ascertained here, particularly given that notice is not required as it would be in a (b)(3) class."); *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) ("Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[M]any courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population."); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) ("[N]otice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited."). Here, Plaintiffs seek only declaratory and injunctive relief in the form of an order requiring the Commissioner to stop its unconstitutional enforcement of Section 46.2-395. As such, the identity of the individual class members has no impact on the ability to afford the requested relief.

plaintiffs "need only make a reasonable estimate of the number of class members." *Harris*, 299

F.R.D. at 489 (quoting *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 486

(W.D.N.C. 2003)) (internal quotations omitted).

Here, the number of class members in both classes makes joinder impracticable. For the

**Suspended Class**, the Commonwealth's own statistics demonstrate that at any particular time

hundreds of thousands of individuals have their licenses indefinitely suspended for failure to pay

court debt. Almost a million people had at least one suspension for court debt as of January

2017. Ex. 7, Email from Matthew Leary, Virginia DMV, to Daniel Davies, Legislative Ass't to

Delegate Dave LaRock (Jan. 5, 2017). According to a press release from then-Governor

McAuliffe quoted by DMV staff, "Nearly 650,000 Virginia currently have a suspended driver

license *because they cannot afford to pay* their legal fees and court costs to the state." *Id.*

(referring to the two-thirds of the one million whose licenses are suspended solely due to unpaid

court debt) (emphasis added).

The **Future Suspension Class** consists of all individuals who will in the future face

suspension for failure to pay under Section 46.2-395. The precise number of individuals in this

class is unknown, but given that hundreds of thousands of individuals are presently suspended

for non-payment at any given time, and hundreds of thousands of suspensions for failure to pay

are issued by the Virginia DMV each year, it is reasonable to conclude that the number of

persons whose licenses will be suspended in the future for non-payment will also be voluminous.

The **Future Suspension Class** is forward-looking with the potential for new members to join the

Classes on an ongoing basis, as the DMV will continue to process suspensions absent relief from

this Court. *See Jack v. Am. Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974) (per curiam); *cf.,*

*e.g., Walker v. Styrex Indus.*, No. C-74-197-G, 1976 WL 13224, *1 (M.D.N.C. Jan. 7, 1976)

("Future employees can be proper members of the class in an employment discrimination suit, and, while this makes the exact number of the class unknown, it also contributes to creating so many members as to make joinder impracticable.").

Given the widespread effect of the Commissioner's uniform policy, it is clear that the numerosity requirement has been met.

**B.    Because the Class Claims Derive from the Commissioner's Common Practice, They Are Subject to Common Proof, Satisfying the Commonality Requirement.**

A court must also find that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It is not necessary that "[a]ll questions of fact and law . . . be common to satisfy [Rule 23(a)(2)]." *Johnson*, 275 F.R.D. at 289 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Instead, "[w]hat matters to class certification is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). Commonality under Rule 23(a)(2) can be established by demonstrating that the plaintiffs' and class members' claims "depend upon a common contention . . . [that] is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  However, a "[p]laintiff need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution. So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 359).

"A single common question will suffice" where "its determination will resolve an issue that is central to the validity of each one of the claims in one stroke."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (internal quotations & citations omitted); *see also Plotnick v.*

*Comput. Sci. Corp. Deferred Comp. Plan for Key Execs.*, 182 F. Supp. 3d 573, 582 (E.D. Va. 2016) (commonality "is satisfied when there is even a single common question that will resolve an issue central to the validity of each of the class member's claims"). "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 78 (E.D. Va. 2006) (citation omitted).

Civil rights cases are emblematic of satisfying commonality because the defendants' actions are "central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal ex. rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (citing 7A Charles A. Wright, et al., Fed. Prac. & Proc. § 1763 at 219 (1986)). Indeed, "suits for injunctive relief by their very nature present common questions of law and fact." *Scott v. Clarke*, 61 F. Supp. 3d 569, 585 (W.D. Va. 2014) (quoting *McGlothlin v. Connors*, 142 F.R.D. 626, 633 (W.D. Va. 1992)). Where, as here, the plaintiffs' claims and class claims are challenging an agency's generally applicable systemic practices, commonality is met. *See id.* (holding that whether the Virginia Department of Corrections "systematically provides inadequate medical care" to its women residents presented common questions to all class members); *see also Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014) (holding commonality existed because the case involved "uniform statewide practices created and overseen by two individuals who are charged by law with ultimate responsibility for health care" of inmates); *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016) (certifying class of prisoners for claims arising from "pattern or practice of agency action or inaction"); *Holmes v. Godinez*, 311 F.R.D. 177, 220 (N.D. Ill. 2015) (finding that plaintiffs' allegations of "system-wide practices and/or failures resulting in constitutional and statutory violations" satisfied commonality requirement);

*Dockery v. Fischer*, 253 F. Supp. 3d 832, 846–47 (S.D. Miss. 2015) (explaining that most straightforward method of establishing common practice is through "express adoption by the relevant entity, either through a legislative or administrative act (e.g., a local ordinance) or by an actor who possesses policymaking authority (e.g., a chief executive)"); *Jones v. Gusman,* 296 F.R.D. 416, 465–67 (E.D. La. 2013) (commonality satisfied in action brought by residents of Orleans Parish Prison challenging unlawful conditions attributed to Parish Sheriff's systemic policies).

Here, Plaintiffs' and class members' claims all rise or fall on resolution of several common questions. Common questions of fact include:

- Whether Section 46.2-395 empowers the DMV to suspend, and/or whether the DMV has a practice of suspending, a license for non-payment without requiring a pre-deprivation hearing; and

- Whether Section 46.2-395 empowers the DMV to suspend, and/or whether the DMV has a practice of suspending, a license for non-payment without requiring an inquiry into a motorist's ability to pay and determining the motorist's non-payment was willful.

Common questions of law include:

- Whether Section 46.2-395 violates due process and fundamental fairness by punishing those who owe money to the state for sheer inability to pay;

- Whether Section 46.2-395 strips the Plaintiffs and those like them of a constitutionally protected property interest—their driver's licenses—without the guaranteed safeguards of notice and a hearing;

- Whether Section 46.2-395 violates equal protection by treating those who are

willing but unable to pay more harshly than those who are willing and able to pay, when the only difference between them is their wealth;

- Whether suspending licenses for delinquent court debt pursuant to Section 46.2-395 fails even the most minimum constitutional standards because it is not rationally related to legitimate state interests; and

- Whether Section 46.2-395 subjects the Plaintiffs and those like them to harsher collection practices than those for civil debtors, in violation of equal protection.

(*See* Am. Compl. ¶¶ 310-11.)

There are no material factual variations that would impede the common resolution of these questions. According to the testimony of the Clerk of the Charlottesville Circuit Court, the Commissioner has a uniform policy of issuing license suspensions for non-payment once it receives a computerized notice from the Virginia Supreme Court's Financial Management System. (Ex. 1, Declaration of Llezelle A. Dugger, ¶¶ 6-9.) The process is automatic: no human being reviews the notice, and there is no hearing on its merits or the drivers' ability to pay. (*Id*. ¶¶ 6-9, 12.) Every one of the members of the proposed class is equally subject to Section 46.2-395 at the time they default on payments owed to the courts. *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:14CV238, 2015 WL 4994549, at *12 (E.D. Va. Aug. 19, 2015) (finding commonality where "[a]ll class members will have been subjected to this practice"). Moreover, resolving the question of whether this process violates Plaintiffs' due process rights is central to the lawsuit: if resolved for Plaintiffs, it establishes the need to cease the practice and remove the unconstitutional impediments on their licenses; if resolved against the Plaintiffs, it upholds the policy as it currently exists. Thus, this case presents the typical example where commonality is satisfied because Plaintiffs are challenging an agency's generally applicable

systemic practices. *See Bumgarner v. NCDOC*, 276 F.R.D. 452, 456 (E.D.N.C. 2011) ("[I]in a lawsuit wherein individuals with varying disabilities challenge policies and practices that affect all of the putative class members, factual differences regarding their disabilities does not defeat commonality.").

As such, the proposed classes satisfy the commonality requirement.

### C. Plaintiffs' Claims Are Typical of the Proposed Class.

The typicality prerequisite requires that the class representatives "be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "The test for typicality . . . is not demanding." *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997) (citation omitted). "[T]he class representatives and the class members need not have identical factual and legal claims in all respects." *Fisher v. Va. Elec. and Power Co.*, 217 F.R.D. 201, 212 (E.D. Va. 2003) (citation omitted); *see also Casey*, 43 F.3d at 58 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." (alteration in original) (citation omitted)). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006) (quotation omitted). Thus, in pursuing their own case, the representative parties "must simultaneously tend to advance the interests of the absent class members." *Id.*

Here, Plaintiffs meet the typicality requirement for the same reason that they meet the commonality requirement – the relief sought would benefit all members of the classes in an identical manner. Plaintiffs Stinnie, Morgan, Adams, and Johnson's claims are straightforward and identical; each was harmed by the indefinite suspension of his or her drivers' license in

violation of due process of law. These are the same claims each absent class member of the **Suspended Class** would assert. Similarly, Plaintiff Bandy's claim is identical to the claims brought on behalf of the **Future Suspension Class** because it derives from the Commonwealth's continued practice of suspending licenses during the pendency of the lawsuit. The relief the named Plaintiffs seek is identical as well. Each class member will benefit from the injunctions Plaintiffs seek (1) prohibiting suspension orders for unpaid court debt and (2) seeking reinstatement of drivers' licenses. (Am. Compl. Prayer for Relief d & e.)

The evidence each named Plaintiff will offer to prove his or her claim is also identical to those the class would proffer. Each named plaintiff will show:

- that he or she incurred court fines and costs to various Virginia courts.
- that he or she was unable to pay these costs.
- that his or her license was suspended for non-payment pursuant to Section 46.2-395.
- that he or she was never given an opportunity to show that the non-payment was not intentional.

Am. Compl. ¶¶ 282-84. Any minor factual variations will not affect the essential elements of Plaintiffs' and the Class' due process claims, and thus do not render them atypical. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) ("[T]he mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification."); *see also Scott*, 61 F. Supp. 3d at 586 ("While the claims of the class members must arise from similar practices and be based on the same legal theory, the commonality requirement does not require that all class members share identical factual histories.").

Both the named Plaintiffs and the members of the putative Classes seek to redress common legal injuries through the identical legal theories common to the Classes. For these reasons, Plaintiffs meet the typicality requirement of Rule 23(a)(3).

**D.  Plaintiffs Will Adequately Represent the Interests of the Class.**

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This standard is met if "the named plaintiff has interests common with, and not antagonistic to, the [c]lass' interests." *Milbourne v. JRK Residential Am., LLC*, No. 3:12CV861, 2014 WL 5529731, at *8 (E.D. Va. Oct. 31, 2014) (quoting *In re Se. Hotel Props. Ltd. P'ship Investor Litig.*, 151 F.R.D. 597, 606–07 (W.D.N.C. 1993)). For this reason, the "adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation omitted) (alteration in original).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625. A minor conflict is insufficient to cause the representatives to be deemed inadequate. "For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells*, 348 F.3d at 430). "A conflict is not fundamental when . . . all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *Id.* at 180 (internal quotation marks omitted) (alterations in original). And any purported conflict must be real, not speculative or hypothetical. *Id.*

In this case, the representative Plaintiffs do not have any conflict—let alone a fundamental one—with the other members of the class. The injunctive and declaratory relief they seek will benefit the entire class in the same manner—preventing the unconstitutional deprivation of their driver's licenses simply due to the inability to pay and requiring the reinstatement of licenses that were unlawfully suspended. Furthermore, as their declarations demonstrate, the representative Plaintiffs are knowledgeable about the facts, the litigation, and

the legal obstacles the Class will face, and are dedicated to actively participating in the litigation on behalf of all Virginia's residents who have had their driver's license suspended simply due to their inability to pay court-ordered fines or costs within thirty days. *See* Ex. 2 (Stinnie Dec.); Ex. 3 (Adams Dec.); Ex. 4 (Johnson Dec.); Ex. 5 (Bandy Dec.); Ex. 6 (Morgan Dec.). "Only if the class representatives' 'participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case' should they fail to meet the adequacy of representation requirement." *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 296 (E.D. Va. 2004) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987)). Such is not the case here.

Plaintiffs have met their initial burden to demonstrate adequacy of representation and, absent any evidence to the contrary, the Court must thus presume the adequacy requirement has been satisfied. 1 Newberg on Class Actions § 3.55 (5th ed.).

### E. Class Counsel Is Adequate under Rule 23(g)

"The adequacy [requirement] also factors in competency and conflicts of class counsel." *Amchem*, 521 U.S. at 626 n.20. Class counsel in this case easily meet the adequacy requirement of Rule 23(g). "The adequacy of counsel prong of Rule 23[g] asks whether counsel are qualified, experienced and generally able to conduct the litigation and whether counsel will vigorously prosecute the interests of the class." 1 Newberg on Class Actions § 3:72 (5th ed.) (citations omitted). "[M]embers of the bar in good standing typically [are] deemed qualified and competent to represent a class absent evidence to the contrary." *Id.* (citations omitted). Similarly, under Rule 23(g), the Court must consider (1) "the work counsel has done in identifying or investigating potential claims in the action," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources that

counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here, Plaintiffs are represented by well-known and seasoned attorneys from the Legal Aid Justice Center, McGuireWoods LLP and the University of Virginia Law School. These organizations, and the counsel involved in this case, have extensive experience litigating complex matters and class actions, including class actions involving matters of federal constitutional law, and all have significant experience litigating on behalf of indigent individuals seeking legal recognition of their civil rights, including at the local, state, and federal levels. *See* Declaration of Jonathan Blank, Exhibit 8, at ¶¶ 6-8; Declaration of Angela Ciolfi, Exhibit 9. Counsel has also committed significant resources to this case, having investigated the claims for years prior to the initiation of this action and dedicating thousands of hours to the case thus far. Ex. 9, Ciolfi Dec. at ¶ 13; Ex. 8, Blank Dec. at ¶ 9. Counsel are committed to vigorously prosecuting the claims on behalf of the class.

**F.      Certification under Rule 23(b)(2) Is the Proper Vehicle to Resolve the Class Claims Because They Arise from the Commissioner's Uniform Conduct.**

In addition to satisfying the prerequisites of Rule 23(a), the proposed class satisfies Rule 23(b)(2). Certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also Zimmerman v. Bell*, 800 F.2d 386, 389–90 (4th Cir. 1986) ("[S]ubsection (b)(2) [is] limited to claims where the relief sought [is] primarily injunctive or declaratory."). "The essential consideration is whether the complaint alleges that the plaintiffs have been injured by defendants' conduct which is based on policies and practices applicable to the entire class." *Bumgarner*, 276 F.R.D. at 457–58 (citation omitted).

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes,* 564 U.S. at 360 (citation omitted). In interpreting the requirements of Rule 23(b)(2), the Fourth Circuit has held that certification is appropriate where final injunctive relief is sought and will "settl[e] the legality of the behavior with respect to the class as a whole." *Thorn v. Jefferson Pilot Life Ins. Co.*, 445 F.3d 311, 329 (4th Cir. 2006) (quoting Rule 23(b)(2), advisory committee note to 1966 amendment. Plaintiffs satisfy these requirements here.

Given the reach and intent of Rule 23(b)(2), the Supreme Court has noted that certification under this section is particularly appropriate in "[c]ivil rights cases against parties charged with unlawful, class-based discrimination." *Amchem,*521 U.S. at 614; *see also Thorn*, 445 F.3d at 329-30 n.24 ("Rule 23(b)(2) was created to facilitate civil rights class actions."); *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 311 (3d Cir. 2016) ("The consequences can be significant for those who would otherwise benefit from the relief afforded by Rule 23(b)(2), a rule 'designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons.'"); *Casey*, 43 F.3d at 58–59 ("The (b)(2) class serves most frequently as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment."); *Harris v. Rainey*, 299 F.R.D. 486, 494 (W.D. Va. 2014) (explaining that actions "brought for injunctive relief alleging civil rights violations are precisely the type of suit for which Rule 23(b)(2) was intended to provide class certification.").  For this reason, Rule 23(b)(2) has been liberally applied in the area of civil rights. *See, e.g.*, *Bumgarner*, 276 F.R.D. at 457; *cf. Thorn*, 445 F.3d at 330 ("The twin requirements of Rule 23(b)(2)—that the defendant acted on grounds applicable

to the class and that the plaintiff seeks predominantly injunctive or declaratory relief—make that Rule particularly suited for class actions alleging racial discrimination and seeking a court order putting an end to that discrimination." (citation omitted)).

This is exactly the type of civil rights action Rule 23(b)(2) was created to foster. As discussed above, *supra*, members of the respective proposed classes face the same risk of harm—either the future or the current unconstitutional deprivation of their driver's licenses. This harm results from the DMV's enforcement of same statutory text—Section 46.2-395—which equally applies to all members simply based on their impending or past inability to pay their court debt. *See M.D. ex rel. Stukenburg v. Perry*, 675 F.3d 832, 847-48 (5th Cir. 2012) (explaining class claims need not be "premised on a 'specific policy . . . uniformly affecting—and injuring each [class member],'" but rather can show defendant "engages in a pattern or practice of agency action or inaction . . . 'with respect to the class,' so long as declaratory or injunctive relief settling the legality of the [defendant's] behavior with respect to the class as a whole is appropriate" (internal citations omitted)). Plaintiffs have brought this case seeking a declaration that Section 46.2-395 and the Commissioner's associated practice of automatically issuing license suspensions for nonpayment without notice or any opportunity for a hearing is unconstitutional because it violates due process, fundamental fairness, and equal protection under the Fourteenth Amendment. They also seek an injunction requiring the Commissioner to cease enforcement of Section 46.2-395 and to remove the wrongful suspensions from the Plaintiffs and class members' licenses. This relief—both the declaration and the corresponding injunction—would benefit *all* members of the class.

Because Plaintiffs have satisfied the requirements of Rule 23(a) and Rule 23(b)(2), proceeding as a class action is the proper vehicle for resolution of the claims and the proposed class should be certified.

## IV.     CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court enter an order certifying the Suspended and Future Suspended Classes and granting such further relief that the Court deems just and proper.

Date:   September 11, 2018

By:   */s/ Angela A. Ciolfi*

Jonathan T. Blank (VSB No.: 38487)
MCGUIREWOODS LLP
Court Square Building
310 Fourth Street NE, Suite 300
Post Office Box 1288
Charlottesville, VA 22902
Ph: (434) 977-2509
Fax: (434) 980-2258
*jblank@mcguirewoods.com*

Angela A. Ciolfi (VSB No.: 65337)
Pat Levy-Lavelle (VSB No.: 71190)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Ph: (434) 529-1810
Fax: (434) 977-0558
*angela@justice4all.org*

David P. Baugh (VSB No.: 22528)
DAVID P. BAUGH, ESQ., PLC
2025 E. Main Street, Suite 114
Richmond, VA 23223
Ph: (804) 743-8111
Fax: (804) 225-8035
*dpbaugh@dpbaugh.com*

Leslie Kendrick (VSB No.: 90104)
580 Massie Rd.
Charlottesville, VA 22903
Ph: (434) 243-8633
Fax: (434) 924-7536
*kendrick@virginia.edu*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2018, I electronically filed the foregoing

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification with the Clerk of

Court using the CM/ECF System, which will send a notification of such filing to the following

CM/ECF participants:

Nancy Hull Davidson
Margaret Hoehl O'Shea
Assistant Attorneys General
Criminal Justice and Public Safety Division
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 692-0551
Fax: (804) 786-4239
E-mail: ndavidson@oag.state.va.us
E-mail: moshea@oag.state.va.us

By: */s/ Angela A. Ciolfi*
Angela A. Ciolfi (VSB No.: 65337)
Pat Levy-Lavelle (VSB No.: 71190)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Ph: (434) 529-1810
Fax: (434) 977-0558
*angela@justice4all.org*

107094918_1.docx