**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| DAMIAN STINNIE, MELISSA ADAMS, and ADRAINNE JOHNSON, individually, and on behalf of all others similarly situated; WILLIEST BANDY, and BRIANNA MORGAN, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD D. HOLCOMB, in his official capacity as the Commissioner of the VIRGINIA DEPARTMENT OF MOTOR VEHICLES, <br><br> Defendant. | Civ. No: 3:16-cv-00044 |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Nearly a million Virginians are currently without a driver's license because of unpaid court costs and fines. Roughly one in six drivers in the Commonwealth cannot legally drive to work, medical appointments, the grocery store—or anywhere else for that matter. Plaintiffs Damian Stinnie, Melissa Adams, Adrainne Johnson, Williest Bandy and Brianna Morgan, seek to represent classes of persons whose licenses are currently or will be suspended automatically when they fail to meet payment deadlines for court-related debt.

Defendant, Commissioner Richard D. Holcomb, carries out this suspension process under Section 46.2-395 of the Virginia Code with no meaningful notice, without a hearing, and without consideration of these persons' inability to pay. Plaintiffs, and hundreds of thousands of

1

Virginians like them, lost their licenses for the simple reason that they could not afford the costs and fines imposed on them. Punishing them for their poverty offends the Fourteenth Amendment guarantees of due process and fundamental fairness, as well as equal protection under the law.

Plaintiffs' experiences exemplify the abuses of this system. All rely on a license to pursue their livelihoods and support family. All were unable to pay fines and costs related to minor traffic and criminal offenses. And all received—or will receive—license suspensions for failure to pay.[1] Thus, Plaintiffs currently face (or will soon inevitably face) the impossible choice of driving illegally to meet their basic needs, or failing to provide for themselves and their families. The Commissioner did not provide and will not provide any Plaintiff (or any other Virginian) any sort of hearing or assessment of ability to pay at the time of the suspension.

Plaintiffs bring this action to vindicate their constitutional rights. Pending the Court's ultimate determination of the merits of their claims, Plaintiffs request a preliminary injunction to:

(1)     enjoin the Commissioner from enforcing Section 46.2-395 against Plaintiffs and the Future Suspended Class Members without notice and determination of ability to pay;

(2)     remove any current suspensions of the Plaintiffs' driver's licenses imposed under Section 46.2-395; and

(3)     enjoin the Commissioner from charging a fee to reinstate the Plaintiffs' licenses if there are no other restrictions on their licenses.

## STATEMENT OF FACTS

### I.   Driver's licenses are automatically suspended for failure to pay fines and costs.

"Each year, the Commonwealth of Virginia imposes approximately half a billion dollars' worth of fees and fines in traffic and criminal court. . . . The number and amount of these fees

---

[1] Plaintiffs seek to certify two classes. First, a **Suspended Class** consisting of all persons whose driver's licenses are currently suspended for failure to pay court debt under Section 46.2-395. Second, a **Future Suspended Class** consisting of all persons whose driver's licenses will be suspended for failure to pay court debt under Section 46.2-395.

have grown over time and now fund a wide range of basic government operations and services."
*Stinnie v. Holcomb*, ___ F. App'x ___, 2018 WL 2337750, at *4 (4th Cir. 2018) (Gregory, J.,
dissenting) (summarizing Plaintiffs' allegations). These fees include fees for constitutionally
sensitive areas, such as jury fees and court-appointed counsel fees, as well as courthouse
construction fees, courthouse security fees, criminal justice academy training fees, fixed
misdemeanor fees, electronic summons fees, more-time-to-pay fees, and jail admissions fees,
among a host of others.

"The stacking of these fees, along with interest, on top of offense-specific penalties,
means that even a minor traffic violation could spiral out of control, to the tune of hundreds, or
eventually thousands, of dollars." *Id.* State courts impose costs according to a fee schedule that
does not consider an individual's poverty in setting the amounts owed.

To compel payment, "the state punishes each and every individual who defaults by
automatically suspending his or her driver's license, regardless of the reason for the default." *Id.*
License suspension is automatic and mandatory for "failure or refusal" to pay court debt within
the specified period (thirty days of conviction or according to the terms of any court-ordered
payment plan). Va. Code § 46.2-395(B). Automatic suspensions occur under an algorithm within
court and DMV computer systems with no judicial determination or entered order of suspension.

The Virginia Supreme Court's Office of the Executive Secretary maintains the state's
Financial Management System ("FMS") used by all the General District Courts and almost all
the 120 Circuit Courts in the Commonwealth. *See* Ex. 1, Declaration of Llezelle Dugger, at ¶ 5.
When a scheduled payment to pay a court debt is not received by the due date, the FMS
automatically transmits an electronic record to the DMV stating that an individual's account is in
default. *See id.* ¶ 6. The DMV then updates the account holder's license status in its license

database in accordance with the record. This action effectuates the suspension for all practical purposes, including for the benefit of law enforcement, prosecutors, insurance companies, and other government entities. *See Stinnie*, 2018 WL 2337750, at *4 (Gregory, J., dissenting).

This system does not require a judge or clerk to enter an order of license suspension for failure to pay court costs or fines to effectuate the suspension. *See* Ex. 1 ¶ 7. Instead, the system defaults to suspending the license whenever a payment is due and no payment is entered. In other words, the court clerk must enter payment before the due date to prevent the system from signaling to DMV to suspend the individual's license.

Court files maintain no record reflecting the suspension of a driver's license for non-payment. *Id.* ¶ 8. The driver receives no notice of alleged default, and no process exists for the driver to explain or contest the late payment before the DMV records the suspension. The Commissioner conducts no review of a person's financial condition before—or at any point related to—suspending a person's license for failure to pay, or otherwise learn the reasons for the default. The DMV does not reinstate any suspended license until all payments owed to all state courts are current and the driver has paid a reinstatement fee of at least $145 to the DMV.

## II.  The suspension of driver's licenses pushes people into further poverty.

Under this system—including the Commissioner's actions under Section 46.2-395(B)— hundreds of thousands of Virginians have lost their licenses simply because they lack the financial means to pay court debt. Almost a million people had their licenses suspended for court debt as of January 2017. Ex. 2, Email from Matthew Leary, Virginia DMV, to Daniel Davies, Legislative Ass't to Delegate Dave LaRock (Jan. 5, 2017). This driver's license suspension system deprives them of reliable, lawful transportation necessary to get to and from or to find work, take children to school, keep medical appointments, care for ill or disabled family members, and (paradoxically) to meet their financial obligations to the courts. As then-Governor

McAuliffe observed: "For many, personal vehicles are the only travel option to their job, and their driver license suspension prevents them from employment, and ultimately from paying their court costs and building a more productive life." *Id.*

Plaintiffs are Virginia residents whose driver's licenses were automatically and indefinitely suspended by the Commissioner under Section 46.2-395 when state courts sent information to the DMV noting nonpayment of court debt. Their stories are illustrative.

### A. Damian Stinnie.

Damian Stinnie, who grew up in the Virginia foster care system, has struggled to escape the grip of debt-related suspensions since 2012. In 2012, his license was first suspended because of his inability to pay over fines and costs imposed as a result of three traffic infractions. Ex. 3, Declaration of Damian Stinnie, at ¶ 4. His troubles compounded when he missed a court date (for driving while suspended) while hospitalized suddenly with life-threatening leukemia. He was convicted in his absence and, as a result, received additional fines and costs he could not pay, leading to additional license suspensions. *Id.* ¶¶ 5-7.

Since 2012, Mr. Stinnie has struggled with serious illness, unemployment, and homelessness—all made infinitely harder by the lack of a driver's license. *Id.* ¶¶ 7-9.

In late 2016, Mr. Stinnie's health had improved enough that he could work. *Id.* ¶ 10. He found a part-time job in December 2016, but despite working as many hours as his employer offered him, Mr. Stinnie never had enough money to meet all of his expenses. *Id.* ¶ 12. During this time, Mr. Stinnie faced the impossible choice of driving illegally to look for work, help out family members, and attend medical appointments, or not to drive and face continued unemployment, being late for work, and missing medical appointments. *Id.* ¶ 13.

After enduring a cycle of debt, license suspension, and incarceration for driving-while-suspended for nearly four years, Mr. Stinnie finally overcame the Commonwealth's substantial

barriers to regaining the legal ability to drive. In December 2017, he reinstated his license only by successfully applying for a loan to pay off his court debt. *Id.* ¶¶ 18-20. Mr. Stinnie was excited about the possibility that he would qualify for full-time employment with his current employer, which required all full-time employees to have a valid driver's license. *Id.* ¶ 21.

Meanwhile, however, a year-old charge for driving while suspended became finalized, and he was assessed another $2,189 in fines and costs, in addition to spending twenty days in jail. *Id.* ¶¶ 22-23. He obtained a payment plan of $30 per month, which he thought he could pay—until the City of Charlottesville placed a tax lien on 100% of his wages, making it impossible for him to make the first installment payment. *Id.* ¶¶ 24-26. His license was suspended yet again in June 2018. *Id.* ¶ 27.

If Mr. Stinnie had his license, he could get full-time hours at his work, drive without fear of being pulled over and eventually incarcerated, help out with family responsibilities, and get to and from medical appointments, which he still has as a result of his illness. *Id.* ¶¶ 32-33.

**B. Melissa Adams.**

Melissa Adams lives with her twelve-year-old son in Cascade, Virginia, a rural community west of Danville. Ex. 4, Declaration of Melissa Adams, at ¶ 2. Her license is currently suspended because she cannot afford the costs and fines related to various traffic and misdemeanor offenses, including driving on a suspended license. *Id.* ¶ 3.

In 2013, when Ms. Adams' license was first suspended for failure to pay, she was unemployed and had defaulted on fines and costs owed to the courts. *Id.* ¶ 7. At first, she could scrape together enough funds to make a modest payment. Later, she could not afford the court's payment plan, which required her to pay the remaining $526 in full at the end of three months. *Id.* When she missed a payment, her license was suspended. *Id.* ¶ 8. Neither the courts nor the

DMV ever asked her about her financial circumstances or the reasons for her non-payment, before or after suspending her license. *Id.* ¶ 10.

Ms. Adams has a rare and serious blood disorder, which at that time required her to drive to and from chemotherapy treatments in Greensboro, North Carolina. *Id.* ¶¶ 4, 9. She also worked several low-wage jobs during that time. Forced to choose between driving illegally, and losing her job and missing life-saving treatments, Ms. Adams continued to drive. *Id.* ¶ 9. She was convicted of driving while suspended several times, with each conviction leading to more costs and fines and additional indefinite license suspensions for failure to pay. *Id.* In June 2015, she served twelve days in jail for driving while suspended. During that time, she worried about how her time in jail would affect her young son. *Id.* ¶ 11.

Ms. Adams needs her license, especially given the lack of public transportation infrastructure in the part of Virginia where she lives. She needs to be able to drive to get to medical appointments, seek and maintain employment, go grocery shopping, and keep appointments for her son. *Id.* ¶ 17. Yet she has stopped driving to avoid going back to jail. *Id.* ¶ 12. As a result, she is currently unemployed. She and her son receive food stamps. She owes $300 a month in rent to her mother-in-law, which she pays when she can afford it. *Id.* ¶ 15. She also pays for utilities and buys groceries and other necessities for her herself and her son, for whom she is the sole source of support. *Id.*

Ms. Adams currently owes roughly $2,975 in court debt. To get her license back, she must get on approved payment plans with the courts and pay $260 in reinstatement fees to the DMV. *Id.* ¶ 18. She rarely has enough money to meet her family's basic needs, let alone pay her court debt or the DMV reinstatement fee. *Id.* ¶ 15. If she got her license back, she could get

a job and also attend trainings for jobs that pay more, making it more likely that she could pay off her court debts. *Id.* ¶ 22.

### C. Adrainne Johnson.

Adrainne Johnson lives in Charlottesville, Virginia. She and her two children live in an over-crowded rental unit with another family because they cannot afford their own place. Ex. 5, Declaration of Adrainne Johnson, at ¶¶ 2, 22.

Five years ago, Ms. Johnson was convicted of a drug-related charge and assessed $865 in costs, even though the court found her indigent for purposes of being appointed a lawyer. *Id.* ¶¶ 5-7. She made payments on the debt at first, but she could not afford to keep up with the payment plan and missed a payment. *Id.* ¶ 8. As soon as she missed a payment, her license was suspended. *Id.* ¶ 9.

Since then, Ms. Johnson has continued to work on and off in low-wage jobs. She has tried several times to establish a payment plan, but every time she cannot afford to make a payment, her license gets suspended. *Id.* ¶¶ 10-11. She had to keep driving to take care of her family. It was either drive and take the chance of being stopped, or lose her job and not be able to provide for her family. *Id.* ¶ 12. She also had to take her daughter to a psychiatrist every two weeks, and could not get there except by driving. In November 2017, she was convicted of driving on a suspended license, and assessed additional fines and costs. *Id.* ¶¶ 12, 13-14.

Since that November 2017 conviction, Ms. Johnson stopped driving because she could not risk going to jail. *Id.* ¶ 19. As a result, she has to rely on other people for rides. If her ride does not show up or is late, it makes her miss or be late to important appointments. *Id.* ¶ 20. Recently, her daughter missed a dentist appointment because they could not get to the dentist's office. *Id.* ¶ 26. Her daughter has other medical needs that require frequent doctors' visits, and

Ms. Johnson has much difficulty in getting her there regularly. She worries about her daughter and her ability to meet her family's needs without a driver's license. *Id.*

Ms. Johnson has seen advertisements for jobs with higher wages, or that she could take as a second job. Many are impossible to get to without a license, or the advertisements list a valid driver's license as a job requirement. *Id.* ¶ 24. She needs to be able to drive not only to get more or better-paying work, but also get to the grocery store and to medical appointments. *Id.* ¶ 25.

### D.  Williest Bandy.

Williest Bandy lives in Norfolk, Virginia with his girlfriend and their four children. Ex. 6, Declaration of Williest Bandy, at ¶ 2.

Mr. Bandy recently reinstated his license after living without it for seven years. He lost his license in 2011 because he could not afford to pay $1,820 in court debt related to several traffic convictions, including an expired inspection, failure to carry his license, failure to appear, and speeding. *Id.* ¶ 4. Mr. Bandy tried to avoid driving as much as possible, but not having his license meant that his employment options were very limited, and the time it took to commute via public transportation made holding a second job impossible. *Id.* ¶ 8. He struggled with basic activities like getting to doctors' appointments and grocery shopping. *Id.*

Mr. Bandy and his girlfriend support a family of six on a shoestring. Mr. Bandy is employed as a personal care assistant, working 35 to 40 hours per week at $8 per hour. His girlfriend is disabled and can only work a few hours a week. She receives Supplemental Security Income of $750 per month. The family also receives food stamps and a modest TANF payment of around $100-$200 per month. *Id.* ¶ 16. From their meager income, Mr. Bandy and his girlfriend must pay rent, utilities, transportation, house supplies, food, and clothes for their four children. They have no savings, and struggle to pay all of their bills each month. *Id.* ¶ 17.

Mr. Bandy currently owes well over $2,000 in court debt, spread over several courts. *Id*. ¶ 9. In order to keep his license, one court requires him to complete 75 hours of community services within the next six months, which he intends to do though he knows it will be difficult without transportation. *Id*. ¶ 11. The other two courts do not permit community service, and instead require him to pay at total of $75 each month. *Id*. ¶ 12. Given his extremely limited income, Mr. Bandy is struggling to make even the first monthly payment. He recently told the power company that his payment would be late so that he could hold money aside to make the $75 court payment. *Id*. ¶ 18.

Mr. Bandy desperately wants to keep his license. *Id*. ¶ 21. With his license he believes he can get a job that pays better—such as being a personal care assistant for someone who needs a driver—and even get a second job. *Id*. ¶ 22.

But he knows that soon the day will come when he cannot make another payment because it will mean sacrificing things like water or power. *Id*. ¶¶ 20-21. For Mr. Bandy, default is inevitable—and likely imminent—and he will be right back where he started: no license, no hope, and out the money he just recently paid to DMV in reinstatement fees. *Id*. ¶ 13.

**E. Brianna Morgan.**

Brianna Morgan lives in Petersburg, Virginia, with her three children. Ex. 7, Declaration of Brianna Morgan, at ¶ 2. Ms. Morgan has a disabling stomach condition that causes frequent painful spasms that prevent her from working. *Id.* ¶ 4. Her only income comes from less than $1,000 per month in public benefits.

Ms. Morgan's license was suspended for several years, until just three days ago, when she caught a lucky break and was able to get on community service and payment plans with the courts, as well as borrow $155 from a friend to pay the DMV reinstatement fee. *Id.* at ¶¶ 19-23. Her license was first suspended in 2015 when she could not afford to make payments toward

$179 in court costs (for operating an uninspected vehicle) while still supporting her family. *Id.* ¶¶ 5-9. She stopped driving after her license was suspended. Id. ¶ 10. Not being able to drive made life even harder for her and her family. *Id.* ¶ 11.

Ms. Morgan's father is in a nursing home, and it was tough to visit him without being able to drive. The bus system does not go near where her father lives, and so Ms. Morgan did not visit as often as she used to, and it is too unsafe to take her son and walk along the busy roads from the bus stop. *Id.* ¶ 12. Moreover, Ms. Morgan could not accompany her father to his medical appointments at the Veterans' Administration, as she used to do, for lack of transportation. She worried that her father, who suffered a stroke that affects his communication, would not get the care he needs because she could not be there to help the doctors understand what he said. *Id.* ¶ 13.

Ms. Morgan's household of four survives on less than $900 per month (other than food stamps). *Id.* ¶ 25. Even though she is desperate to keep her license, she worries that she cannot keep up with monthly payments. She typically does not have $25 left over at the end of the month, and believes she is just one unexpected expense away from losing her license again, as she often has unexpected expenses. In reality, making the payments will mean not meeting other basic needs. She worries about asking her children to make those sacrifices, and believes that losing her license again is inevitable. *Id.* ¶ 26.

Ms. Morgan needs to keep her license to take care of her family. With a license she can visit her ailing father and go with him to medical appointments. She can be more responsive to her son's school when they call because he is having an asthma attack. She can get to her own doctors' offices (rather than the emergency room by ambulance). And she can give her children

basic childhood experiences, participate in their school activities, and more easily do basic tasks like grocery shopping. *Id.* ¶ 25.

*

Plaintiffs' experiences typify the many others who have also lost—or will soon—their ability to drive because of poverty. In Virginia, the inability to drive makes it nearly impossible to sustain a livelihood or to provide for one's family. A driver's license is a "very common requirement" to obtain employment, including most jobs that "can actually lift people out of poverty."[2] Nearly 87% of Virginians travel to work by car; only 4.4% travel to work by public

---

[2] *See, e.g.*, Ex. 8, Alana Semuels, *No Driver's License, No Job*, The Atlantic (June 15, 2016), https://goo.gl/xQjyLj; Ex. 9, Stephen Bingham et al., *Stopped, Fined, Arrested: Racial Bias in Policing and Traffic Courts in California* 26-28 (Apr. 2016), http://ebclc.org/wp-content/uploads/2016/04/Stopped_Fined_Arrested_BOTRCA.pdf (describing several job types and job training programs that require a valid driver's license); Ex. 10, John Pawasarat, *Licensing Student Drivers in Wisconsin: Building Assets in Employment and Adulthood* 11-12 (ETI Publ'ns 203, 2016), https://dc.uwm.edu/cgi/viewcontent.cgi?article=1202&context=eti_pubs (reporting that "seventeen … job openings surveys involving thousands of employers in the Milwaukee area (1993 through 2009) have consistently identified scores of jobs requiring a valid driver's license in order to perform the duties of the work," and that many public and private sector employers listed having a valid driver's license as a job requirement); Ex. 11, John Pawasarat & Lois M. Quinn, *The EARN (Early Assessment and Retention Network) Model for Effectively Targeting WIA and TANF Resources to Participants* 2 (ETI Publ'ns Paper 60, 2007). https://dc.uwm.edu/cgi/viewcontent.cgi?article=1059&context=eti_pubs (reporting on a longitudinal survey of single mothers who received public assistance, showing that those with a driver's license were twice as likely as those without to show earnings above the poverty level, and that the gap was four times for the subgroup of people who had less than twelve years of education).

transit.[3] Reliable, accessible public transit remains scarce in the Commonwealth, where nearly all counties are rural.[4] Public transit in Virginia's urban areas also provide limited access to jobs.[5]

The lack of transportation options remains a common barrier to obtaining and maintaining employment for many Virginians.[6] According to the Commonwealth's former Governor, license suspensions for failure to pay fines and costs make it even harder for Virginians to find and keep employment. *See* Ex. 2. They also create an unjust and impossible dilemma: drive illegally and risk more punishment, or stay home and forgo the ability to provide for the most basic of daily living needs for one's self and family.

---

[3] *See* Ex. 12, U.S. Dep't of Transp., Bureau of Transp. Stats., *VIRGINIA Transportation by the Numbers* 190 (2016), https://www.bts.gov/sites/bts.dot.gov/files/legacy/_entire.pdf.

[4] *See* Ex. 13, Va. Dep't of Rail & Pub. Transp., *Statewide Public Transportation and Transportation Demand Management Plan* ES-4 (2014), http://www.drpt.virginia.gov/media/1157/vdrpt_statewide-transit-tdm-plan_final_021214.pdf (reporting that "[s]ignificant gaps exist across the Commonwealth between transit standards and the services that are now being offered").

[5] *See* Ex. 14, Adie Tomer et al., *Missed Opportunity: Transit and Jobs in Metropolitan America* 46 (2011), https://www.brookings.edu/wp-content/uploads/2016/06/0512_jobs_transit.pdf (reporting that only 26.5% of jobs in the Richmond, Virginia area were accessible within 90 minutes by public transportation, and that the figure for Virginia Beach-Norfolk-Newport News area was 15.4%).

[6] *See, e.g.,* Ex. 15, City of Richmond, *Mayor's Anti-Poverty Commission Report* 56-62 (Jan. 18, 2013), http://www.richmondgov.com/CommissionAntiPoverty/documents/Antipovertycommissionfinal1_17_2013c--printready.pdf (describing the spatial mismatch between jobs and low-income populations in the Richmond area, and the lack of adequate transportation options connecting the two); Ex. 16, S. Envtl. Law Ctr. & Housing Va., *Jobs, Transportation, and Affordable Housing: Connecting Home and Work* 8 (2010), https://www.southernenvironment.org/uploads/publications/connecting_home_and_work.pdf (noting that the mismatch in Virginia "between jobs and housing can make it difficult for low income households and other people who do not own a car or cannot drive to get to work or to reach potential jobs. This problem is particularly severe in areas without adequate transit or other transportation alternatives.").

## LEGAL STANDARD

The four-part test for preliminary injunctive relief in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008), applies in the Fourth Circuit. *See Metro Reg'l Info. Sys. v. Am. Home Realty Network, Inc.,* 722 F.3d 591, 595 (4th Cir. 2013); *Real Truth About Obama, Inc., v. FEC,* 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010). To obtain a preliminary injunction, the moving party must establish that: (1) a likelihood of success on the merits; (2) it has suffered and will continue to suffer irreparable harm without preliminary injunctive relief; (3) a balancing of equities weighs in its favor; and (4) issuing a preliminary injunction follows the public interest. *Winter*, 550 U.S. at 20.

## ARGUMENT

### I.  **Plaintiffs are likely to prevail on their claims.**

The Court should award Plaintiffs a preliminary injunction because they can make a "clear showing" that they are is likely to succeed on the merits of their claims. *Di Biase v. SPX Corp.,* 872 F.3d 224, 230 (4th Cir. 2017). This "clear showing" standard does require Plaintiffs to show that they are certain to succeed. *Pashby v. Delia,* 709 F.3d 307, 321 (4th Cir. 2013) ("plaintiffs need not show a certainty of success").

Section 46.2-395 of the Virginia Code is unconstitutional on its face for mandating automatic license suspension without notice or a hearing. This defect violates the procedural due process rights of every driver whose license is suspended under Section 46.2-395.

Additionally, as written and as implemented,[7] Section 46.2-395 is unconstitutional as applied to people who cannot afford to pay because of their modest financial circumstances.

---

[7] In its Order setting a schedule for filing an amended complaint, the Court asked Plaintiffs to clarify whether their suit presents "facial or factual challenges (or both)" to the statute. ECF Doc. 81. One of Plaintiffs' claims is a facial challenge that conforms to the highest standard imposed by the Supreme Court on facial challenges: that the challenged law be unconstitutional in all of

Schemes punishing people who are *unable* to pay violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Bearden v. Georgia*, 461 U.S. 660, 668 (1983). The Virginia license-for-payment system is just such a scheme. Virginia law automatically deprives individuals of their licenses upon any "failure or refusal" to pay court debt. Va. Code Ann. § 46.2-395(B). By its own terms, Virginia law is indifferent to the crucial distinction between "failure" and "refusal" to pay.

Plaintiffs bring this action for themselves and on behalf of all others similarly situated. Plaintiffs seek relief from the Commonwealth's unconstitutional scheme that unfairly traps Virginians in a vicious cycle of debt, unemployment, and incarceration.

In its Memorandum Opinion, this Court noted that the automatic suspension of driver's licenses for inability to pay court-related debt as alleged in the Complaint "may very well violate Plaintiffs' constitutional rights to due process and equal protection." ECF No. 56 at 35. Within the past year, several courts have enjoined comparable license suspension statutes. *E.g.*, *Hixson v. Haslam*, No. 3:17-cv-00005, 2018 U.S. Dist. LEXIS 114622 (M.D. Tenn. July 2, 2018) (granting summary judgment and enjoining revocation of licenses for failure to pay non-traffic court debt); *Fowler v. Johnson*, No. 17-11441, 2017 U.S. Dist. LEXIS 205363 (E.D. Mich. Dec.

---

its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Virginia Code § 46.2-395 unconstitutionally violates procedural due process on its face by revoking driver's licenses—constitutionally protected property interests—without notice or a hearing. In this regard, every enforcement of the provision is unconstitutional. Plaintiffs' other claims challenge the statute as applied to people who are unable to pay: both as written in the Code and as implemented by the Commissioner, the statute violates equal protection and due process when applied against those unable to pay. The Plaintiffs contend that the Commissioner is a proper Defendant to challenge the constitutionality of Section 46.2-395, both as written and as implemented, because (1) under any construction of the statute as written, the Commissioner has a significant and special role in enforcement and (2) regardless of the statute's terms, as it is actually implemented, the Defendant issues suspensions pursuant to Section 46.2-395 without regard to the existence or non-existence of any court document ordering said suspension.

14, 2017) (enjoining suspension of licenses for non-payment); *Robinson v. Purkey*, No. 3:17-cv-1263, 2017 U.S. Dist. LEXIS 165483 (M.D. Tenn. Oct. 5, 2017) (granting TRO reinstating licenses suspended for non-payment of traffic tickets, pending ruling on preliminary injunction).[8]

Section 46.2-395 violates the Constitution in at least five ways. *First*, it strips all affected drivers of a constitutionally protected property interest—their driver's licenses—without the guaranteed safeguards of notice and a hearing. *Second*, it violates due process and fundamental fairness by punishing those who owe money to the state for sheer inability to pay. *Third*, it violates equal protection by treating those who are willing but unable to pay more harshly than those who are willing and able to pay, when the only difference between them is their wealth. *Fourth*, suspending licenses for delinquent court debt fails even the most minimum constitutional standards because it is not rationally related to legitimate state interests. Indeed, by siphoning away law enforcement resources and preventing Plaintiffs from earning a living, it undermines the state's asserted interests in advancing highway safety and prompting repayment. *Fifth*, the license-for-payment scheme subjects Plaintiffs and those like them to harsher collection practices than those for other civil debtors, violating equal protection.

## A. The Commissioner's enforcement of Section 46.2-395 violates procedural due process.

The Fourteenth Amendment provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Driver's licenses are protected property interests and "are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1971); *see*

---

[8] These decisions misapplied the judicial standard under *Bearden v. Georgia*, 461 U.S. 660, 664 (1983). *Fowler* concluded that *Bearden* did not apply, while *Robinson* and *Hixson* applied a lower rational basis analysis in deference to dicta from the Sixth Circuit. As discussed below, this was error. But even under the lowest standard of judicial review, these courts concluded that Tennessee and Michigan's license revocation statutes did not pass constitutional muster.

*also Scott v. Williams*, 924 F.2d 56, 58 (4th Cir. 1991) ("[A] driver's license is a property interest protected by the fourteenth amendment and, once issued, a driver's license may not be taken away without affording a licensee procedural due process."); *Plumer v. Maryland*, 915 F.2d 927, 931 (4th Cir. 1990) ("It is well settled that a driver's license is a property interest that may not be suspended or revoked without due process.").

"The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (internal quotation marks omitted). When suspension of a driver's license is at stake, the state "must afford notice and opportunity for hearing." *Bell*, 402 U.S. at 542. Likewise, the Fourth Circuit has recognized that revocation or suspension of a driver's license requires "notice and an opportunity to be heard." *Plumer*, 915 F.2d at 931. Section 46.2-395 fails to provide either notice or a hearing.

*Notice*. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice *reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action* and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950) (emphasis added). Thus, "when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing [the recipient] might reasonably adopt to accomplish it." *Id.* at 315.

Plaintiffs here received no notice about an impending license suspension; instead, their licenses were suspended automatically upon default. At most, at the time of trial on the underlying traffic or criminal offense, Plaintiffs might receive a standard court form suggesting that future nonpayment would result in automatic suspension. General language about the

possibility of a hypothetical suspension upon a future default is not "reasonably calculated . . . to apprise interested parties of the pendency of the action." *Mullane*, 339 U.S. at 314. Indeed, at that stage there is no action pending of which Plaintiffs could be apprised.

Similarly, the requirement of notice is closely related to requirement of a hearing. Not only should notice "apprise interested parties of the pendency of the action," but it also helps "afford them an opportunity to present their objections." *Id.*; *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978). It is logically impossible for Plaintiffs to receive sufficient notice in this regard, because they are also denied a hearing.

*A Hearing*. Due process here also requires a hearing before deprivation. In *Bell v. Burson*, where a driver's license was suspended to encourage posting of monetary security, the Supreme Court held, "except in emergency situations (and this is not one) due process requires that when a State seeks to terminate an interest such as that here involved, it must afford notice and opportunity for hearing appropriate to the nature of the case *before* the termination becomes effective." 402 U.S. at 542; *see also Dixon v. Love*, 431 U.S. 105, 114 (1977) (endorsing *Bell*'s determination that a pre-deprivation hearing is required when the "only purpose" was to obtain monetary security); *Zinermon v. Burch,* 494 U.S. 113, 127 (1990) (stating that generally "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property.").

Section 46.2-395 does not provide for a hearing of any kind. Suspensions are automatic upon default, with no "opportunity to be heard," *Plumer* 915 F.2d at 931. This lack of a hearing violates the requirements laid down by the Supreme Court in *Bell* and adhered to by the Fourth Circuit.

*Plumer v. Maryland*, 915 F.2d 927 (4th Cir. 1990), is instructive by comparison. There, the Fourth Circuit upheld a Maryland suspension scheme against a challenge by a plaintiff whose license was suspended after a drunk driving conviction and refusal to take a breathalyzer test. *Id.* at 928. The court held that due process requires "that a licensee be informed of the evidence on which the agency is relying, and be given a chance to rebut such evidence." *Id. at* 931. Due process was satisfied because:

> [The Motor Vehicle Administration] cannot suspend any license without *first* making available a hearing prior to the suspension. Such a hearing is held only after written notice is given to the licensee setting forth the time and place of the hearing, and the factual basis for the suspension action. Finally, the licensee has the right to inspect and copy all evidence, as well as call witnesses and present rebuttal evidence.

*Id.* at 932 (internal citations omitted) (emphasis in original).

None of these protections exist here. There is no hearing before suspension—or at any time. The relevant statutory language provides: "No appeal shall lie in any case in which the suspension or revocation of the license or registration was mandatory except to determine the identity of the person concerned when the question of identity is in dispute." Va. Code Ann. § 46.2-410. Thus, for an accurately identified debtor, there is no opportunity for post-deprivation hearing either. There is no written notice "setting forth the time and place" of the non-existent hearing. *Plumer,* 915 F.2d at 932.  And the licensee has no similar rights of inspection and rebuttal, because again there is no hearing. Because Section 46.2-395 includes *none* of the protections the Court found relevant in *Plumer*, it cannot meet the minimum requirements of due process.

**B.  The Commissioner's enforcement of Section 46.2-395 violates due process and fundamental fairness.**

**a.  Section 46.2-395 impairs substantial property interests in Plaintiffs' licenses.**

Suspension of a driver's license implicates the Due Process Clause's guarantee that the state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV s. 1. As the Supreme Court has held and the Fourth Circuit has recognized, "it is well settled that a driver's license is a property interest that may not be suspended or revoked without due process." *Plumer*, 915 F.2d at 931 (citing *Bell v. Burson*, 402 U.S. 535 (1971)). That a driver's license is a protected property interest is sufficient to support Plaintiffs' due process and equal protection claims.[9]

But a driver's license is not only a protected property interest. In modern society, it is essential to the exercise of several fundamental rights. For one, it implicates "the right . . . to engage in any of the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Plaintiffs have a substantial property interest in their driver's licenses because they rely on their licenses as a means of economic survival. *See Mackey v. Montrym*, 443 U.S. 1, 11 (1979). A person's means of support enjoys heightened significance as a property interest. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985); *Bell*, 402 U.S. at 539; *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). A driver's license is "essential in the pursuit of [ ] livelihood," *Bell*, 402 U.S. at 539; *see also Miller v. Anckaitis*, 436 F.2d 115, 120 (3rd Cir. 1970) (license indispensable "for virtually everyone who must work for a living"). Individuals' interest in their driver's license is therefore "substantial." *Scott v. Williams*, 924 F.2d 56, 59 (4th Cir.

---

[9] In his Motion to Dismiss the original Complaint, the Commissioner acknowledge that a driver's license is a constitutionally protected property interest, the deprivation of which must comport with Fourteenth Amendment guarantees. ECF Doc. 10 at 31.

1991). Indeed, once driver's "licenses are issued . . . their continued possession may become *essential in the pursuit of a livelihood*." *Bell*, 402 U.S. at 539 (emphasis added).

Additionally, for most Virginians, exercise of "the fundamental right of interstate movement," realistically speaking, requires a driver's license. *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969). As the Virginia Supreme Court observed:

> The right of a citizen to travel upon the public highways and to transport his property thereon in the ordinary course of life and business is a common right which he has under his right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right in so doing to use the ordinary and usual conveyances of the day; and under the existing modes of travel includes the right . . . to operate an automobile thereon, for the usual and ordinary purposes of life and business. It is not a mere privilege . . . which a city may permit or prohibit at will.

*Thompson v. Smith*, 155 Va. 367, 377 (1930).

Finally, for many voters around the Commonwealth, the "fundamental matter" of "the right to exercise the franchise" also turns on the ability to drive. *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). Because "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard," serious constitutional issues are raised when access to the vote is effectively denied by suspending driver's licenses on the same basis. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966).

Considerations like these compelled Justice Powell's observation: "Serious consequences also may result from convictions not punishable by imprisonment. . . . Losing one's driver's license is more serious for some individuals than a brief stay in jail." *Argersinger v. Hamlin*, 407 U.S. 25, 48 (1972) (Powell, J., concurring).

Simply, "[s]uspension of issued licenses . . . involves state action that adjudicates important interests of the licensees." *Bell*, 402 U.S. at 539. It matters not that a driver's license

has sometimes been characterized as a "privilege." *Walton v. Commonwealth*, 255 Va. 422, 428 (1998). The Supreme Court has rejected the distinction in the driver's license context: "relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.'" *Bell*, 402 U.S. at 539. A state seeking to deprive an individual of a driver's license must comport with the Fourteenth Amendment.

### b. The license-for-payment law is fundamentally unfair.

"Fundamental fairness" in the administration of justice is "the touchstone of due process." *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). Decisions affecting the "life, liberty, or property" interests protected by the due process clause must comport with the principles of due process and fundamental fairness. The Supreme Court has repeatedly held that it offends due process and fundamental fairness for the state to deprive people of constitutionally protected interests for failing to pay fines or costs that they cannot pay.

Take *Bearden v. Georgia*, 461 U.S. 660 (1983). There, the Supreme Court held that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." *Id.* at 667–68. Thus, when the state in *Bearden* revoked defendant's probation for failure to pay a fine—with no inquiry into whether he was financially capable of paying the fine and no inquiry into alternative remedies—the Court found a violation of due process. *Id.* at 668–69.

Consider also *Tate v. Short*, 401 U.S. 395 (1971), and *Williams v. Illinois*, 399 U.S. 235 (1970). In these cases, the Court held that punishing a defendant who was unable to pay a fine violated due process and fundamental fairness. *Tate*, 401 U.S. at 398 (converting a fine into a prison sentence for those unable to pay violates due process); *Williams*, 399 U.S. at 241–42 (imprisoning the defendant past the statutory maximum for failure to pay a fine violates due process).

22

*Tate* and *Williams* (like *Bearden*) involved constitutionally protected liberty interests. Section 46.2-395 deprives drivers of their constitutionally protected property interest in their driver's licenses. In fact, the Supreme Court has invalidated more minor infringements on due process for reasons of fundamental fairness. Take the example of *Mayer v. City of Chicago*, when the Court held that requiring an "impecunious medical student" to pay for a transcript in the context of prosecution for non-felony charges punishable only by fine violated due process. 404 U.S. 189, 196–97 (1971). It was "arbitrary" and fundamentally unjust for the penalty to hinge on ability to pay:

> The practical effects of conviction of even petty offenses of the kind involved here are not to be minimized. *A fine may bear as heavily on an indigent accused as forced confinement. The collateral consequences of conviction may be even more serious,* as when (as was apparently a possibility in this case) the impecunious medical student finds himself barred from the practice of medicine because of a conviction he is unable to appeal for lack of funds.

*Id.* at 197 (emphasis added). Subjecting citizens to penalties—and their practical effects—simply because they cannot pay is fundamentally unfair and offends due process.

In such cases, the distinction between "willful refusal to pay a fine" and inability to pay is "of critical importance." *Bearden*, 461 U.S. at 668. When there is willful refusal, the state may impose punishment. "But," the Court warned in the context of *Bearden*, "if the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available." *Id.* at 668–69.

The logic of these cases is clear: state penalties affecting constitutionally protected interests should not turn on how much money a person has in her pocketbook. Other courts recognize this lesson and have invalidated schemes that disregard inability to pay.

The Fifth Circuit, for example, long ago recognized that a fixed-bond schedule, "without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978). Many recent decisions have similarly held that penalties turning on ability to pay violate due process, as well as equal protection. *Walker v. City of Calhoun*, Civ. A. No. 4:15-CV-0170-HLM, 2016 WL 361612, at *11 (N.D. Ga. Jan 28, 2016); *see also United States v. Flowers*, 946 F. Supp. 2d 1295, 1301 (M.D. Ala. May 22, 2013); *Jones v. City of Clanton*, Civ. A. No. 2:15cv34-MHT, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015); *Cooper v. City of Dothan*, No. 1:15-CV-425-WKW, 2015 WL 10013003, at *2 (M.D. Ala. June 18, 2015); *State v. Johnson*, 315 P.3d 1090, 1099, as amended Mar. 13, 2014, cert. denied, 135 S. Ct. 139 (2014); *State, Dep't of Revenue, Child Support Enf't Div. v. Beans*, 965 P.2d 725, 729 (Alaska 1998).

Virginia's license-for-repayment law does exactly this. Section 46.2-395(B) deprives drivers of a constitutionally protected interest when they fail to pay fines, fees, and costs within the requisite time (usually 30 days after traffic or criminal conviction, or after missing a single payment on an installment plan). Suspension occurs automatically, with no inquiry into the individual's ability to pay. Because there is no such inquiry, there is also no consideration of remedies other than driver's license suspension. Automatically suspending driver's licenses for outstanding court debt, with no consideration of ability to pay, violates principles of due process and fundamental fairness.

### C. The license-for-payment scheme violates equal protection by punishing poverty.

The license-for-payment scheme fails equal justice. The Supreme Court has repeatedly held infringing constitutional interests for lack of ability to pay violates the Equal Protection Clause. *See, e.g.*, *Griffin v. Illinois,* 351 U.S. 12, 16-17 (1956) (holding that denying criminal appeal for inability to pay associated costs violated the Equal Protection Clause); *Williams v.*

24

*Illinois*, 399 U.S. 235, 240-41 (1970) (same for imprisonment for inability to pay criminal fines and court costs); *Tate v. Short*, 401 U.S. 395, 399 (1971) (same for imprisonment for inability to pay traffic fines); *Mayer v. City of Chicago*, 404 U.S. 189, 196-97 (1971) (same for appeal of non-felony charges punishable by fine); *Bearden v. Georgia*, 461 U.S. 660, 662 (1983) (holding that revoking probation for failure to pay fines and restitution, without assessing ability to pay, violated the Fourteenth Amendment).[10]

Likewise, the Fourth Circuit has recognized that inability to pay a fine or restitution is improper grounds for punishment "if the default results from a condition beyond [defendant's] control such as poverty." *United States v. Boyd*, 935 F.2d 1288 (4th Cir. 1991) (unpublished opinion). In the context of a statute requiring certain indigent defendants to pay costs associated with appointed counsel, the Fourth Circuit held, "The state's initiatives in this area naturally must be *narrowly drawn* to avoid either chilling the indigent's exercise of the right to counsel, or creating *discriminating terms of repayment based solely on the defendant's poverty*." *Alexander v. Johnson,* 742 F.2d 117, 123-24 (4th Cir. 1984) (emphasis added).

Plaintiffs here are willing but unable to pay their court debt. Thus, they are similarly situated to others who are willing to pay. But unlike those who are willing and *able* to pay, Plaintiffs lack the means to discharge their court debt. It is precisely because of their *inability to pay* that they face additional penalties not faced by those who pay: license suspension and the attendant consequences. Plaintiffs therefore are treated differently from others with whom they are similarly situated just because of their poverty. The Commonwealth has not narrowly drawn

---

[10] These cases rest on both due process and equal protection grounds. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996) ("As we said in *Bearden v. Georgia*, in the Court's *Griffin*-line cases, 'due process and equal protection principles converge.'").

its statute to avoid infringing on Plaintiffs' constitutionally protected interest in their licenses. Section 46.2-395, and the Commissioner's enforcement of that statute, violates Equal Protection.

### D. Suspending licenses of those who cannot pay does not pass rational basis scrutiny.

Section 46.2-395 embeds inequality and lack of due process into the Commonwealth's justice system. Because it punishes people for their inability to pay, it should be enjoined. The Commonwealth will presumably argue that rational basis review applies to this case. But decisions applying a deferential form of rational basis review are no more relevant to the current case than they were to *Gideon v. Wainwright*, 372 U.S. 335 (1963), or to the many cases cited above dealing with the justice and fundamental fairness of the state's own system of justice.

Even so, Section 46.2-395 cannot survive even rational basis review. The Due Process Clause protects against arbitrary and capricious government action even when the decision to act follows adequate procedures. Due process requires a challenged law to have a reasonable relation to a proper purpose and to be neither arbitrary nor discriminatory. *See, e.g*., *Walton v. Commonwealth*, 24 Va. App. 757 (1997). Meanwhile, rational basis analysis in the Equal Protection context requires that there be "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016). Section 46.2-395(B) fails these standards. Taking away a driver's license because the personal is unable—not unwilling—to pay court debt is, at bottom, irrational. There is no rational relation between the inability to pay court debt and Plaintiffs' constitutionally protected property rights in their driver's licenses and the attendant liberty interests in being able to drive. At the least, Plaintiffs are entitled to establish the irrationality of this scheme at trial.

Virginia's automatic suspension law makes it harder for the people who owe the Commonwealth money to find or maintain employment, which irrationally undercuts the Commonwealth's goal of debt collection. The National Center for State Courts recently

observed, "Even when people can reach work sites without a car, many jobs require a valid driver's license," either because driving is an essential job duty, or because employer's see driver's licenses as indicators of reliability.[11] One study of New Jersey drivers found that 42% of drivers lost their jobs after their driving privileges were suspended.[12] Of those drivers, 45% were unable to find new employment. *Id.* This evidence highlights what is already obvious: taking away transportation options makes it harder to pay court debts and is thus directly contrary to any rational interest.

Moreover, suspensions under Section 46.2-395(B) are unrelated to the Commonwealth's interest in promoting highway safety. Defendant suspends driver's licenses not as a result of traffic offenses, but as a result of unpaid court debt. Even when the underlying conviction relates to traffic offenses, the suspension arises not from that conviction but purely from the later inability to pay fines and costs. And of course, a person with a perfect driving record can have his license suspended for unpaid debt for a non-traffic conviction, while anyone who pays can continue to drive, regardless of his or her safety record.[13]

Not only is the Commonwealth's automatic suspension system unrelated to traffic safety, but the American Association of Motor Vehicles (AAMVA) concluded that suspension of

---

[11] Ex. 17, Andrea M. Marsh, "Rethinking Driver's License Suspensions for Nonpayment of Fines and Fees," Nat'l Ctr. on State Courts (2017), available at https://www.ncsc.org/~/media/Microsites/Files/Trends%202017/Rethinking-Drivers-License-Suspensions-Trends-2017.ashx.

[12] Ex. 18, Jon A. Carnegie, et al., *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007). http://www.nj.gov/transportation/refdata/research/reports/FHWA-NJ-2007-020-V1.pdf.

[13] Suspensions for court debt are disproportionate with penalties imposed for traffic offenses. A person convicted of reckless driving risks no more than a six-month driver's license suspension. *See* Va. Code Ann. § 46.2-393(A). If a driver who kills someone as a result of reckless driving may have her license suspended for up to twelve months. *See id.* § 46.2-396. In contrast, the Commissioner suspends a debtor's license for failure to pay court costs and fines indefinitely, and for as long as the debtor is in arrears by any amount. It is common for such suspensions to last for years. Such a system is unreasonable.

driver's licenses for non-traffic related reasons *increases* the threat to public safety.[14] When law enforcement identifies a driver as driving on a license suspended for court debt, officers have to cite the person, and possibly to arrest and book them, even to confine them before trial.[15]All of this takes time and money, which diverts resources away from investigating violations that present true threats to public safety.[16] For this reason, the AAMVA has concluded that enforcing debt-related suspensions strains state budgets and detracts from public safety priorities and has recommended the repeal of those policies.[17] Promoting highway safety is thus not a credible interest here, let alone one rationally advanced by the statute's operation.

Section 46.2-395(B) is not rationally related to a legitimate state interest. But more than that, this law undermines the state's stated objectives and is fundamentally perverse. First, driver's license suspension inhibits ability to pay. The loss of a license often means the loss of reliable transportation to and from work—which can mean losing one's job. *See supra* Fact Section II; *supra* nn. 12-13. For those who are unemployed or who lose their job, the inability to drive makes the job search exponentially harder. In many parts of the Commonwealth, public transportation options are limited or non-existent. *See supra* Fact Section II. All of this makes it less likely—not more likely—that the debtor will be able to pay the court. If the purpose is to prompt individuals to pay court debt, taking away their driver's licenses cuts them off at the knees.

---

[14] Ex. 19, Suspended/Revoked Working Grp., Am. Ass'n of Motor Vehicle Adm'rs, *Best Practices Guide to Reducing Suspended Drivers*, at 2, 4-5 (2013), *available at* http://www.aamva.org/Suspended-and-Revoked-Drivers-Working-Group/.
[15] *Id.* at 2.
[16] *Id.*
[17] *Id.* at 3.

Second, the license-for-payment scheme is particularly counter-productive for goals of successful reentry after incarceration. For people returning to their communities from jails and prisons, finding a job is a crucial element to successful reentry. But being unemployed and getting reestablished puts those individuals at high risk for not meeting court debt obligations. When their licenses are suspended for court debt, their ability to obtain or maintain stable employment is greatly reduced, and with it their chances of successful reentry. This cycle undermines the Commonwealth's own reentry, rehabilitation, and safety objectives.

Other federal courts have recognized as much in recent decisions:

> The damage that the lack of a driver's license does to one's employment prospects is just the beginning. Being unable to drive is the equivalent of a recurring tax or penalty on engaging in the wholly lawful ordinary activities of life—a tax or penalty that someone who was convicted of the same offense, but was able to pay his initial court debt, would never be obligated to pay. When the State of Tennessee takes away a person's right to drive, that person does not, suddenly and conveniently, stop having to go to transport oneself and family members to medical appoints, stop having to report to court dates, or stop having to venture into the world to obtain food and necessities. Maybe public transportation will work for some of those activities some of the time, and maybe it will not.  Similarly, while some individuals with suspended licenses may be able to rely on family or charitable assistance for some purposes, there is no reason to conclude that such options will be available or adequate in most cases. What, then, is a person on a revoked license to do?  The lawful options are simple: she can simply forgo the life activities, no matter how important, for which she cannot obtain adequate transportation, or she can incur additional transportation expenses—making himself that much less likely ever to satisfy her court debt.

*Robinson v. Purkey*, No. 3:17-cv-01263, 2018 U.S. Dist. LEXIS 97659, at *130 )M.D. Tenn. June 11, 2018); *see also id.* at *131 ("If the purpose of such a scheme were to make an indigent driver's first traffic violation her entrée into an endless cycle of greater and greater debt, it could be said to serve that purpose well."); *id.* at *134 ("There is substantial reason to doubt that imposing driver's license suspensions on indigent debtors makes any sense at all as a tool for collecting traffic debt.").

Thus the license-for-payment scheme of Section 46.2-395(B) is not rationally related to the Commonwealth's objectives. It in fact undermines them.

**E.   The Commissioner's extraordinary collection efforts violates equal protection.**

As for collection efforts, the Equal Protection Clause ensures (1) that debtors to the Commonwealth are not treated differently from civil creditors and (2) that debtors to the Commonwealth have protection for basic necessities and the means of making a living. Virginia's license-for-repayment scheme fails in both these regards.

In *James v. Strange*, 407 U.S. 128 (1972), the Supreme Court struck down a Kansas statutory scheme for recouping the costs of providing court-appointed counsel to indigent defendants. Under the statute, an indigent defendant with appointed counsel became obligated to repay the state for this expense within 60 days. The Court explained:

> If the sum remains unpaid after the 60-day period, a judgment is docketed against defendant for the unpaid amount. Six percent annual interest runs on the debt from the date the expenditure was made. The debt becomes a lien on the real estate of defendant and may be executed by garnishment or in any other manner provided by the Kansas Code of Civil Procedure. The indigent defendant is not, however, accorded any of the exemptions provided by that code for other judgment debtors except the homestead exemption.

*Id*. at 131. The list of exemptions denied to indigent defendants included "restrictions on the amount of disposable earnings subject to garnishment, protection of the debtor from wage garnishment at times of severe personal or family sickness, and exemption from attachment and execution on a debtor's personal clothing, books, and tools of trade." *Id.* at 134.

Because the statute "strip[ped] from indigent defendants the array of protective exemptions . . . erected for other civil judgment debtors," it violated the Equal Protection Clause. *Id.* at 135. While recognizing that "state recoupment statutes may betoken legitimate state interests," the Supreme Court explicitly held that "these interests are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors. . . . State

recoupment laws, notwithstanding the state interests they may serve, need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect." *Id.* at 142-43. It is unconstitutional when the state "strips the indigent defendant of the very exemptions designed primarily to benefit debtors of low and marginal incomes." *Id.* at 139.

Since *James*, federal courts have endorsed these same principles. For instance, the Supreme Court upheld Oregon's state recoupment scheme precisely because it insulated indigent debtors from any obligation to repay. *See Fuller v. Oregon*, 417 U.S. 40, 46 (1974) (recognizing that statute is constitutional because "[d]efendants with no likelihood of having the means to repay are not put under even a conditional obligation to do so, and those upon whom a conditional obligation is imposed are not subjected to collection procedures until their indigency has ended"). Similarly, in *Alexander v. Johnson*, the Fourth Circuit held that, for reimbursement programs to be constitutional, the indigent defendant "cannot be exposed to more severe collection practices than the ordinary civil debtor." 742 F.2d 117, 124 (4th Cir. 1984).

*James* and its progeny inarguably place specific requirements on state debt collection schemes: (1) they must not expose the indigent debtor to "more severe collection practices than the ordinary civil debtor," *id.*, and (2) they must not strip the person of the basic necessities of life and means of making a living. Section 46.2-395 does precisely what this line of cases protects against: (1) it subjects indigent court debtors to a punishment unavailable for civil creditors, and, in the process, (2) it denies these debtors the procedural and substantive protections they would receive if this were a civil debt.

31

First, Section 46.2-395 automatically suspends driver's licenses for unpaid court debt. Nearly all civil debtors are not exposed to this penalty.[18] And under *James* and its progeny, the indigent defendant "cannot be exposed to more severe collection practices than the ordinary civil debtor," *Alexander*, 742 F.2d at 124, the application of Section 46.2-395 is unconstitutional.

Second, the Commonwealth's driver's license suspension, much like the scheme in *James*, fails to afford the indigent defendant basic protections for necessities and livelihood. In Virginia, the "Poor Debtor's Exemption" shields civil debtors from creditors' attempts to claim certain basic belongings. Va. Code Ann. § 34-26. These belongings include clothing, home furnishings, firearms, pets, medically prescribed health aids, *motor vehicles*, and "*[t]ools, books, instruments, implements, equipment, and machines, including motor vehicles, . . . which are necessary for use in the course of the householder's occupation or trade not exceeding $10,000 in value*." Va. Code Ann. § 34-26(4)-(8) (emphasis added). The purpose of these exemptions is to allow the debtor "to provide for herself and her family." *See* Doug Rendleman, *Enforcement of Judgments and Liens in Virginia* § 3.3[B] (2017).

Section 46.2-395 gives no such protections. By suspending driver's licenses under this provision, the Commissioner deprives Plaintiffs of the means to provide for themselves and their families—as surely as repossessing a car or the tools of their trade. "Once [driver's] licenses are issued . . . their continued possession may become *essential in the pursuit of a livelihood*." *Bell v. Burson*, 402 U.S. 535, 539 (1971) (emphasis added). As civil debtors, Plaintiffs could keep a motor vehicle of modest value, but as debtors to the Commonwealth they automatically lose the

---

[18] The only civil judgments for which driver's licenses may be suspended appear to be unpaid judgments relating to traffic accidents for which the defendant was at fault. *See* Va. Code Ann. § 46.2-417 ("Suspension for failure to satisfy motor vehicle accident judgment"). This rule for a sub-variety of civil debtor does not change that Section 46.2-395 exposes the indigent debtor to "more severe collection practices than the ordinary civil debtor." *Alexander*, 742 F.2d at 124.

license required the drive the vehicle in the first place. Such a scheme "strips the indigent

defendant of the very exemptions designed primarily to benefit debtors of low and marginal

incomes," and "blight[s] . . . the hopes of indigents for self-sufficiency and self-respect." *James*,

407 U.S. at 139, 142-43.

Virginia's driver's license suspension scheme fails to afford the indigent defendant basic

protections for necessities and livelihood in another way. Civil garnishees in Virginia can count

on at least two key protections against garnishment of minimal income. Virginia law completely

provides at least $290 per week in income (or roughly $1,243 in monthly income) from

garnishment by creditors. Va. Code Ann. § 34-29(a). And federal law provides that "none of the

moneys paid" under the Social Security Act can be "subject to execution, levy, attachment,

garnishment, or other legal process." 42 U.S.C. § 407(a). These crucial protections of a minimum

financial existence are impliedly stripped from debtors facing driver's license suspension for

unpaid court debt, violating *James* and later cases.

Civil debtors receive notice, can mark these and other protections on a Virginia court

form (DC-454), and receive a hearing. But Virginia's license suspension scheme under Section

46.2-395 provides no statutory floor against collection, no notice, and no hearing. The

Commissioner tells even the poorest Virginia citizens to pay or lose their driver's licenses.

## II.  **Plaintiffs will suffer immediate, irreparable injury without a preliminary injunction.**

Plaintiffs must show that "irreparable injury is likely in the absence of an injunction."

*Winter*, 555 U.S. at 22 (emphasis omitted); *see SAS Inst. Inc. v. World Programming Ltd.*, 874

F.3d 370, 386 (4th Cir. 2017). The irreparable harm must be "likely" and "imminent." *Winter*,

555 U.S. at 22.

Because Plaintiffs' constitutional right are being violated, the Court assumes irreparable

injury. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). The Court "will not be able to

make a driver whole" for any economic harm or inconvenience caused by an erroneously suspended license. *Mackey v. Montrym*, 443 U.S. 1, 11 (1979). Without a driver's license, Plaintiffs and those similarly situated are trapped in a cycle of poverty and prevented from pursuing economic opportunities allowing them to provide for their families' basic needs and to pay off the fines and costs they owe. Here, the inability to drive impedes their ability to work, access groceries and medical care, care for and support their families, and be active community members. *See supra* Fact Section II; *see also Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).

Damages cannot redress these injuries, and they are irreparable. *See Arizona Dream Act*, 855 F.3d at 978 (noting loss of opportunity to pursue employment constitutes irreparable harm); *see also Mackey*, 443 U.S. at 11 (state "will not be able to make a driver whole" for any economic harm or inconvenience caused by erroneously suspended license); *Padberg v. McGrath-McKechnie*, 108 F. Supp. 2d 177, 183 (E.D.N.Y. 2000) (irreparable injury where deprivation of license "imminently threaten[ed]" plaintiff's "continued subsistence, an injury . . . which could not be adequately compensated by a monetary award"). *Cf. Reynolds v. Guiliani*, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."(quoting *Morel v. Guilani*, 927 F. Supp. 622 (S.D.N.Y. 1995)).

In their declarations, Plaintiffs describe the agonizing choice they face every time they realize there is no way to find or keep their jobs, make medical appointments, or fetch the groceries without driving. *See supra* Fact Section II. They describe the anguish they feel when they watch their sons and daughters stranded at home with few opportunities to play or participate in organized sports. *See, e.g.*, Ex. 5 ¶ 16. They lament the missed opportunities they

have for making a better life for themselves and their families by getting higher paying jobs. *See, e.g.*, Ex. 4 ¶ 13. And they describe what it was like to sit in jail for doing nothing more than driving illegally to meet their basic needs. *See, e.g.*, Ex. 3, ¶¶ 17, 22-23; Ex. 4 ¶ 11.

Plaintiffs' declarations leave no doubt: Plaintiffs and similarly-situated debtors have and continue to suffer deprivations, which cause (and will cause) them harm of a character that monetary relief cannot quantify or compensate. *See generally Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir. 1994) (an element of irreparable harm is that "monetary damages are difficult to ascertain or are inadequate"), *abrogated on other grounds by Winter*, 709 F.3d at 329.

## III. The equities and the public interest weigh heavily in favor of a preliminary injunction.

Finally, the balance of the equities (or "hardships") here weighs in favor of the relief sought, and that the public interest also favors granting an injunction. *Winter*, 555 U.S. at 20; *Di Biase*, 872 F.3d at 235; *Pashby*, 709 F.3d at 329.

The threat of injury to Plaintiffs considerably outweighs any potential harm to Defendant. Plaintiffs are being denied a critical ability to support themselves and their families. *See supra* Fact Section II; *see also Bell*, 402 U.S. at 539. In contrast, the Commissioner suffers no cognizable hardship to comply with the Constitution. *Giovanni Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *see also Messmer v. Harrison*, No. 5:15-cv-97-BO, 2015 WL 1885082, at *2 (E.D.N.C. Apr. 24, 2015).

The relief Plaintiffs seek is mainly prohibitory. Such injunctions "aim to maintain the status quo and prevent irreparable harm while [the] lawsuit remains pending." *Pashby*, 709 F.3d at 319. The "status quo" for these purposes is "the last uncontested status between the parties which preceded the controversy." *Id.* at 320 (quoting *Aggarao v. MOL Ship Mgmt. Co.,* 675 F.3d 355, 378 (4th Cir. 2012)). Here, the "last uncontested status" was when Plaintiffs were legally

able to drive, and before the onset of the practices and procedures challenged as unconstitutional against them. Any administrative costs associated with restoring Plaintiffs to the "last uncontested status" during this action is outweighed by Plaintiffs' harms: their ability to drive to keep their jobs, support their families, and meet other essential, basic needs.

Moreover, Section 46.2-395 does not serve the Commonwealth's interest in collecting fines and costs if the driver cannot pay. *See supra* Argument Section I.D. Because no incentive or punishment can force a person to do something she is incapable of doing, the requested injunction will not affect the Commonwealth's rate of collections. *See Bearden*, 461 U.S. at 670 ("Revoking the probation of someone who through no fault of his own is unable to make restitution will not make restitution suddenly forthcoming.").  And because Plaintiffs are not challenging the underlying monetary amounts charged to them, the Commonwealth can collect court debt through alternative measures other than license suspensions.[19]

Courts in this circuit often assess together the "balance of equities" and "public interest" elements of the *Winter* test, especially in cases involving constitutional rights and when the movant has satisfied the "likelihood of success" and "irreparable" harm criteria. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an

---

[19] Court debt resulting from criminal and traffic proceedings "shall constitute a judgment and, if not paid at the time they are imposed, execution may issue thereon in the same manner as upon any other monetary judgment." Va. Code Ann. § 19.2-341. Thus, collections—undertaken by a range of entities on the court's behalf, *see id.* § 19.2-349(C)—can involve garnishment, personal property liens, and attachment to real estate. In addition, the Virginia Department of Taxation's Court Debt Collections Office and Set-Off Debt Collection Program can collect court debt. *Id.* § 19.2-349(C). The Department of Taxation can recoup outstanding court debt from tax refunds. *See id.* §§ 58.1-523 *et seq.* Criminal penalties can also be imposed when a debtor willfully fails to pay. *See, e.g., id.* §§ 19.2-358 (show cause/contempt proceedings for failure to pay court debt), 19.2-356 (probation or suspension of sentence can be conditioned on payment of court debt).

injunction. . . . [U]pholding constitutional rights surely serves the public interest." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (citations and internal quotation marks omitted); *Giovani Carandola, Ltd.*, 303 F.3d at 521 (same). Granting the injunction would enable Plaintiffs to drive, thus allowing for employment and meeting their and their families' daily needs, as well as, ultimately being able to pay off their unpaid court debt. All of these things are in the public interest.

## IV. The Court should waive bond.

Under Civil Rule 65(c), a preliminary injunction can be granted only if the movant provides some form of security to protect the defendant from costs incurred if a court later determines that the injunction was improperly granted. In the Fourth Circuit, "the district court retains the discretion to set the bond in the amount it sees fit or waive the security requirement." *Pashby*, 709 F.3d at 332. This Court can (and should) exercise its discretion to excuse a bond requirement under appropriate circumstances. The Court should waive bond because Plaintiffs lack the finances to post such a bond. *See, e.g., Draego v. City of Charlottesville*, No. 3:16-cv-00057, 2016 WL 6834025, at *24 (bond waived where plaintiff was an "ordinary citizen unable to post anything more than a nominal bond," but had a strong case on the merits "and the injunction will result in little to no harm to the government" (citing *Doe v. Pittsylvania Cty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012)).

## CONCLUSION

Plaintiffs ask the Court to grant this motion, enter the proposed order, and afford all other appropriate relief.

Date:   September 11, 2018

By:   /s/ Angela A. Ciolfi
Jonathan T. Blank (VSB No.: 38487)
MCGUIREWOODS LLP
Court Square Building
310 Fourth Street NE, Suite 300
Post Office Box 1288
Charlottesville, VA 22902
Ph: (434) 977-2509
Fax: (434) 980-2258
*jblank@mcguirewoods.com*

Angela A. Ciolfi (VSB No.: 65337)
Pat Levy-Lavelle (VSB No.: 71190)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Ph: (434) 529-1810
Fax: (434) 977-0558
*angela@justice4all.org*

David P. Baugh (VSB No.: 22528)
DAVID P. BAUGH, ESQ., PLC
2025 E. Main Street, Suite 114
Richmond, VA 23223
Ph: (804) 743-8111
Fax: (804) 225-8035
*dpbaugh@dpbaugh.com*

Leslie Kendrick (VSB No.: 90104)
580 Massie Rd.
Charlottesville, VA 22903
Ph: (434) 243-8633
Fax: (434) 924-7536
*kendrick@virginia.edu*

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2018, I electronically filed the foregoing

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification with the Clerk of

Court using the CM/ECF System, which will send a notification of such filing to the following

CM/ECF participants:

> Nancy Hull Davidson
> Margaret Hoehl O'Shea
> Assistant Attorneys General
> Criminal Justice and Public Safety Division
> Office of the Attorney General
> 202 North Ninth Street
> Richmond, Virginia 23219
> Phone: (804) 692-0551
> Fax: (804) 786-4239
> E-mail: ndavidson@oag.state.va.us
> E-mail: moshea@oag.state.va.us

> By:   /s/ Angela A. Ciolfi
> Angela A. Ciolfi (VSB No.: 65337)
> Pat Levy-Lavelle (VSB No.: 71190)
> LEGAL AID JUSTICE CENTER
> 1000 Preston Avenue, Suite A
> Charlottesville, VA 22903
> Ph: (434) 529-1810
> Fax: (434) 977-0558
> *angela@justice4all.org*

107089646_3.docx