**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| DAMIAN STINNIE, MELISSA ADAMS, and ADRAINNE JOHNSON, individually, and on behalf of all others similarly situated; WILLIEST BANDY, and BRIANNA MORGAN, individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>RICHARD D. HOLCOMB, in his official capacity as the Commissioner of the VIRGINIA DEPARTMENT OF MOTOR VEHICLES,<br><br>        Defendant. | Civ. No: 3:16-cv-00044 |

## REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Attorney General Mark Herring himself said last week: "We cannot have a justice system that determines fairness and freedom based on wealth and means. . . . [T]hat [is] wrong and unjust."[1] Plaintiffs bring this action to challenge a statute that does just that—Virginia Code § 46.2-395 punishes Virginia drivers who are *willing but fiscally unable* to pay court debts, and thus treats those poor Virginians differently from the financially well-off with the means to satisfy courts debts. Like Attorney General Herring said, that system is indeed "wrong and unjust."

In contrast, the defendant DMV Commissioner Richard Holcomb opposes Plaintiffs' motion for preliminarily injunction in order to continue the Commonwealth's unconstitutional, wrong and unjust license suspension scheme. But nothing in the Commissioner's opposition

---

[1] Interview of Mark Herring at 9:39-10:04, *HearSay with Cathy Lewis*, WHRO PUBLIC MEDIA (October 30, 2018), *available at* https://goo.gl/TJ5z1n (last visited November 8, 2018).

prevents this Court from granting Plaintiffs' motion.

In the past six months, three other federal cases declared unconstitutional a driver's license suspension scheme strikingly similar to Virginia's statute and granted a preliminary injunction based on virtually identical arguments. *See Robinson v. Purkey,* No. 3:17-CV-01263, 2018 U.S. Dist. LEXIS 177769 (M.D. Tenn. Oct. 16, 2018); *Hixson v. Haslam*, No. 3:17-CV-00005, 2018 U.S. Dist. LEXIS 114622 (M.D. Tenn. July 2, 2018); *Fowler v. Johnson*, No. 17-11441, 2017 U.S. Dist. LEXIS 205363 (E.D. Mich. Dec. 14, 2017).[2] The Commissioner ignores this precedent, not once citing or trying to distinguish the *Robinson*, *Hixson*, and *Fowler* cases. Similarly, the Commissioner outright fails to address—much less refute—Judge Gregory's eight pages of dissent in the Fourth Circuit appeal. *Stinnie v. Holcomb*, 734 F. App'x 858, 863 (4th Cir. 2018) (Gregory, C.J., dissenting). Judge Gregory meticulously concludes that Plaintiffs do not lack standing, the *Rooker-Feldman* doctrine does not apply, and the DMV Commissioner is not immune from this lawsuit. The Fourth Circuit majority did not disagree; they simply declined to reach those issues.

In line with what these other jurists have already concluded, Plaintiffs have established a likelihood of success on the merits. Plaintiffs also have sufficiently shown irreparable harm and established that issuing a preliminary injunction would follow both the balancing of the equities and the public interest. This Court should grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

Plaintiffs met the preliminary injunction prerequisites. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Commissioner does not show otherwise.

---

[2] These cases are attached as Exhibits 1, 2, and 3. The *Hixson* injunction is stayed pending appeal.

# I.     Plaintiffs are likely to prevail on their claims.

## A.  The exceedingly narrow *Rooker-Feldman* doctrine has no relevance to this case.

"*Rooker-Feldman* is an exceedingly narrow doctrine that has no relevance to the facts of this case." *Stinnie v. Holcomb*, 734 F. App'x 858, 868 (4th Cir. 2018) (Gregory, C.J., dissenting). The *Rooker-Feldman* doctrine "holds that 'lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments.'" *Thana v. Bd. of License Comm'rs for Charles Cty., Md.*, 827 F.3d 314, 319 (4th Cir. 2016) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)). The Commissioner argues that this narrow, rarely-applied doctrine bars suit. He is wrong.

"[B]y definition," the *Rooker-Feldman* doctrine has no application here because Plaintiffs do not ask this Court to exercise appellate jurisdiction over a final state court judgment. *Stinnie*, 734 F. App'x at 870. The doctrine lacks relevance to district courts' jurisdiction over claims in which a party "challenge[s] the validity of statutes or rules governing the state court decision or the constitutionality of the process by which a state court judgment is reached." *Stinnie*, 734 F. App'x at 869 (quoting *Skinner v. Switzer*, 562 U.S. 521, 532 (2011)); *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (*Rooker-Feldman* is no bar to plaintiffs presenting independent claims to a federal court). That is this case, as Plaintiffs do not challenge their underlying "convictions, the applicability of the assessed payments, or their failure to make the required payments." *Id*. at 870. Instead, they independently challenge a "statute or rule" that relates to state action. *Skinner*, 562 U.S. at 532. This is a proper claim.

The Commissioner gets one thing right: this Court's ruling in favor of Plaintiffs would affect future court decisions and would undermine the correctness and frustrate the enforcement of previously-entered decisions. But that is not the test. "[T]hat a federal plaintiff's suit would undermine the correctness of a state court decision or otherwise frustrate its enforcement does not, by itself, trigger *Rooker-Feldman*." *Stinnie*, 734 F. App'x at 869 (citing *Thana*, 827 F.3d at 322).

The *Rooker-Feldman* doctrine applies only when challenging state judicial action—but not (like here) when the state's *nonjudicial* action is of an administrative, ministerial, or legislative nature. *Feldman*, 460 U.S. at 476-77, 479; *Thana*, 827 F.3d at 320; *see* Law Professors Amici Curiae Brief, attached as Ex. 4, at 6-10. The state court role in Virginia's license suspension scheme is purely ministerial. The transfer of information from a court clerk to the DMV, and the DMV's later and automatic suspension of the license, is not "truly judicial" in nature. *Feldman*, 460 U.S. at 476 n.13; Ex. 4 at 11-16. The process does not involve a "judicial inquiry" into whether suspension is warranted. *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 201 (4th Cir. 1997). No court hears any "legal," "policy," or "equitable arguments" about whether the license should be suspended. *Feldman*, 460 U.S. at 480-81. And no court exercises judgment in the "application of existing laws to the facts of a particular case." *Jordahl*, 122 F.3d at 199. Instead, the entire suspension process relies upon state actors who "simply engage in ministerial action"—which does not trigger the *Rooker-Feldman* bar. *Feldman*, 460 U.S. at 479.

## B. Plaintiffs have Article III standing.

Plaintiffs have Article III standing to sue the Commissioner. The Commissioner challenges only whether Plaintiffs' injuries are "causally connected to the complained-of conduct," and whether those injuries "will likely to be redressed." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). Plaintiffs' injuries are causally connected to the Commissioner's actions, and these injuries are likely to be redressed if Plaintiffs prevail. Standing exists.

### 1. Plaintiffs' injuries are causally connected to the Commissioner's actions.

The first contested element—causal connection between injury and the Commissioner's conduct—is known as "causation" or "traceability." *Stinnie*, 734 F. App'x at 871. To meet this element, Plaintiffs "must show that their injuries are 'fairly traceable'" to the Commissioner's conduct. *Id*. The standard is not like the more stringent proximate cause standard most often seen

in tort cases. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). Rather, Plaintiffs need only show a "genuine nexus" between their injuries and the Commissioner's conduct. *Id*. Plaintiffs did so here: the previous suspension of their licenses, that continued suspension, and the lack of reinstatement are all directly traceable to the Commissioner.

Three reasons sink the Commissioner's argument that courts, not the DMV, suspend licenses, and thus the DMV does not cause Plaintiffs' injuries. First, whether the courts *might also* play a role in Plaintiffs' injuries is irrelevant. The Commissioner's "challenged action" need only be responsible "in part . . . for frustrating [Plaintiffs'] attempt to fully assert his or her rights." *Stinnie*, 734 F. App'x at 871 (citation omitted); *see also Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (holding that a plaintiff has standing if they sue any party that stands at any "step in the chain of causation," and not necessarily the party who stands at the first or last step in the causation chain). The traceability standard remains true "notwithstanding the presence of another proximate cause" for a plaintiff's injuries. *Stinnie*, 734 F. App'x at 871; *see also Libertarian Party*, 718 F.3d at 315-16 (rejecting "the stringent proximate cause standard, derived from principles of tort law," for an Article III standing analysis). Plaintiffs satisfy traceability.

Second, this position misconstrues Virginia law by wrongly asserting that the DMV does not suspend licenses. The DMV automatically suspends licenses under an algorithm within the court and DMV computer systems, with no judicial determination or entry of a suspension order. *See* ECF No. 84-1 (declaration of Llezelle Dugger). The courts use the state's Financial Management System (the "FMS") as part of its Court Automated Information System ("CAIS"), and when a scheduled payment for court debt is not timely made, the CAIS/FMS automatically transmits an electronic record to the DMV showing an individual's account in default. *Id.* at 2 ¶¶ 5-6. The DMV then updates the account holder's license status in its database to comport with the

FMS electronic transmission, thus issuing the suspension for all practical purposes, including for law enforcement, prosecutors, insurance companies, and other entities. ECF No. 84 at 8 ¶ 50.

Virginia law reflects these facts. Without the Commissioner's actions (including the actual suspension of licenses and refusal to reinstate until both court debt and a reinstatement fee are paid), Plaintiffs would have their licenses. Va. Code § 46.2-395(B) (allowing license reinstatement only after payment to the Commissioner of a fee); *id.* § 46.2-200 ("The [DMV] shall be responsible for . . . the issuance, suspension, and revocation of driver's licenses . . . ."). That's why Virginia courts have held that *the DMV*, not the courts, is the ultimate party who revokes or suspends the license. *E.g.*, *Plummer v. Commonwealth*, 408 S.E.2d 765, 766 (Va. App. 1991) ("The DMV agent agreed that appellant's license remained valid until the DMV order [of suspension] was actually executed."). The system does not require a judge or clerk to issue or enter an order of license suspension for failure to pay court costs or fines to effectuate the suspension. The Commissioner cannot succeed in shifting responsibility to the state courts. ECF No. 84-1 at 3 ¶ 7.

Third, the Commissioner's argument about who suspends licenses in Virginia is based on Ms. Ford's flawed affidavit. To start Ms. Ford is wrong because courts speak only through their orders, and here, there are no orders of suspension for failure to pay court debts. *McBride v. Commonwealth*, 480 S.E.2d 126 (Va. App. 1997). Ms. Ford does not know, and cannot speak to, what happens on the court side of the process. *See* ECF No. 99-1 at 2 ¶ 4. She only tells the Court what Plaintiffs have alleged from the DMV's perspective: that the DMV automatically suspends licenses once a state court tells it of nonpayment. Or, in Ms. Ford's words, once the DMV receives notice of nonpayment from a state court (a "suspension indicator from the court"), the DMV automatically generates a notice of suspension and mails it out. *Id.* at 5 ¶¶ 14-15.

Ms. Ford's affidavit has other problems. She states that the "DMV receives no information

via the [FMS]." ECF No. 99-1 at 3 ¶ 8. The FMS is an integral part of the CAIS. *See* Judiciary's Year in Review 2010, attached as Ex. 5, at A-102 ¶¶ 1-2. FMS "provides extensive reporting on collection of fines and costs," and "[i]nterfaces have been developed . . . to other state agencies, such as DMV." *Id.* at A-102 ¶¶ 2-3. That the DMV receives information from CAIS does not mean the DMV does not receive information from FMS or that FMS does not feed into CAIS.

Virginia's Auditor of Public Accounts supplies more evidence that the DMV suspends the license and not courts. *See Specifications for Audits of Counties, Cities, and Towns*, Audit of Circuit Court Clerks, Ch. 6 (May 2017), *available at* http://www.apa.virginia.gov/data/download/local_government/manuals/CCTAuditSpecs17.doc (last visited Nov. 8, 2018). Virginia's Auditor states not only that "Circuit Court Clerks are required to manage accounts receivable by establishing individual accounts for all defendants assessed fines, costs and restitution" but "[a]ll unpaid accounts are *submitted to the Department of Motor Vehicles for license suspension*."

Evidence from state district courts also shows that Ms. Ford's declaration is factually incorrect. The websites for the General District Courts of Charlottesville, Albemarle, Henrico, and Chesterfield *expressly* state that the DMV suspends licenses.[3]

That Virginia courts and agencies point to the DMV as who suspends licenses shows the prominence of the DMV's role in enforcing Section 46.2-395.

### 2.   Plaintiffs' injuries are likely to be redressed if they prevail.

The final element to establish standing is known as "redressability." *Stinnie*, 734 F. App'x at 871. "For purposes of redressability, it is enough that the relief being sought would abat[e]

---

[3] *See, e.g.*, https://goo.gl/oALxo7 (Charlottesville) (last visited Nov. 8, 2018) ("IF YOUR AMOUNT HAS NOT BEEN PAID IN FULL OR AN EXTENSION HAS NOT BEEN GRANTED: *YOUR DRIVER'S LICENSE WILL BE SUSPENDED BY DMV*"); *see also, e.g.*, https://goo.gl/u9H5WM (Albemarle County) (last visited Nov. 8, 2018) ("If payment in full is not made by the due date, your driver's license will be suspended by DMV."); https://goo.gl/aLHXyB (Chesterfield County) (last visited Nov. 8, 2018); https://goo.gl/gtRF4f (Henrico County) (last visited Nov. 8, 2018).

current violations and prevent[] future ones, such as by deterring future violations." *Id.* at 872 (internal quotations omitted). "As the Supreme Court and the [Fourth Circuit] have held, an injury is redressible if a favorable court ruling would frustrate the implementation of the challenged statute or action." *Id.* at 873 (citing cases). Plaintiffs have shown that a favorable decision is likely to redress their injuries. "Indeed, the removal of the reinstatement fees alone satisfies the redressability requirement." *Id.* Moreover, granting Plaintiffs' requested relief would require this Court "to have decided that the suspensions were effectuated pursuant to an unconstitutional process," and so "the suspensions would no longer be valid or enforceable" because they were "obtained through unlawful means." *Id.* at 874. This relief would thus satisfy redressability because "even in a technical, legal sense, Plaintiffs' licenses would no longer be suspended." *Id.* Plaintiffs need show only that a favorable ruling against the Commissioner would "reduc[e] to some extent" the "risk" of Plaintiffs suffering injury of being charged with driving on unconstitutionally-suspended licenses. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). Because there is no order of suspension maintained in the court file reflecting that a person's license has been suspended for non-payment, ECF No. 90-1 at 3 ¶ 8, and because the statute that mandates suspension would be invalidated, a favorable ruling would eliminate that risk.

### C.  The Commissioner is not immune to suit because *Ex parte Young* applies.

The Commissioner is not immune to suit under the Eleventh Amendment to the United States Constitution because the *Ex parte Young*, 209 U.S. 123 (1908), exception applies. "*Ex parte Young* permits suits challenging the unconstitutional actions of state officers acting in their official capacity, notwithstanding states' Eleventh Amendment immunity." *Stinnie*, 734 F. App'x at 874. The doctrine permits suits against a state actor when the official "by virtue of his office" has "some connection with the enforcement" of the challenged statute. *Ex parte Young*, 209 U.S. at 157. The official must have a "special relation" to the challenged statute, and not "general authority to

enforce the laws of the state." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). Even so, the official need not be the primary authority to enforce the law. Instead, he or she need only "have *some* connection with the enforcement of the act." *Stinnie*, 734 F. App'x at 875.

The requisite "special relationship" or connection exists here. The Commissioner "has specific enforcement obligations under Virginia Code § 46.2-395 pertaining to the suspension and reinstatement of licenses." *Stinnie*, 734 F. App'x at 874. He asserts he lacks statutory authority to suspend licenses. This misses the mark, because "[t]he DMV . . . effectuat[es] the suspension for all practical purposes, including for law enforcement." *Stinnie*, 734 F. App'x at 863; *see also Plummer*, 408 S.E.2d at 766 ("The DMV agent agreed that appellant's license remained valid until the DMV order [of suspension] was actually executed."); ECF No. 56 at 27 (describing the Commissioner's role as "overseeing the entry or 'processing' of the court suspension orders into statewide databases"). The Commissioner and DMV thus has "*proximity to* and *responsibility for* the challenged state action." *McBurney v. Cuccinelli*, 616 F.3d 393, 396 (4th Cir. 2010). That the courts also play a role in suspensions yet again is irrelevant to the Court's inquiry. *Stinnie*, 734 F. App'x at 875; *see also Finberg v. Sullivan*, 634 F.2d 50, 53-54 (3d Cir. 1980); *Summers v. Adams*, 669 F. Supp. 2d 637, 653-55 (D.S.C. 2009). Thus, because Plaintiffs have shown that the Commissioner has "some connection" to the enforcement of Section 46.2-395 by virtue of "express enforcement responsibilities under [the law] to implement license suspensions and to reinstate licenses," *Stinnie*, 734 F. App'x at 875, the "special relationship" is established, and the *Ex parte Young* exception to the Eleventh Amendment applies. *Id.*

### D.  Plaintiffs are likely to succeed on the merits of their procedural due process claim.

Plaintiffs showed likely success on their procedural due process claim. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests . . . ." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Procedural due process

minimally requires fair notice and "opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. at 333.

The Commissioner concedes that the first requirement—the existence of a property or liberty interest—is satisfied. ECF No. 99 at 14. Driver's licenses are property interests "not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell*, 402 U.S. at 539; *see also Scott v. Williams*, 924 F.2d 56, 58 (4th Cir. 1991) (reaffirming the Fourteenth Amendment's protection of a driver's license); *Plumer*, 915 F.2d at 931.

The Commissioner asserts that Plaintiffs' interests in their licenses is not "vital or essential." ECF No. 99 at 14 (quoting *Tomai-Minogue v. St. Farm Mut. Auto Ins. Co.*, 770 F.2d 1228, 1235 (4th Cir. 1985)). The Commissioner's point is inaccurate and misplaced given the facts here. To begin, the Fourth Circuit in *Tomai-Minogue* never held that an interest in a license was *not* vital or important. Instead, the Court cited *Dixon v. Love*, 431 U.S. 105 (1977), which only commented that such an interest "may not be so vital and essential as are social insurance payments on which the recipient may depend for his very subsistence." *Dixon*, 431 U.S. at 113. The Commissioner's use of this partial quote does not advance their argument. That is because the facts here bear witness to the plain truth that most Virginians rely on their licenses for their "very subsistence." *Id*.; *see Stinnie*, 734 F. App'x at 863-64 ("The license suspensions make it difficult, or even impossible, to maintain employment."). Any argument that Plaintiffs' interest in their licenses is not "vital and essential" fails under the law and the facts.

More fundamentally, whether an interest in a license is "vital" is a red herring. The Commissioner presses this point to support its argument that a pre-deprivation hearing is required only if an interest is "vital or essential." ECF No. 99 at 14–15. This is not the law. The acceptability of post-deprivation process does not turn on the interest at stake, but on the feasibility of pre-

10

deprivation process. *Zinermon v. Burch*, 494 U.S. 113, 128–29 (1990). A post-deprivation hearing can satisfy due process when "the loss is not the result of some established state procedure and the State cannot predict precisely when the loss will occur." *Id.* at 129. When a state procedure is involved, there is a "root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid government interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971); *see Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 396 (4th Cir. 1990) ("[T]here is no requirement of a pre-deprivation hearing *under emergency circumstances*." (emphasis added)). The Commissioner does not (and cannot) argue that this case presents the kind of emergency that would justify denial of a pre-deprivation hearing.

Given this principle, the Commissioner's suggestion that a show cause proceeding can provide requisite opportunity to be heard is unsupportable. ECF No. 99 at 16. Even if it provided adequate protections, such a proceeding occurs *after* an individual's license is suspended. Va. Code § 19.2-358(A). Even then, the individual has no right to request such a hearing, which only occurs upon the motion of a prosecutor or by the court itself. *Id.* And while an individual can avoid other fines or imprisonment by showing that his failure to pay was not intentional, the proceeding provides no opportunity to address the license suspension. *Id.* § 19.2-358(B).

Plaintiffs also have properly shown sufficient notice is lacking to support a procedural due process claim. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Sufficient notice must be more than a "mere gesture." *Id.* at 315. Plaintiffs received no

11

constitutionally sufficient notice of the suspension of their licenses. ECF No. 84 at 9 ¶¶ 55-57.

The Commissioner's arguments to the contrary fail. He points to five instances he calls "notice." ECF No. 99 at 15-16. The so-called "notices" relate to a conviction for a substantive offense, not at the later time when there is any real likelihood of license suspension. This is not enough. "Neither the court nor the DMV sends any notice of default or suspension to the driver when a payment becomes overdue and the suspension takes effect. Instead, the state court only informs the driver prospectively, when the fine is first imposed, that her license will be suspended [if] not made in full." *Stinnie*, 734 F. App'x at 864 n.1. A speculative, prospective notice is, at best, a "mere gesture" and does not constitute sufficient notice under the Fourteenth Amendment.

Nor does the Commissioner's reference to Virginia Code § 19.2-354.1 and Virginia Rule 1:24 move the ball. Even where a payment plan exists, if a person defaults, neither courts nor DMV nor any entity inquires to the reason for default before the license is suspended. Moreover, Plaintiffs themselves show that, *even if* a Virginia court uses these procedures, an individual's license is automatically suspended upon nonpayment (regardless of reason or willfulness). *E.g.*, ECF No. 84 at 24 ¶¶ 190-92 (a court put Plaintiff Johnson on a payment plan to pay her court debt, but "[a]s soon as [she] missed a payment, her license was suspended").

Finally, Plaintiffs showed that they have been denied a right to be heard on the reasons for default and for the court to find whether the default was willful. The Commissioner does not address an opportunity to be heard separate from notice. ECF No. 99 at 16. While the two concepts are similar, they are distinct. Plaintiffs had no opportunity to be heard *on* their accused default and later suspension, before (or even following) their suspensions. Instead, the "state punishes each and every individual who defaults by *automatically suspending* his or her driver's license, regardless of the reason for the default." *Stinnie*, 734 F. App'x at 863 (emphasis added).

**E.  Section 46.2-395 is unconstitutional because it is fundamentally unfair.**

In challenging Plaintiffs' fundamental fairness argument, the Commissioner ignores the key line of cases on point. Beginning with *Griffin v. Illinois*, the United States Supreme Court has repeatedly held that it offends due process and fundamental fairness for the state to penalize people for the inability to pay state-imposed fines or costs. 351 U.S. 12, 18 (1956) ("Plainly the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence and could not be used as an excuse to deprive a defendant of a fair trial."); *see also Bearden v. Georgia*, 461 U.S. 660, 66768 (1983); *Tate v. Short*, 401 U.S. 395, 397-98 (1971); *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970); *Mayer v. City of Chicago*, 404 U.S. 189, 196-97 (1971).

Whether a method of punishment is fundamentally unfair turns "on the reasons for non-payment." *Bearden*, 461 U.S. at 668. The distinction between "willful refusal to pay a fine" and inability to pay "is of critical importance." *Id.* On the one hand, "it is fundamentally unfair to revoke probation automatically" where "the probationer has made all reasonable bona fide efforts to pay the fine and yet cannot do so through no fault of his own." *Id.* On the other hand, "[i]f the probationer has willfully refused to pay the fine or restitution when he has the means to pay, the State is perfectly justified in using imprisonment as a sanction to enforce collection." *Id.* Declining to "inquire into the reasons for the failure to pay" is "contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* at 672-73.

In two recent cases—*Robinson* and *Hixson*—plaintiffs successfully challenged a driver's license suspension statute much like Section 46.2-395. *See Robinson*, 2018 U.S. Dist. LEXIS 177769, at *58-61 (finding that plaintiffs showed a likelihood of success on the merits and granting in part their preliminary injunction motion); *Hixson*, 2018 U.S. Dist. LEXIS 114622, at *166 (declaring that the state license suspension statute violates the Due Process and Equal Protection Clauses "because it provides for no exception from revocation for debtors whose failure to pay is

13

based solely on their indigence"). In these two cases, the Middle District of Tennessee correctly followed the *Griffin* line of precedent. The *Robinson* court held that:

> a statute that penalizes or withholds relief from a defendant in a criminal or quasi-criminal case, based solely on his nonpayment of a particular sum of money and without providing for an exception if he is willing but unable to pay, is the constitutional equivalent of a statute that specifically imposes a harsher sanction on indigent defendants than on non-indigent defendants.

2018 U.S. Dist. LEXIS 177769, at *13-14. The Court also stated that the Constitution:

> is not blind to the commonsense fact that, if the government gives defendants the ostensible choice between paying a sum of money or suffering a harsh, non-monetary penalty, then the government is, in effect, propounding a harsher rule for defendants who cannot pay the sum than for those who can.

*Id.* at *14; *see Hixson*, 2018 U.S. Dist. LEXIS 114622, at *8 (finding that the Supreme Court "is not blind to the commonsense fact that an ultimatum following the formula of 'the money or your ___' is a different proposition for someone who has the money than for someone who does not").

This "commonsense fact" described in the *Griffin* line of Supreme Court cases and applied more recently in *Robinson* and *Hixson*, goes to the heart of "fundamental fairness" in the administration of justice, which is "the touchstone of due process." *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). Yet except for a discrete footnote citing *Bearden*,[4] the Commissioner fails to address a single one of these cases.

Instead, the only precedent the Commissioner discusses in its fundamental fairness argument is *Mathews v. Eldridge*, 424 U.S. 319 (1976). The Commissioner claims that *Mathews* provides the relevant inquiry because Plaintiffs challenge "a collateral deprivation of property, rather than a part of the criminal trial itself." ECF No. 99 at 20. The Commissioner misses the mark. *Mathews* is about procedural due process, not the fundamental fairness inquiry.

---

[4] Defendant's footnote includes only a quotation describing generally the difference between the due process and equal protection analyses. ECF No. 99 at 20 n.82.

Like the Commissioner, the state defendant in *Robinson* made "no mention" of *Griffin*, *Williams*, *Tate*, *Mayer*, or *Bearden* in his opposition to the preliminary injunction motion. 2018 U.S. Dist. LEXIS 177769, at *32. The Tennessee court found unhelpful the approach the Commissioner adopts here, as it did "little to undermine the plaintiffs' demonstrated likelihood of success on the merits." *Id.* "Rather than offering any argument why the Supreme Court's numerous cases about indigent criminal defendants would not apply here, the [defendant] simply chooses to set forth his argument as if those cases never existed." *Id.* The *Robinson* court ultimately granted plaintiffs' motion for a preliminary injunction. This case merits the same determination.

### F.  Plaintiffs are likely to succeed on their equal protection claim.

Treating a low-income citizen who is willing but unable to pay, differently from a person with means who can and does pay, violates Equal Protection. The Attorney General acknowledged as much in the similar context of Virginia's cash bail system: "disparate treatment of low-income defendants and those with money could raise Equal Protection Concerns." 10-19-18 Letter from Attorney General Herring to Senator Mark Obenshain, attached as Ex. 6, at 2. Similarly, Equal Protection is likely violated here when Virginia's license suspension scheme treats differently "low-income defendants and those with money." *See id.*

The Commissioner mischaracterizes both the facts and the law in arguing against Plaintiffs' likelihood of success on the equal protection claim. First, the Commissioner disregards facts showing that Section 46.2-395 treats similarly situated individuals differently. Second, it misconstrues the law in arguing that a successful equal protection claim requires intentional or purposeful discrimination. And third, the Commissioner's rational basis review of Section 46.2-395 ignores the difference between being *unable* versus *unwilling* to pay court debt.

### 1.  Section 46.2-395 treats indigent people harsher than others similarly situated.

The Commissioner tries to circumvent Plaintiffs' equal protection claim by incorrectly

describing the relevant comparison as between those who have complied with court orders and those who are in default. But the relevant comparison is between those who can pay their court debt and those who cannot. *See, e.g.*, *Bearden*, 461 U.S. at 665 (the relevant comparison is between those able and unable to pay a fine). Plaintiffs are willing but unable to pay, and the driver's license suspension scheme treats them differently than those who are willing and able to pay.

Different treatment based on wealth is not permissible under Fourth Circuit law. The state may not penalize a debtor "as long as his default is attributable to his poverty, not his contumacy." *Alexander v. Johnson*, 742 F.2d 117, 124 (4th Cir. 1984). Furthermore, "[t]he state's initiatives in this area naturally must be narrowly drawn to avoid . . . creating discriminating terms of repayment based solely on the defendant's poverty." *Id.* at 123-24. In carrying out these initiatives, the state "must take cognizance of the individual's resources, the other demands on his own and family's finances, and the hardships he or his family will endure if repayment is required." *Id.* at 124.

The *Robinson* court made similar observations about the disparate treatment of those who are able versus unable to pay fines in the context of a driver's license suspension statute:

> Exacerbating the counterproductive nature of the suspension regime is its tendency to trap drivers in a cycle of repeated violations and ever-mounting debt. A driver may begin by getting a single ticket for a minor traffic violation. If he cannot pay the resulting debt, however, his license will be suspended unless he is lucky enough to be granted a form of wholly discretionary relief by a court. The suspended driver, faced with a need to engage in essential life activities and a paucity of alternative transportation options, may choose to drive, despite his suspension. . . .
>
> A driver who violates his suspension . . . may find himself subject to new fines, new court costs, and new litigation taxes. Because he could not pay the original traffic debt, he will be just as unable to pay the new debt, and the cycle will begin again, only with the driver further in the red. The [defendant] has not identified or asserted any legitimate governmental interest in allowing a single traffic ticket to serve as the gateway to a mounting cycle of unpayable debt that keeps a fully qualified driver off of the road and out of productive economic life.

2018 U.S. Dist. LEXIS 177769, at *17-18.

This Court need look no further than *Robinson*. The same cycle identified there is at play

under the Virginia license suspension scheme. Plaintiffs have shown that Virginians who violate the same traffic or criminal laws obtain vastly different outcomes as a direct result of their wealth. Section 46.2-395 is not narrowly drawn as required by *Alexander*, nor does it account for debtors' financial circumstances. Section 46.2-395 treats those willing but unable to pay their court debt more harshly than those willing and able to pay, violating the Equal Protection Clause.

**2.  Plaintiffs need not establish intentional or purposeful discrimination.**

To succeed on the equal protection claim, Plaintiffs do not have to establish that different treatment results from intentional or purposeful discrimination. While some equal protection doctrines require a showing of purposeful discrimination, the *Griffin* line of cases involving differential treatment, as here, does not. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 103 (1996) (holding that *Griffin*'s principles have not been confined to a type of case).

The Supreme Court rejected the claim that later cases requiring discriminatory intent—like *Washington v. Davis*, 426 U.S. 229 (1976)—have had any impact on the *Griffin* line of cases. *See M.L.B.*, 519 U.S. at 126-27 ("*Washington v. Davis* . . . does not have the sweeping effect respondents attribute to it"). The *M.L.B.* Court reiterated the concern of *Griffin* that the justice system not be "grossly discriminatory in its operation." *Id.* The Court noted that *Bearden*, a post-*Washington v. Davis* case, "adher[ed] in 1983 to *Griffin*'s principle of equal justice." *Id.* at 127 (citing *Bearden*, 461 U.S. at 664–65). The Court thus rejected a discriminatory intent requirement in the equal justice arena: "this Court has not so conceived the meaning and effect of our 1976 'disproportionate impact' precedent." *Id.*; *see also Alexander*, 742 F.2d at 125 (analyzing whether the state scheme is "narrowly drawn to avoid unfairness and discriminatory *effects*").

Even so, Plaintiffs sufficiently allege intentional and purposeful discrimination. Legislative history and historical background are relevant considerations to "whether discriminatory intent motivates a facially neutral law." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220

(4th Cir. 2016). Plaintiffs allege that the historical background of Virginia's license-for-payment scheme shows that the General Assembly enacted the current statute knowing that many defendants were unable to pay their debt and still imposed additional punishment on them for failure to do so. Plaintiffs alleged that:

- A legislative report from 1993 found that many offenders "[we]re poor and without obvious means to satisfy court judgments." ECF No. 84 at 9 ¶ 59.

- In 1994, the legislation *removed* language from the existing Virginia Code requiring investigation into the reasons for nonpayment and permitting collection only if the investigation suggested that the debtor might be able to pay. *Id.* at 10 ¶ 60.

- Because the General Assembly "remov[ed] all safeguards designed to differentiate those *unable* to pay from those *unwilling* to pay—and enacting Section 46.2-395 with full knowledge that the law's consequences would fall disproportionately on the poor—" the General Assembly "intentionally chose to discriminate against people on the basis of poverty." *Id.* at 10 ¶ 61; *see also id.* at 40 ¶ 345.

In addition to historical background, disparate impact also is a relevant consideration about whether discriminatory intent exists. *See McCrory*, 831 F.3d at 220-21 (including disproportionate impact in "a nonexhaustive list of factors to consider" when determining whether "the legislature enact[ed] a law 'because of,' and not 'in spite of,' its discriminatory effect" (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979))). The crux of Plaintiffs' argument is that Section 46.2-395 creates a disparate impact between those who are willing but unable to pay their court debt and those who are willing and able to pay their court debt. Thus, Plaintiffs have sufficiently alleged discriminatory intent based on both disparate impact and legislative history, even though they can succeed on their equal protection claim with no such allegation.

### 3. Section 46.2-395 fails rational basis review.

In the equal protection context, rational basis review requires that there be "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016). Thus, to survive rational basis review, the

Commissioner must establish that there is a rational relationship between his goal of getting indigent people to pay their court debt and suspending Plaintiffs' constitutionally protected property interests in their driver's licenses and the attendant liberty interests in being able to drive.

In conducting a rational basis review of the equivalent suspension statute in Tennessee, the *Robinson* court made these findings in determining that the statute was irrational:

> A driver's license suspension cannot coerce an indigent person into paying his traffic debt, because his failure to pay was never voluntary in the first place. What a suspension does do, however, is impose a significant material hardship on the driver that is likely to make him less able to develop the resources and, if possible, the economic self-sufficiency necessary to pay the underlying debt. Suspending the driver's license of an indigent person because he has failed to pay his traffic debt is not only wholly ineffective, but powerfully counterproductive.

*Robinson*, 2018 U.S. Dist. LEXIS 177769, at *17. Thus, "that the application of [the equivalent suspension statute] to indigent drivers is so profoundly counterproductive, in light of the centrality of driving to economic life in Tennessee, that it cannot meet the bare minimum standard of rationality; and that no other rational basis exists to sustain the state's policies." *Id.* at *21.

The *Hixson* court reached the same conclusion. First, the court noted that "[r]evocation [of a license] would not be an effective mechanism for coercing payment from a truly indigent debtor, because no person can be threatened or coerced into paying money that he does not have and cannot get." 2018 U.S. Dist. LEXIS 114622, at *11. *Hixson* went on to say, however, that:

> [u]ltimately, the court need not determine if the driver's license revocation law would fail rational basis review based on its sheer ineffectiveness alone, because, as applied to indigent drivers, the law is not merely ineffective; it is powerfully counterproductive. If a person has no resources to pay a debt, he cannot be threatened or cajoled into paying it; he may, however, become able to pay it in the future. But taking his license away sabotages that prospect. For one thing, the lack of a driver's license substantially limits one's ability to obtain and maintain employment. Even aside from the effect on employment, however, the inability to drive introduces new obstacles, risks, and costs to a wide array of life activities, as the former driver is forced into a daily ordeal of logistical triage to compensate for his inadequate transportation. In short, losing one's driver's license simultaneously makes the burdens of life more expensive and renders the prospect of amassing the resources needed to overcome those burdens more remote.

Because driving is necessary for so many important life activities, some [citizens] whose licenses have been revoked continue to drive, despite the state's revocation . . . . [R]evocation based on court debt from a single conviction may begin a cycle of subsequent convictions and mounting court debt that renders the driver increasingly unable to amass the resources necessary to get his license back. . . . This propensity to create a debt spiral further exacerbates the counterproductive nature of [the] scheme, as applied to indigent drivers. Not only is the law ineffective at collecting debt; not only is it counterproductive with regard to existing debt; but, in at least some cases, it affirmatively leaves *more* unpayable debt in its wake.

*Id.* at *12-14. Thus, "the plaintiffs have stated a plausible theory of constitutional protection and constitutional injury, because they have been deprived of equal protection and due process by a law that lacks a rational basis for furthering any legitimate government objective." *Id.* at *14.

Like the state defendants in *Robinson* and *Hixson*, the Commissioner has not established and cannot establish any rational relationship between his goal of getting indigent people to pay their court debt and suspending Plaintiffs' constitutionally protected property interests in their driver's licenses and the attendant liberty interests in being able to drive. The Commissioner simply argues that, "[b]y imposing a motivation to accomplish what an individual might otherwise be disinclined to do (*i.e.*, pay money to the court), the suspension of driver's licenses for non-payment of court-imposed fees and costs is rationally-related to these legitimate government purposes." ECF No. 99 at 23. As in *Robinson* and *Hixson*, this is an irrational, ineffective, and counterproductive argument as applied to indigent people who are *willing but unable* to pay their court debt. There is no reason for this Court to reach a different conclusion for Section 46.2-395.

The Commissioner also incorrectly cites *City of Milwakee v. Kilgore*, 532 NW.2d 690 (Wis. 1995) and *In the Interest of M.E.G.*, 2002 Tex. App. LEXIS 1948 (Tex. Ct. App. Mar. 14, 2002) to argue that "[s]imilar purposes have been upheld by other courts under rational-basis review." ECF No. 99 at 21 n.95. The statute at issue in *Kilgore* provided that "the suspension will not be enforced against any individual who is able to demonstrate an inability, for good cause *or indigence*, to pay the fine." 532 N.W.2d at 698 (emphasis added). And the *M.E.G.* court never

addressed a person's ability or inability to pay a debt. *See* 2002 Tex. App. LEXIS 1948, at *1-2 (upholding the trial court's "order suspending [appellant's] driver's license following his *failure* to pay child support"). Thus, the Commissioner has shown no viable support for his argument.

### G.  The Commissioner's extraordinary collection efforts violate equal protection.

The Commissioner tries to downplay both the coerciveness of Section 46.2-395 and the Commissioner's role, to claim that the DMV does not engage in extraordinary collection efforts. ECF No. 99 at 24. Both assertions are incorrect and the *Robinson* and *Hixson* courts—again, missing from the Commissioner's brief—concluded as much for a similar suspension schemes.

First, the Commissioner cannot shift the blame for the coerciveness of Section 46.2-395 away from the DMV Commissioner and to the state courts. Plaintiffs have already set forth how the DMV plays an integral part in Virginia's license suspension scheme. *See supra* Section I.B. The Commissioner cannot shift responsibility to state courts to erase Plaintiff's Article III standing or avoid the DMV's role in extraordinary (and unconstitutional) collection efforts.

Second, not only is the Commissioner responsible for implementing suspensions, but the license suspension scheme constitutes extraordinary collection efforts violating *James v. Strange* and the Equal Protection Clause. That Clause ensures (1) that debtors to the state are not treated differently from civil debtors and (2) that debtors have protection for basic necessities and the means of making a living. In *Strange*, the Supreme Court held that a statute violated the Equal Protection Clause because it "strip[ped] from indigent defendants the array of protective exemptions . . . erected for other civil judgment debtors." 407 U.S. 128, 135 (1972); *see also Alexander*, 742 F.2d at 124 (holding that, in accordance with *Strange*, "the [indigent] defendant cannot be exposed to more severe collection practices than the ordinary civil debtor").

Here, by automatically suspending driver's licenses for unpaid court debt, Section 46.2-395 exposes indigent defendants to a penalty that nearly all civil debtors do not face. That alone is

unconstitutional under *Strange* and its progeny. *Alexander*, 742 F.2d at 124.[5]

Additionally, driver's license suspension, much like the scheme in *Strange*, fails to afford the indigent defendant basic protections for necessities and livelihood. In Virginia, the "Poor Debtor's Exemption" shields civil debtors from creditors' attempts to claim certain basic belongings, including a motor vehicle of modest value. Va. Code § 34-26. And unlike Plaintiffs, civil garnishees in Virginia can count on protections against garnishment of minimal income. *See id.* § 34-29(a) (providing that at least $290 per week in income is protected against garnishment); 42 U.S.C. § 407(a) (providing that "none of the moneys paid" under the Social Security Act can be "subject to execution, levy, attachment, garnishment, or other legal process").

Other federal courts have validated Plaintiffs' reasoning. The *Robinson* court held that the Tennessee license suspension statute violated the Equal Protection Clause "based on the rule, set forth in *James v. Strange*, that a state's uniquely harsh treatment of a class of indigent debtors cannot be carried out in 'such a discriminatory fashion' that it 'blight[s] . . . the hopes of indigents for self-sufficiency and self-respect,' merely because the indigent debtor owes a particular type of debt to the government rather than a private party." 2018 U.S. Dist. LEXIS 177769, at *21-22.

> Traffic debt, like ordinary judgment debt, can be collected through standard civil collection tools, such as garnishment and attachment. . . . Driver's license suspensions amount to an additional, harsh mechanism that is directed not merely at putting resources in the hands of the creditor but in disrupting the life of the debtor, and traffic debtors are made subject to that mechanism, whereas comparable private debtors are not. Under Tennessee law, a financially secure civil judgment debtor who fails to pay what he owes simply out of defiance, greed, or spite faces no risk of losing his license, whereas a person who wishes to, but cannot, pay a minor traffic ticket is likely to have his license suspended. That wide differential in treatment runs afoul of *James v. Strange* . . . .

---

[5] Only unpaid judgments for traffic accidents where the at-fault defendant was uninsured may result in a license suspension. *See* Va. Code § 46.2-417. This rule for a specific sub-variety of civil debtor does not change that Section 46.2-395 exposes the indigent debtor to "more severe collection practices than the *ordinary* civil debtor." *Alexander*, 742 F.2d at 124 (emphasis added).

*Id.* at *36-37. In sum, "[b]ecause indigent traffic debtors are subject to an exceedingly harsh collection scheme, while other judgment debtors are not, the state's policies violate the constitutional guarantee of equal protection." *Id.* at *22.

The *Hixson* court reached the same conclusion. There, the suspension statute "threaten[ed] serious financial harm to those who run afoul of it" and that "taking a person's driver's license away is . . . a threat to the debtor's basic subsistence." *Hixson*, 2018 U.S. Dist. LEXIS 114622, at *141. The court also noted "just how severe a sanction the revocation of a license is and just how greatly it harms the debtor's basic subsistence or ability to build economic self-sufficiency." *Id.*

These federal courts have already found that a similar driver's license suspension statute is *not* "a far cry from the restrictions at issue in *James v. Strange*," as the Commissioner claims. ECF No. 99 at 24. Plaintiffs are likely to succeed on the merits of their claim that Section 46.2-395 violates the Equal Protection Clause for its use of extraordinary collection efforts.

## II. <u>Plaintiffs will suffer immediate, irreparable injury without a preliminary injunction.</u>

Besides questioning Plaintiffs' ability to succeed on the merits, the Commissioner challenges Plaintiffs' assertion of irreparable harm on two grounds. First, he argues that irreparable harm is not automatically presumed upon the assertion of a constitutional violation. Second, he characterizes the Complaint as "focus[ed]" on economic injuries, which normally do not qualify as irreparable harm. Each argument is flawed and Plaintiffs have shown irreparable harm.

In *Ross*, the Fourth Circuit noted—without condition—that "the denial of a constitutional right . . . constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). The Commissioner challenges this presumption by relying on an inapposite, out-of-circuit case. ECF No. 99 at 23 n.103 (citing *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (per curiam)). But *Siegel* concerned a political candidate's efforts to enjoin an election recount, so it did not implicate the personal deprivation of constitutional rights at issue here. 234 F.3d at 1168. *Siegel*

also emphasized that its review of a denial of a preliminary injunction was "highly deferential," *id.* at 1178, so its application to an initial determination of irreparable harm is tenuous.

Even if *Ross* establishes no *per se* rule in favor of irreparable harm, *see A Helping Hand, LLC v. Balt. Cty.*, 355 F. App'x 773, 777 (4th Cir. 2009) (unpublished), the facts here compel such a finding. The Commissioner does not—and cannot—challenge the fact that Plaintiffs' interest in their driver's licenses "is a substantial one." *Mackey v. Montrym*, 443 U.S. 1, 11 (1979); *Dixon v. Love*, 431 U.S. 105, 112–113 (1977). The question, then, is not whether, *in theory*, a constitutional deprivation always qualifies as irreparable harm, but whether the particular constitutional deprivation in this case, *in fact*, qualifies as such.

On this latter question—which the Commissioner avoids—the answer is clear. Injunctive relief is appropriate to address "a statutory scheme for administrative suspension of a driver's license for statutorily defined cause without a presuspension hearing." *Mackey*, 443 U.S. at 11.

The Commissioner construes Plaintiffs' argument as "focus[ed] on the economic injuries they allegedly suffer by not being able to drive," ECF No. 99 at 23—which is flat wrong. Plaintiffs assert several types on injuries, only one type of which is economic. *E.g.*, ECF No. 90 at 34 ("[T]he inability to drive impedes [Plaintiffs'] ability to work, access groceries and medical care, care for and support their families, and be active community members."). Far from being "compensable through monetary damages," ECF No. 99 at 23, "a licensee is *not* made entirely whole if his suspension or revocation is later vacated," *Dixon*, 431 U.S. at 113 (emphasis added).

The Commissioner also incorrectly argues that supposed post-suspension relief (after paying a reinstatement fee with money that indigent Virginians do not have) obviates irreparable harm. But the constitutional harm is when a license is suspended without a hearing. *See id.* at 112.

The Supreme Court recognizes a citizen's constitutionally-protected interest in a driver's

license. And the suspension of Plaintiffs' licenses continues to inflict social, legal, medical, and economic harm. Rather than meaningfully engage the Amended Complaint's allegations, the Commissioner retreats to academic inquiries into when irreparable harm can be "presumed." This case does not call for any such speculation. The harm here is direct and consequential. *See, e.g.*, Doc. 90 at 5–12 (detailing the named Plaintiffs' harms). This Court should conclude that Plaintiffs will continue to suffer irreparable harm without injunctive relief.

III.    <u>**The equities and the public interest weigh heavily in favor of a preliminary injunction.**</u>

On these factors, the Commissioner fails to assert any interest other than maintaining the status quo. The "status quo" is "the last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Contrary to the Commissioner's assertion, therefore, the status quo here refers to the time *preceding* the unconstitutional license deprivation. Maintenance of the status quo counsels in favor of a preliminary injunction. Nor is the public interest harmed, because, "[i]f anything, the system is improved" by the "issuance of a preliminary injunction which prevents the state from enforcing [a law] likely to be found unconstitutional." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013).

The remainder of the Commissioner's argument addresses whether Plaintiffs sued the right party. This issue is not germane to equity or public interest, and thus appears to acknowledge that the equities favor Plaintiffs. As detailed above, Plaintiffs continue to suffer irreparable harm from the Commissioner's unconstitutional actions. And the Commissioner's purported objective— revenue collection—is undermined by the unconstitutional deprivations. The Commissioner has failed to articulate any harm it will suffer from a preliminary injunction, and "upholding constitutional rights surely serves the public interest." *Centro Tepeyac*, 722 F.3d at 191.

<div align="center">**CONCLUSION**</div>

Plaintiffs ask the Court to grant their motion and afford all other appropriate relief.

<div align="center">25</div>

Dated: November 9, 2018

By:   /s/ Benjamin P. Abel
Jonathan T. Blank (VSB No.: 38487)
Benjamin P. Abel (VSB No.: 88961)
MCGUIREWOODS LLP
Court Square Building
310 Fourth Street NE, Suite 300
Post Office Box 1288
Charlottesville, VA 22902
Ph: (434) 977-2509
Fax: (434) 980-2258
*jblank@mcguirewoods.com*
*babel@mcguirewoods.com*

Angela A. Ciolfi (VSB No.: 65337)
Pat Levy-Lavelle (VSB No.: 71190)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
Ph: (434) 529-1810
Fax: (434) 977-0558
*angela@justice4all.org*

David P. Baugh (VSB No.: 22528)
DAVID P. BAUGH, ESQ., PLC
2025 E. Main Street, Suite 114
Richmond, VA 23223
Ph: (804) 743-8111
Fax: (804) 225-8035
*dpbaugh@dpbaugh.com*

Leslie Kendrick (VSB No.: 90104)
580 Massie Rd.
Charlottesville, VA 22903
Ph: (434) 243-8633
Fax: (434) 924-7536
*kendrick@virginia.edu*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2018, I electronically filed the foregoing Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF System, which will send a notification of such filing to the following CM/ECF participants:

Janet W. Baugh (VSB No. 44649)
Senior Assistant Attorney General
Margaret Hoehl O'Shea (VSB No. 66611)
Christian A. Parrish (VSB No. 446427)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 786-4596
Fax: (804) 786-4239
E-mail: jbaugh@oag.state.va.us

By:    /s/ Benjamin P. Abel
Jonathan T. Blank (VSB No.: 38487)
Benjamin P. Abel (VSB No.: 88961)
MCGUIREWOODS LLP
Court Square Building
310 Fourth Street NE, Suite 300
Post Office Box 1288
Charlottesville, VA 22902
Ph: (434) 977-2509
Fax: (434) 980-2258
jblank@mcguirewoods.com
babel@mcguirewoods.com