Stinnie, et al. v. Holcomb, 11/15/18

1              UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF VIRGINIA
2                 CHARLOTTESVILLE DIVISION

3    _____

DAMIAN STINNIE, individually
4    and on behalf of all others
     similarly situated, et al.,    CIVIL ACTION 3:16-CV-00044
5                                   NOVEMBER 15, 2018, 1:32 P.M.
                                    CHARLOTTESVILLE, VA
6              Plaintiffs,          PRELIMINARY INJUNCTION HEARING
                                    VOLUME I OF I
7    vs.

8    RICHARD D. HOLCOMB, in his
     official capacity as the
9    Commissioner of the Virginia
     Department of Motor Vehicles,  Before:
10                                  HONORABLE NORMAN K. MOON
                                    UNITED STATES DISTRICT JUDGE
11             Defendant.           WESTERN DISTRICT OF VIRGINIA

12   _____

13   APPEARANCES:
     For the Plaintiffs:        ANGELA A. CIOLFI, ESQUIRE
14                              Legal Aid Justice Center
                                1000 Preston Avenue, Suite A
15                              Charlottesville, VA 22903

16                              JONATHAN TODD BLANK, ESQUIRE
                                BENJAMIN PETER ABEL, ESQUIRE
17                              McGuireWoods, LLP
                                Court Square Building
18                              310 Fourth Street, N.E., Suite 300
                                Charlottesville, VA 22902
19
                                ALYSSA M. PAZANDAK, ESQUIRE
20                              McGuireWoods LLP - Texas
                                2000 McKinney Avenue, Suite 1400
21                              Dallas, TX 75201
                                214-932-6480
22
     Court Reporter:    JoRita B. Meyer, RMR, CRR
23                      210 Franklin Road, S.W., Room 540
                        Roanoke, Virginia 24006
24                      (540)857-5100 Ext. 5311
     Proceedings recorded by mechanical stenography,
25   transcript produced by computer.

Stinnie, et al. v. Holcomb, 11/15/18

1    APPEARANCES (Continued):

2    For the Plaintiffs:        LESLIE CAROLYN KENDRICK, ESQUIRE
                                University of Virginia School of Law
3                               580 Massie Road
                                Charlottesville, VA 22903
4

5    For the Defendant:         MARGARET HOEHL O'SHEA, ESQUIRE
                                NANCY HULL DAVIDSON, ESQUIRE
6                               Office of the Attorney General
                                of Virginia
7                               202 North Ninth Street
                                Richmond, VA 23219
8    ///

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stinnie, et al. v. Holcomb, 11/15/18

INDEX OF WITNESSES

WITNESSES ON BEHALF OF THE PLAINTIFFS:              PAGE

**ADRAINNE JOHNSON**

  Direct Examination by Ms. Ciolfi.................14
  Cross-Examination by Ms. O'Shea.................22
  Redirect Examination by Ms. Ciolfi...............38

**LLEZELLE A. DUGGER**

  Direct Examination by Mr. Blank..................42
  Cross-Examination by Ms. O'Shea..................49
  Redirect Examination by Mr. Blank...............61

**JULIE MOATS**

  Direct Examination by Mr. Blank..................63
  Cross-Examination by Ms. O'Shea..................66

**DIANA PEARCE, Ph.D.**

  Direct Examination by Ms. Pazandak...............76
  Cross-Examination by Ms. O'Shea..................91
  Redirect Examination by Ms. Pazandak.............99

**STEVEN ROBERT PETERSON, Ph.D.**

  Direct Examination by Mr. Abel...................101
  Cross-Examination by Ms. O'Shea.................122


WITNESSES ON BEHALF OF THE DEFENDANT:

**MILLICENT FORD**

  Direct Examination by Ms. O'Shea................132
  Cross-Examination by Mr. Blank..................143
  Redirect Examination by O'Shea..................147

///

Stinnie, et al. v. Holcomb, 11/15/18

1                        INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFFS:

3            EXHIBIT:                        Admitted

4            1                               131

5            2                               131

6

7    EXHIBITS ON BEHALF OF THE DEFENDANT:

8            EXHIBIT:                        Admitted

9            1                               61

10           2                               150

11   ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stinnie, et al. v. Holcomb, 11/15/18

```
 1  (Proceedings commenced, 1:32 p.m.)
 2          THE COURT:  Good afternoon.
 3          MR. BLANK:  Good afternoon, Judge.
 4          MS. O'SHEA:  Good afternoon, Your Honor.
 5          THE COURT:  Call the case, please.
 6          THE CLERK:  Yes, Your Honor.  This is Civil Action
 7  Number 3:16-CV-44, Damian Stinnie and others versus Richard
 8  B. Holcomb.
 9          THE COURT:  Plaintiffs ready?
10          MS. CIOLFI:  Yes, Your Honor.
11          THE COURT:  Defendants ready?
12          MS. O'SHEA:  Yes, sir.
13          THE COURT:  All right.  You may proceed.
14          MS. CIOLFI:  Good afternoon, Your Honor.  Angela
15  Ciolfi for the plaintiffs.  With me here is Jonathan Blank,
16  Leslie Kendrick, Alyssa Pazandak, and Ben Abel for the
17  plaintiffs.  We are here on the plaintiffs' motion for a
18  preliminary injunction.
19          Your Honor, we welcome the opportunity to be back in
20  front of this Court.  We have carefully read and re-read the
21  Court's opinion on the motion to dismiss and Judge Gregory's
22  opinion on the appeal, and we have made every effort to
23  satisfy the Court's concerns.  And that's critically
24  important because since we filed the complaint in 2016, the
25  Commonwealth has suspended hundreds of thousands of licenses
```

Stinnie, et al. v. Holcomb, 11/15/18

1    for failure to pay and hundreds of thousands of people have

2    been convicted and/or gone to jail for driving while

3    suspended where the underlying reason for the suspension was

4    solely failure to pay.

5             So what has changed since we were last before you?

6             Two federal courts in Tennessee and Michigan have

7    issued statewide injunctions against the future enforcement

8    of similar statutes, and in ruling on a motion to stay the

9    Sixth Circuit said the state was unlikely to succeed on the

10   merits of this appeal, challenging the District Court's

11   ruling on procedural due process.

12            Judge Gregory, who is the only judge from the Fourth

13   Circuit who examined the jurisdictional issues on this

14   appeal, said unequivocally that this court has jurisdiction,

15   and we have amended our complaint in several significant

16   ways, including alleging clearly and unequivocally that,

17   despite what the statute says, the Commissioner issues the

18   automatic suspension without any order from the Court.

19            We've alleged clearly and unequivocally that the

20   electronic transmission that goes to the DMV from the courts

21   is just a notification of an unpaid account, no more and no

22   less.  And we are ready to present testimony today to

23   establish the truth of those allegations.

24            We've also added plaintiffs whose licenses were

25   suspended well after any appeal deadlines had run and they

Stinnie, et al. v. Holcomb, 11/15/18

1   defaulted on payment plans.

2          And finally, we clarified that the relief we are

3   seeking is an order declaring the statute unconstitutional

4   and enjoining the DMV officer from enforcing it.

5          This statewide enforcement scheme is devastating to

6   individuals and families in every jurisdiction in the

7   Commonwealth.  Today we plan to present evidence

8   demonstrating that a narrowly crafted preliminary injunction

9   should issue in order to prevent further devastation, but

10  first we would like to address some of the procedural issues

11  raised by the defendant.

12         First, this Court has and cannot abrogate

13  jurisdiction based on *Rooker-Feldman*, because no state court

14  has heard or decided plaintiffs' constitutional claims and

15  because any role the state courts play in plaintiffs'

16  suspension is purely ministerial.  *Rooker-Feldman* only bars

17  federal courts from reviewing decisions where the state court

18  actually weighs the issues and renders a decision.

19         The plaintiffs also have standing because the

20  Commissioner is at least partly responsible for their

21  injuries, which is all we need to show for causation and

22  because an order to the Commissioner would address most, if

23  not all, of the plaintiffs' injuries.

24         As Judge Gregory pointed out, if the Court issues an

25  injunction, it would be because the suspensions were

Stinnie, et al. v. Holcomb, 11/15/18

1    effectuated pursuant to an unconstitutional process, and so

2    the plaintiffs' licenses would no longer be suspended even in

3    a legal, technical sort of sense, but also because an order

4    waiving the reinstatement fee alone is enough to confer

5    standing to these plaintiffs.

6           Finally, the Commissioner is not entitled to

7    Eleventh Amendment immunity because the Commissioner has

8    express enforcement responsibilities under 46.2-395 and is,

9    in fact, the only state official responsible for

10   reinstatement of licenses.  No more is required to apply the

11   *Ex Parte Young* exception.

12          Your Honor, fundamentally, the Commonwealth's

13   arguments on jurisdiction boil down to three words:  It

14   wasn't me.  They point the finger at the courts.  They would

15   like this court to focus on what I will call time one, which

16   is the time of conviction.  They want you to do that because

17   time one is messy, dealing with payment plans and community

18   service and what the judges do versus what the clerks do.

19   But we simply didn't challenge what happens at time one.  We

20   challenged what happens at time two, which is the time of

21   default; and at time two, this case is very simple, because

22   there is no due process.

23          At the time of default, there is no notice of

24   alleged default.  There is no ability-to-pay hearing.  There

25   is no determination of willfulness, no process at all.  There

Stinnie, et al. v. Holcomb, 11/15/18

1    is just an electronic transmission from the court computer to

2    the DMV computer and, zap, there goes your license, and in

3    many cases, for many of our plaintiffs, their livelihood.

4    Nothing in the Commonwealth's briefs or Ms. Ford's

5    declaration attached thereto contradicts that.

6          Perhaps the Commonwealth would like us to sue

7    hundreds of court clerks and hundreds of judges, but putting

8    aside the waste of judicial resources that would entail, if

9    we sue the courts they are likely to say exactly the same

10   thing that the DMV Commissioner is now saying:  We are immune

11   and, hey, it wasn't us, it was the DMV.

12         And we know that's what they'll say because that's

13   what the clerk of the Circuit Court for the City of

14   Charlottesville says:  It's the DMV.  And that's what the

15   chief judge of the Albemarle General District Court says:  It

16   is the DMV, in his policy regarding payment plans, which was

17   attached to our reply brief at footnote 3.

18         We never said the courts had no role to play.  Sure

19   they do.  They track payments on court debt and input

20   deadlines into the computer system, but that role is purely

21   ministerial, and nothing this court could do would upset any

22   judicial decision-making.

23         There is no rule that says that we have to sue

24   everybody responsible for the plaintiffs' suspensions, but we

25   chose to sue the DMV Commissioner.  And why did we do that?

Stinnie, et al. v. Holcomb, 11/15/18

1    Because he is the single statewide actor who represents the

2    Commonwealth's interests in this uniform statewide

3    enforcement scheme.  Because we aren't contesting what the

4    courts do with respect to payment plans or community service,

5    however flawed they may be, and because he is the proximate

6    cause of the plaintiffs' injuries.  He is the one who

7    maintains the database that the police check when they decide

8    whether to pull someone over for driving while suspended.  He

9    produces the driving transcripts that prosecutors and courts

10   rely on for driving while suspended convictions, and he

11   imposes the $145 reinstatement fee.  An order against the

12   Commissioner would prevent all of those injuries, and more.

13        Your Honor, you need look no further than Ms. Ford's

14   declaration submitted by the defendant at paragraph 5 to see

15   that the DMV Commissioner has a special relationship to the

16   statute that we're challenging.  She says, "I have specific

17   knowledge of the process mandated by Virginia Code 46.2-395

18   and DMV's responsibilities thereunder.  In addition, I have

19   been instrumental in working with the Office of the Executive

20   Secretary of the Supreme Court, OES, to implement those

21   policies and procedures."  She then goes on to describe all

22   of the activities that DMV engages in to enforce the statute.

23        So this is the point:  The Commonwealth enacted a

24   statute that mandates license suspension for unpaid court

25   debt.  The Commonwealth tasked the OES and the DMV to set up

Stinnie, et al. v. Holcomb, 11/15/18

1    a system to enforce that statute as automatically and as

2    administratively efficiently as possible.

3           All that the Ford declaration proves is that the

4    enforcement scheme works exactly as it was intended to work:

5    Automatically, mandatorily, and with utter disregard for

6    whether people are unwilling or simply unable to pay.  It is

7    the Commonwealth that chose to set it up that way, and

8    although the evidence we present today will demonstrate that

9    the DMV suspends the licenses without a court order,

10   ultimately it doesn't matter whether the court initiates the

11   suspension or not, because the Commonwealth cannot deny that

12   the Commissioner is absolutely indispensable to the

13   enforcement scheme.  It simply doesn't work without him.  And

14   it's clear that the Commissioner is a proper defendant so

15   long as an order against him would provide meaningful relief

16   to the plaintiffs.

17          With the Court's indulgence, we are prepared to put

18   on evidence today to demonstrate we're likely to succeed on

19   the merits, that the plaintiffs will continue to suffer

20   irreparable harm in the absence of an junction, and that the

21   balance of the equities are in the plaintiffs' favor and an

22   injunction is in the public interest.  Such an order would

23   bring this court into alignment with the other two federal

24   courts that have looked at this issue, found that the federal

25   courts did have jurisdiction and that the plaintiffs had

Stinnie, et al. v. Holcomb, 11/15/18

1    established likelihood of success on the merits on at least

2    one of their claims, which is all we need for preliminary

3    injunctive relief.

4            You'll hear from Ms. Adrainne Johnson, mother of

5    three, who recently lost her job because she could not get to

6    and from the new location she was assigned to across town

7    without a license; Llezelle Dugger, the clerk of the court

8    for the City of Charlottesville Circuit Court, and Julie

9    Moats, a former general district court clerk, who will both

10   testify that all they do on the court side is enter a payment

11   due date and that licenses are suspended not by any clerk or

12   judge, but by the DMV after the court computer talks to the

13   DMV computer, transmitting a record of nonpayment; Dr. Diana

14   Pearce, who is an expert in poverty and economic inequality,

15   will testify that each of the named plaintiffs, and others

16   like them, cannot afford to meet their basic needs while also

17   making payments to the court; and Dr. Steven Peterson, an

18   economist who will testify that license suspension

19   disparately impacts Virginia's poor, limits their ability to

20   work, and also makes it more difficult to pay their costs and

21   fines to the court.

22           Under Rule 43, we are also prepared to offer

23   declarations from Jon Carnegie and Robert Fuentes, experts on

24   the relationship between reliance on driving and access to

25   economic opportunities.

Stinnie, et al. v. Holcomb, 11/15/18

1        At the close of the evidence we'll ask this Court to

2    enter a preliminary injunction enjoining the Commissioner

3    from enforcing Section 46.2-395 against the plaintiffs and

4    the future suspended class unless and until the Commissioner,

5    or another state actor, determines through a hearing and

6    adequate notice thereof that their failure to pay was

7    willful, and ordering the Commissioner to remove any current

8    suspensions imposed under the statute against the individual

9    named plaintiffs without charging a reinstatement fee.

10        The relief we are asking for here is modest.  The

11    Commonwealth simply can't claim it is administratively

12    burdensome to remove three suspensions from their database

13    and not to process future suspensions.  Their burden is

14    insignificant, especially compared to the burden on the

15    plaintiffs.

16        As Judge Trauger in the Middle District of Tennessee

17    observed, "Every day without adequate transportation is a day

18    in which a person is likely to be pulled more deeply into

19    poverty; to grow more isolated from family and community; and

20    to fail to receive needed medical care or perform necessary

21    tasks.  A person cannot merely put his participation in life

22    on hold for months or years at a time and hope to return no

23    worse for wear."

24        After the Commonwealth responds, we'd like to be

25    able to put on evidence in support of our motion.

Johnson - Direct

1           Thank you, Your Honor.

2           THE COURT:  All right.

3           MS. O'SHEA:  Good afternoon, Your Honor.  Margaret

4    O'Shea on behalf of Commissioner Holcomb.

5           In light of the fact that the plaintiffs are

6    intending to present evidence to the Court for consideration

7    of the preliminary injunction, the Commissioner will reserve

8    our substantive arguments for closing in the interest of

9    moving things along this afternoon.

10          THE COURT:  All right.

11          MS. O'SHEA:  Thank you.

12          THE COURT:  Maybe you can agree to some of the --

13   what they're putting on evidence for.

14          MS. O'SHEA:  Yes, Your Honor, and we have.

15   Considering that this is a motion for preliminary injunction,

16   we've stipulated that the documentary evidence can be entered

17   to the Court without need to go through hearsay exceptions

18   and so on and so forth.  Yes, sir.

19          THE COURT:  All right.  Call your first witness,

20   then.

21          MS. CIOLFI:  Plaintiffs call Ms. Adrainne Johnson.

22        ADRAINNE JOHNSON, CALLED BY PLAINTIFFS, SWORN

23                      DIRECT EXAMINATION

24   BY MS. CIOLFI:

25   Q   Good afternoon, Ms. Johnson.

                            Johnson - Direct

1   A   Good afternoon.

2   Q   Please state your name.

3   A   Adrainne Johnson.

4   Q   And how old are you?

5   A   34.

6   Q   And where do you live?

7   A   Charlottesville, Virginia.

8   Q   How long have you lived here?

9   A   All my life.

10  Q   Do you have any children?

11  A   Yes.

12  Q   How many?

13  A   Three.

14  Q   And what are their ages?

15  A   15, 14, and 12.

16  Q   Can you tell us what the status of your driver's license

17  is?

18  A   Suspended.

19  Q   And how long has it been suspended?

20  A   Off and on since 2016.

21  Q   Why is it suspended?

22  A   For court fines and costs.

23  Q   And for nonpayment of court costs and fines?

24  A   Yes.

25  Q   And why didn't you pay your court costs and fines?

Johnson - Direct

1    A    I went on -- I tried to pay it.  I was on a payment

2    arrangement agreement, and my expenses as far as with my

3    income didn't work out.  It left me with nothing to have to

4    pay on it.

5    Q    What is your income now?

6    A    My income now is only $9 an hour.

7    Q    And about how many hours do you work a week?

8    A    37.

9    Q    Do you have any money left over at the end of the week?

10   A    No.

11   Q    Do you have any savings?

12   A    No.

13   Q    Do you have any debts?

14   A    Yes.

15   Q    And can you tell us about those?

16   A    To a previous landlord.

17   Q    And how much?

18   A    It's over a thousand dollars.

19   Q    And do you know how much you owe to the courts?

20   A    A little over a thousand.

21   Q    Can you afford to pay that now?

22   A    No.

23   Q    Did you have a hearing at the time that your license was

24   suspended?

25   A    No.

Johnson - Direct

1   Q    And has your license been suspended more than once for

2   failure to pay court costs and fines?

3   A    Yes.

4   Q    And did you have a hearing at any time?

5   A    Yes.

6   Q    I'm sorry.  Did you have a hearing at any time when it

7   was suspended?

8   A    No.

9   Q    Has anyone from the courts or the DMV ever asked you what

10  you could afford to pay?

11  A    No.

12  Q    What is it like not to have a license?

13  A    It's very stressful.  It's very inconvenient to me and to

14  my children.  I have my daughter who has medical issues, and

15  she has to see a counselor, and it's not on the bus line.

16  And my son, he plays sports, and I'm unable to take him or to

17  go to any of his games.  And he doesn't understand.  It's

18  very -- it hurts him very bad.  It's very emotional to him

19  and myself.

20  Q    How has not having a license affected your employment

21  options?

22  A    With me not being able to have my license, I have lost a

23  job.  I have also been to the point where I went through

24  interviews and was offered a job, but without my license, I

25  could not accept the job, because my license was suspended.

Johnson - Direct

1  Q   How far did you get in the process when you were not

2  getting the job because of your license?

3  A   All the way to the end, to the point where, if my license

4  wasn't suspended, I would have had the job.

5  Q   And you mentioned that you lost a job because of not

6  having a license.  Can you tell us more about that?

7  A   Yes.  I was working for a company and our hours got cut

8  back, and I went to my manager complaining about it.  And

9  they reached out to another store, where the other store had

10  opportunity for me to get some hours there, but it was not in

11  the bus route.  It was all the way past out Ivy Road, and I

12  explained to them that I did not have the transportation to

13  get there.  And when I didn't go, they gave me a no call, no

14  show, and I got terminated.

15  Q   And when was that?

16  A   Beginning of October.

17  Q   Of this year?

18  A   Yes, sir -- ma'am.

19  Q   And were you unemployed then, after that happened?

20  A   Yes.

21  Q   And how long were you unemployed?

22  A   I was unemployed for two to three weeks.

23  Q   And were there any consequences to being unemployed?

24  A   Yes.  I fell behind in my rent.  And then I received a

25  30-day eviction notice.

Johnson - Direct

1    Q    Are you employed now?

2    A    Yes.

3    Q    And how do you get to work?

4    A    I have two job locations.  The store that I work for has

5    two locations; one on Cherry Avenue, one on Pantops.  If I

6    work the Cherry Avenue store, I will walk.  If I work

7    Pantops, I have to catch the bus, and I will have to leave

8    home a whole hour to hour and a half before my scheduled

9    shift.

10   Q    And when you walk, about how long does it take?

11   A    Like, 20 to 25 minutes.

12   Q    Do you have any opportunities for advancement at your

13   current job?

14   A    Yes, I do.

15   Q    Can you tell us about that?

16   A    My manager has spoke with me about being the manager for

17   the Pantops store.  And with that position I would have to --

18   I am required to do bank deposits.  And I can't do bank

19   deposits without having a license, because I can't drive.

20   And if I don't -- can't do that, I won't be able to take the

21   position.

22   Q    And would that position pay more?

23   A    Yes, it will.

24   Q    How do you buy food?

25   A    I buy food every two weeks, and I try to get enough to

Johnson - Direct

1   last for two weeks; but by the end of the second week, we're

2   running out.

3       I have to sit there and get -- try to find a ride.  If I

4   don't have a ride, because I don't have the income to pay

5   someone to take me, I don't -- I have to walk to the grocery

6   store.  I have to walk to the grocery store, and I'm only

7   limited to getting a little bit of stuff because of not being

8   able to carry all the bags and stuff.

9   Q   Can you tell us about your current housing situation?

10  A   My current housing situation is overcrowded.  It's a

11  shared housing.  It's overcrowded.

12  Q   And would your housing situation be any different if you

13  had a driver's license?

14  A   Yes, it would be.

15  Q   How is that?

16  A   Because with my driver's license, I will be able to have

17  a better paying job, where I can afford to be somewhere with

18  me and my kids where they have their own privacy and we

19  wouldn't have to be in a shared housing.

20  Q   Have you ever driven while your license was suspended?

21  A   Yes, I have.

22  Q   And what happened?

23  A   I got pulled over.  And when I got pulled over, the

24  officer asked me for my driver's license; I gave it to him.

25  He went back to his vehicle, he came back, and he said, Well,

Johnson - Direct

1  Ms. Johnson, your license is suspended.  Are you aware of

2  that?

3       And at the time, I was not aware.  And then it was a

4  second time.  But the first time, he gave me a paper where I

5  had to surrender my driver's license to him, and he gave me a

6  paper stating that I surrendered my driver's license, and

7  then he also told me that my license was suspended.

8  Q   And you said there was a second time?

9  A   Yes.

10 Q   And so why did you -- and were you charged with driving

11 while suspended the second time?

12 A   Yes.

13 Q   And convicted?

14 A   Yes.

15 Q   And as a result of that, what happened?

16 A   More court costs and court fines.

17 Q   And why did you keep driving when you knew your license

18 was suspended?

19 A   Because I needed to get to work so that I could be able

20 to provide for my kids and myself.  And where I was living at

21 at the time did not have no public transportation.

22 Q   And do you drive now?

23 A   No.

24 Q   Why not?

25 A   Because I don't want to go to jail and I don't want to

Johnson - Cross

1    leave my kids.

2    Q    How would your life be different if you had a license?

3    A    If I had a license, I would be -- my life would be

4    different because I would be able to have a better paying job

5    so that I could be more able to provide for my kids and

6    myself better.  And I also would be able to pay my court

7    costs and my court fines because of a better paying job

8    instead of a low-paying job.

9         MS. CIOLFI:  Thank you, Ms. Johnson.

10                        CROSS-EXAMINATION

11   BY MS. O'SHEA:

12   Q    Good afternoon, Ms. Johnson.

13   A    Good afternoon.

14   Q    My name is Margaret O'Shea.  I'm going to ask you a few

15   questions about the testimony that you have just given.

16        You testified that you live here in Charlottesville, and

17   that you're able to walk to one of your jobs and take a bus

18   to a different location; is that correct?

19   A    Yes.

20   Q    And you said that you work for a store?

21   A    Yes.

22   Q    What type of store is that?

23   A    It's Boost Mobile.  It's Tower Associates.

24   Q    Okay.  So, like, an electronics-type store, then?

25   A    Uh-huh.

Johnson - Cross

1    Q    Okay.

2    A    Cellular phones.

3    Q    Okay.  What other sort of job opportunities would you be

4    interested in pursuing apart from the job that you currently

5    have?

6    A    A driving job.

7    Q    Like what?

8    A    Driving, like, a shuttle bus for a hotel.  Or even I

9    wanted to drive the bus; not the school bus, but the city

10   bus.

11   Q    What are the qualifications for being able to drive a

12   city bus?

13   A    You have to have a license and then you have to get your

14   CDLs.

15   Q    Well, are you able to obtain those things with a prior

16   felony conviction?

17   A    Yes.

18   Q    Are you sure about that?

19   A    Yes.

20   Q    Apart from driving a city bus or a shuttle bus, what

21   other sorts of jobs would you be interested in pursuing?

22   A    Umm, I don't know.

23   Q    How much money would you get paid if you drove a city

24   bus?

25   A    I don't remember off the top of my head.

Johnson - Cross

1   Q   How much money would you get paid for driving a shuttle

2   bus for a hotel?

3   A   With my interviews, it was $12 an hour.

4   Q   How many hours a week?

5   A   40.

6   Q   Now, you agree that there's a bus system here in

7   Charlottesville, correct?

8   A   Yes.

9   Q   There are taxis, too, right?

10  A   Yes.

11  Q   There are bike paths, correct?

12  A   Uh-huh.

13  Q   Would you agree that there's a large student population

14  here in Charlottesville that's able to get around without a

15  car on campus?

16  A   I mean, I can't speak on that one.

17  Q   I'm going to ask you a few questions now about your

18  driving history and some things that have come up in the past

19  here in Virginia.  All right?

20  A   Uh-huh.

21  Q   So it appears that back in 2008, going back to 2008, you

22  got some traffic infractions here in Charlottesville in

23  general district court.

24      Do you recall that?

25  A   Uh-huh.

Johnson - Cross

1   Q    And you were assessed fines and costs as a result of

2   those traffic infractions, correct?

3   A    Yes.

4   Q    And you were able to pay those, right?

5   A    Yes.

6   Q    And you did, in fact, pay those, right?

7   A    Yes.

8   Q    Okay.  And then the next time that you ended up with a

9   traffic infraction was in Albemarle General District Court,

10  and that was in 2011.

11       Do you recall that?

12  A    Yes.

13  Q    And you were assessed fines and costs as a result those

14  traffic infractions, too, right?

15  A    Yes.

16  Q    And you paid those, right?

17  A    Yes.

18  Q    And then the next time that you had some traffic

19  infractions, there was one here in Charlottesville in 2012,

20  correct?

21       Do you recall that?

22  A    (Shaking head.)

23  Q    For failing to obey a stop sign?

24  A    Yes.

25  Q    Okay.  And again you were assessed fines and costs as a

Johnson - Cross

1    result of that traffic infraction, right?

2    A    Yes.

3    Q    And you paid those, right?

4    A    Yes.

5    Q    The next time that you were brought before the court was

6    not for a traffic infraction; that was for your prior felony

7    conviction in Brunswick Circuit Court, correct?

8    A    Yes.

9    Q    And that was the felony for delivering drugs to a

10   prisoner?

11           MS. CIOLFI:  Objection, Your Honor, the relevance of

12   the type of felony.

13           THE COURT:  What is it?

14           MS. O'SHEA:  It goes to employability.  It was a

15   felony for delivering drugs to a prisoner.

16           MS. CIOLFI:  Your Honor, there's --

17           THE COURT:  I don't think it's particularly

18   relevant.  I mean, it may keep her from getting certain jobs,

19   but not all jobs.

20           MS. O'SHEA:  Correct.

21           THE COURT:  All right.  It just makes it harder for

22   her to get a job.

23   BY MS. O'SHEA:

24   Q    All right.  And as a result of that conviction in 2013 in

25   Brunswick County, you were assessed court costs in the amount

Johnson - Cross

1  of $865?

2  A    Yes.

3  Q    Did you have any other costs associated with that

4  conviction other than that $865?

5  A    No.

6  Q    Okay.  And what did you do when you got that felony

7  conviction and you were assessed the $865 in terms of paying

8  that off?  For example, did you get a payment plan or

9  installment plan with the Brunswick Circuit Court?

10 A    Yes.

11 Q    And you were, in fact, able to make payments for about

12 three years on that particular -- on those outstanding court

13 costs, correct?

14 A    Yes.

15 Q    Do you know how much of that $865 you paid off during the

16 three years that you were on the payment plan?

17 A    No.

18 Q    Do you know how much of that $865 is left today?

19 A    I think it's 700-and-something.

20 Q    At any time before or after you defaulted on the payment

21 plan that you got, did you go to the Brunswick Circuit Court

22 and file anything with the court or ask them to change that

23 payment plan?

24 A    No.  What happened was I spoke with the clerk.

25 Q    So did you physically go to the clerk, or did you call

Johnson - Cross

1    them up on the phone?

2    A    Phone.

3    Q    And so when you talked to the clerk, what did you tell

4    the clerk?

5    A    I explained to her about my situation and my income.

6    Q    Okay.

7    A    And she advised me that my payments, they couldn't go no

8    lower than what I was already on at the time.

9    Q    How much were you paying?

10   A    I was doing $100 a month.

11   Q    So you paid $100 a month for three years and it only took

12   off --

13   A    No.

14   Q    I'm confused.  Help me with the math.

15   A    That was my payment arrangement, was $100 per month.

16   Q    For the entire three years that you were on the payment

17   plan?

18   A    No.

19   Q    Okay.  What was it when you started on the payment plan?

20   A    $100.

21   Q    Okay.

22   A    And then I lost my employment, so the payment plan had

23   stopped.

24   Q    The payment plan stopped, meaning the court stopped

25   offering the payment plan --

Johnson - Cross

1    A    No.

2    Q    -- or meaning that you stopped making your payments under

3    the payment plan?

4    A    Yes, because I didn't have no income.

5    Q    I guess my question is:  At what point in time did that

6    happen?  Was that 2016, or was that before 2016?

7    A    It was, like, 2016.

8    Q    Okay.  So my question is:  Between 2013 and 2016, were

9    you continuously making your payments during that time

10   period?

11   A    Yes, I was making payments, but it wasn't for the $100.

12   Q    Okay.  So how much were those payments during that

13   three-year period of time?

14   A    $75.  And then I got knocked off of the payment plan

15   because of not being able to pay because I lost employment.

16   Q    No, I understand.  I just -- I'm having some problems

17   with the math here.  Because you were convicted in 2013, and

18   you're saying you got knocked off in 2016, but you were

19   paying -- making payments, monthly payments, during those

20   three years.  I'm just trying to figure out how much those

21   payments added up to.

22        Okay.  So at one point it was $75 a month, and at a

23   different time it was $100 a month?  Yes?

24   A    Yes.

25   Q    So after you lost your job, you said that you called the

Johnson - Cross

1    clerk's office, correct?

2    A    Yes.

3    Q    All right.  And what, if anything, did the clerk's office

4    from Brunswick County advise you?

5    A    What she had told me was that she would have to get back

6    with me to let me know if I could restart a payment plan

7    because of the payment plan, being that I didn't complete it.

8    And so she never -- I never had heard nothing back from her,

9    so I reached back out to her.  And when I reached back out to

10   her, she said that they can restart my payment plan, but I

11   would have to pay a certain amount down and this is the

12   amount that I would have to pay each month.

13   Q    And have you, in fact, restarted a payment plan in

14   Brunswick County?

15   A    No, I haven't.

16   Q    Have you gone to the Brunswick County courts and asked

17   them to give you a restricted driver's license?

18   A    No, because I wasn't eligible at the time because my

19   license -- I didn't have a job when I spoke with her.

20   Q    You have a job now, though, right?

21   A    Yes, I do.

22   Q    And when did you get this job?

23   A    On Halloween.  I started on Halloween.

24   Q    October of this year?

25   A    Yes.

Johnson - Cross

1    Q    Is this the first time that you've been employed in the

2    past 12 months?

3    A    No.

4    Q    What job did you hold before this?

5    A    It was at a gas station.

6    Q    And when did you hold that job?

7    A    For, like, six months.  I started there approximately

8    August.

9    Q    2018?

10   A    Yes.

11   Q    And how long were you at the gas station for?

12   A    Approximately six months.

13   Q    Well, August -- do you mean August 2017?

14   A    No.  It was May -- sorry, sorry.  April.  It was April.

15   April until the beginning of October.

16   Q    So from April of 2018 until October 2018, you were

17   employed at a gas station?

18   A    Yes.

19   Q    And then in October of 2018, after Halloween, or on

20   Halloween, right about Halloween, is when you got the job

21   that you have now?

22   A    Uh-huh.  Yes.

23   Q    Make sure you say yes or no for the court reporter.

24        Prior to working at the gas station in April of 2018,

25   what was the last job you had before that?

Johnson - Cross

1   A    I used to do home health.

2   Q    And when was the last time you had a job in home health?

3   A    2016.

4   Q    How long did you -- did you stop in 2016 or start in

5   2016?

6   A    I stopped in 2016.

7   Q    So between 2016 and April of 2018, you were unemployed?

8   A    Yes.

9   Q    What was your source of income during those two years?

10  A    I had no income.

11  Q    What did you do for money?

12  A    I had tried to file unemployment, but I couldn't get

13  unemployment.

14  Q    Did you have any other source of funding at all?

15  A    No, I didn't have any income.  I mean, my kids had

16  income, but I didn't have income personally myself.

17  Q    Do you receive child support for your children?

18  A    No, I don't receive child support for my children.

19  Q    Do your children receive child support for them?

20  A    No, they don't.  My daughter received an SSI check, but

21  she doesn't receive that anymore.

22  Q    The oldest daughter, the 15-year-old?

23  A    Yes.  I only have one daughter.

24  Q    So your family, your household, during those two years,

25  the only money that was coming into it was through your

<sup>33</sup>

Johnson - Cross

1   daughter's social security check?

2   A   Yes.

3   Q   So I think we agreed that you haven't gone to the

4   Brunswick County Circuit Court to ask them to issue you a

5   restricted license.

6       Have you gone to the Brunswick County Circuit Court to

7   ask them if you could convert your payments to them into a

8   community service obligation?

9   A   No.  I wasn't aware of any of that.  And how am I going

10  to get to Brunswick?  I have no license.

11  Q   But the answer, though, is no --

12  A   Yes.

13  Q   -- you haven't done that?

14      Have you ever asked the Brunswick County Circuit Court to

15  forgive the debt?

16  A   No.

17  Q   Before your license was suspended in 2016, were you aware

18  that it could be suspended if you didn't pay the money that

19  you owed the court?

20  A   Yes.

21  Q   The job you have right now, how much money do you believe

22  that you can pay on a monthly basis from your existing income

23  towards a payment plan?  Like, $5 a month?  $10 a month?  Are

24  you able to say?

25  A   No.  I don't have anything left over after my expenses

Johnson - Cross

1   with my household and my kids.  I have nothing left because I

2   also -- I have a child support obligation that I pay out,

3   too.

4   Q   Is that for a child who is not presently physically

5   living with you?

6   A   Yes.

7   Q   How much is your child support obligation?

8   A   264.

9   Q   What other monthly expenses do you have apart from that

10   child support obligation?  For example, do you have a phone

11   bill?

12   A   Yes, I do.

13   Q   How much is that?

14   A   $100 a month.

15   Q   Is that for your phone and your children -- and phones

16   for your children, or just for you?

17   A   No, me and my children.

18   Q   Do you have a cable bill, like television, television

19   cable bill?

20   A   No.  I don't have cable.  We don't have cable.

21   Q   Apart from your monthly child support obligation and your

22   $100 a month cell phone bill?

23   A   Rent.

24   Q   Rent.  How much is your monthly rent?

25   A   Currently my rent is $200 right now.

Johnson - Cross

1   Q    Do you have any other recurring monthly expenses that are

2   set like that?  So apart from, like, groceries, like, do you

3   have a set electricity bill or water bill or anything like

4   that?

5   A    Just groceries.

6   Q    Now, you mentioned that you were pulled over at one point

7   and you were unaware that your license was suspended so the

8   officer let you know that it was.

9        Where was that?

10  A    In Waynesboro.

11  Q    Okay.  So that was in Waynesboro.  And that was in 2017,

12  September 2017?

13  A    No.  September 2017 is when I got the summons for court.

14  It was before that.

15  Q    I'm sorry.  When did that happen, the prior action?

16  A    I don't remember the exact date, but I know that I was on

17  my way to work and he pulled me over.

18  Q    So if you were on your way to work, would it be fair to

19  say that was probably back in 2016?

20  A    Uh-huh.

21  Q    Or before that, but right around 2016?

22  A    Uh-huh.

23  Q    So your testimony is you were on your way to work, you

24  got pulled over, the officer informed you that you were

25  suspended for -- did he tell you why you were suspended, or

Johnson - Cross

1    did he just tell you you were suspended?

2    A    He just told me that my license was suspended.  He asked

3    was I aware my license was suspended, and I told him no, I

4    was not aware.

5    Q    And at that time you were on your way to work?

6    A    Yes, ma'am.

7    Q    So you still had an income at that point, but you

8    apparently then defaulted on your payment plan already?

9    A    Yeah.  Before I got that job, yeah.

10   Q    Now, you mentioned the 2017 incident.  And that was in

11   Augusta County General District Court; is that correct?

12   A    Yes.

13   Q    And that's when you had the infraction for driving on a

14   suspended license, right?

15   A    Yes.

16   Q    And you were assessed a $100 fine and $139 in court

17   costs?  Does that sound right?

18   A    Yes, that's what the papers said.

19   Q    So it's a $239 total that you owe to that jurisdiction,

20   correct?

21   A    Yeah.  It's more than that; but yeah.

22   Q    You say that you think it's more than that.  How much do

23   you think it is?

24   A    It's like -- when I checked it, it was, like,

25   three-something.  I think it was, like, three-something with

Johnson - Cross

1   interest or something.

2   Q    So in the neighborhood of $300 owed to Augusta General

3   District Court?

4   A    Yes, ma'am.

5   Q    And then you still owe, you said, you think about $700 to

6   the Brunswick County Circuit Court, correct?

7   A    Yes.

8   Q    Okay.  Are those the only two financial obligations that

9   you're aware of that you owe to courts in the Commonwealth of

10  Virginia right now?

11  A    Yes.

12          MS. O'SHEA:  If I could have just one moment, Your

13  Honor.

14  BY MS. O'SHEA:

15  Q    Now, isn't it also true, Ms. Johnson, that you are

16  currently facing new felony charges in Albemarle Circuit

17  Court?

18  A    Yes.

19  Q    And those felony charges are set to go before the Grand

20  Jury on December the 3rd, correct?  Yes?

21  A    Yes.

22  Q    Okay.  And those are for felony failure to return bail

23  property; is that correct?

24  A    Yes.

25  Q    But you're out of custody on that right now on a personal

Johnson - Redirect

1    recognizance bond, right?

2    A    Yes.

3    Q    Do you have any knowledge of what a conviction in that

4    case would do to your employment prospects?

5           MS. CIOLFI:  Objection, Your Honor.

6           THE COURT:  Sustained.

7           MS. O'SHEA:  Thank you, Judge.  I don't have any

8    other questions.

9           THE COURT:  All right.

10                         REDIRECT EXAMINATION

11   BY MS. CIOLFI:

12   Q    Ms. Johnson, Ms. O'Shea ran through a number of minor

13   traffic infractions from earlier in the 2000s where you paid

14   your court costs and fines.

15        Did you try to pay when you could?

16   A    Yes, I did.

17   Q    And for the most recent charges, have you always tried to

18   pay when you could?

19   A    Yes.

20   Q    When you -- when the Brunswick County Circuit Court gave

21   you a $100 payment plan, did they ask you how much you could

22   afford?

23   A    No.

24   Q    Could you afford that amount?

25   A    No.

Johnson - Redirect

1    Q    Did anyone tell you in either Brunswick County or in

2    Amherst County about the availability of a restricted

3    license?

4    A    No.

5    Q    How did you know about it?

6    A    I looked it up myself.

7    Q    And you determined you were ineligible because you were

8    unemployed; is that right?

9    A    Yes.

10   Q    And at the time that you were employed, would you have

11   been able to pay the $145 reinstatement fee --

12   A    No.

13   Q    -- in order to get the restricted license?

14   A    No.

15   Q    Did anybody at either of those courts tell you about

16   community service being available?

17   A    No.

18   Q    And when you missed payments on your payment plan to

19   Brunswick County, what happened?

20   A    My license was re-suspended.

21   Q    And did you get a hearing?

22   A    No.

23   Q    Did you get notice of it?

24   A    No, I didn't receive any notice.

25   Q    Have you tried to get on a payment plan recently?

Johnson - Redirect

1    A    Yes.

2    Q    And what happened?

3    A    I couldn't get on it because I had lost my job.  And

4    without me having a job, I can't pay on something.

5    Q    And when did you try to get on a payment plan?

6    A    It was the beginning -- it was, like, the end of

7    September, beginning of October.  Right when I lost my job.

8    Q    And did either court -- so you called both courts,

9    correct?

10   A    Yes, I did.

11   Q    And what did the courts say?

12   A    Brunswick told me that they could restart me on a payment

13   plan, I would pay the $35 to start off, and then I would have

14   to pay $50 every two weeks on my payment arrangement.

15       And then I told the clerk that I would not be able to

16   afford the $100, $50 every two weeks.  And she told me that

17   she was going to check and see if she could do something

18   about it.

19       So when I reached back out to her, she had told me

20   that -- asked me if I could pay $25.  I told her yes.

21       But Augusta, when I called Augusta Court, they told me

22   that I have to come in there, I would have to bring in my

23   compliance letter from DMV, and I would have to come in there

24   before they can do anything about a payment arrangement.

25   Q    And you would have to come in person?

Johnson - Redirect

1    A    In person to the court.

2    Q    How far away is that?

3    A    It's like 45 minutes.

4    Q    And back to the Amherst County, where they said you could

5    pay $35 down and $25 a month, why didn't you do that?

6    A    Because I didn't have it.  I don't have it.  Like, the

7    job that I have is, like, a low-paying job.  And with a

8    low-paying job, with me having my obligations with my

9    children, child support, my obligations with taking care of

10   my other two kids and being able to provide for them, it just

11   leaves me with nothing, nothing at all.

12         MS. CIOLFI:  Thank you, Ms. Johnson.

13         THE COURT:  All right.  Is that all?

14         MS. O'SHEA:  Yes.

15         THE COURT:  Thank you.  You may step down.  Call the

16   next witness.

17         MS. CIOLFI:  Judge, at this time I'd like to

18   approach and give you this binder, which is the exhibits

19   we've given to the Commonwealth, so you can follow along.

20         THE COURT:  All right.

21         MS. CIOLFI:  I'll pass that up.

22         Your Honor, before I call the next witness, in the

23   exhibits that we just handed you, the first five exhibits are

24   the declarations from the plaintiffs.  You just heard from

25   Ms. Johnson, Damian Stinnie, Melissa Adams, Williest Bandy,

Dugger - Direct

1    and Brianna Morgan.

2            And again, their statements are very similar to

3    Ms. Johnson.  Their licenses were suspended for failure to

4    pay court fines and costs; none of them were asked by anyone

5    at the court about their ability to pay; and all of them

6    suffer, and continue to suffer, the immediate injury because

7    of their license suspension.  They're attached to the

8    complaint as well, but we wanted to put them into evidence.

9            The next is the declaration of Llezelle Dugger, but

10   I'll call Llezelle Dugger to the stand.

11       LLEZELLE A. DUGGER, CALLED BY THE PLAINTIFFS, SWORN

12                      DIRECT EXAMINATION

13   BY MR. BLANK:

14   Q    Please state your name for the Court.

15   A    Llezelle Agustin Dugger.

16   Q    And what's your current employment?

17   A    I'm the clerk of court for the Charlottesville Circuit

18   Court.

19   Q    And how long have you been the clerk of the court?

20   A    Since January 1st, 2012.

21   Q    So that's approximately?

22   A    Seven years.

23   Q    Excellent.  In your position as the clerk of the court,

24   do you have knowledge of Virginia Code Section 46.2-395 and

25   defendants' -- license suspensions because of defendants'

Dugger - Direct

1   failure to pay court debts and costs?

2   A    I do.

3   Q    In your position as clerk of the court, what is your job

4   responsibility with regard to creating and maintaining court

5   files, financial records, preparing court orders, charging

6   and collecting fees due to the court, and preparing financial

7   and other reports required to be submitted to state and local

8   agencies?

9   A    All of the above.

10  Q    Tell us just a little bit more than "all of the above."

11  A    When a case comes into the circuit court, myself, as well

12  as the staff I have, we will enter it into what we call the

13  Circuit Case Management System, which we call CCMS.  It is a

14  case management system run by the Supreme Court.

15      In addition, if there are any filing fees or bond that

16  comes up from, say, general district court, we will receipt

17  that into what we now call FAS.  It used to be FMS.  They

18  upgraded -- "they" being the Supreme Court -- upgraded to the

19  Financial Accounting System.  Those two systems are

20  intertwined in many ways.

21      For purposes of this hearing, when we have a criminal

22  case that finishes at sentencing, my deputy clerk on the

23  bench or myself, whoever is doing the case, will then enter

24  the disposition in Case Management, and then also enter what

25  the costs they're assessed, meaning the felony fixed fee or

Dugger - Direct

1    any add-ons, which then get transferred into FAS, which

2    creates the financial accounting for the individual account.

3    Q    You had submitted a declaration that we had put into the

4    evidence before you stepped up.  There you discuss FMS versus

5    FAS.

6         Can you explain to the Court how FMS is different or the

7    same as FAS?

8    A    So when I started in 2012, the circuit court, the general

9    district court, and the juvenile courts are all on FMS, which

10   is Financial Management System.  It's a DOS-based program

11   written in Fortran code, which means I look at an amber

12   screen with green letters on it, that I hadn't seen since

13   before I got to college.  So that was the first learning

14   curve as a clerk, was relearning DOS and Fortran.

15        Last year, year and a half, the Supreme Court finally

16   started rolling out a Java overlay on that program.  And what

17   they call the system now is FAS, which is Financial

18   Accounting System.

19        I understand all our circuit courts that are with the

20   Supreme Court are using it.  I'm not quite sure if the

21   District Courts have completely rolled out onto FAS.  They

22   may still be using FMS.

23   Q    And how is FMS -- I think you started to say this.  How

24   is FMS integrated with the Case Management System, or CMS?

25   A    I guess in layman's terms, they talk to each other.  So

Dugger - Direct

1  when I and my deputies enter court costs into the Case

2  Management System, it says this is how much we're assessing

3  this defendant for this type of felony and any add-ons that

4  the statute requires.  That then gets transmitted to FMS, so

5  then there's what's called an individual account that's

6  created in FMS.  When you type in a defendant's name, that

7  will pull up how much they owe the court and for what.

8      We've got three number systems.  You know, one is the

9  felony fixed fee.  One is internet crime that we collect, the

10  fees; all the add-ons that we would do for court costs.

11  Q    When a person fails to pay court costs or fines, what

12  order is entered by a clerk or a judge with regard to a

13  driver's license suspension for failure to pay court fines

14  and costs?

15  A    You mean at the time that they default?

16  Q    Correct.

17  A    When they're supposed to pay, my judge does not enter a

18  separate order.

19  Q    Does the clerk enter an order?

20  A    No, sir.

21  Q    How does the FMS system transmit the record of nonpayment

22  to DMV?

23  A    So at sentencing hearing, my judge will, or if we have a

24  substitute judge, the substitute judge will say that the

25  defendant is ordered to pay court costs and fines.  My deputy

Dugger - Direct

1    clerk, through a chart, we have what those costs are.  We

2    assess them, and depending on what the Court says when the

3    due date is -- so in our court, our judge will typically say

4    the defendant is ordered to pay court costs and fines during

5    the period of supervised probation.

6        So let's take, for example, the defendant gets a one-year

7    sentence and he's placed on two years' supervised probation

8    upon release from incarceration.  My clerk will then put --

9    there's a field in FMS and in CCMS that has the due date.  So

10   we will look at one year, plus the two years supervised

11   probation, and the due date we put into our system will be

12   three years from the date of sentencing, because that's the

13   time period that the judge is deferring the payment of court

14   costs for the defendant.

15   Q   And then when that time hits, do you enter anything if

16   somebody doesn't make a payment, or does it automatically go

17   to DMV?

18   A   So when the due date approaches, and passes, if no

19   payment is made, DMV's computer system pings our systems, and

20   it will then go to DMV that this person has failed to pay

21   court costs.  And then that person will then get a letter

22   from DMV saying their license has been suspended for failure

23   to pay court costs.

24   Q   But your court doesn't enter an order that says that the

25   license has been suspended?

Dugger - Direct

1   A    Not at the time of default, no.

2   Q    And you don't send a letter as the clerk that says your

3   license is suspended?

4   A    No, sir.

5   Q    Ms. Ford from DMV, I think, is here.  You don't know

6   Ms. Ford, do you?

7   A    No, sir.

8   Q    Okay.  Did you read her affidavit?

9   A    I did.

10  Q    In paragraph 6 of her affidavit, Ms. Ford states that DMV

11  never receives physical paper copies of any orders.

12       Again, there are no orders that come; is that correct?

13  A    Not at the time where someone fails to pay court costs,

14  no.

15  Q    And in paragraph 11, Ms. Ford states the clerk office

16  inputs an indicator into the system to DMV that the court has

17  suspended the driver's license of that person.

18       What is your response to that, the accuracy of that

19  statement?

20  A    So there's not any run-of-the-mill felony, but in a

21  run-of-the-mill felony that is not driving-related, we just

22  enter what -- the costs we enter.  There's no field that says

23  the license is suspended.

24       You compare that with a felony for -- or it could be a

25  misdemeanor -- DUI or a drug conviction.  In that, you will

Dugger - Direct

1    have a field that says:  Is this DMV reportable?  And it is,

2    because under the statute there's a six months' loss of

3    license under drug conviction.  And depending what type of

4    DUI it is, it's either a year, three years, or indefinite.

5    And that does have a yes/no field for us that says, sent to

6    DMV.  And my deputies or I would put in yes if it's a drug

7    conviction, if it's a DUI conviction.  Leaving the scene of a

8    crime after a car accident, that also is reportable.

9        But let's say grand larceny, when someone gets convicted

10   of a grand larceny and we get to sentencing, there's no field

11   there that we put that this is DMV reportable.  That's

12   different from the court costs.

13       And so no, I don't know what field she would be talking

14   about, at the circuit court level, at least.

15   Q    And she indicates in her affidavit there's a field 14.

16       Do you have any knowledge of what a field 14 is?

17   A    We don't have numbers on our fields of the screens we

18   see.

19   Q    In paragraph 14, Ms. Ford states that DMV must assume if

20   the clerk included such indicator that the Court issued a

21   suspension.

22       What's your response to that?

23   A    I don't issue a suspension, and my judge hasn't given me

24   an order of suspension.

25               MR. BLANK:  No further questions.

49

Dugger - Cross

1        THE COURT:  Okay.

2                    CROSS-EXAMINATION

3    BY MS. O'SHEA:

4    Q    Good afternoon, Ms. Dugger.

5    A    Good afternoon.

6    Q    Just to follow up on a few questions, you would agree

7    that there are different types of license suspensions that

8    occur in the Virginia system, right?

9    A    Yes.

10   Q    I mean, there are mandatory suspensions by statute for

11   different types of things?

12   A    Yes.

13   Q    And under some circumstances, DMV is the entity that

14   makes the decision whether or not a suspension should be

15   made, right?

16   A    Yes.

17   Q    So, like, for a DUI third offense, I think it is, you

18   know, DMV will suspend a license upon entry of that

19   conviction, right?

20   A    Yes.  And my judge also orders from the bench that --

21   let's just take a DUI first.  He'll order from the bench:

22   Your punishment is one year loss of license.  So he actually

23   orders a suspension, loss of license.  He orders a $500 fine;

24   suspends $350 of it if they go to VASAP; and then a 30-day

25   jail sentence, all suspended, is the typical first DUI

Dugger - Cross

1    sentence.

2    Q   So all that information has to be communicated to DMV,

3    right?

4    A   It goes into our Case Management System, and then there's

5    a field that says, yes/no, DMV.

6        If it's one of those -- drug, DUI, leaving the scene of

7    the accident; anything that has that mandatory DMV

8    suspension -- we put in a yes.  And that's a field that comes

9    up.  So yeah, those would get to DMV via our computer.

10       We don't transmit the final sentencing order to DMV.  We

11   transmit it to DOC.  We transmit it to the sentencing

12   commission and the parties involved, Commonwealth Attorney

13   and defense attorney, but we don't typically send the final

14   sentencing order for those types of cases.  For any type of

15   cases, actually.

16   Q   So the order the judge signs never goes out, but the

17   information is sent, is my question; right?

18   A   Depending on the case, yes, the information goes

19   electronically.

20   Q   Correct.  Does it also go to, like, the state police to

21   populate a VCIN, or to the FBI to populate a NCIC?

22   A   So CCMS, and I believe also the general district court

23   system, has an interface with DMV, and it also has an

24   interface with the state police.  They are currently working

25   on an interface with DOC.

Dugger - Cross

1   Q   So let's say you get back an order in one of these

2   mandatory license suspension cases; a DUI third offense, for

3   example.  The Court has entered an order suspending an

4   individual's driver's license for a year.  You pull it up on

5   your database.  Is there, like, a specific code that keys to

6   these different traffic felonies?

7   A   Well, if done correctly, once it gets into our -- so DUI

8   third is a felony, so there would have been a preliminary

9   hearing down in general district court.  So at the general

10  district court level, from the magistrates, all the

11  information regarding the statute he was charged under,

12  whether it was a misdemeanor or a felony, would have all been

13  entered.  It comes up to our system from general district

14  court once it gets certified.  So all that is typically all

15  filled in when we get there.

16      What my clerks and I will then fill in is the

17  disposition --

18  Q   Correct.

19  A   -- that the Court orders from the bench.  So, you know,

20  one year loss of license will go in.  There's a field -- in

21  there, when you pull up that statute, there's a field in

22  there that says "operator license suspended."  Then you put

23  in what period of time it's suspended.

24  Q   Right.  So then you finish filling out these fields,

25  right?

Dugger - Cross

1    A    Yes, ma'am.

2    Q    And so then how is it that the finalized record is

3    transmitted out, like, to DMV or to the other authorities

4    that you're talking about your computer is interfacing with?

5    A    So my understanding is that DMV's computer will ping the

6    state system at regular intervals.  And these will then come

7    up to DMV to show -- particularly when we say, yes, this goes

8    to DMV, then it will go to the DMV computer system, and they

9    do with it what they need to do with it.

10   Q    You said that's your understanding, this pinging.  Is

11   that something you've talked about to somebody, or is that

12   your assumption of how it happens?

13   A    It's -- no, it's not an assumption.  It's what they -- so

14   as a new clerk or as a deputy clerk, we have new training,

15   ongoing training.  So at our training we are taught by OES

16   what the interface means.

17        So, for example, the state police interface, that pings

18   every 15 minutes.  That will pick up stuff, particularly sex

19   offense crimes.  So that has a faster ping rate than the DMV.

20   Q    So when you say "ping," do you mean kind of like prodding

21   your system to put out any new information that's been

22   entered since the last time it was prodded?

23   A    It's computer talking to computer, basically.

24   Q    So I'm trying to figure out what your understanding is,

25   though, of this pinging.  Is that the outside system telling

Dugger - Cross

1   your system to transmit any new information that's been

2   entered?  Is that what it is?

3   A    That would be my understanding.  But the programmers at

4   OES are probably the better folks to ask how the mechanics

5   work.  We enter the information, and at some point it goes to

6   DMV electronically.

7   Q    Okay.  So then you were testifying before about a fines

8   and costs situation in a non-traffic felony.  So let's say

9   we've got a grand larceny, assessed fines and costs; your

10  judge gave them three years to pay; the three years has come

11  up.  And you testified that DMV's computer pings your

12  computer.

13  A    So when we put in a due date -- so what's today?

14  November 15th, 2018.  So, three years, I'm going to put in a

15  due date that your court costs are due November 13th, 2021.

16  If you don't make a payment when that due date passes, it

17  goes into a report, I guess, for lack of a better term.  And

18  it will be 30 days -- well, now it's 40, because the law

19  changed.  40 days it will sit there to see if someone pays.

20      If nothing happens, if no payment is made or nothing, if

21  they don't enter into a payment plan or do something, on day

22  41, that report is automatically transmitted to DMV stating

23  that someone has failed to pay their court costs.

24  Q    And what form does that report take?

25  A    I -- there's no -- there's a report called IN05.  And

Dugger - Cross

1    that tells me when you look at it which ones were sent off to

2    DMV.

3        What DMV receives in terms of their report, I can't speak

4    to that.

5    Q    Is that something that you review before it's

6    transmitted?

7    A    Yes.  Just in case someone did make a payment, someone

8    did enter a payment plan and it mistakenly got into this

9    report, I have a deputy, and my chief deputy and I review

10   that to make sure, as much as possible, we don't have

11   someone's license suspended by DMV that shouldn't be.

12   Q    So as a clerk, you want to make sure that your

13   recordkeeping is accurate --

14   A    Correct.

15   Q    -- so that you're not sending stuff off to DMV that's not

16   true?

17   A    Correct.

18   Q    All right.  So when you're looking over this report that

19   reflects, you know, an individual hasn't paid their fines and

20   costs, as a clerk's office, do you send another letter to

21   that individual letting them know that their driver's license

22   is about to be suspended?

23   A    No, ma'am.

24   Q    Do you or anyone in your office call that individual or

25   take any steps to let them know that their license is about

Dugger - Cross

1    to be suspended?

2    A    No.

3    Q    Reach out to them, do anything at all to see why they

4    haven't paid their fines and costs?

5    A    No, ma'am.

6    Q    Would you agree that the authority for creating

7    installment plans and payment plans is with your office?

8    You're able to do that, right?

9    A    It's with the court.  So the judge actually has to sign

10   the order on payment plans.  But my judge has given our

11   office some discretion, up to a certain point.  If someone

12   owes less than, I think it's $2,500, we can sign off on that.

13   But anything above that, our judge likes to review the

14   payment plan.

15   Q    So is that the order from November 1st, 2015 that

16   delegated certain responsibility to your office for different

17   payment plans?  Is that what you're referring to?

18   A    Yes.

19   Q    I have handed you a document that reads something along

20   the lines of "Guidelines for Installment Payment Plan

21   Options," correct?

22   A    Yes, ma'am.

23   Q    And there's a judge's signature there on that form,

24   correct?

25   A    Yes.

Dugger - Cross

1  Q   And then your signature appears on that form as well,

2  right?

3  A   Yes.

4  Q   And is that the guidelines that you were talking about in

5  terms of your office and your authority to set up installment

6  payment plans without having to go to a judge first?

7  A   Correct.

8  Q   If you've got a situation that falls outside the scope of

9  those particular guidelines there, and you said the judge

10  wants to review it, how does that happen?

11  A   So anytime someone comes into our office wanting to set

12  up a payment plan, they will typically meet with either

13  Ms. Pugh, Mr. Schmidt, or myself, because the form,

14  application, the petition for payment plan, has detailed

15  information regarding what's your take-home pay, what are

16  your expenses, and things like that.  So we go over it with

17  them to make sure it's accurate.  We don't want all zeros.

18      If it doesn't fall within the parameters that my office

19  has discretion to sign off on it, we then submit that

20  petition up to the judge, and the judge will review it, and

21  then we'll -- in the bottom part, in the order part, we'll

22  order "approved" or put in whatever payment plan conditions

23  he may require.

24  Q   Okay.  And once the judge has done that, approved or

25  modified a payment plan that's been submitted to him for

Dugger - Cross

1   consideration, how is the debtor notified that the payment

2   plan has been approved?

3   A    So if a payment plan comes back down from the judge's

4   office, Ms. Pugh, she runs point on it.  She will call the

5   person and say, We have a certified copy of the payment plan

6   for you to come pick up.  Because they need to take that to

7   DMV so that they can show DMV that they have an active

8   payment plan so that DMV can unsuspend or unrestrict --

9   unsuspend their license.

10      Once we have the order, we also enter all that

11  information into their individual account, and we put in that

12  it's under a TTP, which is a time-to-pay plan.  And then we

13  put in whatever due date is next.  So we would probably say

14  January 1st, 2019, your first payment of $50 a month is due,

15  or whatever date the judge wants to put in there.

16      And so that's how that individual account is then created

17  for that payment plan.

18  Q    So when someone goes on an installment payment plan

19  that's been either approved through your office or approved

20  through the judge, either way, let's say they make payments

21  for a certain period of time -- six months, a year -- and

22  then they stop making payments.

23      What steps are taken by your court or by your office to

24  let the debtor know that they are missing payments?

25  A    Nothing.  We have over 1,500 cases any given year.  We

Dugger - Cross

1    have probably over 700 folks on payment plans, if not more,

2    at any given day.  And the computer does all of that.

3         If there is no payment made by the due date, it goes into

4    that 40-day window.  And if nothing happens in 40 days, day

5    41, DMV is then electronically sent that this person has

6    paid -- has failed to pay their court costs.

7    Q    So the situation where someone who has been on an

8    installment plan and then defaulted, they also appear on that

9    40-day report that you were talking about earlier?

10   A    Yes, ma'am.

11   Q    Does your office -- does your jurisdiction offer

12   community service as an option for remitting fines and costs?

13   A    On a case-by-case basis.  That's completely within the

14   judge's purview.

15   Q    Are you -- do you have any knowledge of how this system

16   operated before we had these computers that talk to each

17   other?

18   A    No.  The computers were there when I started as a clerk.

19   Prior to that, as a defense attorney, I had no clue how all

20   that would work.

21   Q    Fair enough.  Would you agree, though, that somebody has

22   to make this information available for DMV to even know that

23   there are outstanding fines and costs that have not been

24   paid?

25   A    Yes.  And the report, like I said, once the due date has

Dugger - Cross

1  passed, that's the report that goes to DMV; so that's how DMV

2  gets notified electronically through the computer systems.

3  Q   And would you agree that when you look at the statute,

4  the language of the statute actually says "the Court shall

5  suspend," right?

6  A   That's what the statute says.

7       MS. O'SHEA:  If I can just have a moment.

8       THE COURT:  If a person makes a partial payment, say

9  they're supposed to pay $50 a month and they pay $25, is

10  there an exception made automatically by you with regard to

11  sending the report to DMV?

12      THE WITNESS:  My staff would have the discretion to

13  ask Judge Moore if this is something we could do and then

14  change the due date to say that something has been paid.

15      I've been fortunate that both Judge Moore and Judge

16  Hogshire before him have been very liberal in helping folks

17  make their court costs possible, and their payments.  And so

18  there is a lot more liberalness in my court, and I understand

19  that.  And that's because I've worked for two judges, with

20  two judges, that really do believe folks need their driver's

21  license.

22  BY MS. O'SHEA:

23  Q   Would you agree that -- if you know.  The system that you

24  have in place in Charlottesville, you know, you have intimate

25  knowledge of that.  Would you agree that it's different from

Dugger - Cross

1   jurisdiction to jurisdiction to jurisdiction around the

2   Commonwealth?

3   A    So every -- I'm just going to talk about circuit courts.

4        Every circuit court except Fairfax and Arlington are on

5   the Case Management System and on the Financial Accounting

6   System that the Supreme Court has.

7   Q    Do you mean Arlington or Alexandria?

8   A    Alexandria.  I'm sorry.  I get the As confused.

9   Q    I'm not talking about the computers.  I'm talking about

10  your mechanisms for installment plans and approval for the

11  judges, and what you offer, and so on and so forth.

12  A    Correct.  So the Supreme Court promulgated a rule saying

13  each circuit court should have available installment or

14  deferred payment plans for defendants to enter into one.

15       We've always had it, even before then.  We just put it

16  into writing once that rule was promulgated.

17       But as people like to say, there's 120 different ways to

18  do things in Virginia because there are 120 different circuit

19  courts.  And each clerk is elected.  Each clerk has a

20  different judge.  So it literally varies from circuit court

21  to circuit court.

22  Q    Right.  So, like, a deferred payment plan that might be

23  okay or acceptable in Charlottesville might not be okay in

24  Augusta County or Harrisonburg or somewhere else?

25  A    Yes, that's correct.

Dugger - Redirect

1   Q   Ms. Dugger, you serve on the advisory board for the Legal

2   Aid Justice Center here in Charlottesville; is that correct?

3   A   I do, for about five years now.

4            MS. O'SHEA:  Okay.  Very nice.  Thank you.

5            I don't have any other questions.

6            THE WITNESS:  Do you want your exhibit back?

7            MS. O'SHEA:  If I could have that marked and

8   admitted as Defendant's Exhibit 1.

9            MR. BLANK:  No objection.

10           THE COURT:  It will be admitted.

11           (Defendant's Exhibit 1 admitted)

12                    REDIRECT EXAMINATION

13  BY MR. BLANK:

14  Q   Ms. Dugger, just a short follow-up.  I heard about the

15  120 jurisdictions and circuit courts and that the payment

16  plans may be a little bit different, but once a person

17  defaults, once a default has occurred, the process is the

18  same for every jurisdiction with regard to the FMS, FAS

19  system, and CMS?

20  A   Yes.  Once the due date passes or the time-to-pay date

21  has passed, the report will go to DMV on day 41.

22  Q   And then DMV will suspend, correct?

23  A   That's when they will get the suspension letter from DMV,

24  yes.

25           MR. BLANK:  Thank you.

Dugger - Redirect

1              Oh, Your Honor, if we could have one second.

2              (Counsel conferring)

3    BY MR. BLANK:

4    Q    And on that $25, if there was a change, that would have

5    to go to DMV in order for there to be a change in the due

6    date?

7    A    We would do a -- and that's why it has to go up to Judge

8    Moore.  We need to do a new payment plan.

9    Q    And it will go to DMV by default unless you change the

10   due date?

11   A    Yes.  If a due date comes and I haven't or one of my

12   staff members has not changed it, the computer will

13   automatically send it to DMV.

14              MR. BLANK:  Okay.

15              THE COURT:  All right.  Thank you.

16              MR. BLANK:  Judge, before I call Ms. Moats to the

17   stand, I'd like to turn your attention to tab 7 and tab 8 in

18   the book, specifically tab 7 to start with, Your Honor.  And

19   you have to go pretty far back in the back, but it's on page

20   6-4.  And what you're looking at, Your Honor, this is a

21   record, it's from the Virginia Commonwealth auditor of

22   accounts -- excuse me, Auditor of Public Accounts.  It's in

23   our brief.  There's a website link that you can access to

24   actually see this.

25              But if you go to page 6-4, this is the audit of a

Moats - Direct

1   circuit court, and it says, "All unpaid accounts are

2   submitted to the Department of Motor Vehicles for license

3   suspension and each unpaid case must be submitted to the

4   Department of Taxation for set-off debt collection for at

5   least three years."

6          Again, we want to note that the agency, the Auditor

7   of Public Accounts, is stating that the Department of Motor

8   Vehicles is the one that suspends the license.

9          Second, Judge Moon, we'd like to turn your attention

10  to tab 8, and that is a 2000 report.  It's a special report.

11  It's a review of Virginia courts management unpaid fines and

12  costs, again the Auditor of Public Accounts.  And if you go

13  on the top of page 5 -- and this goes to this statement of

14  FMS and CMS.  And the acronyms get a little bit fuzzy for me,

15  but if you look at the top of page 5, the system also

16  interfaces with the Department of Motor Vehicles for

17  automated submission of license suspension.  And that goes

18  back to Ms. Ford's affidavit, paragraph 8, that says, "DMV

19  receives no information via the financial management system."

20          It's clear these systems are talking to each other.

21          At this time we'll call Ms. Moats.

22          JULIE MOATS, CALLED BY THE PLAINTIFF, SWORN

23                    DIRECT EXAMINATION

24  BY MR. BLANK:

25  Q   Can you state your name for the record, please?

Moats - Direct

1   A   Julie Moats.

2   Q   And where do you currently work, Ms. Moats?

3   A   At the Charlottesville Circuit Court.

4   Q   And what's your job title?

5   A   Deputy clerk.

6   Q   And how long have you been in that position?

7   A   I've been there a little over two years.

8   Q   Excellent.  And before you were deputy clerk of the

9   circuit court, where did you work?

10  A   I was at the Charlottesville General District Court.

11  Q   And how long did you work at the -- what was your title

12  there?

13  A   I was deputy clerk.

14  Q   And how long did you work at the general district court?

15  A   That was actually a little over two years.

16  Q   I -- did I -- did you have an opportunity to review

17  Ms. Ford's affidavit in this case?

18  A   Yes.

19          MR. BLANK:  And I just want to let the record show,

20  Your Honor, that I correctly grabbed the ring of the Elmo

21  instead of the top of it.

22          THE WITNESS:  As you so practiced earlier.

23  BY MR. BLANK:

24  Q   And this document was attached to Ms. Ford's affidavit.

25  It's titled "CASINQ Inquire CAIS Original Transaction."

Moats - Direct

1     As a deputy clerk for the circuit court and deputy clerk

2   of the general district court, have you ever seen this

3   document before?

4   A    No, I have not.

5   Q    As a deputy clerk for the general district court or the

6   circuit court, did you ever fill out this document or screen?

7   A    No, I have not.

8   Q    When Ms. Ford put in her affidavit, paragraph 11 and 12,

9   that the clerk's office inputs an indicator in the system in

10  identified field 14, CTORNIND -- which, Judge, is right there

11  on the document -- what is your knowledge of such indicator?

12  A    I have none.

13  Q    And what is your knowledge of field 14?

14  A    I have no knowledge of a field 14.  None of our fields

15  have numbers, or at the general district court, either.

16  Q    From your observation and knowledge as a general district

17  court clerk, who suspends a driver's license for failure to

18  pay court fines and costs?  The court, the clerk, or DMV?

19         MS. O'SHEA:  Your Honor, I'm going to object to the

20  extent that requires a legal conclusion.

21         THE COURT:  Well, she can testify as to what they

22  do, but not more.

23         THE WITNESS:  DMV.

24         THE COURT:  I'll accept it as evidence, a lay

25  opinion.

Moats - Cross

1          MR. BLANK:  Understood, Your Honor.

2    BY MR. BLANK:

3    Q    Does the judge enter a suspension order for a driver's

4    license for failure to pay court costs and fines?

5    A    Not for failure to pay court costs and fines, no.

6    Q    Does the clerk?

7    A    No.

8    Q    How long after the conviction did DMV -- how long after

9    the conviction would it take before DMV suspended a license

10   for failure to pay court fines and costs?

11   A    On the 41st day.  It used to be 30, and then it increased

12   to 40; and on the 41st day.

13   Q    And how did that happen in the general district court?

14   As you heard Ms. Dugger describe how it does in the circuit

15   court, tell us how it happened in the district court.

16   A    When someone does not pay their fines and costs, they had

17   that time period in which to pay, and if they didn't pay on

18   the 41st day, the computers would talk to each other and DMV

19   would suspend their license.

20   Q    And was there ever an order on that 41st day from the

21   general district court ordering you to suspend the license?

22   A    No, I didn't -- we didn't suspend their license.

23          MR. BLANK:  No further questions.

24          THE COURT:  Okay.

25                     CROSS-EXAMINATION

Moats - Cross

1    BY MS. O'SHEA:

2    Q    Good afternoon, Ms. Motts.  I'm going to talk --

3    A    Moats.

4    Q    Moats.  Sorry.  Moats.

5         I'm going to talk specifically about general district

6    court and traffic court in Charlottesville.

7    A    Okay.

8    Q    All right.  Traffic court is held in general district

9    court, right?

10   A    Yes.

11   Q    So people come to general district court and they've been

12   charged with a set of traffic infractions, right?

13   A    Uh-huh.

14   Q    Okay.  And they show up for their hearing and they come

15   before the judge, and let's say the judge elects to

16   adjudicate them guilty of the traffic infractions, right?

17   A    Sure.

18   Q    And the judge assesses a particular sentence or fines or

19   costs, or whatever he elects to do for those fines and costs,

20   from the bench in general district court, right?

21   A    He generally has to follow the laws, yes.

22   Q    Okay.  So he will say, for example, I'm going to, you

23   know, convict you of speeding, I'm going to impose a

24   statutory fine and costs; something like that, right?

25   A    Yes.

Moats - Cross

1   Q   And then before him he's going to have a uniform summons,

2   usually, right?

3   A   Yes.

4   Q   Or some sort of warrant of arrest?

5   A   Talking about traffic infractions, it would be a uniform

6   summons.

7   Q   So he's going to note his disposition, usually, on that

8   document, correct?

9   A   Uh-huh.  Uh-huh.

10  Q   And then when the Court assesses whatever that sentence

11  is, the individual is in court usually, but not necessarily

12  always, right?

13  A   Correct.

14  Q   Because there are certain traffic infractions for which

15  you can be found guilty in absentia?

16  A   Yeah, you can be found guilty of all of them in absentia.

17  Q   For the traffic infractions, but not the traffic

18  misdemeanors?

19  A   Well, if you're not there, you're going to get a capias;

20  but yeah.

21  Q   So in any case, I'm talking about a situation when the

22  person is present in court.  All right?

23  A   Okay.

24  Q   And hears the judge pronounce sentence.  Okay?

25  A   Okay.

Moats - Cross

1   Q   And then that document gets taken to the clerk's office

2   in general district court in some manner of speaking, right?

3   A   Okay.

4   Q   Either there's a -- well, if I'm wrong, tell me.  Don't

5   assume.

6       So there's probably the clerk sitting in the courtroom

7   who gets the documents from the judge, right?

8   A   Yes.

9   Q   And then someone in the clerk's office is responsible for

10  inputting that information into your computerized system,

11  right?

12  A   Yes.

13  Q   So you look at what the judge has ordered, and you put it

14  in the system, right?

15  A   Yes.

16  Q   So let's say the court has imposed a certain amount of

17  fines and costs in a particular case, the individual has been

18  given the 30 days, 40 days, however you want to phrase it, to

19  pay, right?

20  A   That's not ordered by the judge.  That's an automatic.

21  That's a state law.

22  Q   But that's automatic?

23  A   Yeah.

24  Q   So the Court imposed fines and costs.  You input into

25  your system whatever it is the Court ordered?

Moats - Cross

1    A    Yes, the amount that they owe.

2    Q    Right.  So let's say day 40 rolls around and the

3    individual who has been assessed the fines and costs hasn't

4    paid their fines and costs.  Now, we heard from Ms. Dugger

5    with respect to circuit court that, basically, they generate

6    an order, review it, and then send it on to DMV.

7         MR. BLANK:  Objection, Judge.  That's not what she

8    testified to.

9         THE COURT:  Well, just ask her --

10        THE WITNESS:  Yeah, I'm confused.

11   BY MS. O'SHEA:

12   Q    So you're saying the person --

13        THE COURT:  Just rephrase the question.

14        MS. O'SHEA:  Okay.

15   BY MS. O'SHEA:

16   Q    Day 40 rolls around, the person hasn't paid.  What does

17   the general district court do with that information?

18   A    Nothing.

19   Q    Do you generate a report?

20   A    No.

21   Q    Do you contact the individual who has defaulted?

22   A    No.

23   Q    Do you take any measures to go back and look at the

24   accounting and make sure that the person who hasn't paid,

25   that it's not just been entered incorrectly at some point in

Moats - Cross

1   the system?

2   A   I as a deputy clerk, no.

3   Q   Anybody in the office?

4   A   I can't speak on the clerk herself.

5   Q   Okay.  To your knowledge, does anybody do that

6   doublecheck of the failure to pay on day 40?

7   A   Not to my knowledge.

8   Q   Are deferred payment plans and installment payment plans

9   offered in the Charlottesville General District Court?

10  A   Yes.

11  Q   Is community service offered as an option in the

12  Charlottesville General District Court?

13  A   I do not deal typically with payment plans, but I have

14  heard that they are up to the judge.

15  Q   If somebody wants to go on a deferred payment plan in the

16  general district court as opposed to the circuit court, what

17  are they supposed to do?

18  A   They would ask.

19  Q   Ask who?

20  A   They would just come to the clerk's office and say, I

21  want to enter a payment plan.  And then we have them fill out

22  the financial form and we -- they go in to talk to the judge,

23  and the judge puts them under oath regarding their financial

24  status and sets them up on a plan.

25      It's usually -- down at the general district court, Judge

Moats - Cross

1    Downer is usually very generous.  He does not want anyone to

2    not have a license.

3    Q    Okay.  So the person -- that's the process:  The judge

4    puts them under oath and the judge decides what the payment

5    plan is going to be?

6    A    Yes.

7    Q    With respect to the Charlottesville General District

8    Court, is there a minimum monthly payment, an amount that has

9    to be on that installment plan?

10   A    I cannot speak to that.  I don't have anything to do with

11   the plans in Charlottesville Circuit Court.  I'm in land

12   records at the circuit court.

13   Q    What about when you were in general district court?  My

14   questions are all focused on general district court.

15   A    Oh, at general district court?

16   Q    Yes, ma'am.

17   A    What was the question about?

18   Q    Was there a minimum amount that had to be paid per month

19   in order to enter into a deferred payment plan in general

20   district court, or an installment payment plan?

21   A    To my recollection, Judge Downer would, depending on

22   their finances, sometimes ask for a certain amount down and

23   then a certain amount a month.  And then if they couldn't

24   afford that for whatever reason, to -- asked him to reduce it

25   or he would renegotiate or redo their financial plan.

Moats - Cross

1    Q    So it varied according to the circumstances?

2    A    Yes.

3    Q    Now, with respect to someone who has been found guilty in

4    absentia, so they didn't show up in court --

5    A    Okay.

6    Q    -- and the Court just imposed, say, the statutory fine

7    for a speeding offense and then, like, a $25 court cost on

8    top of that.  All right?

9    A    Uh-huh.

10   Q    How is the information relative to that sentence

11   communicated to the person who didn't show up in court?

12   A    How do they know that they owe money?

13   Q    Correct.

14   A    The next day after trial, when someone has been tried in

15   absence, the court mails out a 225.

16   Q    What is a 225?

17   A    It's a DC225.  It's a notice to pay, which tells them

18   they have 40 days to pay, or enter into a payment plan.

19   Q    Or their license will be suspended?

20   A    I don't -- I'm not sure if it says that.  I just know it

21   says that they owe fines.  I'm not sure exactly of the

22   wording of it.  It's a 225.  I don't know the wording of it

23   precisely.

24   Q    Okay.

25   A    Sorry.

Moats - Cross

1  Q   And that 225 form is going to be mailed to the person's

2  last known address of record, correct?

3  A   Which would have been what's on the summons that was on

4  their driver's license.

5  Q   Do you ever get those returned as, you know, the

6  recipient not found, recipient unavailable?

7  A   Occasionally.

8  Q   If those were returned, you know, the person wasn't at

9  the address that was written down on the uniform summons,

10 what, if anything, does your office do with that information?

11 A   You know, I wasn't in charge of anything that had to do

12 with those, so I'm not sure exactly what they did with them.

13 Q   And you said that you work in land records now in circuit

14 court?

15 A   Uh-huh.  Yes.

16 Q   In your position in circuit court, have you ever been

17 responsible for inputting information relative to criminal

18 convictions?

19 A   No, ma'am.

20         MS. O'SHEA:  Thank you.  I don't have any other

21 questions.

22         THE COURT:  Is that all?

23         MR. BLANK:  She's free to go.  Thank you, Ms. Moats.

24         Judge, if you follow along in the -- in the notebook

25 that we submitted, there are four documents that we wanted to

Moats - Cross

1    draw attention to the Court.  They're behind tab 9, 10, 11,

2    and 12.  These are screenshots from four District Courts.

3    One is from Charlottesville.  And if you go to the second

4    page, in all caps bold:  "IF YOUR AMOUNT HAS NOT BEEN PAID IN

5    FULL OR AN EXTENSION HAS NOT BEEN GRANTED, YOUR DRIVER'S

6    LICENSE WILL BE SUSPENDED BY DMV."  That's one.

7         Number two is Albemarle.  Not in bold, but it's in

8    there, and it says:  "If payment in full is not made by the

9    due date, your driver's license will be suspended by DMV."

10        11 is from Chesterfield County.  And in Chesterfield

11   County, on page 1:  "Notification is sent to the Department

12   of Motor Vehicles for suspension of defendant's operator's

13   license."

14        And then Henrico County, which is the smallest

15   print -- I know it's in here because I wrote it out.  It

16   says, "You will have 30 calendar days to pay" -- I'm looking

17   for it, Judge.  Why can't I find it?  I think I'm missing a

18   page on mine, Judge.  We'll go back and find it.  My notes

19   say:  "You will have 30 calendar days to pay all fines and

20   costs owed to the court.  Failure to pay your fines and costs

21   will result in your privilege to drive being suspended or

22   revoked by the Virginia Department of Motor Vehicles."

23        Your Honor, at this time, I'll pass the podium over

24   to Ms. Pazandak.

25        Was that the correct pronunciation, or was I close?

Pearce - Direct

1          MS. PAZANDAK:  Pazandak.

2          MR. BLANK:  Pazandak.  I apologize.  She's been pro

3    hac'd into this court.  She's with McGuire, Woods, and she

4    will take the examination of Diana Pearce.

5          THE COURT:  All right.

6          MS. PAZANDAK:  Plaintiffs call Dr. Diana Pearce.

7          MS. O'SHEA:  Your Honor, to the extent it's helpful,

8    before Ms. Pearce testifies we're certainly willing to

9    stipulate that driving is an important part of people's lives

10   and that it's harder to get to work when you don't have a

11   driver's license.  If that's basically what Ms. Pearce is

12   going to testify to, we're happy to stipulate that if this

13   will move things along.

14         THE COURT:  Well, you can take that as agreed to,

15   admitted, and not touch on those matters --

16         MS. PAZANDAK:  Okay.

17         THE COURT:  -- any further.

18         MS. PAZANDAK:  Understood.

19      DIANA PEARCE, Ph.D., CALLED BY THE PLAINTIFFS, SWORN

20                      DIRECT EXAMINATION

21   BY MS. PAZANDAK:

22   Q   Dr. Pearce, can you please state your name?

23   A   Diana Pearce.

24   Q   And where do you live?

25   A   Seattle, Washington.

Pearce - Direct

1   Q    And where are you currently employed?

2   A    University of Washington.

3   Q    What's your title at the University of Washington?

4   A    I'm a senior lecturer and director of the Center for

5   Women's Welfare.

6   Q    How long have you held that position?

7   A    I've been at the university for 20 years.

8   Q    And what are your current job responsibilities?

9   A    I direct the Center for Women's Welfare and teach as

10  required, and the center conducts research.

11  Q    What is the subject of your research?

12  A    Basically, what we do is we calculate and write reports

13  and analyze data using a measure that I developed called The

14  Self-Sufficiency Standard.

15  Q    And where did you work before the University of

16  Washington?

17  A    I was in Washington, DC.  I had an independent project

18  called the Women in Poverty Project associated with wider

19  opportunities for women.

20          MS. PAZANDAK:  Your Honor, may I approach the

21  witness?

22          THE COURT:  You may.

23  BY MS. PAZANDAK:

24  Q    Dr. Pearce, I'm handing you a stack of documents, and

25  we'll go through them.  I'll put them on the screen.

Pearce - Direct

1      Can you identify the first document in front of you?

2   A   It's my curriculum vitae.

3   Q   And Dr. Pearce, is this a true and accurate copy of your

4   CV?

5   A   Yes, it is.

6   Q   Where did you go to college, Dr. Pearce?

7   A   I went to the College of Wooster in Wooster, Ohio.

8   Q   And what degree did that lead to?

9   A   Bachelor's degree in sociology and history.

10         MS. O'SHEA:  Your Honor, is there some sort of --

11   are we leading up to a request to certify as an expert?  So

12   if you can tell me the field, because I may be able just to

13   stipulate to that so we don't have to walk through the entire

14   CV.

15         MS. PAZANDAK:  Sure.  We would like to qualify

16   Dr. Pearce as an expert in The Self-Sufficiency Standard,

17   which is a standard that she created.  It talks about whether

18   someone's income is adequate to meet their basic needs for

19   housing, food, healthcare, other basic costs.  We'd also like

20   to qualify her as an expert witness in the self-sufficiency

21   standard as compared to the federal poverty level and the

22   self-sufficiency standard for the Commonwealth of Virginia.

23         MS. O'SHEA:  So you want to qualify her as an expert

24   in the standard that she created, basically?

25         MS. PAZANDAK:  Yes.

Pearce - Direct

1          MS. O'SHEA:  And what is the relevance of that

2     standard to this litigation?

3          MS. PAZANDAK:  We think it's a more appropriate

4     measure than the federal poverty level to say whether someone

5     has enough income to be able to meet their basic needs and

6     pay court costs and fines or make payments on a payment plan.

7          MS. O'SHEA:  Your Honor, I'm not sure that it's

8     relevant, Your Honor, but I certainly stipulate that she's an

9     expert in the standard that she has created and published

10    about.

11         THE COURT:  All right.  You may proceed.

12    BY MS. PAZANDAK:

13    Q    Okay.  Dr. Pearce, can you tell us what The

14    Self-Sufficiency Standard is?

15    A    The Self-Sufficiency Standard is a measure of income

16    adequacy based on a basic needs budget.  It varies by where

17    you live and it varies by your family composition, including

18    the number of adults and children and the ages of children,

19    because costs differ by age of children, such as childcare.

20    Q    And when was it developed?

21    A    I developed it and first calculated it in 1996 for the

22    State of Iowa under a grant from The Women's Bureau, the

23    United States Women's Bureau.

24    Q    And why was the standard developed?

25    A    The standard was developed because I was doing research

Pearce - Direct

1    on the performance standards used in job training programs,

2    which at that time were called JTPA and now are called WIOA,

3    Workforce Investment Opportunity Act.

4         They measured -- the performance standard was

5    self-sufficiency, but they measured it by averaging together

6    all the participants in a program's wages.  It didn't take

7    into account what it took to be self-sufficient.

8         So a single person would need much less income to be

9    self-sufficient than, say, a person with children to support.

10   And by putting everybody together, you ignored that and you

11   weren't really measuring self-sufficiency.  So I was asked to

12   develop that.

13        So I drew upon a number of sources, looking at the

14   various critiques of the federal poverty level, as well as

15   others who had developed a similar thing.  But not really

16   developed it, just had, you know, put out some ideas for

17   doing this by building it up from the various basic needs.

18   Q    Okay.  So how did you go about developing the standard?

19   A    So the way I -- you mean how do I calculate it?

20   Q    Yes.

21   A    What we do is we take basic needs -- housing, food,

22   childcare, transportation, healthcare, plus, of course, and

23   miscellaneous, which covers things like clothing and personal

24   necessities, household necessities like soap, and as well as

25   taxes and tax credits, because everybody has to pay taxes --

Pearce - Direct

1   and then we look at those costs using credible government

2   sources, such as Census Bureau, Housing and Urban Development

3   for housing costs, the food budgets from the United States

4   Department of Agriculture.

5       So we use credible sources that also distinguish those

6   costs by geography and by age, as appropriate.

7   Q   And how is The Self-Sufficiency Standard different from

8   the federal poverty level?

9   A   Well, the federal poverty level was developed in the

10  1960s by Mollie Orshansky.  At the time, the only standard we

11  had for what you needed to meet your basic needs was

12  nutrition standards from those USDA food budgets.

13      So she used a food budget, and at that time people spent

14  about a third of their income on food; the average family

15  spent a third of their income on food.  So she just

16  multiplied food times three.  Well, that froze -- and it's

17  only been updated for inflation since then.  So that froze in

18  place that relationship between food and other things.  And,

19  of course, food is one of the things that's increased the

20  least of all.  As everybody knows, housing and healthcare

21  have increased enormously, particularly in recent years.

22      So what we do is allow each of those costs to increase

23  independently of each other.  So there's not a fixed ratio of

24  one-to-three like there is in the federal poverty level.

25      Also, the federal poverty level, she didn't have the

Pearce - Direct

1    data.  It doesn't vary geographically, so it doesn't take

2    account of the very different costs of living.

3       We take account of the different costs of living to the

4    lowest geographical area that we -- that is available, that's

5    accurate and available, and standardize across the country.

6    Q   When did you first develop the standard for the

7    Commonwealth of Virginia?

8    A   First developed that in 2002.

9    Q   And when was it last updated?

10   A   2018.  This year.

11   Q   How was it updated for 2018?

12   A   Well, it turns out that IKEA was using this data to vary

13   their starting wages by where their stores were located so it

14   would reflect the local cost of living.  And they noted that

15   it had not been updated in some states as regularly, because

16   we're dependent upon our partners in each state.  And so they

17   paid for updating the standard in 27 states where there's

18   IKEA stores.

19   Q   Would you look at the second document I handed you?

20   A   Yes.

21   Q   And will you identify that document, please?

22   A   That's the Methodology Appendix for The Self-Sufficiency

23   Standard for Virginia in 2012.

24         MS. PAZANDAK:  And, Your Honor, this is in your

25   notebook behind tab 13.

Pearce - Direct

1   BY MS. PAZANDAK:

2   Q   What agency of the Commonwealth of Virginia requested the

3   2012 calculation?

4   A   This was prepared for -- in 2012 for the Virginia

5   Department of Social Services.

6   Q   And is this a fair and accurate copy of the Methodology

7   Appendix?

8   A   Yes, it is.  And it specifies our data sources,

9   assumptions, and our calculation methods for Virginia, which

10  is standardized but gives us specifics for Virginia.

11  Q   Would you identify this next document?

12  A   This is a Technical Brief for The Self-Sufficiency

13  Standard for 2018 for the -- all the standards that were

14  calculated under the IKEA project.

15  Q   And is this a fair and accurate copy of that methodology?

16  A   Yes, it is.

17  Q   So you were going into this before, but what are these

18  appendices?  What do they show?

19  A   They show where our data sources are, what assumptions

20  are made; basically tells you how we calculated, where we get

21  the numbers, how we -- the methodology and the sources of the

22  data.

23  Q   Are there any significant differences between the two?

24  A   No significant differences.  There's -- you know, we do

25  some fine-tuning.

Pearce - Direct

1    Unlike the poverty standard, which got frozen in the

2  1960s based on what data that was available then, if we get

3  data that provides a more accurate way of calculating

4  something, then we will refine it.  But, basically, it's the

5  same categories and the same sources.

6  Q   Dr. Pearce, do you have an opinion as to whether the

7  suspension of licenses for failure to pay court debts and

8  fines disproportionately impacts individuals in Virginia that

9  do not meet self-sufficiency standards?

10  A   Yes.

11       MS. O'SHEA:  I'm going to object to that; that the

12  basis of that is not in evidence and it's beyond the scope of

13  her expertise, which is in self-sufficiency, it's not in

14  legal fields.

15       THE COURT:  What was the question again?

16  BY MS. PAZANDAK:

17  Q   Do you have an opinion as to whether the suspension of

18  licenses for failure to pay court debts and fines

19  disproportionately impacts individuals in Virginia that do

20  not meet The Self-Sufficiency Standard?

21  A   Yes.

22       THE COURT:  I understand the objection.  I'll let

23  her answer and explain her answer.

24  BY MS. PAZANDAK:

25  Q   Okay.  So why don't you tell us your opinion?

Pearce - Direct

1    A    My opinion is that it does affect them, because they are

2    not able to meet their basic needs as it is, so taking away

3    their driver's licenses obviously makes it impossible to earn

4    an income to meet their basic needs.

5    Q    Okay.  And what's the basis of your opinion?

6    A    The basis of my opinion is my research on the standard.

7    Q    Dr. Pearce, have you reviewed any information related to

8    Adrainne Johnson?

9    A    Yes, I have.

10   Q    What have you reviewed?

11   A    I've looked at her income, benefits, which provide a

12   source of resources to meet her basic needs, and compared

13   these to the standard.  So her income and benefits and

14   expenditures.

15   Q    Is there a way to zoom out?

16        Do you have an opinion as to whether Adrainne Johnson

17   meets The Self-Sufficiency Standard?

18   A    No, she does not.  Yes, I have an opinion.

19   Q    Do you hold that opinion to a reasonable degree of

20   certainty in your field of expertise?

21   A    Yes.

22   Q    And what is that opinion?

23   A    She does not.  She's not able to meet her basic needs,

24   given her income and benefits.

25   Q    And what is the basis of that opinion?

Pearce - Direct

1    A    From reviewing, again, her income, benefits, and

2    expenditures versus The Self-Sufficiency Standard.

3    Q    Okay.  And if you'll turn to the fourth document I handed

4    you, which is also up here on the screen, can you please

5    identify that document?

6    A    That's a demonstrative for Adrainne Johnson.

7    Q    And can you explain what that demonstrative shows?

8    A    So this compares the amounts in The Self-Sufficiency

9    Standard for housing and food to what she spends for those

10   standards, and then shows what the shortfall for the surplus

11   is for each of these items.

12        So, for example, for housing, we used the fair market

13   rents, which is what the Department of Housing and Urban

14   Development has determined is the minimum you need to spend

15   to meet, minimally meet -- you know, adequately meet your

16   need for housing.  So this includes housing.  This includes

17   both the rent and utilities.

18        So in Charlottesville, Virginia, you should be spending

19   $1,179.

20        She's only spending $200.  She's doubled-upped.  And she

21   didn't quite say it, but basically she's sharing housing,

22   where she and her two children share a room, and they have a

23   shared kitchen and shared bath, and it's not acceptable, you

24   know, living conditions.  It's both overcrowded and not

25   clean.

Pearce - Direct

1    And so she's way spending under what she needs to meet

2    her basic needs.  I mean, she doesn't have any extra income

3    for other things, because she's not even meeting what she

4    should be, what the government thinks, because the fair

5    market rents are established for people receiving housing

6    assistance.  So this is what low-income people who do not

7    have enough income to meet their housing need, this is the

8    level at which the rent, including -- and plus utilities,

9    they get from HUD.

10    And the same thing for food.  So for food, again, this is

11   what the USDA gives people who are getting stamps, getting

12   the full benefit from food stamps, for people who don't have

13   any income to pay for their food stamps.  So, again, it's the

14   minimum.

15    And it only covers groceries.  It doesn't cover a pizza

16   or lattes.  It's a very bare minimum of what you need to meet

17   your food needs if you have an adult, a school-aged child,

18   and a teenager.  This is where age makes a difference.

19    She's spending less than half that, so clearly she is not

20   able to meet her family's nutrition needs on her income.  So

21   even just, you know, these two things aren't enough to

22   meet -- you know, these two items in the basic needs budget

23   is less than -- is more than her income.

24         MS. O'SHEA:  I'm going to object to that last bit of

25   testimony of finding that somebody is not getting sufficient

Pearce - Direct

1   nutrition based on the amount of money that's spent on

2   groceries.  I certainly think the doctor can testify about

3   what people normally spend on groceries versus what was spent

4   on groceries here, but unless she has personal knowledge of

5   what's in those grocery bags when they come home from the

6   grocery store, I think that's beyond the scope of her

7   knowledge and expertise.

8           THE WITNESS:  This is what the United States

9   Department of Agriculture has determined is the minimum you

10   need to meet your nutritional needs, looking at all, you

11   know, the vitamins and minerals and protein that we need.

12   And they do a market basket; they determine what it costs to

13   meet those needs.  One survey found that, using this budget,

14   only about 30 percent of people were able to meet their basic

15   needs.

16           THE COURT:  With that information, thank you, that's

17   sufficient.  The Court can decide whether it's nutritious or

18   not.

19   BY MS. PAZANDAK:

20   Q    If you'll turn to the next page in your demonstrative,

21   Dr. Pearce, can you tell us what this chart shows?

22   A    This is just a way of showing graphically what I've been

23   saying in terms of numbers.

24       So she's only spending about 17 percent of what HUD

25   thinks you need to spend to minimally meet your needs for

Pearce - Direct

1    housing.  She's clearly spending a great deal less than that.

2    And she should spend more than that.  If she had more

3    dollars, she would spend more to better meet her --

4              MS. O'SHEA:  I object to that as speculative.

5              THE COURT:  Go ahead.

6    BY MS. PAZANDAK:

7    Q    And can you tell us what this final demonstrative shows,

8    Dr. Pearce?

9    A    Again, it's the food.  So she's spending 39 percent of

10   what the USDA food budget says should be spent to meet your

11   nutritional needs for this size and age of children.  It says

12   family and age of children.

13   Q    Dr. Pearce, have you been given information about the

14   other four named plaintiffs in this matter?

15   A    Yes, I have.

16   Q    And what type of information have you been given?

17   A    Similar information on their income, expenditures, and

18   benefits.

19   Q    Do you have an opinion as to whether any of those meet

20   The Self-Sufficiency Standard?

21   A    Yes, I do.

22   Q    And do you hold that opinion to a reasonable degree of

23   certainty in your field of expertise?

24   A    Yes.

25   Q    And what is that opinion?

Pearce - Direct

1  A   All of them are well below The Self-Sufficiency Standard.

2  They are not able, with their current income, to meet their

3  basic needs.  So, basically, asking them to pay court fines

4  is taking milk away from babies.

5  Q   And do you have an opinion as to whether any of the named

6  plaintiffs can afford a payment plan to get their license

7  back and still meet The Self-Sufficiency Standard for their

8  locality?

9  A   I can say that they would not be able to meet their basic

10  needs using The Self-Sufficiency Standard as a measure of

11  that.

12  Q   And if they were put on a payment plan, what would that

13  mean for them and their families?

14  A   I assume it would mean being deeper in the hole and less

15  able to meet their basic needs.

16       MS. O'SHEA:  I'm going to object to that as

17  speculative as well.

18       THE COURT:  Okay.  Well, they don't have enough

19  money now and, of course, if you take what little they've got

20  from them, it's pretty obvious, I mean.

21       MS. O'SHEA:  We don't need expert testimony, Your

22  Honor, frankly.

23       THE COURT:  What I'm saying is it's not prejudicial.

24  It's just stating.  The facts she is telling the Court are

25  sufficient for the Court to reach the same conclusion as

Pearce - Cross

1   she's reaching.  So her information is helpful to the Court.

2   Her opinion, no one would disagree with it, with all these

3   facts, I wouldn't think.

4              MS. O'SHEA:  I was objecting to the extent that she

5   was opining as to some contingencies that may depend on facts

6   and circumstances that aren't before the Court.

7              THE COURT:  All right.

8              MS. PAZANDAK:  That's our final question.  Thank

9   you, Dr. Pearce.

10             THE COURT:  Okay.  You may cross.  Do you want to

11  cross?

12             MS. O'SHEA:  Yes, sir.

13             THE COURT:  Okay.

14                        CROSS-EXAMINATION

15  BY MS. O'SHEA:

16  Q   Good afternoon.  Is it Pearce?

17  A   Yes.

18  Q   Dr. Pearce?

19  A   Yes.  Thank you.

20  Q   Okay.  I'm just going to ask you just a few follow-up

21  questions with respect to the information that underlies the

22  opinions that you've arrived at for this case.

23      All right?

24  A   Okay.

25  Q   You testified that you were given information about

Pearce - Cross

1  Ms. Johnson and her finances and circumstances, correct?

2  A    Yes.

3  Q    How did you get that information?

4  A    By computer.  I mean, I'm not sure what you mean, how did

5  I get that information.

6  Q    Was it communicated to you from Ms. Johnson or from

7  Ms. Johnson's counsel?

8  A    Both.

9  Q    Were you given financial statements and invoices and W-2s

10 and receipts, or were you just kind of given a different type

11 of information?

12 A    I wasn't given documents, if you're asking that.

13 Q    So you weren't given documents.  So then were you told,

14 this is what Ms. Johnson's income is?

15 A    Yes.

16 Q    Were you told what her source of income was, where she

17 was getting the income from?

18 A    Yes.

19 Q    So you were given a figure and you were given a source,

20 correct?

21 A    Yes.

22 Q    Okay.

23 A    I mean, not a specific employer or anything like that.

24 Q    I understand.  So you were told that she was working for

25 a certain hourly wage and a certain number of hours per week,

Pearce - Cross

1    right?

2    A    Right.

3    Q    And is that the figure that you used to come up with the

4    current income of $1,399 per month?

5    A    Yes.   That's her new job.

6    Q    Right.   Now, with respect to expenditures, a similar

7    question.   Were you just told, this is what her monthly

8    expenditures are for groceries?

9    A    Yes.

10   Q    So that was reported to you.   Did that come from

11   Ms. Johnson herself, or did that come through her attorney?

12   A    It came through her attorney.

13   Q    Did you ever speak with or interview Ms. Johnson?

14   A    Yes.

15   Q    Was that in person or over the phone?

16   A    Both.

17   Q    And have you been to the residence where she's currently

18   living?

19   A    No.

20   Q    Did you interview her children?

21   A    No, I did not.

22   Q    Did you speak to her children in school about whether or

23   not they obtain, like, free lunches through school programs?

24   A    No, I did not.

25   Q    Did you speak with her -- the people that she lives with?

Pearce - Cross

1  A   No, I did not.

2  Q   Okay.  So you have this self-reported here expenditure of

3  $320 for groceries per month, correct?

4  A   Yes.

5  Q   Did you inquire as to whether or not she had any other

6  fixed expenditures?

7  A   Yes.

8  Q   And what were those?

9  A   She has child support, the rent.  I mean -- I mean, to

10 some extent food is a fixed expenditure, a necessary

11 expenditure.  I don't know what you mean exactly by "fixed."

12 Q   Like a cell phone bill, for example.

13 A   Yes, I did use a telephone bill, too.

14 Q   So there's a phone bill, rent, groceries.  Did you ask

15 her about her eating habits, how often they eat out or

16 ordered food out?

17 A   No.

18 Q   Did you ask about things like if they go to the movies?

19 A   No.

20 Q   Or have entertainment expenses?

21 A   No.

22 Q   So based on the numbers that were given to you, you

23 calculated that she had an income of $1,399 a month, right?

24 Correct?

25 A   Correct.

Pearce - Cross

1   Q    Okay.  And then from that, with that starting figure, you

2   take out the $200 in rent, right?

3   A    Yes.

4   Q    Okay.  And then the $320 that she reported in groceries,

5   right?

6   A    Yes.

7   Q    And the math on that, if you take approximately $1,400

8   and you subtract $520, that leaves you with what?  Sorry.

9   I'm trying to do the math here.

10       $880, right?  Correct?

11  A    From 1994, 520?

12  Q    No.  I'm saying, she reported an income of $1,399 a

13  month, right?

14  A    Oh, okay.

15  Q    And then if you take that as her budget, and you take out

16  the $200 in rent, and you take out the $320 in groceries, you

17  are left with $880, right?

18  A    Yes.

19  Q    All right.  And from that $880, then out of that comes

20  the child support payment, correct?

21  A    Yes.

22  Q    And then the only other fixed budget item that she

23  reported was a $100 phone bill, right?

24  A    There were several others, actually.  I think we have

25  some other -- there were several other costs, I think.  There

Pearce - Cross

1   was a Y membership and a number of other costs.

2   Q   A wine membership?

3   A   I can't remember exactly.

4   Q   Oh, you said "Y," like YMCA.  I thought you said "wine,"

5   like alcohol.

6   A   No, I said "Y," YMCA.  I'm sorry.

7   Q   Thank you.  I misheard.  All right.  Thank you.

8       So other than the YMCA membership, can you remember any

9   other specific recurring monthly costs?

10  A   Well, of course she has transportation.

11  Q   Like a bus pass?

12  A   Well, she can't always get places by bus, so she would

13  have to take other things as well if she's going to get to --

14  you know, get to her employment.

15  Q   Were you in the courtroom when she testified before?

16  A   Yeah.

17  Q   You heard her testify?

18  A   She also takes a bus.

19  Q   Correct.

20  A   Yeah.

21  Q   So do you know how much a bus pass is in the City of

22  Charlottesville?

23  A   I think it's $20.

24  Q   Per month or per year?

25  A   Per month.

Pearce - Cross

1  Q   So if she has a bus pass, that's an additional $20,

2  correct?

3  A   Right.

4  Q   Okay.  So would you agree, then, that taking out these

5  other sorts of fixed sources, that it appears that she still

6  has around 400 or $500 in cash every month left over of the

7  amount that she earns?

8  A   Yes.

9  Q   Now, you testified before, your exact language was, if I

10  recall correctly, that it's impossible for people who are

11  below the self-sufficiency threshold to pay back their fines

12  and costs.

13      Was that your testimony?

14  A   I said that if they did so, they would be taking it out

15  from meeting their basic needs.

16      So if she has additional, you know, income now that she

17  has a current job, she should be spending that towards her

18  housing and towards her food, because she's not spending

19  enough now to meet her nutritional needs or to meet her

20  housing needs.  Living in one room with two children is not

21  meeting a basic need.

22  Q   Would you agree that if you have a house, a roof over

23  your head, heat, water, aren't those life's basic

24  necessities?

25  A   Not if you're living in housing that's overcrowded.  It

Pearce - Cross

1    affects your health.  It affects your children's.  I mean, by

2    basic needs, they have no more than two people in a bedroom,

3    and children and adults do not share a bedroom.  That's a

4    basic rule for HUD in every housing, public housing, that

5    they subsidize, and not to be sharing a housing unit that was

6    meant for one family with two families.

7    Q    Would you agree that everyone's ability to pay certain

8    recurring expenses is going to be dependent upon their own

9    unique factual circumstances?

10   A    No.  I think the whole point of developing something like

11   The Self-Sufficiency Standard is to say that, yes, you have

12   to meet some arbitrary decisions, but you do come up with

13   some numbers that say, this is the minimum people need to

14   meet their basic needs.

15       And the government, in fact, does that when they do that

16   for housing assistance, when they do it for childcare

17   assistance, when they do it for food assistance.

18   Q    So I understand you've got a general rule.  The general

19   rule is, this is the amount of money people should have in

20   order to meet their basic needs.  I get that that's basically

21   what your standard says.

22       But what I'm saying is:  Don't you also have to look at

23   the individual circumstances of the person to decide whether

24   or not their needs are being met and whether or not they

25   might have extra income that could go to pay things like

Pearce - Redirect

1    their court-ordered fines and costs?

2    A    It's not extra income.  It's income that is now

3    available, maybe, to begin to meet her basic needs.

4         But you can't count on the fact that people will find

5    wonderful housing for $200 a month.  Maybe a few people

6    could, but you can't count on that.  And when you look at

7    what people can afford, you have to give some credence to

8    what basically government agencies have said is necessary to

9    meet your basic needs.

10   Q    So, then, your testimony is basically, regardless, some

11   people might get lucky?

12   A    You can't count on luck.

13   Q    You can't count on luck, but some people do?

14   A    Right.

15   Q    So if you're got somebody and you're trying to assess

16   whether or not they have enough money to meet their needs,

17   don't you need to look at things like that that are unique to

18   each circumstance?

19   A    I think that becomes essentially arbitrary.

20        MS. O'SHEA:  All right.  I don't have any other

21   questions.  Thank you, Judge.

22        THE COURT:  Redirect?

23                      REDIRECT EXAMINATION

24   BY MS. PAZANDAK:

25   Q    Dr. Pearce, just a couple more questions.  Do you believe

Pearce - Redirect

1    that Adrainne Johnson got lucky with her housing situation?

2    A    Not at all.

3         That's crooked.

4    Q    Sorry.

5         Can you identify the document up on the screen?

6    A    That is a document looking at Adrainne Johnson's expenses

7    in all different areas and compared to the standard, and

8    again looking at benefits.

9    Q    So before we were just looking at an example?

10   A    Yeah.  Just a couple of the items, yeah.

11   Q    A couple items?

12   A    Because those items alone are, you know --

13   Q    So certainly, although you couldn't recall all them from

14   memory, Ms. Johnson has a number of other expenses --

15   A    Right.

16   Q    -- is that correct?

17   A    Right.

18   Q    And in your opinion, is Ms. Johnson meeting her family's

19   basic needs with the income that she has now?

20   A    No.

21   Q    Are any of the named plaintiffs?

22   A    No.

23            MS. PAZANDAK:  That's all.

24            THE COURT:  Okay.  Let's take about a ten-minute

25   recess.

Peterson - Direct

1          MR. BLANK:  Thank you, Your Honor.

2          THE MARSHAL:  All rise.

3          (Recess, 3:36 to 3:47 p.m.)

4          THE COURT:  All right.

5          MR. BLANK:  Your Honor, we're going to ask Mr. Abel

6     to call Mr. Peterson.

7          Judge, just to make it clear for the record, because

8     speaking to the court reporter, my expectation at the end of

9     our presentation is to put in our notebook as one exhibit to

10    make it easy on the court reporter.  I understand from the

11    Commonwealth they're okay with that.  The only exception is,

12    I didn't have Ms. Adrainne Johnson, the last one.  We'll put

13    that in as Exhibit 2.

14          So the whole notebook will be 1, with everything.

15    We'll put the additional demonstrative in as Exhibit 2.

16          THE COURT:  Thank you.

17          MR. BLANK:  Thank you.

18          MR. ABEL:  Your Honor, plaintiffs will call

19    Dr. Steven Peterson.

20      STEVEN PETERSON, Ph.D., CALLED BY THE PLAINTIFFS, SWORN

21                      DIRECT EXAMINATION

22    BY MR. ABEL:

23    Q   Good afternoon.  Would you state your name for the

24    record?

25    A   My name is Steven Robert Peterson.

Peterson - Direct

1   Q    Where do you live?

2   A    I live in Arlington, Massachusetts.

3   Q    Where are you currently employed?

4   A    I work for Compass Lexicon.

5   Q    What is Compass Lexicon?

6   A    Compass Lexicon is an economic consulting firm that

7   specializes in finance and competition issues, and so we

8   provide expert testimony and other analysis for law firms,

9   corporations, and the government.

10  Q    What's your title at Compass Lexicon?

11  A    I'm an executive vice president.

12  Q    How long have you been an executive vice president?

13  A    I believe I was promoted to that level in April 2013.

14  Q    As an executive vice president, what do your job duties

15  include?

16  A    I serve my clients and do economic studies and provide

17  expert testimony.  I supervise expert testimony that will be

18  given by others, and write reports, draft reports.  And I

19  share responsibility for managing the Boston office.

20  Q    How long have you been employed by Compass Lexicon?

21  A    I started working for a predecessor to Compass Lexicon in

22  1990, while I was still in graduate school.

23  Q    Where did you go to college?

24  A    I went to the University of California Davis.

25  Q    What degree did you receive from them?

Peterson - Direct

1    A    I received a bachelor's degree in economics.

2    Q    What other degrees do you hold?

3    A    In 1992, I received a Ph.D. in economics from Harvard

4    University.

5    Q    Do you teach?

6    A    I teach when I have the time, yes.

7    Q    Where have you taught?

8    A    Well, I taught in graduate school, obviously; and over

9    the last six or seven years, I've taught at Northeastern

10   University in Boston.

11   Q    What have you taught at Northeastern?

12   A    I've taught Principles of Economics, but I more generally

13   would teach a class called Government and Business, which

14   covers antitrust, economic regulation, the political economy

15   of regulation, which is sort of the theory of where

16   regulations come from economically, and other aspects of

17   government policy.

18        I also created a course with a colleague called Image

19   Economics and Policy, which we've taught together there a few

20   times.

21   Q    Within economics, what's your field of expertise?

22   A    I'm a microeconomist.

23   Q    What is microeconomics?

24   A    Well, in general, microeconomics is the study of the

25   incentives that people face and how they respond to them.

104

Peterson - Direct

1    And I guess that would cover people and firms.

2    Q    What speciality do you have within microeconomics?

3    A    Well, my work at Compass Lexicon involves using data,

4    typically large amounts of data, to understand markets and

5    the incentives that firms face.

6    Q    Do you work with large datasets as part of that work?

7    A    Frequently we do, yes.  For example, I'm currently

8    working with data for an airline matter.  One client -- one

9    party has 200 million tickets and 500 million individual

10   flight coupons, and so we're working on that data.  Other

11   datasets have, you know, more or less.

12   Q    As part of your work at Compass Lexicon, do you routinely

13   make economic inferences based on those large datasets?

14   A    Yes.  We try to characterize markets and apply economic

15   principles to what we see to make economic inferences.  We

16   also test economic inferences and, you know, validate them

17   with the data.

18   Q    Have you published in your field?

19   A    I have.

20   Q    What --

21         MS. O'SHEA:  I'm sorry, I didn't mean to cut you

22   off.  We're happy to stipulate that he's an expert in the

23   field of economics, with a subspecialty in microeconomics, if

24   that will facilitate matters.

25         THE COURT:  All right.

Peterson - Direct

1          MR. ABEL:  For purposes of the record, Your Honor,

2     I'll just show Dr. Peterson.

3     BY MR. ABEL:

4     Q   Do you recognize that document?

5     A   That's my curriculum vitae, yes.

6          MR. ABEL:  For the Court's reference, that's at tab

7     14A within the binder.

8          THE COURT:  All right.

9     BY MR. ABEL:

10    Q   Dr. Peterson, what were you asked to address today?

11    A   I was asked to address two primary questions, and the

12    first is whether the loss of a driver's license for failure

13    to pay court fines would have a negative impact on an

14    individual's ability to obtain work and maintain employment.

15        And I was also asked to address the question of whether

16    suspending licenses for failure to pay would

17    disproportionately affect poor people rather than more

18    affluent people.

19    Q   In answering that first question, what research did you

20    do to prepare to answer it?

21    A   Well, the first thing I wanted to do was determine the

22    importance of being a legal driver for employment, and so I

23    think we have some data from the Department of

24    Transportation --

25    Q   Sure.

Peterson - Direct

1   A   -- that shows that.

2   Q   Based on your review and that research, did you create a

3   series of demonstratives for the Court?

4   A   Yes, I did.  My staff created them under my direction.

5           MR. ABEL:  And, Your Honor, these demonstratives,

6   for the record, begin at tab 14B within the binder.

7   BY MR. ABEL:

8   Q   Dr. Peterson, is this the first of those demonstratives?

9   A   It is.

10  Q   And what does this demonstrative show?

11  A   This shows the different categories of work, you know,

12  the type of jobs that require driving.  And for our purposes

13  here, in general, all jobs are reported to require, on

14  average, 30 -- it shows that, of all jobs, 30 percent require

15  some type of driving.

16          MR. ABEL:  Your Honor, if I can approach the

17  witness, just because it seems like we might be having some

18  zoom issues, just so I can hand him up a copy of the

19  demonstrative so he can view it in full?

20          THE COURT:  All right.

21          THE WITNESS:  Thank you.

22  BY MR. ABEL:

23  Q   Dr. Peterson, did you and your team create a second

24  demonstrative for the Court?

25  A   Yes, we did.

107

Peterson - Direct

1   Q   Is this that demonstrative?

2   A   It is.

3   Q   What does this demonstrative show?

4   A   Well, this just shows that most people use private

5   vehicles in order to commute to work nationally and in

6   Virginia.  The red bars represent Virginia.

7       So over 75 percent drive to work alone, and not quite

8   10 percent carpool.  And, notably, relatively small numbers

9   of people use public transportation or walk or use other

10  transportation.

11  Q   So in answering that first question, how did this

12  information help you answer that?

13  A   Well, what it shows is that the usual experience of

14  people is that a car is useful for getting to work.  And we

15  heard today what is economic common sense, I suppose; that if

16  a job is distant from a bus line or something like that,

17  there will be jobs that people cannot readily reach.

18      And so here we see a car is important for a lot of people

19  to reach jobs; and the more jobs you can reach, the better

20  your employment opportunities are.  And so this gives support

21  for that economic conclusion.

22          MR. ABEL:  Your Honor, for the record, I'll state

23  that a study from which this demonstrative comes is attached

24  as Exhibit 12 to the memorandum in support of the motion for

25  preliminary injunction?

Peterson - Direct

1           THE COURT:  All right.

2    BY MR. ABEL:

3    Q   Dr. Peterson, in addition to the data and the figures

4    we've discussed already, did you review any studies to answer

5    that first question?

6    A   I reviewed a number of studies.  And we have a third

7    demonstrative, I think, where I extracted a quote from a

8    study by the National Center for State Courts.

9    Q   Is this that demonstrative?

10   A   It is.

11   Q   What does this demonstrative show?

12   A   Well, this study would support the previous two

13   conclusions: that jobs require driving and that driving makes

14   more jobs accessible for people.

15       But it also reached this additional conclusion, and it

16   basically points out -- the last phrase here is that, "Some

17   employers view having a valid driver's license as an

18   indicator of reliability."

19       So a valid driver's license is, in a sense, a screen for

20   employability with at least some employers, and so not having

21   a valid driver's license could hurt the opportunity to obtain

22   a job, even if you can reach it.

23           MR. ABEL:  Your Honor, for the record, I'll state

24   that the Center for State Courts study is attached in full to

25   the memorandum in support of the motion for the preliminary

Peterson - Direct

1    injunction at Exhibit 17.

2              THE COURT:  Thank you.

3    BY MR. ABEL:

4    Q    Dr. Peterson, in addition to this study, did you review

5    any other studies?

6    A    There is one other study that I found interesting and

7    supportive of what we have already talked about, and that is

8    a study from the Voorhees Center for Transportation at

9    Rutgers University that was done in conjunction with the New

10   Jersey Department of Transportation.

11   Q    What did that study show?

12   A    Well, that study used a number of different methodologies

13   to address the issue of what happens when you suspend

14   licenses for failure to pay.  And one thing that they did was

15   just ask people who had their licenses suspended, and what

16   they found was that between 40 and 45 percent of people with

17   suspended licenses reported losing their jobs.  And

18   approximately 45 percent, as I recall, of the people who lost

19   their jobs reported having some difficulty in finding another

20   job or reported not being able to find another job.

21        And finally, they report that, even for the people who

22   found another job, 88 percent experienced a reduction in

23   income.

24        So that shows that, you know, the immediate effect for a

25   large number of people was a reduction in income.  The

Peterson - Direct

1    immediate effect of losing a driver's license is a reduction

2    of income.  And, of course, you know, for others, if they

3    have a change in circumstance or something, then their

4    flexibility to change jobs is affected as well.

5              MR. ABEL:  Your Honor --

6              THE WITNESS:  I should say successfully change jobs.

7              MR. ABEL:  Your Honor, for the record, I'll state

8    that the Voorhees study is attached in full in the memorandum

9    in support of the motion for preliminary injunction as

10   Exhibit 18.

11             THE COURT:  Thank you.

12   BY MR. ABEL:

13   Q   Dr. Peterson, you heard Ms. Johnson testify here today;

14   is that correct?

15   A   That's right.

16   Q   Before you testified here today, were you able to speak

17   to any of the other named plaintiffs in this case?

18   A   I was.

19   Q   Do you remember which named plaintiffs you spoke with?

20   A   Let's see.  Ms. Abrams.  Is that --

21   Q   Adams.

22   A   Adams.  I'm sorry.  And Brianna --

23   Q   Does Morgan sound right?

24   A   Morgan.

25   Q   Based on -- were you able to talk to Ms. Johnson before

Peterson - Direct

1    her testimony here today?

2    A    I was.

3    Q    Based on Ms. Johnson's testimony here today, as well as

4    the conversations you had with other named plaintiffs before

5    your testimony here today, what did those conversations and

6    that testimony do to help you to answer that question, the

7    first question you were asked?

8    A    Well, we heard directly from Ms. Johnson that she lost a

9    job because of an inability to reach work.  So that's

10   consistent with what we're finding in the studies here and

11   the evidence showing the importance of driving as related to

12   employability and reaching work.

13       We also heard that she would like to get jobs that

14   require driving, and even has an opportunity to raise her

15   income if she could drive and take receipts to the bank as a

16   manager.

17       So her experiences are very consistent with what we're

18   hearing here.  And other people basically reported continuing

19   to drive because they had to support their families, and so

20   driving was an important aspect of their being able to

21   maintain employment and support their families.

22   Q    Dr. Peterson, based on your review of the data, the

23   information that you've shown the Court so far in the

24   demonstratives, and in listening to the testimony of

25   Ms. Johnson, as well as the conversations you had with the

Peterson - Direct

1    other named plaintiffs before today, were you able to form an

2    opinion as to the first question you were asked to answer

3    here today?

4    A    I was.

5    Q    And were you able to form that opinion within a

6    reasonable degree of certainty in your field of expertise?

7    A    Yes.

8    Q    And what is that opinion?

9    A    My opinion is that the loss of a driver's license for

10   failure to pay court fines adversely affects people's ability

11   to gain employment and maintain employment, and that the loss

12   of a driver's license can readily lead to a reduction in

13   income from the loss of employment or from having to take a

14   less desirable job.

15   Q    Dr. Peterson, I want to turn to that second question you

16   were asked to answer here today.

17        In addressing that second question, did you seek out any

18   information?

19   A    I did.

20   Q    What information did you seek out?

21   A    Well, first I wanted to understand the scale of the

22   problem, and so I sought out information on the number of

23   people with suspended driver's licenses in the state of

24   Virginia and, in particular, the number of people with

25   suspended driver's licenses for failure to pay court fines

Peterson - Direct

1   and costs.

2   Q   Were you able to find that information?

3   A   I was.

4   Q   Where were you able to find that information?

5   A   It was contained in an e-mail that I understand to be

6   part of this case.

7   Q   Does this look like that e-mail?

8   A   It does.

9   Q   What does this e-mail show?

10  A   Well, what's important to me is what's blown up and

11  highlighted, and that's that there are basically 978,000

12  people in Virginia with suspended licenses, and 647,000 or

13  648,000 of those are suspended only as a result not paying

14  fines and costs.

15  Q   Did you review any other information in seeking to answer

16  the second question?

17  A   I did.

18  Q   What information is that?

19  A   I was able to obtain information showing the results of

20  court cases in Virginia over the period 2010 through 2017.

21  Q   Can you describe that dataset in more detail to the

22  Court?

23  A   Sure.  As I understand it, the state of Virginia posts

24  the results of its hearings and court cases and citations on

25  the internet, with people's names and some identifying

Peterson - Direct

1    information, and this is present on different systems across

2    the Commonwealth.

3        A computer scientist named Ben Schoenfeld wrote software

4    to basically scrape all of that information off of all of the

5    different websites and pull it together into a common

6    database.

7        And what's notable about this is it has identifying

8    information, so we can match records.  And it shows what the

9    charge was.  It shows hearing dates.  It shows the results of

10   the hearing, what fines were assessed, whether they've been

11   paid, what the payment date is, jail days that have been

12   sentenced and suspended, and so forth.

13       So we have, basically, a row of information for each

14   charge.

15   Q   And how many individual pieces of data are included in

16   Mr. Schoenfeld's dataset?

17   A   For the years I looked at, there were approximately

18   14 million records.

19   Q   Have you spoken to Mr. Schoenfeld about this data?

20   A   I have.

21   Q   Did you and your team create a series of demonstratives

22   for the Court based on your review of that data?

23   A   I have.

24   Q   Is this the first of those demonstratives?

25   A   It is.

Peterson - Direct

1   Q   What does this demonstrative show?

2   A   This is a subset of the data for Adrainne Johnson.   So

3   this shows, you know, the charge, as written in the data.

4   There's a free-form field that describes the charge.   There's

5   a code section, offense date, file date, and the costs and

6   the fines that were imposed.   There would also be jail time

7   and other information in each record.

8   Q   Did you prepare another demonstrative for the court based

9   on your review of Mr. Schoenfeld's data?

10  A   Yes.   I was interested in understanding, given that there

11  are, call it 650,000 or so people who are suspended with --

12  with a suspended license for failure to pay, how often are

13  they entering the system and being charged with driving with

14  a license suspended?

15      And so I was able to calculate, basically just count,

16  those cases in Mr. Schoenfeld's dataset, or in our version of

17  it.

18      And what I should say is these are DWLS cases related to

19  the failure to pay.   We can observe license suspensions in

20  the data as well.   And so for offense dates that would fall

21  inside of a license suspension, we didn't count those.

22  Q   Is this that demonstrative?

23  A   It is.

24  Q   What does this demonstrative show?

25  A   It shows the prevalence of these DWLS cases for failure

Peterson - Direct

1   to pay fines and costs.  And between 2015 and 2017, there

2   have been roughly 50 to 54,000 DWLS cases per year, affecting

3   40 to 44,000 individuals a year.

4   Q   In addition to DWLS cases, were you able to see other

5   offenses appear in Mr. Schoenfeld's data?

6   A   Yes.

7   Q   Being able to see other offenses other than DWLS, what

8   did that allow you do?

9   A   Well, it allowed us to make a comparison of payment rates

10  for DWLS.  And we chose speeding as what we thought would be

11  sort of an equal-opportunity offense that would be committed

12  by, you know, affluent and less affluent people together.

13          MR. ABEL:  Your Honor, I'll just mention that the

14  demonstrative shown before, there was a change in the order,

15  so I just wanted to call that out.

16  BY MR. ABEL:

17  Q   Based on that comparison that you and your team did,

18  Dr. Peterson, did you create another demonstrative for the

19  Court?

20  A   Yes.

21  Q   Is that this demonstrative?

22  A   It is.

23  Q   What does this demonstrative show?

24  A   This demonstrative shows the share of DWLS fines that

25  were paid within 60 days and the share of speeding fines that

Peterson - Direct

1    were paid within 60 days.  So we see a dramatic difference,

2    where over 85 percent of speeding fines are paid off in 60

3    days, but over these years, only a little over 8 to

4    10 percent of DWLS charges or fines were paid in 60 days.

5    Q    What did that disparity tell you?

6    A    Well, this is exactly the results you would expect if the

7    people who are suspended for failure to pay also have trouble

8    paying the fine related to a DWLS charge.

9         I mean, I suppose this isn't surprising, because if their

10   license was suspended for a failure to pay previous fines,

11   you know, it's not surprising that this fine wouldn't be paid

12   as well, at a high rate.

13   Q    Did you create another demonstrative for the Court based

14   on your review of Mr. Schoenfeld's data?

15   A    I did.

16   Q    Is this that demonstrative?

17   A    It is.

18   Q    What does this demonstrative show?

19   A    This demonstrative answers another question that I had

20   with regard to answering the second question about the focus

21   of suspensions on -- the effect of suspensions on poor

22   people.

23        And so I wanted to understand if, you know, people are

24   treading water and paying off fines while they're getting

25   DWLS offenses, as we're sampling some of these people with

Peterson - Direct

1   suspended licenses, or if they're going deeper into debt.

2       So the way we did that was we looked in 2016, and we

3   chose 2016 because it was late in the database and -- but

4   likely to have complete data.  And that gave us a history, a

5   potential history, for each individual back through 2010,

6   which is the first year that we downloaded.  And we looked in

7   2016 for people who, in 2016, were having their first DWLS

8   offense, and we found that they had $709 of unpaid court fees

9   and fines and debt at the time of their DWLS.

10      For people having their second DWLS in 2016, their

11  outstanding debt was $982.

12      And for the third DWLS, for people with the third in

13  2016, they had accumulated nearly $1,400 worth of debt.

14      And then for people with four or more in 2016, we see

15  over $2,000 worth of debt, nearly $2,200 worth of debt.

16      My conclusion from this is that there are people here

17  who, you know, are continuing to drive and are falling

18  further behind.  They're not able -- you know, they are not

19  paying off their debts to the court.

20  Q   Did you create another demonstrative for the Court based

21  on your review of Mr. Schoenfeld's data?

22  A   I did.  I wanted to understand, you know, what the

23  incentives were to pay off this debt, particularly for this

24  group of people who were driving.  And I understand that,

25  with a third DWLS offense, there's a mandatory jail sentence.

Peterson - Direct

1   And so I -- I was able to look at DWLS cases that resulted in

2   jail time, and we find there are about 9,600 to 11,500 of

3   those in 2017 to 2015 where people were getting 23 to 26 days

4   of jail.  And I show the total jail days here.

5       And I should just note, we don't observe jail time

6   served.  What we observe in this dataset is sentenced jail

7   time and less -- we subtracted out suspended jail time.  So

8   that's what's shown here.

9   Q   Dr. Peterson, based on everything we've discussed here

10  today, including the studies and data contained in the

11  demonstratives you've shown the Court, were you able to form

12  an opinion as to question number two you were asked?

13  A   I was.

14  Q   Were you able to form that opinion within a reasonable

15  degree of certainty in your field of expertise?

16  A   Yes.

17  Q   What is that opinion?

18  A   That opinion -- well, I think it's important to recognize

19  how all this data fits together in reaching that opinion.

20      So going back to the beginning, what we observed is that

21  the loss of a driver's license hurts people's income, and so

22  you would expect that people would pay, you know, their

23  traffic fines and things like that rather than suffer the

24  income from the loss of a license.

25      And, of course, for those who continue to drive, we see

Peterson - Direct

1    that they are at risk of being cited for driving with a

2    suspended license.  And that's a path that people really

3    shouldn't want to go down, because it ultimately ends up with

4    jail time.

5         And upon going to jail in Virginia and being released, I

6    understand that people's fines are not extinguished.  So

7    there is no benefit to going to jail.  So we don't even have

8    to assess whether there are people who are going to jail as a

9    way to extinguish court debt.

10        So what we have to conclude is that suspending licenses

11   for failure to pay is affecting poor people, because the

12   economic incentives are to pay the debt, if you can.  And, of

13   course, that's consistent with the incentives that are built

14   into the sanction of not paying debt.

15        Suspending a driver's license is supposed to be a strong

16   incentive to pay that debt; and for the people who don't

17   respond to that incentive, the economic conclusion is that

18   they're going to have difficulty paying that debt or

19   sustaining a payment plan, or something like that.

20   Q    Dr. Peterson, I want to draw your attention first back to

21   demonstrative 8, the data contained there, and then to

22   demonstrative 9, jail time.

23        Looking at those two numbers together, what is that able

24   to tell you?

25   A    Well, for me, you know, people going to jail are going to

Peterson - Direct

1    jail for relatively small amounts of money, you know, if

2    $1,300 is a small amount of money.

3        Now, if you're making $1,399 a month, $1,370 is not a

4    small amount of money.  But for, you know, people working in

5    an office or something like that, executive assistants or

6    whatever, I think that that is an amount of money that you

7    would not expect someone to go to jail over.

8    Q    Dr. Peterson, you heard Ms. Johnson testify here today?

9    A    I did.

10   Q    You heard her say that after her second violation, or

11   being pulled over the second time for driving with a license

12   suspended, she didn't drive anymore because she didn't want

13   to go to jail.

14       Do you remember that?

15   A    I do.

16   Q    How did that factor into your analysis of the second

17   question?

18   A    Well, it warmed my economist's heart, because it shows

19   that she was responding to incentives.  As the potential

20   sanction for driving without a license changed, her behavior

21   changed.  So she was behaving in a perfectly rational way.

22       Based on my conversation with her, her primary goal is to

23   take care of her family, and she can't do that if she goes to

24   jail.  And so driving without a license for a while was one

25   way to take care of her family and accept some risks, and

Peterson - Cross

1    when the risks grew, she changed her behavior.

2        And so that supports the economic inferences that we

3    would draw from that data, or from this data.  That is an

4    example of why the economic inferences we're drawing are

5    correct.

6              MR. ABEL:  Your Honor, no further questions at this

7    time.

8                      CROSS-EXAMINATION

9    BY MS. O'SHEA:

10   Q   I just have a couple of follow-up questions about your

11   underlying data, Dr. Peterson.  Is it Peterson?

12   A   Yes.

13   Q   So referring to your demonstrative number 2, where you

14   report people across the United States versus people in

15   Virginia who choose to drive alone in order to go to work,

16   and the data here, it says 77.4 percent of people in the

17   United States versus -- I can't tell which number is which --

18   versus 76.4 choose to drive alone in a car to work?

19   A   Virginia is in red.

20   Q   Oh.  My copy is in black and white.

21   A   Oh.  I'm sorry.

22   Q   So hence the difficulty.

23   A   The left-hand bars are Virginia, then.

24   Q   Thank you.

25        So my question is:  Do you know, the study that these

Peterson - Cross

1   numbers were pulled for, were the people asked if they had to

2   drive alone to go to work versus they chose to drive alone to

3   go to work?  Was that information included?

4   A   I don't know.  And I assume that they're choosing,

5   because, obviously, if you want to round up a carpool, you're

6   able to do that.  So as an economist, that question isn't

7   really very important to me.

8       This is how -- people want the flexibility.  This is

9   evidence that people, when they are able to, want the

10  flexibility of driving to work alone, for schedule and

11  getting to the specific location that they need to go.

12  Q   Certainly.  I choose to drive to work alone.  But I could

13  get a carpool out of my neighborhood if I wanted to.  I'd

14  still like not to.

15      But so how, if at all, does the difference between people

16  who choose to drive to work alone versus people who have to

17  drive to work alone, how does that plug into your ultimate

18  conclusion that not having a driver's license makes it so

19  that those people have problems getting to work?

20  A   Well, certainly when we see more than three-quarters of

21  people driving to work alone, it suggests that people may

22  have trouble getting a carpool.

23      I mean, we heard from Ms. Johnson -- or, actually, we

24  spoke to her, and she has different start times at work, I

25  believe.  So it can depend on which store she works at.  So I

Peterson - Cross

1  think a car -- you know, she would have to find someone with

2  matching -- a matching schedule.  And matching is always

3  difficult.  We know that in economics, right?  So carpools

4  are often difficult, would be difficult to assemble, because

5  they require a confluence of timing and location for work in

6  order to not be extremely inconvenient.  So I don't see this

7  as an important consideration.

8      We see what people are choosing to do, and also, we also

9  see that it largely -- you may not have to drive, but, you

10  know, private transportation is very important for people

11  commuting to work.

12 Q   So is this -- back to the report that pulled these

13  figures on the manner in which people choose to go to work,

14  did it break down at all different localities within the

15  Commonwealth of Virginia, or did it just lump together

16  everyone from Virginia?

17 A   The data we have is for Virginia as a whole.

18 Q   And would you agree that, then, these numbers might vary

19  depending on from location to location; urban center versus a

20  rural center, for example?

21 A   I would expect there to be some variations, yes.

22 Q   Or if you live in a city like Charlottesville that has a

23  bus line, versus you live in a different city that doesn't

24  have a bus line, that might be different, too, right?

25 A   Well, if there's no bus line, then I expect the public

Peterson - Cross

1    transportation bars would go down.

2    Q    Right.  So going to my point, then, it's going to vary

3    from locality to locality within the Commonwealth of

4    Virginia, right?

5    A    Well, these particular results will vary, but the overall

6    principle, the economic principle that this speaks to, is

7    that more -- when people are trying to do the best they can,

8    having a wider range of opportunities allows them to do

9    better.  And so not having a driver's license limits their

10   range of ability, their opportunity to get to particular

11   places and to perform certain jobs.  And so that's the

12   overarching conclusion here.

13   Q    Fair enough.

14   A    And so some of those details -- someone might be lucky

15   and find a good job in walking distance to work, but that

16   isn't, you know, the regular experience.

17   Q    Depending on location?  I mean, if you live in a place

18   like Alexandria, where there's a ton of things within walking

19   distance, it might be easier, right?

20   A    I guess that might be easier.  And the relevance would

21   depend on the cost of living in downtown Alexandria, I

22   suppose.

23   Q    Certainly.

24       I'm going to ask you now about the dataset that you

25   reviewed from the -- I think you said through the Virginia

Peterson - Cross

1  courts?

2  A   Yes.  It was data that was compiled by Ben Schoenfeld.

3  Q   All right.  And so it references in the graphics that you

4  put together convictions for driving while on a suspended

5  license, correct?

6  A   Correct.

7  Q   Are you aware that, in Virginia, driver's licenses can be

8  suspended for lots of different reasons?

9  A   Yes.

10 Q   Right.  It's not just failure to pay fines and costs; it

11 can be for failing to pay child support; it can be because

12 you have a felony traffic offense, something along those

13 lines?  Right?

14 A   Right.

15 Q   And are you aware that people in Virginia can have their

16 driver's licenses suspended -- have multiple suspensions in

17 effect at the same time?

18 A   That's right.

19 Q   So you can be suspended for three or four different

20 reasons all over the same period, right?

21 A   Correct.

22 Q   Now, you said that you were looking at information from

23 the website or the dataset that you were given on convictions

24 for driving while on a suspended license, while your license

25 is suspended.

127

Peterson - Cross

1    Now, are you also aware that the code section in Virginia

2    law for driving on a suspended license doesn't differentiate

3    between the reasons that you are suspended?

4    A   My data analysis assumes that.

5    Q   So I guess my question is how -- when you're reporting

6    your data, you're making -- you're reporting, like, this

7    number of people who are convicted for driving while on a

8    suspended license.  How are you able to make the leap that

9    the people who were convicted of driving on a suspended

10   license were suspended solely for failure pay fines and

11   costs, when the crime that you're charged with doesn't

12   differentiate between the reason that you're charged?  Does

13   that make sense?

14   A   Yes.  I thought I explained this on direct, but the

15   dataset also shows license suspension times.  And so I can

16   see a DWI where an individual is suspended for 365 days, for

17   example, and so from the hearing date that we see, if we see

18   a suspension, a DWLS offense in the year following that

19   hearing date, we don't count it here.

20       So if we see evidence of a suspension in the data, we can

21   determine the time when that suspension should be in effect.

22   And we did not count DWLS charges that took -- that occurred

23   when another suspension was in effect.

24   Q   Okay.  So you lifted out all of the driving while

25   suspended convictions that you were able to determine

Peterson - Cross

1    corresponded to something other than a suspension for failure

2    to pay fines and costs?

3    A    That's right.  So the suspensions -- the DWLS offenses

4    that we are observing here are those that occurred when there

5    is no evidence of a suspension for a driving-related reason;

6    where that is part of your sentence, if you will.

7    Q    Understood.

8         I don't think it was available to you, but I'm asking

9    just to make sure.  Things like the average income of the

10   individuals whose driver's licenses were suspended for

11   failure to pay fines and costs, that's not data that's

12   available to you, correct?

13   A    No, we do not have data that would allow us to identify

14   those specific individuals or anything like that.  And we

15   don't -- there's no income information.  It's purely data

16   related to the court proceeding; the fields I described,

17   generally.

18             MS. O'SHEA:  All right.  Thank you.  I don't have

19   any other questions.

20             THE WITNESS:  Thank you.

21             MR. ABEL:  Just a second, Your Honor.

22             That's all we have, Your Honor.

23             THE COURT:  Thank you, sir.  You may step down.

24             MR. BLANK:  Your Honor, I've got three more -- four

25   more pieces of evidence.  Three are going to be very short.

Peterson - Cross

1    One is going to be about ten minutes, but I just need to ask

2    him one question.

3           I was checking.  He has a flight to catch.  I didn't

4    want him to miss his flight.

5           Your Honor, the next piece of evidence that we would

6    put in are two declarations -- excuse me, two affidavits.

7    One of them is behind tab 15, which is the affidavit of

8    Robert Fuentes.  His résumé is attached, as is one of his

9    studies.

10          The second affidavit is of Jon Carnegie, with his

11   résumé; the AAMVA Best Practices Guide to Reducing Suspended

12   Licenses; and an AAMVA video, which I will play in a second.

13          Just to summarize for Your Honor, but you can read

14   the affidavits, Mr. Fuentes puts in his affidavit that:

15   Virginia has limited public transportation.  87 percent of

16   Virginians travel to work by car.  Lack of public

17   transportation and license cuts off job opportunities for

18   low-income individuals.  And Virginia Code Section 46.2-395

19   deprives workers of economic opportunities.  That's a general

20   synopsis of it.

21          For Mr. Carnegie, his affidavit testifies that

22   suspending driver's licenses for failure to pay court debt

23   potentially undermines traffic safety; in the local

24   communities, employers experience negative consequences from

25   the license suspension because those who have licenses have

Peterson - Cross

1   more stable employment.

2           Your Honor, we have attached as a video to our -- we

3   cited to it, and with your indulgence -- I know we've run

4   over.  It is about ten minutes.  I'd like to play it for Your

5   Honor so that you can see it so you don't have to go back and

6   look at it, and then we will wrap up shortly with our case in

7   chief on the preliminary injunction.

8           Mr. Abel, if you will play it.

9           This is the video from AAMVA that Mr. Carnegie

10  authenticates.

11          (Video played)

12          MR. BLANK:  Thank you, Your Honor, for indulging us

13  in the video.

14          Two more pieces of evidence.  One is behind tab 17,

15  and this is the -- from the AAMVA website, and it's the Board

16  of Directors.  And our defendant, Mr. Holcomb, is a Board

17  Director of AAMVA.  Just to legitimize, if needed to, AAMVA's

18  legitimacy, our defendant is on the Board of Directors of

19  AAMVA.  That's behind tab 17.

20          And behind tab 18, while a different issue, is a

21  letter that's been issued by the Attorney General to Senator

22  Obenshain dealing with the issue of bail bonds.  And while it

23  is a different issue, the issue dealing with whether or not

24  low-income defendants and those with money could raise equal

25  protection questions, that is addressed in his letter.  So

Peterson - Cross

1   the Attorney General himself, both in this letter and then we

2   cited to an interview that he gave in the last three weeks,

3   where he does expressly address that, tying these issues to

4   low-income defendants, those with money could raise equal

5   protection concerns.

6          Your Honor, with that, that is the plaintiffs' case

7   on our preliminary injunction.  We at this time ask for the

8   notebook to be admitted as Exhibit 1.  And if I can approach

9   the clerk, I'll hand the supplemental Adrainne Johnson

10  demonstrative as Exhibit 2.

11         THE COURT:  All right.

12         MR. BLANK:  I think, Your Honor -- I have the

13  notebook, an additional notebook to hand to the clerk.  What

14  is missing, and I can ask the Commonwealth, is behind tab 16

15  there is a thumb drive in cellophane, and I would like to

16  have the thumb drive back.

17         THE COURT:  There is a thumb drive in the back of

18  the one I have.

19         MR. BLANK:  That's correct, Your Honor.  I didn't

20  know if the Court -- we were going to give one to the clerk

21  and one for you to have.  So yours has a thumb drive in it as

22  well.

23         THE COURT:  Okay.

24         (Plaintiff's Exhibits 1 and 2 admitted)

25         MR. BLANK:  Let me -- Your Honor, we will pass the

Ford - Direct

1    baton to the Commonwealth.

2          THE COURT:  All right.

3          MS. O'SHEA:  Thank you, Your Honor.  The defendant

4    calls Millicent Ford, please.

5          THE COURT:  Okay.

6          MILLICENT FORD, CALLED BY THE DEFENDANT, SWORN

7                      DIRECT EXAMINATION

8    BY MS. O'SHEA:

9    Q    Good afternoon, Ms. Ford.

10   A    Good afternoon.

11   Q    Would you please introduce yourself to the Court?

12   A    Your Honor, I'm Millicent Ford.  I'm the Assistant

13   Commissioner for Driver, Vehicle, and Data Management

14   Services at DMV.

15   Q    What are your responsibilities as the Assistant

16   Commissioner?

17   A    I am responsible for executive level oversight, guidance,

18   and direction to the driver services, vehicle services, and

19   data management services administrations at DMV, including

20   major initiatives and efforts related to process

21   improvements, policies and procedures related to those areas,

22   driver licensing, vehicle titling and registration,

23   suspensions, conviction processing.

24       I'm also responsible for the implementation of special

25   projects, legislation -- any process improvements, really --

Ford - Direct

1   as well as delivering presentations to judges, Commonwealth's

2   attorneys, and serving as liaison with our various

3   stakeholders related to those areas.

4   Q   How long have you had your current position?

5   A   I've been in my current position for approximately two

6   years.

7   Q   And how long have you been with the Department of Motor

8   Vehicles?

9   A   I've been with the Department of Motor Vehicles since May

10  of 1991.

11  Q   During the course of your employment at the Department of

12  Motor Vehicles, have you had any sort of relationship with

13  the Office of the Executive Secretary, the OES?

14  A   Yes, I have.

15  Q   Would you describe that for the Court, please?

16  A   My primary responsibility was serving and has been

17  serving as a liaison with the Supreme Court Office of the

18  Executive Secretary, working primarily with the Court

19  Services Managers that -- related to the interface that

20  exists between the courts, OES, and DMV.

21  Q   So you are the liaison between DMV and OES?

22  A   Yes.

23  Q   Now, you brought up the computer systems, so I will ask

24  you about those now.

25      How long has the current system been in place, if you

Ford - Direct

1   know?

2   A   The current system has been in place since -- for about

3   three years, but there have been gradual improvements in that

4   process.

5   Q   Okay.  Currently under the DMV system -- the computer

6   system, as opposed to receiving papers -- under the computer

7   system, how do you receive notification that an individual in

8   a jurisdiction has not paid court-ordered fines and costs?

9   A   We receive that information electronically, except for

10  two courts that exist that transmit paper court orders to us.

11  But we receive that information electronically from the

12  courts, through OES, to DMV.

13  Q   So when you say you receive it electronically from OES --

14  A   Yes.

15  Q   -- what is the system called where it's sent from OES to

16  DMV?

17  A   It's referred to as the Court Automated Information

18  System, and it's basically a system-to-system, a

19  server-to-server process that exists.

20  Q   Now, do you know whether there is a different system or

21  some other way that the courts get their information to OES,

22  the individual trial courts?

23  A   Based on my work with OES over the years, the court

24  clerks enter the information into their system.  OES has

25  worked, along with DMV, to program and -- program the

Ford - Direct

1    transmission of the data so that certain information

2    ultimately gets to DMV from the courts through OES so that we

3    can populate a driver's record.  And that might be conviction

4    information, suspension information, including suspensions

5    for failure to pay fines and costs.

6    Q    Now, do you know whether the -- were you in the courtroom

7    when Ms. Dugger was testifying earlier?

8    A    Yes.

9    Q    And she referenced the CCMS system, or the Court Case

10   Management System?

11   A    Yes.

12   Q    Is that a system that you are familiar with?

13   A    I've heard of the system, the system referred to as the

14   Case Management System, yes, over the years.

15   Q    Okay.  Do you know whether the CCMS system is different

16   than the Court Automated Information System that you were

17   referring to, CAIS?

18   A    I think it's -- I believe the Case Management System that

19   she referred to feeds into the Court Automated Information

20   System, again moving data from the courts through OES to DMV.

21   Q    And when that data is transferred from CCMS, the Court

22   Case Management System, to CAIS, the Court Automated

23   Information System, is that something that -- you know, is

24   DMV a middleman in that at all?

25   A    No.  We simply wait to receive information from the

Ford - Direct

1    courts through that system.

2    Q    So you only get your information through the Court

3    Automated Information System, or CAIS?

4    A    Yes.

5    Q    From the Office of the Executive Secretary?

6    A    Yes.

7    Q    Now, would you explain to the Court how it is you know

8    that there has been a suspension issue for nonpayment of

9    fines and costs?

10   A    There is an electronic -- the process that exists in Case

11   includes an electronic notification regarding court

12   indicators; first, that the person has -- that the Court is

13   ordering a suspension for failure to pay fines and costs;

14   that they were either in person at the time of that

15   notification of that suspension, or that the court has mailed

16   that notification to them via the DC225, that process; or

17   that no notice was given at all.

18       But once that indicator regarding that fines and costs

19   order comes to us, it comes to us along with an effective

20   date.  So the fines and costs indicator, along with the --

21   along with the suspension effective date, is what DMV uses

22   and receives as an order from the Court for us to implement

23   and record that on the customer's record.

24   Q    So, then, when you run the DMV transcript or the driver

25   history transcript, the suspension for failure to pay fines

Ford - Direct

1   and costs will show up?

2   A   Yes.

3   Q   If you didn't receive this information from the courts

4   electronically, does DMV have the discretion to go in and

5   enter a fines and costs suspension anyways?

6   A   No.

7   Q   Do you ever get in an order from the courts and say, hey,

8   maybe this shouldn't be a fines and costs suspension, and

9   kick it back?

10  A   No.

11  Q   Do you ever receive any information about how much money

12  somebody owes in fines and costs?

13  A   We get that information.  I don't believe it's a

14  mandatory field, but we -- but we never -- that's not a field

15  that we use.  It's just a part of the information that we

16  receive related to the conviction, and it comes in as a part

17  of the conviction record.  But that's not anything that DMV

18  acts upon or takes any action.

19  Q   So some courts might send it in and other courts might

20  not?

21  A   Right.

22  Q   Okay.  Now, with respect to -- are there different types

23  of suspensions that are entered by DMV administratively as

24  opposed to through this Court Automated Information System?

25  A   Yes.

Ford - Direct

1   Q   Okay.  What are those types of suspensions?

2   A   There are suspensions for non-motor-vehicle-related drug

3   violations.  There are suspensions for DUIs.  There are

4   suspensions for driving while suspended, when you're

5   suspended for a DUI-related offense.

6       Those are just examples of times when DMV is required to

7   take administrative action based upon receipt of the

8   conviction.

9   Q   So even if the Court hadn't included a suspension in its

10  order, DMV will administratively suspend it based on those

11  specific statutes?

12  A   Yes.

13  Q   But, again, the difference here is, if the court doesn't

14  send you the information about nonpayment of fines and costs,

15  DMV has no discretion to go in and suspend anyone?

16  A   That's correct.

17  Q   Okay.  And once you receive this fines and costs

18  indicator and the effective date from the court, it then gets

19  updated on the driving transcript, correct?

20  A   That's correct.

21  Q   And who is that transcript made available to?

22  A   Transcripts are made available to law enforcement,

23  courts, attorneys; insurance companies have the ability to

24  get transcripts; and individuals, for personal use.

25  Q   Now, we talked about the computer systems and how

Ford - Direct

1   information gets funneled through OES electronically and then

2   is brought to DMV.

3       Now, you mentioned that there are two jurisdictions that

4   don't use the computer system, right?

5   A    Yes.

6   Q    It's Alexandria and Fairfax?

7   A    Yes.

8   Q    How do you receive information regarding nonpayment of

9   fines and costs from those jurisdictions?

10  A    Those courts send us paper documents directly.  They

11  send -- they mail their paper documents directly to DMV.

12  Q    I've handed you a sample form that's labeled at the top

13  "Abstract of Conviction."

14      Is this an example of the type of form that you might

15  receive from those two -- the court systems that don't

16  transmit information electronically?

17  A    Yes, it is.

18  Q    Okay.  So you receive these in the mail?

19  A    Yes.

20  Q    And what do you do with them when you receive them?

21  A    We update the record, update the record to reflect what's

22  noted on the document.

23  Q    Now, if you look in the lower right-hand corner of that

24  form, there is a specific field regarding fines and costs; is

25  that correct?

Ford - Direct

1    A    Yes.

2    Q    And what is the purpose of that little box down there?

3    A    The purpose of that box is to -- is to indicate whether

4    the Court has ordered a suspension for failure to pay court

5    fines and costs, and when they want DMV to make that

6    suspension effective.

7    Q    If that box isn't filled out from those courts that are

8    sending you in these paper documents, would DMV suspend a

9    driver's license or update a transcript to show a suspension?

10   A    No.

11   Q    From DMV's perspective, is a suspension for nonpayment of

12   fines and costs done by the court at the time of the

13   conviction, or is it done administratively by the Department

14   of Motor Vehicles?

15   A    It's done by the courts, not administratively by DMV.

16           MS. O'SHEA:  I don't have any other questions.

17   Thank you.

18           THE COURT:  Who adds the $145 reinstatement fee?

19           THE WITNESS:  I'm sorry, Judge?

20           THE COURT:  The reinstatement fee of $145, does the

21   court have anything to do with it?

22           THE WITNESS:  That is -- by statute, it requires DMV

23   to impose $145 reinstatement fee whenever a person is

24   suspended for nonpayment of fines and costs.  And there's a

25   few other suspensions that relate to that.  But that's

Ford - Direct

1    specifically directed by statute.

2              THE COURT:  All right.  Okay.  Another question.

3              THE WITNESS:  Yes.

4              THE COURT:  What does it cost to get your initial

5    driver's license?  The fee, what fee do you pay when you go

6    in and --

7              THE WITNESS:  I believe now -- it went up recently,

8    but I believe it's $32; $8 per year.

9              THE COURT:  Does it cost any more to process the

10   initial driver's license than it does to reinstate?

11             THE WITNESS:  Umm.

12             THE COURT:  Or any less?

13             THE WITNESS:  For reinstatement it's -- it's -- when

14   you're reinstating your driving privilege, there's a process

15   of all the compliance transactions that we have to handle in

16   addition to the -- if the person, if they're testing, if

17   there's testing involved, that has to be completed as well.

18   It's a little longer process --

19             THE COURT:  Okay.

20             THE WITNESS:  -- depending upon how long they've

21   been suspended.

22             THE COURT:  All right.  Okay.

23             MR. BLANK:  The Commonwealth would like to ask

24   another question based on what you said.  I don't mind you

25   going --

Ford - Direct

1          THE COURT:  All right.  Go ahead.

2     BY MS. O'SHEA:

3     Q    Do you know what happens to that DMV reinstatement fee?

4     A    Yes.  By statute the -- yes.

5     Q    What happens to it?

6     A    The statute specifically directs DMV to retain $45 of

7     that, and $100 of that goes to the Trauma Center Fund.

8          THE COURT:  To the what fund?

9          THE WITNESS:  Trauma Center Fund.

10    BY MS. O'SHEA:

11    Q    Do you know what the Trauma Center Fund is?

12         MR. BLANK:  Judge, I have to object.  I don't know

13    what relevance that could possibly have.

14         THE COURT:  Well, I mean, it doesn't have -- it's

15    another way of the state collecting revenue --

16         MS. O'SHEA:  Right.

17         THE COURT:  -- to pay other costs that the

18    Commonwealth incurs.

19         THE WITNESS:  I'm not positive of that.

20         THE COURT:  It's sort of like the lottery that goes

21    to the education fund.  It has nothing to do -- I mean, you

22    don't have anything to do with it, I know.

23         THE WITNESS:  No.

24         THE COURT:  But the $100 is just earmarked by the

25    legislature, I'm sure, to pay --

Ford - Cross

1           MS. O'SHEA:  Correct.  The point of the question was

2     just that only the $45 stays at DMV, and that's commensurate

3     with the --

4           THE COURT:  I understand.

5           MS. O'SHEA:  -- amount for the initial license.

6           THE COURT:  The driver has to pay it; doesn't make

7     any difference what it's for.

8           All right.  I'm sorry.  Go ahead.

9           MS. O'SHEA:  Thank you.  No, that was the only

10    question I had.  Thank you.

11          THE COURT:  Okay.  Go ahead.

12          MR. BLANK:  Thank you, Your Honor.

13                         CROSS-EXAMINATION

14    BY MR. BLANK:

15    Q   Ms. Ford, thank you for your time.  You're not -- you've

16    never been employed by a district court, have you?

17    A   I have not.

18    Q   You've never been employed by a circuit court?

19    A   I have not.

20    Q   You've never been behind a desk dealing with the computer

21    screens that Ms. Moats testified about?

22    A   I have not.

23    Q   And you haven't been in a circuit court dealing with the

24    screens that Ms. Dugger was testifying about?

25    A   I have not.

Ford - Cross

1    Q    In fact, you've not gone and looked at any of the court

2    records for any of these plaintiffs, correct?

3    A    The court records?

4    Q    Yes.

5    A    No, I have not.

6    Q    And you haven't looked at any court records for anybody

7    that's driving while suspended, or had their license

8    suspended for failure to court debts and fines, have you?

9    A    No, I don't have access to that.

10   Q    You don't have access to the court records, correct?  You

11   don't have access to the court records; is that what you

12   said?

13   A    Just as it relates to the information that's been

14   transmitted by the court.

15   Q    You don't -- you're not -- you have no idea whether or

16   not there's a court order that suspends the license in the

17   court record, do you?

18   A    Only based upon the information; but no.

19   Q    You haven't seen it?

20   A    No.

21   Q    You haven't seen it?

22   A    I haven't seen it.

23   Q    And, in fact, in your affidavit, you said you assume that

24   it's there.

25        You're just making an assumption of what's in that court

145

Ford - Cross

1    record, correct?

2    A    Based upon what the court has submitted to us.

3    Q    But you haven't gone and looked at the record?

4    A    No.

5    Q    And Ms. Dugger said there's no order in the court file.

6    You have nothing to refute that, do you?

7    A    No.

8    Q    And Ms. Moats said there's no court order.  You have

9    nothing to refute that?

10   A    No, just based upon what the Court said.

11   Q    You're not saying that the DMV doesn't have anything to

12   do with the license suspension, are you?

13   A    I'm saying that, by statute, certain suspensions are

14   ordered by the Court and certain suspensions are ordered by

15   DMV; and fines and costs isn't one.

16   Q    That's not my question.

17   A    Oh.

18   Q    Let's refine it.  For court suspensions -- excuse me, for

19   license suspensions for failure to pay court debts and

20   fines -- let's focus on that, because that's what this case

21   is about.

22   A    Okay.

23   Q    You're not saying that DMV has anything to do with

24   license suspensions, are you?

25   A    The ordering of a suspension, yes, that's what I'm

Ford - Cross

1  saying.

2  Q   No, no, I'm not talking -- you're parsing words.

3  A   Okay.

4  Q   I'm talking about any part of it.  DMV has got something

5  to do with license suspensions, correct?

6  A   Correct.

7  Q   And they have something to do with license suspensions

8  for failure to court debts and fines; something?

9  A   Reinstating them, yes.

10  Q   Even the actual computer system that you talked about has

11  something to do with the actual suspension.  Not

12  reinstatement; I'm talking about suspension.  Those computer

13  systems are talking to each other.

14      Your system and the court system and the OES system,

15  they're interfaced, correct?

16  A   There's an interface, yes.

17  Q   So if DMV wasn't there, it couldn't happen, could it?

18  There couldn't be a suspension, could there, for failure to

19  pay court debts and costs?

20  A   We act on what the court sends us, yes.

21  Q   But you have to be there for it to be suspended, correct?

22  A   We put it on the record, yes, sir.

23  Q   If DMV didn't exist, would a license be suspended for

24  failure to pay court debts and fines?

25  A   We would not do it based upon -- I --

147

Ford - Redirect

1   Q    If DMV didn't exist --

2   A    Uh-huh.

3   Q    -- could you suspend a license for failure to pay court

4   debts and fines?

5   A    No.  The record would not show it.

6           MR. BLANK:  No further questions, Your Honor.

7           THE WITNESS:  Wow.

8           THE COURT:  All right.  Thank you.

9                   REDIRECT EXAMINATION

10  BY MS. O'SHEA:

11  Q    Would you agree that there's a difference between the

12  record reflecting a suspension and the entity that issues the

13  suspension in the first instance?

14  A    Yes, there is.

15  Q    So when the court issues a suspension, is it effective

16  from the moment that the court issues it, regardless of

17  whether or not it's ultimately updated on somebody's

18  transcript?

19  A    Yes.

20          MR. BLANK:  Objection to the question, Judge,

21  because it definitely calls for a legal conclusion.  She's

22  not in the court system to make --

23          THE COURT:  Well, that's covered by the statute.  I

24  mean, the law makes it effective as stated, right?

25          MS. O'SHEA:  Correct.

Ford - Redirect

1          MR. BLANK:  Your Honor, we disagree with that

2    interpretation, which we can deal with.

3          THE COURT:  Okay.

4          MR. BLANK:  And I think the testimony --

5          THE COURT:  It's a legal question.

6          MR. BLANK:  I think the testimony so far is that it

7    doesn't happen until 41 days, and it's after the failure to

8    pay.

9          THE COURT:  Right.

10          MR. BLANK:  So I think she testified that it's day

11    one, and I don't think that's what the evidence shows.

12          THE COURT:  Okay.

13    BY MS. O'SHEA:

14    Q    So if there's been a court-ordered suspension, let's say,

15    in a different context -- somebody is convicted of a DUI

16    third and the Court suspends their license for 90 days, all

17    right, and it's an actual court conviction, or the judge

18    signs an order that says, I am suspending your license --

19         Right?

20    A    Yes.

21    Q    -- does DMV have to receive a copy of that order before

22    the suspension is real, or is it real from the moment that

23    the judge signs his name on the bottom line?

24          MR. BLANK:  Objection.  Again, I'm not sure she can

25    testify to that, but --

Ford - Redirect

1          THE COURT:  Well, I think when the judge suspends it

2     and the person is there, it's effective right then.  Isn't

3     that the point you're making?

4          MS. O'SHEA:  It is, Judge.  So if Your Honor is

5     satisfied with that, then I won't --

6          THE COURT:  Yeah, there's no question about that.

7          MS. O'SHEA:  I won't walk down that path any

8     further, then.

9     BY MS. O'SHEA:

10    Q   So you were asked, as well, if you had been in court or

11    in the court clerk's offices.

12         In your role as liaison to OES and your job as Assistant

13    Commissioner, though, do you interact at all with the court

14    clerks?

15    A   In past years in roles prior to this, I attended clerk's

16    conferences, circuit court conferences, as well as general

17    district court conferences.

18    Q   Were you involved in any training at all with the court

19    clerks?

20    A   Yes, when they had regional conferences, regional

21    meetings, which involved presentations from DMV, as well as

22    the all-state conferences.

23    Q   Did any of those presentations or trainings revolve

24    around this information communication from the clerk's

25    offices to DMV through the computer system?

Ford - Redirect

1   A   Yes, because we wanted the clerks to understand how the

2   process works so that when there were questions about what

3   DMV received and why a customer may be in front of us saying,

4   you know, the Court suspended, we would -- they would

5   understand how the process worked and how we knew what we had

6   on the record was correct or incorrect.

7           MS. O'SHEA:  Okay.  Thank you.

8           And, Your Honor, at this time I'd also like to move

9   to admit the blank sample document that I handed up to the

10  witness earlier, and that would be Defense Exhibit 2.

11          MR. BLANK:  No objection.

12          THE COURT:  Okay.  It will be admitted.

13          (Defendant's Exhibit 2 admitted)

14          MS. O'SHEA:  Thank you.  I don't have any other

15  questions.

16          THE COURT:  Thank you.  You may step down.

17          MS. O'SHEA:  No further evidence or witnesses from

18  the defense, sir.  Just argument.

19          THE COURT:  Okay.  Would y'all like to argue just

20  for a few minutes?

21          MR. BLANK:  Judge, I know it's a little abnormal,

22  but I have a specific presentation that I would like to make,

23  and then Ms. Ciolfi would like to address some specific

24  issues that were brought up today in terms of payment plans,

25  statute interpretation, and redressability.  So we'd like to

151

1    split up the argument briefly.

2            THE COURT:  All right.

3            MR. BLANK:  And I won't take too long in opening,

4    Your Honor.

5            Judge, why are we here today?  That's always a

6    question that I know you ask yourself and ask me.  And I'll

7    start basically with our order that we're asking.

8            We're asking for a preliminary injunction.  We're

9    asking for an order that during the pendency of this

10   action -- because we're not at motion to dismiss; we're not

11   at ultimate issue; we're at pendency of action right now --

12   that the Commissioner is enjoined from enforcing 46.2-395 of

13   the Virginia Code against the plaintiffs, and the putative

14   class, unless and until defendant or another entity

15   determines through a hearing, with adequate notice thereof,

16   that the failure to pay was willful, not excusable because of

17   inability to pay.  We think that you should stop this

18   practice of just automatically suspending without asking

19   people:  Can you pay?

20           The Commissioner also should remove the current

21   suspension of the five plaintiffs, because you have the

22   evidence in their declaration to show that they've got

23   irreparable and immediate harm and that their constitutional

24   rights have been deprived.  So we would ask to remove the

25   suspension for them.

1            And then we ask that the Commissioner's enjoined

2      from charging the fee to reinstate them.

3            That's the three things we're asking.  But why?  Why

4      are we asking that?

5            It's not often that I get to come here and argue

6      constitutional law.  I spent a lot of time preparing for it.

7      But to answer the question of why we're here:  We're here

8      because the Constitution of the United States of America

9      guarantees that the Commonwealth of Virginia may not deprive

10     any person of life, they may not deprive them of liberty or

11     property, without due process of law.  We learned it in

12     elementary school up through high school and college.  We're

13     here.  It is real.  It is real because of Ms. Johnson and it

14     is real because of the other people that are in this

15     Commonwealth that are suffering.

16           We're here because the United States Supreme Court

17     in *Bearden* tells you, and tells us, you cannot punish a

18     person because they lack the resources to pay a debt, like

19     Ms. Johnson told you.

20           We're here because the United States Supreme Court

21     in *Bell*, the Fourth Circuit in *Scott* and *Plummer*, told us

22     that a driver's license is a property -- protected property

23     right that can't be taken away without procedural due

24     process.  It can't be taken away without a form of a

25     pre-deprivation hearing, with notice and opportunity to be

1   heard.

2          And the evidence in this case is uncontradicted that

3   that doesn't happen.  That doesn't happen before the default.

4          When Ms. Ciolfi said T1, that's not what we're

5   talking about.  We're talking about T2.  T2, Time 2, when

6   that default happens, nobody gets any notice.  Ms. Johnson

7   testified to it.  No Court asks you:  Can you pay?  Can you

8   not pay?  That is just what is just diametrically wrong and

9   diabolically wrong with this system.

10         We're here because the Supreme Court, in *Griffin* and

11  *Williams* and *Tate* and *Meyer* and *Bearden*, this history of

12  court cases, they made it clear you can't treat people who

13  are unable to pay differently from people who are able to

14  pay.

15         We're here because this is the modern-day debtors'

16  prison.  We've got close to a million people, or 700,000

17  prisoners, who are facing captivity in our system that

18  requires a driver's license.  You heard Mr. Peterson, you

19  heard -- excuse me, Dr. Peterson, you heard Dr. Pearce, that,

20  again, our system requires this driver's license to have

21  specific jobs, to get to jobs, to take your kids, to go see

22  them in a sporting event.  It is there as a protected

23  property right.  And we've got hundreds -- we've got

24  thousands of people that, through this system, end up in

25  jail; hundreds of thousands of days of jail time.

1          We're here because Justice Gregory told the

2    Commonwealth in oral argument -- you can go back and you can

3    listen to it -- the Commissioner is doing it.  He's carrying

4    out the will of the state.  It's a question of whether or not

5    it's constitutional in terms of economic justice.

6          Almost nearly a million Virginians, many of whom

7    because of their poverty can't drive, poverty alone.  And

8    there's no differentiation between someone who is

9    recalcitrant, refusal to pay, versus the inability to pay,

10   because our system doesn't ask that question.

11         We're here because the Tennessee federal judge, less

12   than a month ago, and earlier in June, took the exact same

13   arguments that I expect you're going to hear from the

14   Commonwealth -- and you saw it in their briefs -- and she

15   rejected every single one of them.  It's on appeal to the

16   Sixth Circuit, granted, but she rejected them because they

17   are constitutional principles that do not support the

18   argument to defend this system based on the *Rooker-Feldman* or

19   the abstention doctrine or immunity.  There's constitutional

20   violations going on.

21         A separate Michigan judge, separate from the

22   Tennessee judge, looked at those statutes that are similar to

23   ours and entered injunctions stopping the state from

24   continuing the practice.

25         We're here because our named plaintiffs, Ms. Johnson

1    included, and 700 of our fellow citizens, are being harmed

2    immediately and irreparably by 46.2-395 in an

3    unconstitutional and an un-American way.  We're here to ask

4    you to stop that practice.  Stop the practice to allow people

5    who are unable to pay to have the license to take care of

6    their kids.  Let them drive to a job.  Let them go to a

7    medical appointment.  Let them take their kids to a medical

8    appointment.  Let them have the opportunity to lift

9    themselves up so that they can pay the fine, so that Virginia

10   can get the money.

11       We're here to ask you to take the action based on

12   your statement.  With all due respect, Judge, you put it in

13   your opinion in the last pages.  You said on your statement

14   on Virginia Code 46.2-395, "Automatic suspension of a

15   driver's license for nonpayment of court fees and fines,

16   regardless of inability to pay, may very well violate

17   plaintiffs' rights to due process and equal protection."

18       That goes to the very first prong, the elements for

19   the motion for a protective order -- for preliminary

20   injunction.  Excuse me.  Are we likely to prevail on

21   plaintiffs' claims?  We don't have to prove all of them.  We

22   don't have to prove them today.  We have to show that we're

23   likely to be successful on the merits.

24       And you even said it yourself.  Taking aside the

25   jurisdictional question that, according to you and according

1    to the Tennessee judge, according to Justice Gregory,

2    according to Michigan, we are likely to prevail on the legal

3    side, the legal discussion on these constitutional

4    deprivations, on the fact that there's a fundamental

5    fairness, a due process, that's been violated; that there's a

6    procedural due process leg to the deprivation claim,

7    substantive due process of taking away a property right,

8    equal protection of treating people different because they're

9    unable to pay versus unwilling to pay; equal protection

10   because it treats debtors in the Commonwealth differently

11   from those with civil debts.

12        We are likely to succeed, I think, on all of it, but

13   we are certainly likely to succeed on one of them; and that's

14   the criteria that we're here today on.

15        Look at the physical evidence that we brought before

16   you, the physical evidence.  Again, Ms. Johnson testified in

17   terms of wanting to be able to do this; the inability to pay,

18   what it does to her; the likelihood that she should be able

19   to succeed on the merits because she was not given the

20   opportunity at the default time, not later, not earlier, but

21   at the time of default, to be asked -- and Ms. Ciolfi asked

22   her:  Were you asked could you pay?  How could you pay?

23   Could you do community service?  Those things, nobody asked

24   her, because it doesn't exist in our system.  It doesn't

25   exist at that time, the time before default.

157

```
1              You heard Dr. Peterson testify, $1,200 to get out of

2    jail, no rational person would not pay that money unless they

3    were unable to pay.  That's the uncontroverted evidence from

4    a Harvard Ph.D. economist that came here from Arlington,

5    Massachusetts, outside of Boston.  That's his testimony.

6              You heard Dr. Pearce that, again, basic needs, the

7    inability to pay for basic needs, if you put one more dollar

8    on the payment plan, that person is going to not -- these

9    people can't even afford their basic needs, but you're going

10   to add to it.

11             Again, the inability to pay is fundamental to these

12   constitutional rights.  If you're just going to set up that

13   system that automatically does it, it's just not there.

14             You heard irreparable harm.  You heard it from

15   Ms. Johnson.  You heard it from Dr. Pearce.  You heard it

16   from Dr. Peterson.  Those caught up in this vicious cycle,

17   they continue to suffer immediate and irreparable harm.

18             And I don't know how the Commonwealth can come up

19   and say that those people aren't being harmed on a daily

20   basis, in a society that we should not do that.  We should be

21   giving people an opportunity to lift themselves up.  We

22   shouldn't be forcing them down.

23             That may sound like a political speech, but that's a

24   constitutional fundamental fairness if it's based on

25   inability to pay versus ability to pay.
```

158

1          We're not saying get rid of the system for people

2     that can pay.  If somebody -- if you have this injunction

3     that's in place, it's not getting rid of any of the things

4     that the state has the ability to do.  Let them ask the

5     person: Can you pay?  Test it.  Can you pay?  Because I'm

6     going to pay if I have the money.  I'm not going -- as

7     Dr. Peterson says, I'm not going to put myself in jeopardy of

8     going to jail.  I'm not going to put myself in jeopardy of

9     going to court.

10          If you have that pre-deprivation hearing, the

11     constitutional rights will be acknowledged.  The equities are

12     clearly in favor.  The Commissioner has no hardship enforced

13     upon him by following this constitutional standard.  If you

14     are following the Constitution, again, by asking this

15     question, are people unable to pay versus able to pay, again,

16     that is not a hardship on a Commissioner when close to a

17     million Virginians or, again, if it's the 700,000, have been

18     stripped of their right because they're too poor.

19          The Attorney General, who they work for, said in his

20     interview we cannot have a justice system that determines

21     fairness and freedom based on wealth and means.

22          That is the system we have with an automatic

23     suspension of licenses.

24          And, again, Judge Moon, you said yourself in that

25     opinion, it may very well violate plaintiffs' constitutional

1    rights to due process and equal protection.

2           You should stop it today.  Stop it today, until we

3    find out the ultimate issue in this case of the violation of

4    the plaintiffs' constitutional rights to due process and

5    equal protection.

6           We put on all of this evidence.  It's overwhelmingly

7    in our favor to enter this injunction now so that it doesn't

8    continue to happen to more Virginians, to put them in this

9    vicious cycle that could ultimately end up in jail time.  But

10   even if it doesn't, it's keeping them from having a protected

11   property right, keeping them from satisfying the basic needs

12   that they need to to support their families and to be a

13   productive part of this society.

14          We ask you today to stop it today, and then we can

15   go on, we can have whatever hearings we want, we can come in

16   and we can deal with the constitutional issues, but this

17   should stop today.

18          I pass it to Ms. Ciolfi and she can answer the three

19   specific questions that came up with regard to the payment

20   plan, redressability, and interpretation.

21          Thank you, Your Honor.

22          MS. CIOLFI:  Your Honor, I really appreciate the

23   time that the Court has given us to put on our case today,

24   and I just want to address a few matters that came up during

25   the testimony.

1          You heard a lot about payment plans today.  And as

2     an initial matter, it is important to stress that the

3     plaintiffs are not challenging the availability of payment

4     plans, the availability of community service and debt

5     forgiveness.

6          The availability, or lack thereof, of these

7     alternatives does nothing to change the fact that when a

8     payment is due and not received, the nonpayment is assumed by

9     the Commonwealth to be willful for the purpose of license

10    suspension.

11         And so putting aside the questions, serious

12    questions, about whether plaintiffs -- or whether defendants

13    in criminal traffic cases receive adequate notice of the

14    availability of these alternatives, their hypothetical

15    availability of payment plans or community service is no

16    substitute for a pre-deprivation hearing or a determination

17    of willfulness, which is required before the state can take

18    action to punish nonpayment.

19         And, in fact, Ms. O'Shea's questioning of Dr. Pearce

20    about an individualized determination of ability to pay only

21    demonstrates the need for that kind of inquiry before the

22    state takes action to penalize a person for nonpayment.

23         In rejecting a similar defense from the Tennessee

24    Commissioner Judge Trauger in the Middle District of

25    Tennessee says, "What the plaintiffs seek is not merely the

161

1    opportunity to throw themselves upon the mercy of the Court

2    in a proceeding in which indigence may be one factor of many

3    for the Court to consider or disregard; they seek the right

4    to a pre-deprivation hearing in which they are allowed to

5    demonstrate their eligibility for an exception based on

6    indigence."

7         I also want to address the references to debt

8    forgiveness, which came up during Ms. Johnson's testimony and

9    also has been in the Commonwealth's briefs.  Those references

10   to Virginia Code 19.2-358(C) are misleading.  The forgiveness

11   of court debt is available only upon the issuance of a show

12   cause by a Court or a prosecutor for failure to pay which may

13   result in the defendant's confinement or the imposition of an

14   additional fine.

15        So it's simply not the case that one of our

16   plaintiffs could walk into court and ask for debt

17   forgiveness.  And it's only in the event of a successful

18   defense to the show cause does the Court even have the option

19   of considering debt forgiveness.  And the show cause statute

20   doesn't address license suspension at all.

21        There have been amendments to the code regarding

22   payment plans, but those ultimately have nothing to do with

23   the plaintiffs' challenge to the automatic suspension

24   statute.  They didn't amend the suspension statute.  And the

25   lack of a meaningful alternative can be inferred from the

1   fact that the Commissioner continued to suspend licenses each

2   month for failure to pay court costs and fines from February

3   2017, when first the Supreme Court ruled, and then later that

4   year, in July, the statute which made those amendments to

5   payment plans.  The Commissioner continued to suspend

6   licenses, tens of thousands of licenses each month, for

7   failure to pay.  And as of December 2017, ten months after

8   the rule went into effect, there were still nearly a million

9   licenses suspended.

10          I suspect the Commissioner is going to rely heavily

11   on the wording of the statute where it says "The Court shall

12   forthwith suspend" and cleave to the Court's previous holding

13   that every conviction involving the assessment of court debt

14   immediately triggers a court-ordered suspension of the

15   defendant's license that is a legal reality without

16   involvement by the Commissioner.

17          But this interpretation simply fails to make sense

18   of the text of that statute.  It renders the statute

19   inconsistent with related statutes, which clearly gives

20   30 days to pay in order to avoid license suspension, and

21   conflicts with the interpretation of that statute, the

22   authoritative interpretation of that statute, by two distinct

23   Courts of Appeals, Virginia Courts of Appeals, in *Plummer* and

24   *Carew*.

25          And, in fact, under the statute as interpreted by

1    the Virginia courts and as alleged in the amended complaint,

2    payment is due 30 days after sentencing, not immediately upon

3    assessment.  The suspension of the driver's license is

4    triggered by the failure to pay within 30 days, not at the

5    moment of conviction.  And the suspension is not effective

6    until it is implemented by the DMV and the debtor receives

7    notice of that implementation.

8           It's just not plausible that everyone who is

9    convicted of an offense is walking around with a latent

10   license suspension hanging over their heads.  That's not, in

11   fact, what the Commonwealth said in 2017 when we were back

12   here arguing the motion to dismiss, and it's not what two

13   different Virginia Courts of Appeals have held.

14          And on what the Commonwealth said, quoting from the

15   transcript of the motion to dismiss hearing at page 15, Ms.

16   O'Shea, in response to the Court's questioning, said, "I'm

17   talking about at the time of your criminal conviction and the

18   Court says, 'You owe us $500.  Pay us $500.  You have 30 days

19   to pay under the statute.'  There is no suspension at all

20   until the 30 days has lapsed and you haven't paid, and that's

21   when the suspension goes into effect."

22          Your Honor, *Plummer* and later in -- as recently as

23   2013, in *Carew*, the Virginia Court of Appeals has made it

24   clear that it is the DMV, not the sentencing court, that

25   suspends the driver's license, and that the suspension is not

1    self-executing but occurs after the DMV executes the

2    suspension.

3            That makes it different from the colloquy that Your

4    Honor had with Ms. O'Shea earlier about licenses that are

5    suspended for driving reasons, where the person has actually

6    been tried and convicted of a driving offense and is standing

7    right there in the court when the Court orders the

8    suspension.

9            And then, finally, to address some of the standing

10   issues, the plaintiffs, of course, contend that it's the DMV

11   that actually suspended their licenses, but even if one

12   relies on the statutory language to conclude it's the courts,

13   the plaintiffs' injuries are nevertheless directly traceable

14   to the Commissioner's conduct in implementing those

15   suspensions, which cannot be accomplished legally, according

16   to the Court of Appeals in *Plummer* and *Carew*, without action

17   by the DMV, regardless of any upstream activity by the

18   courts.

19           And in a case, an opinion issued just a couple of

20   weeks after this Court rendered its decision in the motion to

21   dismiss in 2017, in *Lamar versus Ebert*, the Fourth Circuit

22   made it absolutely clear that in challenging a statute's

23   constitutionality, the fact that the defendant, quote, "is

24   but one of several persons or entities in charge of

25   implementing it is not controlling," unquote, so long as

1    there's a causal connection.  That's *Lamar versus Ebert*,

2    which is cited in our briefs.  It's 2017 WestLaw 1040450, at

3    page 5.

4           The amended complaint at paragraphs 62 to 84

5    describe the Commissioner's role in enforcing the statute,

6    that's corroborated by Ms. Ford here today, including the

7    Commissioner's overall responsibility for the issuance and

8    suspension of driver's licenses, the Commissioner's specific

9    role in working with OES to develop and implement an

10   automated system to enforce the statute, the Commissioner's

11   maintenance of an database of individual driver profiles that

12   are updated based on information received from the state, and

13   the fact that, as you'll see from Exhibit 3 of the amended

14   complaint, that the Commissioner issues automatic suspensions

15   without confirming the existence of a Court order and, in

16   many cases, when there is no evidence thereof.

17          The Commissioner further will not reinstate the

18   plaintiffs' licenses until they satisfy their court debt

19   entirely or obtain payment plans and then, should the

20   plaintiffs ever become eligible to reinstate, the

21   Commissioner would first have to be paid $145, at least,

22   possibly more if they have multiple orders.

23          Turning to redressability, and then I'll wrap up:

24   Redressability turns on whether an order from this Court

25   would provide meaningful relief to the plaintiffs.  And it

1    would.  If the plaintiffs are successful in proving that the

2    suspension process is constitutionally flawed, this Court

3    could declare Virginia Code 46.2-395 unconstitutional, which

4    would invalidate the suspensions flowing from it.

5           Moreover, the Court could order the Commissioner to

6    remove the unconstitutional suspensions from DMV's database

7    and enjoin the Commissioner from participating in future

8    enforcement of the statute.

9           It's, again, the DMV that makes these suspensions

10   meaningful because everyone, including law enforcement and

11   the courts -- I don't think there's any disagreement about

12   that -- relies solely on the information maintained by the

13   DMV to document license suspensions.

14          Once those suspensions are removed from the

15   database, the plaintiffs would not have to pay reinstatement

16   fees, they would not be arrested for driving on suspended

17   licenses, and they would be able to provide proof of a valid

18   license to employers.

19          In other words, removal of these invalid suspensions

20   from the database would free most of the plaintiffs from the

21   terrible dilemma they now face: driving illegally and risking

22   incarceration, or staying at home and failing to pay off

23   their court debt or meet the needs of their families.

24          Importantly, none of these changes would affect the

25   manner in which Virginia courts go about the business of

1    assessing and collecting fines and costs.  The Courts could

2    still enter judgments imposing fees and costs; court clerks

3    could continue to enter payment information into the system,

4    which would continue to flag accounts in default.

5         The Court could also issue orders to show cause for

6    failure to pay, make contempt findings, impose fines or jail

7    time, garnish wages, impose liens on personal property, and

8    obtain hold-backs from the tax department from federal and

9    state tax refunds.  All of the remedies currently available

10   to the courts to enforce judgments, assessing fees and costs,

11   would remain available to them.  The only thing that would

12   not happen is that the DMV would no longer issue a driver's

13   license suspension upon receiving notice of nonpayment.

14        And, finally, perhaps the best proof that the courts

15   need not be part of any relief is that the Commissioner is

16   currently working on a system where a debtor can walk into a

17   DMV customer service center and pay all of their court debt,

18   and DMV will reinstate their license without any court

19   involvement.  That is a system that is being worked on and

20   reported on by the Commissioner.  And you'll see that is

21   attached to our -- the letter from Commissioner Holcomb to

22   the General Assembly is attached to our amended complaint at

23   Exhibit 4.

24        And the point is, if the Commissioner's customer

25   service representatives can accept payment from the

1    plaintiffs and remove their suspensions that were issued

2    under the Virginia Code 46.2-395, and reinstate their

3    licenses upon payment of the $145 fee, all without any action

4    by the convicting courts, then certainly the Commissioner

5    could comply with an order from this Court to remove the

6    unconstitutional license suspensions.

7            Thank you.

8            THE COURT:  Okay.

9            MS. O'SHEA:  Good afternoon, Your Honor.

10           Mr. Blank stood up before the Court and he gave you

11   a litany of reasons why he believes that we are here in the

12   courtroom today.  I would submit to the Court that there is a

13   question on the part of the DMV Commissioner as to why we are

14   here in the courtroom today.

15           In the Court's detailed prior opinion, the Court let

16   the plaintiffs know, with no uncertainty, that they had sued

17   the wrong defendant.  The DMV Commissioner does not suspend

18   licenses for failure to pay fines and costs.  They are

19   seeking a remedy against a defendant who is not empowered to

20   grant the relief that they seek.  There are other forums.

21   There are policymaking forums and there are the courts.

22           THE COURT:  If the Commissioner did not make

23   available to the police the records, then that would go a

24   long ways toward --

25           MS. O'SHEA:  Well, not necessarily.  I still don't

1    think that that wouldn't erase the fact that the Court issued

2    the suspension in the first place.

3         The analogy I would make would be to, like, a VCIN,

4    or an NCIC report, the criminal records that are made

5    available by computer to a police officer.  VCIN, for

6    example, is run through the state police, the Virginia state

7    police.  And so a police officer pulls over somebody or

8    interacts with somebody, pulls up their VCIN, and sees what

9    their criminal record is.

10        This Court could order, perhaps, the Department of

11   the State Police to take a conviction off of that abstract so

12   it would no longer be available to the officer who was

13   looking to see what a person's prior convictions were.  For

14   example, maybe he's trying to see if they have prior petty

15   larceny convictions to make a petty larceny third.

16        Taking a conviction off the transcript doesn't make

17   the conviction go away.  It still exists.  It's still on the

18   Court order.  It may not be available to as many people.  The

19   record of it might not be disseminated as freely to the

20   public and other law enforcement agencies, but the conviction

21   still exists.

22        THE COURT:  Well, if the Court should rule that the

23   process is unconstitutional and say that the Commissioner

24   cannot do anything to enforce the law, I mean, the ruling

25   would affect the courts, too.

1          MS. O'SHEA:  Well, Your Honor, I think that relies

2     on the faulty supposition that the Commissioner enforces the

3     order.  The Commissioner is the record-keeper for these

4     suspensions; he puts it on the transcript, but he doesn't

5     enforce them.  He updates the information and puts it on the

6     database, certainly, but he's not the enforcing entity.  The

7     courts are.  The court clerks are, not the Commissioner.

8          The plaintiffs are asking this Court to judicially

9     rewrite the statute, to give the Commissioner a role he does

10    not have and the General Assembly has not seen fit to give

11    him.

12         In this role specific to fines and costs,

13    suspensions, he is a record-keeper and not an actor.  They

14    need to bring their suit against an actor.

15         THE COURT:  What is the remedy of the debtor when

16    the license is suspended and he sends the -- he gets the

17    letter, I guess, from the court, some form comes from the

18    court, saying your license has been suspended because you did

19    not pay the fine and costs.  Okay?

20         MS. O'SHEA:  Yes.

21         THE COURT:  What is his remedy then?

22         MS. O'SHEA:  To go to the court that issued the

23    suspension and talk to the Court, go in and talk to the judge

24    in chambers, like you heard one of the witnesses talk about;

25    enter into a payment plan; apply for a restricted license; do

1    all of those things that are made available to you as a

2    judgment debtor under Virginia law.  But to go to the courts.

3           If you were to show up at DMV headquarters and say,

4    hey, the Court suspended my license for nonpayment of fines

5    and costs, there's nothing the DMV Commissioner can do for

6    you.

7           THE COURT:  But even if he paid the court costs, all

8    he gets is a right to go to DMV to pay another $145 to get

9    his license.

10          MS. O'SHEA:  To get his license completely restored,

11   yes, but not to undo the suspension.  The suspension is

12   undone upon the payment, and then it's marked as restored

13   once you pay the reinstatement fee.

14          THE COURT:  Right.  But he can still be convicted in

15   between the time he pays his court fees and the time that --

16   if he drives, in between the time he pays his court fees and

17   pays the $145.

18          MS. O'SHEA:  Not for driving on a suspended license.

19   It would be for driving without a license, which is

20   different.

21          So it's different, Your Honor.  The suspension is

22   undone once you pay that to the court.  You don't have an

23   effective license, but you also don't have a suspended

24   license, which implicates different principles.

25          THE COURT:  But if you're poor, maybe you can pay

1    the court all your money, but then you can't -- you don't

2    have the $145 to pay the Commissioner.

3              MS. O'SHEA:  But you're not suspended.

4              THE COURT:  But you're still hurt, because if you

5    pay the court all your money to get rid of the fines and

6    costs, you still owe the $145, and you might not be able to

7    pay it.

8              MS. O'SHEA:  You do owe the $145 to the Department

9    of Motor Vehicles to get an effective license.

10             THE COURT:  There's no forgiveness there.  I mean,

11   right?

12             MS. O'SHEA:  I don't believe so.  That's the statute

13   that was set up by the General Assembly.  The Commissioner

14   doesn't have any discretion there, either.

15             THE COURT:  Well, I know, because the state can't

16   just charge people money without some sort of process.

17             MS. O'SHEA:  Well, but the state can condition the

18   granting of a privilege upon the payment of money.  That's

19   what they do with going to get your driver's license in the

20   first place.  You don't get a driver's license for free.

21   There are other privileges that you don't get for free,

22   either.  The state can condition --

23             THE COURT:  But the DMV then is getting the

24   advantage of what the plaintiff says is an unconstitutional

25   process.

```
 1            MS. O'SHEA:  What they say is an unconstitutional

 2   process.

 3            THE COURT:  Well, that will be determined.

 4            MS. O'SHEA:  Right.

 5            THE COURT:  But still, if it's an unconstitutional

 6   process that the state has imposed on the courts, that

 7   requires the courts to act in an unconstitutional way through

 8   the statute, then they're getting a second crack at it by

 9   requiring the Commissioner to collect $145 and send them $100

10   and the Commissioner takes -- keeps $45.  Or I guess it goes

11   in the general fund as a matter of accounting, but still, the

12   Commissioner is getting the -- the Commissioner is enforcing

13   the $145 extra charge.

14            MS. O'SHEA:  Right.  But the $145 is separate and

15   apart from the suspension.  It's not part and parcel.

16            THE COURT:  It wouldn't be there except for the

17   suspension having occurred.

18            MS. O'SHEA:  I'm not a hundred percent certain that

19   that's true.  Like, if I allow my driver's license to lapse

20   and I don't get it renewed, I don't know if there's --

21            THE COURT:  That's not this situation, though.  Your

22   license is suspended because you didn't pay the fines and

23   costs.

24            MS. O'SHEA:  Right.  What I'm saying is, I don't

25   know if this $145 is only for people who seek reinstatement
```

1    after suspension, or it's for anybody who seeks reinstatement

2    after a license stops being effective.

3         THE COURT:  Well, everybody -- you have to do

4    something to owe the $145.

5         MS. O'SHEA:  Correct.

6         THE COURT:  But here, taking the plaintiffs' case,

7    unconstitutionally the defendant, the debtor, is put in a

8    position where he owes the $145.

9         MS. O'SHEA:  If -- but --

10        THE COURT:  Or he loses a property right, which is

11   his driver's license, or is not able to have it restored to

12   him.

13        MS. O'SHEA:  Correct.  So the argument there, A, it

14   presupposes that there was an unconstitutional deprivation in

15   the first place, which the Commissioner contests; and B, I'm

16   not aware of any case law that says that the Commonwealth

17   can't --

18        THE COURT:  Well, if it's not unconstitutional,

19   there's no problem.

20        MS. O'SHEA:  There's no problem.

21        THE COURT:  So, I mean, just presuming for the --

22   assuming hypothetically that it's an unconstitutional

23   process, either the courts did it all in -- I don't want to

24   say "cahoots," but following the directions of the

25   legislature, still there's a separate -- the debtor still has

175

1    to pay this other $145, which comes about because of the

2    unconstitutional process in the court.

3         MS. O'SHEA:  Right, assuming that it's an

4    unconstitutional process in the court.

5         THE COURT:  Okay.

6         MS. O'SHEA:  Right.

7         THE COURT:  And Judge Gregory was quite impressed

8    with that fact, as I recall.

9         MS. O'SHEA:  Right, Judge Gregory and only Judge

10   Gregory.

11        THE COURT:  Well, you don't know.  The others said

12   they didn't -- they didn't say they disagreed with Judge

13   Gregory in that respect.

14        MS. O'SHEA:  They elected not to reach the issue.

15        THE COURT:  Right.

16        MS. O'SHEA:  But I wanted to address, though, Your

17   Honor, the two Court of Appeals cases that were brought up

18   from the Virginia Court of Appeals.

19        THE COURT:  Right.

20        MS. O'SHEA:  The *Plummer* case was from 1991.  And in

21   1991, the statutory suspension mechanism gave the

22   Commissioner the authority to suspend for fines and costs.

23        The statute was amended in 1994.  So the version of

24   the statute that was being construed by the Court of Appeals

25   in 1991 included the Commissioner as a suspending entity.

176

 1            The General Assembly took that out in 1994.  And so

 2    to the extent that *Plummer* at all stands for the rather

 3    tenuous proposition that DMV is the suspending entity, the

 4    General Assembly changed the statute.  So *Plummer* can no

 5    longer be considered good authority for that particular

 6    proposition.

 7            The other Virginia Court of Appeals opinion that was

 8    cited was *Carew v. Commonwealth* from 2013.  That case dealt

 9    with an administrative DMV suspension, a suspension that is

10    done by DMV.  And the DMV will admit that they do.  So you

11    can't take *Carew* out of context and say, based on *Carew*, now

12    the Virginia Court of Appeals thinks that DMV does all

13    license suspensions.  That is too big of a stretch.

14            So, Your Honor, the Commissioner maintains, for all

15    of the arguments that we raised initially and that we've

16    raised now in this current iteration of the litigation, that

17    he is immune from suit, that he's not the right person to

18    have sued here.

19            And even setting aside that, *Rooker-Feldman* still

20    applies, from the Commissioner's perspective, because they're

21    still challenging an aspect of the initial Court order of

22    conviction, and rather than doing that through the state

23    courts, they've elected to bring it to the federal court

24    system.

25            I mean, one of these plaintiffs, according to his

1    allegations in the complaint, Mr. Stinnie, the lead named

2    plaintiff, was just convicted for driving on a suspended

3    license.  For a defense, rather than appealing that up

4    through the Virginia state court systems and raising his

5    arguments anew, he didn't.  He's here in federal court.

6           THE COURT:  Well, if you don't pay the fine, then

7    you go back to the Court and ask the Court to reduce, give

8    you a different payment plan, and you disagree with what the

9    Court did, what's the procedure for appealing that?

10          MS. O'SHEA:  For appealing the Court not changing

11   the fine?  Well, I think that you have to --

12          THE COURT:  For not giving you a payment plan that

13   you can get along with.

14          MS. O'SHEA:  I don't know that you can appeal the

15   payment plan, but what you can appeal is your criminal

16   sentence at the time it's given.

17          I mean, in Mr. Stinnie's case, a jury elected to

18   find him --

19          THE COURT:  Well, that seems to be the problem.  The

20   defendant may think he's able to pay at the time, he's

21   waiting for a payday loan on Saturday or he's going to -- you

22   know, expecting a bonus or a gift over the weekend, and then

23   that doesn't come through.

24          Can they -- you know, I guess you've got ten days.

25   You used to have ten days to appeal.  But anyway, after the

1    appeal time has gone by, something might intervene and he's

2    not able to pay.  I don't see that that -- doesn't seem he

3    has any appeal from that.

4         MS. O'SHEA:  He could, under Virginia state law

5    precedent, file a petition for modification.

6         THE COURT:  Right.

7         MS. O'SHEA:  And if the Court denied the petition

8    for modification, then there is a denial of a request that

9    would form the basis for a resulting appeal.

10        THE COURT:  Good luck on getting a lawyer that would

11   be cheaper than paying the fines and costs.

12        MS. O'SHEA:  It could be, but that doesn't mean that

13   remedy is not there.

14        THE COURT:  Right.

15        MS. O'SHEA:  If you've got a problem with the way

16   the courts are structuring the payment plans, you need to

17   raise that in the courts and give the Virginia state courts a

18   chance to fix that.

19        You heard testimony from the two court clerks today

20   that it's different across the Commonwealth.  Different court

21   clerks are going to offer different payment plans and they're

22   going to administer them in different manners.  And to the

23   extent that there's a problem with the way in which the

24   payment plans are offered and administered, that's an issue

25   that needs to be taken up with the courts and the court

1    clerks.

2          The Commissioner doesn't even know how much money

3    people owe in fines and costs.  He has no idea if a payment

4    plan has been offered or has been appropriately structured.

5    That's not --

6          THE COURT:  At this point, though, if the -- he

7    knows what the process is, and if the process is

8    unconstitutional on its face, then -- in particular, on its

9    face, then he would not -- he couldn't enforce an

10   unconstitutional process, or should not.

11         MS. O'SHEA:  Well, he's not enforcing it.

12         But to the broader question, the statute is not

13   unconstitutional on its face.  In order to make a facial

14   challenge to a statute, you have to show that the statute

15   cannot be constitutional under any application.

16         And all the plaintiffs said in a footnote in their

17   complaint that they were bringing a facial challenge to the

18   statute.  In argument today they seem to have conceded that

19   there are circumstances under which the statute can operate

20   constitutionally, meaning when someone who has the ability to

21   pay and deliberately fails to do so has their license

22   suspended.  They haven't raised any sort of plausible

23   argument that that scenario would violate the Constitution.

24         THE COURT:  Well, why wouldn't even that person be

25   entitled to notice and the right to be heard?

1          MS. O'SHEA:  They get notice.  They have notice.

2          In fact, Ms. Johnson testified today that she knew

3     that if she didn't pay her fines and costs, her license was

4     going to be suspended.  Notice is --

5          THE COURT:  Well, what's the right to be heard,

6     then?

7          MS. O'SHEA:  The right to be heard exists at the

8     time of your criminal sentence.  The right to be heard

9     attaches --

10         THE COURT:  Well, that's before you have the

11    problem.

12         MS. O'SHEA:  "Before you have the problem" meaning

13    your inability to pay fines and costs?

14         THE COURT:  Right.

15         MS. O'SHEA:  There's an ability to be heard and a

16    mechanism that the Virginia General Assembly has set up in

17    the statutes that says that you can petition for

18    modification, that says that you can go to the Court after

19    the fact and say, hey, I can't afford this, I need a change.

20         The Virginia Supreme Court enacted in Rule 1:24, and

21    that the General Assembly codified just last year, that you

22    have the opportunity to be heard, and that opportunity is in

23    the courts.  The opportunity is not before the DMV

24    Commissioner, who has no ability or authority to convene a

25    pre-deprivation or post-deprivation ability-to-pay hearing

1  with respect to fines and costs, that he doesn't even know

2  how much they are.  That's not his role.  That's not his

3  bailiwick.  This is not an issue that he can redress.

4          I'm happy to talk more about the specifics of the

5  equal protection analysis or the procedural due process

6  analysis, if the Court wishes.  I've spelled it all out in

7  the briefs, Your Honor.

8          THE COURT:  Yeah.

9          MS. O'SHEA:  I did want to note with respect to the

10  out-of-circuit precedents that have been cited by the

11  plaintiffs, the cases from Tennessee, the case from Michigan,

12  the Tennessee cases have been stayed pending appeal.  That

13  case is notable in that the DMV -- the Tennessee statute for

14  suspension for nonpayment of fines and costs, the person who

15  suspends there is the Commissioner; and that's why they sued

16  the Commissioner of the DMV, because that's what the

17  Tennessee statute says.

18          It's the same in Michigan.  In Michigan, the

19  Secretary of State suspends for nonpayment of fines and

20  costs.  And so the Court in Michigan, in a suit brought

21  against the Michigan Secretary of State, said, well, the

22  Secretary of State needs to have some sort of ability-to-pay

23  hearing.

24          So those cases are distinguishable from these

25  circumstances both in that it deals with different statutes

182

1    and in that the person who is responsible for the enforcement

2    mechanism and the determination of the ability to pay was, in

3    fact, before the Court. And that's not what we have here.

4         By contrast, I did want to point out that the

5    Eleventh Circuit recently affirmed Florida's statute, very

6    similar to Virginia's, against a due process challenge that

7    was raised in that jurisdiction. And that Eleventh Circuit

8    Court case is *Evans v. Rhodes*. We had cited to an earlier

9    version of it, but now it was affirmed earlier this year.

10   And the cite for the Eleventh Circuit case is 735 Federal

11   Appendix 986.

12        So the Eleventh Circuit, to my knowledge, is the

13   first federal Court of Appeals to address this issue. They

14   addressed it and they affirmed the judgment of the district

15   court that upheld the Florida statute against a very

16   analogous due process that was brought by courts -- brought

17   in courts in that jurisdiction.

18        Just briefly touching on the irreparable harm

19   question, this Court should not presume irreparable harm,

20   particularly not as to an entire class of individuals who are

21   not before the Court.

22        For example, Ms. Johnson, who came up and testified

23   today, said that she is being irreparably harmed because she

24   might be able to get other jobs that might pay her more, but

25   I would note that she has not applied for a restricted

1   license, which is available to her under the terms of

2   Virginia law.  And I would also note she also testified that

3   she has other miscellaneous expenses, like a $100 phone fee,

4   that could easily be taken and applied to a court payment

5   plan.

6          So I would hesitate to presume irreparable harm in

7   this particular context.  And I think that the Fourth Circuit

8   has expressly said that you don't presume irreparable harm,

9   even in a constitutional context, outside of cases involving

10  the First Amendment and the Fourth Amendment right to privacy

11  in your home.

12         So the bottom line on irreparable harm, they're

13  basically just alleging economic injuries; and that, by its

14  very definition, is not irreparable.

15         With respect to the public policy prong of the

16  injunction analysis, I wanted to note that if this Court

17  says, hey, Commonwealth of Virginia, Department of Motor

18  Vehicles, whatever entity is bound by this particular Court

19  order, you can no longer enforce Code Section 46.2-395, you

20  can't do it, Virginia basically would be left with no

21  enforcement mechanism as to its fines and costs.

22         Despite what the plaintiffs argue, the only other

23  alternative that would be available would be a show cause,

24  leading to incarceration.  Incarceration is surely a much

25  harsher measure.  And I believe the United States Supreme

1    Court has said that you can't incarcerate where someone

2    refuses to pay fines -- or cannot pay fines and costs and is

3    indigent, that you're implicating their liberty interest at

4    that point.

5         THE COURT:  Well, what's wrong with if the only

6    person you would incarcerate would be that one that willfully

7    was not paying?

8         MS. O'SHEA:  Because the Commonwealth still needs to

9    have an enforcement.  You have a line there between people

10   who are willfully not paying -- okay, fine, incarcerate those

11   individuals -- and individuals who claim that they can't pay.

12   But there's a bit of a question mark associated with that.

13        THE COURT:  Back in my time in state court, I mean,

14   there was sort of an assumption that if someone didn't pay

15   their child support, if you put them in jail, probably by the

16   end of the week the family -- somewhere the money would show

17   up.  It wouldn't necessarily be from the person in jail, but

18   all the family would feel bad and get together and pay it.

19        But that's not proper, to put people in jail in the

20   hope that somebody will come along.

21        MS. O'SHEA:  Well, I agree.  And that's why

22   incarceration is a last-ditch effort.  That's not what the

23   courts want to resort to doing, if they can.

24        THE COURT:  Well, but here you're taking their

25   property.

185

 1           MS. O'SHEA:  Which is a lesser measure.

 2           THE COURT:  Well, I know it, but you're taking their

 3   property when they cannot -- they cannot pay.  They shouldn't

 4   be punished if they cannot pay.

 5           MS. O'SHEA:  I would argue it's not punishment, at

 6   least not in the constitutional context, when you take away

 7   someone's privilege to drive.  That's not punishment.  That

 8   is giving them --

 9           THE COURT:  Well, if you charge them an extra $145,

10   I mean, that's --

11           MS. O'SHEA:  I don't know that you can call that

12   punishment, either, Your Honor, at least not within the

13   constitutional context.

14           THE COURT:  Well, if it's keeping you from having

15   your car --

16           MS. O'SHEA:  My point, Your Honor, is that there are

17   fact-finders, there are juries, that impose these fines, and

18   they impose them for a reason, and they become part and

19   parcel of a criminal order of conviction.  And the

20   Commonwealth of Virginia has an interest in continuing to

21   have some enforcement mechanism to go with those fines that

22   have been assessed by the juries, by the voices of the people

23   who live in the Commonwealth of Virginia.

24           The Court shouldn't strip them of what is one of

25   their only ways of trying to incentivize people to comply

1   with these Court orders, because otherwise, the only option

2   that's going to be left to the Court is incarceration.  And

3   nobody wants that.

4           So I also wanted to note, Your Honor, that enjoining

5   the Commissioner from updating DMV transcripts -- because

6   that's basically what that would be.  It would be saying,

7   record-keeper, when you get a suspension notice from the

8   court, don't put it in your system.  It's not going to stop

9   the courts from issuing those orders.  And the plaintiffs

10  admitted as much.  The injunction they're seeking, then,

11  isn't tailored to the actual outcome they want.  Not having

12  updated DMV transcripts isn't going to change the fact that

13  these licenses have been suspended for nonpayment of fines

14  and costs.  It's not going to stop the Commonwealth from

15  being able to charge these individuals with driving on a

16  suspended license.  All it's going to change is the type of

17  proof that is offered in those conviction proceedings.

18  Rather than being a DMV transcript, you're going to get

19  certified Court orders.  It's not going to change anything.

20          I would note, to the extent that the plaintiffs have

21  asked this Court to order full restoration of the five

22  plaintiffs' driver's licenses, two of the plaintiffs have

23  their driver's licenses; they're not suspended right now.

24  Well, actually, one is not suspended and the other has a

25  learner's permit.  It's not clear that he ever even had a

1    valid driver's license.  And that would be Williest Bandy

2    from Norfolk.

3           With respect to the other three, if the Court is

4    entertaining this at all, then I would submit that there

5    would be need to be some inclusion in the Court order for

6    restoration only to the extent that they are otherwise

7    eligible, because I don't know -- for example, they might

8    have enough points on their license or other things outside

9    the context of fines and costs that would also bar them from

10   having a valid driver's license.

11          THE COURT:  Well, the Court couldn't do anything but

12   what's connected with this case.  If they can't drive for

13   other reasons, that's --

14          MS. O'SHEA:  I understand.

15          THE COURT:  -- that's not --

16          MS. O'SHEA:  But to the extent that they've asked

17   for a broad injunction, saying nobody should be suspended in

18   the future for payment of fines and costs, period, like,

19   starting now, moving on, DMV, if you get these orders, don't

20   update the transcripts, I would submit that that's not

21   narrowly tailored to the issues present in this particular

22   dispute.  That's saying under no circumstances, regardless of

23   ability to pay versus, you know, just inability to pay, don't

24   enforce the statute.  And that's overbroad.  It paints too

25   far.

1          Ultimately, Your Honor, it's the plaintiffs' burden

2     of showing entitlement to a preliminary injunction.  And

3     they're asking for extraordinarily equitable relief, and they

4     need to show that they are likely to succeed on the merits

5     and all of the other elements that go part and parcel with a

6     preliminary injunction.  They have not.  They have not met

7     their burden.

8          The injunction would be ineffective.  It would not

9     stop the suspension orders from coming.  It would presumably

10    bind or affect parties who are not before the Court to state

11    their interests, like the court clerks, who are involved in

12    all of this very intimately at the clerk's office.

13         Now, I will certainly concede from a personal

14    perspective, if not from that of the Commissioner, that there

15    may very well be more effective ways to handle this problem.

16    I get that.  I think the Court gets that.  I think everybody

17    sitting in this courtroom gets that.  But the fact that there

18    might be more effective ways, from a policy perspective, of

19    handling the issue of indigent individuals who cannot pay

20    their fines and costs does not mean that they are entitled to

21    the preliminary injunction they seek.

22         Their arguments should be for the General Assembly.

23    Their economic experts should go to the General Assembly and

24    talk to the General Assembly or, at the very least, bring

25    these issues up through the state courts, who would be

1    empowered to actually address this issue.

2           As before this Court, this federal court is not the

3    appropriate forum.  This defendant, the Commissioner of the

4    DMV, is not the appropriate defendant.

5           This Court should -- in the exercise of its

6    discretion, the Court should stay its hand, let the case

7    develop, and deny the request for a preliminary injunction.

8           THE COURT:  All right.  Thank you.

9           MR. BLANK:  We're way over time, Judge, so I'm going

10   to be brief.  I'm not going to address all the things, but I

11   do want to address two specific points.  It really ends where

12   we started.

13          THE COURT:  Let me ask you one thing.

14          MR. BLANK:  Yes, sir.

15          THE COURT:  Does the Court have to first decide not

16   likely to prevail and that sort of thing?  With regard to the

17   jurisdictional issues, does the Court have to decide that the

18   case -- jurisdictionally the case can proceed?

19          MS. CIOLFI:  Judge, I don't think so, because that's

20   not actually before you today.  The preliminary injunction is

21   before you.  Their jurisdictional issues are not.

22          THE COURT:  Well, but if I don't have jurisdiction,

23   I mean, that -- is there any law, I mean, what --

24          MR. BLANK:  Your Honor, it may be the case where you

25   order the injunction and then say, I want to then, you know,

1   go to a jurisdictional hearing and deal with the

2   jurisdictional issue.  But I don't -- again, at this point in

3   time, that issue is not before you.

4          THE COURT:  Okay.

5          MR. BLANK:  If we're going to deal with that, we can

6   deal with it, but I don't think you have to deal with that up

7   front.  I agree with you jurisdiction is always the issue,

8   but that's not what is at issue in this hearing.

9          THE COURT:  Okay.

10         MR. BLANK:  Again, if there's immediate need and

11  irreparable harm, you can stop the practice; and then if they

12  come back and raise this issue on jurisdiction, we can

13  address it.

14         But, Judge, again, I want to deal with two quick

15  issues.  One is where we started -- sort of where we ended

16  with Judge Gregory in the Commonwealth and where we started

17  with Ms. Ciolfi today, and it's the "it's not me" argument.

18  They want to say, it's not me; it's the clerks, it's the

19  payment plan, it's the judges.  That's just not -- that's not

20  true and it's not required.  And first I want to say what's

21  not true.

22         There's not a shred of evidence before you that

23  there are orders by the Court to suspend the licenses for

24  failure to pay.  There's not a shred of evidence.  They

25  didn't bring it.  We had a circuit court clerk say that it

1    didn't happened.  We had a district court clerk say there's

2    no orders.  We had Ms. Ford say she didn't see any orders.

3    We had before you the auditor of public accounts say that the

4    DMV suspends.  We have four district court websites to say

5    it's the DMV.  And we have no Court orders.

6         And you -- again, Judge, back in the Court of

7    Appeals, and we cited to it, *McBride versus Commonwealth of*

8    *Virginia*, and it's time-honored, a Court speaks through its

9    orders and those orders are presumed to be accurate.

10        There is no Court order, so this idea when she --

11   when my learned opposition stands up and says, it's not the

12   DMV, it's the Court, the Court orders, Courts speak through

13   orders, and there are no orders.  And there's not a scintilla

14   of evidence that there's orders here.

15        What we have is a DMV that is directly involved in

16   the license suspension for failure to pay court debts and

17   fines.  You can say the court has something to do with it, as

18   Ms. Ciolfi said; you can say the DMV has all of it; but you

19   cannot say that the DMV is not involved in license

20   suspension.

21        And I made the point on cross -- again, it may have

22   seemed silly at the time, but I didn't think it was silly --

23   it doesn't happen without the DMV.  And the computers don't

24   talk to each other without the DMV.  And the convictions

25   don't get abstracted without the DMV.  And the $145 doesn't

1    get collected without the DMV.  And the suspension doesn't

2    happen without the DMV.

3          The DMV is involved.  You can say how much, but you

4    cannot refute that they are involved.  And without a Court

5    order, without any evidence of a Court order, and with all

6    the evidence that we put in from the public record that it is

7    the DMV, again, that issue shouldn't even be on the table in

8    terms of the order that you can enter.

9          And go back to the last two points.  There's not a

10   hint of due process, not a hint of it, with regard to that

11   time of default.  It's just not there.  There's nobody asking

12   the question of the ability to pay.  It doesn't exist.  The

13   default happens.  There's no due process.  It's not fair.

14         It shouldn't be -- in America, it shouldn't be -- if

15   it's not constitutional, this Court should stop that process.

16   And our order that we request is narrowly tailored to that.

17         "During the pendency of the action, the Commissioner

18   is enjoined from enforcing Section 46.2-395 against

19   plaintiffs and future suspended class members unless and

20   until defendant or another entity determines through a

21   hearing, with adequate notice, that their failure to pay was

22   willful."

23         That doesn't exist with what we've got right now.

24   She says that they should do it at the time of conviction.

25   There isn't even -- as you said, they could be waiting for

193

1    the payday loan.  It's 30 or 41 days down the path.  That is

2    not the time.  The time is T2.  And until we have a system

3    that says that that inability to pay versus willfulness to

4    pay, then you do not have a hint of due process.  We are

5    likely to prevail on its merits.  And the other issues and

6    the other elements, if you look at the totality of the

7    evidence that we presented today, is overwhelmingly in the

8    favor of the plaintiffs.

9            We ask you to enter this injunction.  Stop this

10   process now.  It is unconstitutional.

11           Thank you, Your Honor.

12           THE COURT:  All right.  Thank you all.  We'll recess

13   court.

14           THE MARSHAL:  All rise.

15   (Proceedings adjourned, 6:01 p.m.)

16                           CERTIFICATE

17      I, JoRita B. Meyer, certify that the foregoing is a

18   correct transcript from the record of proceedings in

19   the above-entitled matter.

20   /s/ JoRita B. Meyer                    Date: 11/19/2018

21

22

23

24

25