CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
12/21/2018
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
 DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

DAMIAN STINNIE, *ET AL*,

*Plaintiffs,*

v.

RICHARD D. HOLCOMB, IN HIS OFFICIAL
CAPACITY AS THE COMMISSIONER OF THE
VIRGINIA DEPARTMENT OF MOTOR VEHICLES,

*Defendant.*

CASE NO. 3:16-CV-00044

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

The plaintiffs in this putative class action have sued the Commissioner of Virginia's Department of Motor Vehicles, challenging the constitutionality of Virginia Code § 46.2-395 ("§ 46.2-395"), which requires the automatic suspension of drivers' licenses for failure to pay state court fines and costs. Plaintiffs have moved for a preliminary injunction to: (1) enjoin the Commissioner from enforcing § 46.2-395; (2) remove current suspensions of Plaintiffs' driver's licenses imposed under § 46.2-395; and (3) enjoin the Commissioner from charging a fee to reinstate Plaintiffs' licenses where there are no other current restrictions on their licenses. The parties briefed the motion, and the Court held an evidentiary hearing and oral argument. Based on the current record, the Court concludes that Plaintiffs are likely to succeed on the merits of their procedural due process claim because the Commissioner suspends licenses without an opportunity to be heard. The motion for a preliminary injunction will therefore be granted.

## I.     Background

This case was first filed with this Court in July 2016 and was dismissed without prejudice. (Dkt. 57). The Fourth Circuit dismissed Plaintiffs' appeal for lack of appellate jurisdiction. *Stinnie v. Holcomb*, 734 F.App'x 858, 869 (4th Cir. 2018). The Fourth Circuit

1

explained that this Court's "grounds for dismissal [did] not clearly indicate that no amendment in the complaint could cure the defects in the plaintiff's case." *Id*. at 861 (internal quotations omitted). Accordingly, on remand, in September 2018, Plaintiffs[1] submitted an amended complaint, alleging that § 46.2-395 "as written and as implemented by the [Virginia Department of Motor Vehicles ("DMV") Commissioner Richard D. Holcomb ("Commissioner")] . . . is unconstitutional on its face for failing to provide sufficient notice or hearing to any driver before license suspension." (Dkt. 84 ¶ 5). Plaintiffs also allege § 46.2-395 is "unconstitutional as applied to people who cannot afford to pay due to their modest financial circumstances." (*Id*.).

In their motion for preliminary injunction, Plaintiffs request that this Court: "(1) enjoin the Commissioner from enforcing Section 46.2-395 against Plaintiffs and the Future Suspended Class Members without notice and determination of ability to pay; (2) remove any current suspensions of [Plaintiffs'] driver's licenses imposed under Section 46.2-395; and (3) enjoin the Commissioner from charging a fee to reinstate the Plaintiffs' licenses if there are no other restrictions on their licenses." (Dkt. 90 at 2).

## II.    Findings of Fact

In assessing the appropriateness of this relief, the Court finds the following facts from the preliminary injunction record.

### A.

1. Plaintiffs are Virginia residents whose licenses have been suspended due to failure to pay court fines and costs. (Dkt. 90 at 5).

---

[1]    The plaintiffs named in the amended complaint are Damian Stinnie, Melissa Adams, Adrainne Johnson, Williest Bandy, and Brianna Morgan ("Plaintiffs"). They bring this action "for themselves individually and on behalf of all others similarly situated," seeking the certification of two classes: (1) a "Suspended Class" consisting of all persons whose drivers' licenses are currently suspended due to their failure to pay court debt pursuant to § 46.2-395 and (2) a "Future Suspended Class" consisting of all persons whose drivers' licenses will be suspended due to their failure to pay court debt pursuant to § 46.2-395. (Dkt. 84 ¶¶ 296–298).

2. Plaintiff Adrainne Johnson, a resident of Charlottesville, Virginia, is the mother of three children. (Dkt. 113 (Hr'g Tr.) at 15).

3. Johnson's license has been suspended "off and on since 2016," and is currently suspended for nonpayment of court fines and costs. (*Id*.).

4. Due to her lack of a license, Johnson struggles to get to the grocery store or meet her daughter's medical needs, and cannot take her son to, or attend, any of his sporting events. (*Id*. at 17, 19).

5. Johnson's lack of a license has impacted her employment, causing her to lose a job, preventing her from being hired, and frustrating her opportunities for advancement. (*Id*. at 17–19).

6. Johnson and her children currently share a single family home with another family, but with a better paying job, she would be able to improve her living situation. (*Id*. at 18).

7. Johnson's current income does not leave her with any money after necessary expenses each week. (*Id*. at 16).

8. At no time did any court inquire how much Johnson could afford to pay or inform her about the availability of alternatives to payments, and she has been unable to provide the requested amount. (*Id*. at 38–41).[2]

9. Plaintiffs Stinnie and Adams find themselves in similar circumstances. (*See* Dkt. 90-3 and 90-4).

---

[2] The convictions associated with Johnson's court fines and costs occurred before the codification of Supreme Court of Virginia Rule 1:24 and Va. Code § 19.2-354.1. Va. Code § 19.2-354.1 requires state courts to "give a defendant ordered to pay fines and costs written notice of the availability of deferred, modified deferred, and installment payment agreements." That code section also requires state courts to "offer any defendant who is unable to pay in full the fines and costs within 30 days of sentencing the opportunity to enter into a" payment agreement. Va. Code § 19.2-354.1(B). Rule 1:24 "is intended to ensure that all courts approve deferred and installment payment agreements consistent with §§ 19.2-354, 19.2-354.1."

10. Stinnie describes a "cycle of debt, license suspension, and more debt and incarceration for driving while suspended" that prevents him from improving his employment situation or meeting basic needs, such as medical treatment and housing. (Dkt. 90-3 at 2).

11. Adams's license is currently suspended because she cannot afford to pay court fines and costs. (Dkt. 90-4 at 1).

12. Adams's "rare and serious blood disorder" has prevented her from maintaining steady employment, and although she initially made payments on her court debt, she could not "keep [them] up and support [herself] and [her] son on [her] limited income." (*Id.*).

13. At no time before the suspension of their licenses were Stinnie or Adams asked about their financial circumstances or reasons for non-payment. (Dkt. 90-3 at 3; dkt. 90-4 at 2).

14. Plaintiffs Bandy and Morgan's licenses were suspended for several years and were recently reinstated, but both face imminent suspension because they cannot afford the payments required by their payment plans. (Dkt. 90-6 at 1; dkt. 90-7 at 1).

15. Bandy and Morgan are currently on installment plans established to pay state court fines and costs, but they face the decision of providing necessities for their families, such as water and electricity, or paying monthly installments. (Dkt. 90-6 at 2; dkt. 90-7 at 4).

16. There was no inquiry into Bandy or Morgan's financial circumstances before or after their licenses were suspended. (Dkt. 90-6 at 1; dkt. 90-7 at 1–2).

**B.**

17. Loss of a driver's license adversely affects people's ability to gain and maintain employment, often leading to a reduction in income. (Hr'g Tr. at 112).

18. When suspension occurs pursuant to § 46.2-395, neither a judge nor a clerk enters an order suspending the license or notifies the debtor of a license suspension. (*Id.* at 45–47, 66).

19. Rather, DMV inputs suspensions based on electronic data automatically transmitted from state court computers to DMV. (*Id*. at 46, 146–7).

20. At sentencing hearings in Virginia state courts, the presiding judge assesses court fines and costs as well as their due date. (*Id*. at 45–46)

21. At (or within five days of) sentencing, a criminal defendant is provided with a notice indicating possible license suspension if he or she does not pay assessed costs by a designated date. (*Id*. at 45; 67; 73; § 46.2-395(C)).

22. After sentencing, the court's disposition, assessed costs, and the due date of any assessed costs are entered into the Circuit Case Management System ("CCMS") and the Financial Accounting System ("FAS").[3] (Hr'g Tr. at 43–44, 46).

23. The date that costs become due may be years after the date of sentencing. (*Id*. at 46, 113).[4]

24. If a person fails to pay assessed costs within 40 days of the designated date, a fines and costs indicator is automatically, electronically transmitted to DMV.[5] (*Id*. at 46, 66).

25. This information is transmitted from CCMS to the Court Automated Information

[3]   FAS is an updated version of the Financial Management System ("FMS") that has been implemented in Virginia court systems over the last year and a half. (Hr'g Tr. at 44). For current purposes, the systems perform the same function: recording individuals' court debt. (*Id*. at 44–45). CCMS and FAS are integrated systems: when a clerk enters information in CCMS, the data relevant to an individual's financial account is transmitted to FAS. (*Id*.)

[4]   There are two instances where a due date may be years after the underlying conviction. First, where a defendant is sentenced to imprisonment and/or placed on supervised probation the payment may be deferred until after the completion of the sentence. (Hr'g Tr. at 46). Additionally, where individuals establish payment plans with the state court, they are not in danger of default until they fail to make a payment, which can be years after the fines and costs were initially assessed. (*Id*. at 113 (establishing that Plaintiff Johnson made payments via a payment plan for years before her license was suspended)).

[5]   This is true for all but two counties in Virginia, Alexandria and Fairfax, where courts send paper documents regarding nonpayment of fines and costs directly to DMV. (*Id*. at 139).

System, a "system-to-system" process between DMV and the Supreme Court Office of the Executive Secretary ("OES") that allows DMV to routinely receive data from state courts. (*Id*. at 52, 134).

26. Data goes from CCMS to the Court Automated Information System through OES without any action by the courts. (*Id*.).

27. At the time of default, neither the judge nor the clerk enters an order regarding a driver's license suspension for failure to pay fines and costs. (*Id*. at 45).

28. At the time of default, no notice is sent to the licensee regarding the pending license suspension. (*Id*. at 47, 70).

29. Through a computer-generated report, the state court clerk's office is able to review information sent to DMV, but the court does not contact defaulted individuals to inform them of license suspensions. (*Id*. at 54–55).

30. The computer-generated report is used only to ensure that payments or non-payments are appropriately recorded. (*Id*. at 56).

31. Upon receipt of information regarding non-payment of court fines and costs, DMV records a license suspension and sends a letter informing the defaulted individual that his or her license has been suspended for failure to pay court debt. (*Id*. at 46).

32. The driving transcript updated by DMV is made available to law enforcement, courts, and attorneys, and can be obtained by insurance companies, as well as individuals. (*Id*. at 138).

33. Without DMV's actions, an individual's driving record would not reflect a suspension. (*Id*. at 147).

34. State courts have the authority to create installment payment plans to aid individuals

struggling to pay court fines and costs.  (*Id*. at 112); Va. Code § 19.2-354.1.

35. DMV can remove a license suspension based on failure to pay court fines and costs where a debtor provides a certified copy of a court-approved payment plan.   (Hr'g Tr. at 57).

36. The court does not take any action to notify a debtor that he is missing payments, and once a payment is missed, the individual's information is transmitted to DMV through the process described above. *See supra* ¶¶ 25–32; (Hr'g Tr. at 58).

37. The process of establishing payment plans differs among Virginia courts, but in all jurisdictions, when a payment is missed, a debtor's data is automatically transmitted to DMV through OES and the Court Automated Information System.  (Hr'g Tr. at 61).

38. When a license is suspended for nonpayment of fines and costs, it cannot be reinstated until the individual pays DMV's $145 reinstatement fee.  (*Id*. at 140).

39. DMV has sole responsibility for the collection of the reinstatement fee.  (*Id*.)

40. DMV retains $45 of the reinstatement fee, and the remaining $100 goes to the Trauma Center Fund.  (*Id*. at 142).

41. Without DMV's actions, a license could not be suspended under § 46.2-395.  (*Id*. at 147).

### III.    Commissioner's Jurisdictional Arguments

In response to Plaintiffs' motion for a preliminary injunction, the Commissioner argues that this Court lacks jurisdiction for three reasons: (1) the *Rooker-Feldman* doctrine precludes this Court from exercising jurisdiction over the claims; (2) Plaintiffs lack Article III standing; and (3) the Commissioner is immune from suit under the Eleventh Amendment.

### A.  The *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine precludes federal district courts from exercising appellate

jurisdiction over a state court's final judgment in a judicial proceeding. *See District of Columbia Courts of Appeals v. Feldman*, 460 U.S. 462, 481–82 (1983). The doctrine does not apply "if a plaintiff in federal court does not seek review of the state court judgment itself but instead presents an independent claim." *Thana v. Bd. of License Comm'rs for Charles Cty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016) (internal quotations omitted). The evidence shows that Plaintiffs do not suffer the challenged injury due to a state court judgment. Rather, Plaintiffs contest the actions of a state executive officer—the Commissioner—in suspending their driver's licenses. Insofar as the state court acts at all, Plaintiffs do not challenge that action but bring an independent claim.

The "essence of a judicial proceeding" is the adjudication and rejection of a party's arguments. *Feldman*, 460 U.S. at 480–81. There is no judicial proceeding surrounding license suspension under § 46.2-395. The court's only action is the assessment of fines and costs associated with an underlying conviction. Forty days after payment of those costs is due, without notification to affected individuals and without entrance of a court order, data is automatically, administratively, and electronically transmitted to DMV. *DMV*, in turn, enters a suspension on the debtor's driving record. The suspension is an administrative action, and "state administrative decisions, even those that are subject to judicial review by state courts, are beyond doubt subject to challenge in an independent federal action." *Thana*, 827 F.3d at 321.

Additionally, the *Rooker-Feldman* doctrine does not bar this Court's review of a facial challenge to the statute because Plaintiffs present an independent claim. "A state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action." *Skinner v. Switzer*, 562 U.S. 521, 532 (2011). Accordingly, where an individual challenges the constitutionality of a statute, rather than the judgment

enforcing the statute, they have brought an independent claim to which *Rooker-Feldman* does not apply. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282 (2005). ("If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction.").

Plaintiffs do not contest their convictions or the fines and costs assessed by the state court, (Dkt. 90 at 1). Therefore, the outcome of this case will not affect those judgments. Plaintiffs challenge the constitutionality of a statute that, they claim, violates their rights to due process and equal protection under the law. (*Id*. at 1–2). There has been no state court ruling on the constitutionality of this statute, and therefore no state judgment that would bar this Court's review of Plaintiffs' claims. *See also Stinnie,* 734 F.App'x at 870 (Gregory, C.J., dissenting) ("The absence of a reviewable state judgment, by definition, means *Rooker-Feldman* cannot apply, for it precludes only appellate review by district courts."). For these reasons, the *Rooker-Feldman* doctrine does not bar jurisdiction over Plaintiffs' claims.

### B. Article III Standing

To satisfy Article III standing requirements, Plaintiffs must show that (1) they suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision. *Doe v. Va. Dep't of St. Police*, 713 F.3d 745, 753 (4th Cir. 2013). The Commissioner argues that Plaintiffs fail to demonstrate traceability or redressability. (Dkt. 99 at 11). However, the evidence shows that the Commissioner is at least partially responsible for Plaintiffs' harms, and Plaintiffs' requested relief would eliminate most, if not all, of the harms caused by § 46.2-395.

### i.     Traceability

To establish that their injuries are "fairly traceable" to the Commissioner, Plaintiffs must show that the challenged action is "at least in part responsible for frustrating" their constitutional rights. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315 (4th Cir. 2013). Plaintiffs need not show that the Commissioner's actions "are the very last step in the chain of causation." *Judd*, 718 F.3d at 316. Rather, the Supreme Court has "recognized the concept of concurrent causation as useful in evaluating whether the pleadings and proof demonstrate a sufficient connection between plaintiff's injury and the conduct of the defendant." *Id*.

Consistent with these principles, in *Doe*, the Fourth Circuit held that an injury was fairly traceable to a defendant who implemented an allegedly unconstitutional statute. 713 F.3d at 757–758. In that case, the plaintiff filed suit due to her inclusion on a Virginia sex offender registry, and the Court held that she had standing to bring her due process claim against the police superintendent whose only role was publishing the registry. *Id*. at 751. The superintendent was not responsible for the classification decisions affecting the plaintiff, but the Court reasoned that, where the injury was directly traceable to the defendant's implementation of the challenged statute, the plaintiff met the requirements of traceability and redressability. *Id*. at 757–58.

The facts here are similar to those in *Doe*. The Commissioner has no discretion as to whose license is suspended, but he records the suspension, and without that action, Plaintiffs' driving records would not reflect a suspension. (Hr'g Tr. at 146–47). Additionally, the Commissioner is solely responsible for the reinstatement of licenses and collection of the $145 reinstatement fee. (Hr'g Tr. at 140). For individuals who have little to no income, the reinstatement fee alone may deprive them of their ability to drive due to their inability to pay.

Without the Commissioner's actions, not only would Plaintiffs be able to drive without fear of being cited, fined, or possibly incarcerated, but they would not face the additional, and possibly insurmountable, burden of the reinstatement fee. Accordingly, Plaintiffs have established that their injury is fairly traceable to the actions of the Commissioner.

### ii. Redressability

To establish redressability, Plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167 (2000). An injury is redressible where a favorable ruling would frustrate the implementation of a challenged statute or action. *See, e.g., Cooksey v. Futrell*, 721 F.3d 226, 238 (4th Cir. 2013) (finding the redressability requirement met where a decision favoring the plaintiff "would mean the [defendant] would be enjoined from enforcing" an alleged unconstitutional statute, "and/or [the statute] would be deemed unconstitutional."); *Metro Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 (1991) (finding redressability requirement satisfied where invalidation of a board's veto power would prevent the enactment of the allegedly harmful plan.).

Here, Plaintiffs seek to prevent the Commissioner from implementing § 46.2-395, which would restore (or preserve) their ability to drive without fear of punishment, affording them the ability to improve their financial, home, and health conditions. Specifically, Plaintiffs request that the Commissioner be ordered to reinstate their licenses without imposing a reinstatement fee and that he be enjoined from taking further action that results in the suspension of licenses through an allegedly unconstitutional scheme. This would return Plaintiffs Stinnie, Adams, Johnson, and members of the putative Suspended Class to the position they would have been in but for the allegedly unconstitutional suspension—*i.e.*, their licenses would be returned without

imposition of a burdensome fee. For Plaintiffs Bandy, Morgan, and the putative Future Suspended Class, who are facing imminent suspension under § 46.2-395, this would prevent an allegedly unconstitutional deprivation of their licenses.

Without the Commissioner's actions, it would be impossible to effectuate a license suspension. (Hr'g Tr. at 147). Accordingly, granting Plaintiffs' request would allow them to "find full redress," as their ability to drive "would be restored without fear of penalty." *Cooksey*, 721 F.3d at 238. For these reasons, the alleged injuries are redressible.

### C. Eleventh Amendment Immunity

Generally, the Eleventh Amendment bars suits against states, state entities, and state officials. *Gray v. Lewis*, 51 F.3d 426, 431 (4th Cir. 1995). However, *Ex Parte Young* provides an exception, permitting suits challenging state officials who have some duty regarding enforcement of an allegedly unconstitutional act. 209 U.S. 123, 130–131 (1908). In such cases, citizens can bring suits against a state officer, in his official capacity, where he has a "special relation" to the challenged act. *Id*. at 201. To meet the "special relation" requirement, the challenged official must have "proximity to and responsibility for the challenged state action," ensuring "that a federal injunction will be effective with respect to the underlying claim." *South Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324, 332–33 (4th Cir. 2008). This test does not require that the challenged statute specify the official's role, but where there are express obligations, the officer's duty is made more clear. *Ex Parte Young*, 209 U.S. at 453. Ultimately, the "important and material fact" is that "the state officer, by virtue of his office, has some connection with the enforcement of the act." *Id*. Because the Commissioner has obligations under § 46.2-395, he has the special relationship required by *Ex Parte Young*, and Plaintiffs' action is not barred by the Eleventh Amendment.

The Commissioner not only has express duties under § 46.2-395, but the evidence presented emphasizes his key role in creating, administering, and enforcing license suspensions. First, the Commissioner is the designated recipient and record-keeper for notices of unpaid court costs. § 46.2-395(C). Receipt of this notice alone permits the Commissioner to effectuate a license suspension. Second, an individual's license will not be reinstated until the Commissioner is presented with evidence establishing that debt has been paid in full or a payment plan has been implemented. § 46.2-395(D). Finally, the Commissioner is responsible for collecting the $145 license reinstatement fee, which must be paid before a suspension is lifted. §46.2-395(C); (Hr'g Tr. at 140). Given these duties, the Commissioner clearly has the proximity and responsibility necessary to establish "some connection" with the challenged statute. *Ex Parte Young*, 209 U.S. at 453; *see*, *e.g.*, *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) (holding that circuit court clerk bore the requisite connection to the enforcement of state marriage laws because the plaintiffs could trace the denial of their rights to the defendant's role in enforcing the allegedly unconstitutional law); *cf. Hutto v. South Carolina Ret. Sys.*, 773 F.3d 536, 551 (4th Cir. 2014) (holding plaintiffs could not sue named state officials to enjoin collection of pension contributions because the officials "actually ha[d] no role" in the collection process). For these reasons, Plaintiffs' suit is not barred by the Eleventh Amendment.

## IV. Preliminary Injunction Factors

With the threshold issues decided, the Court turns to the merits of the preliminary injunction. The four-part test from *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7 (2008) governs. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013). To obtain a preliminary injunction, the moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 550 U.S. at 20. The plaintiff "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 244, 230 (4th Cir. 2017).

## V.     Plaintiffs' Likelihood of Success on the Merits

Plaintiffs assert that the Commissioner carries out the suspension process under § 46.2-395 "with no meaningful notice, without a hearing, and without consideration of the persons' inability to pay." (Dkt. 90 at 1). They argue that they, "and hundreds of thousands of Virginians like them, lost their licenses for the simple reason that they could not afford the fines and costs imposed on them . . . offend[ing] the Fourteenth Amendment guarantees of due process and fundamental fairness, as well as equal protection under the law." (*Id*. at 1–2). Plaintiffs advance several theories as to how their claims will succeed, but all that is necessary for preliminary injunctive relief is establishing the likelihood of success on at least one of their claims. (Hr'g Tr. at 12); *see League of Women Voters of N.C. v. N.C.*, 769 F.3d 224 (4th Cir. 2014) (remanding with instructions to enter a preliminary injunction where plaintiffs were likely to succeed on at least one of their claims); *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999) ("At the preliminary injunction stage, plaintiffs need to show a likelihood of success with respect to only one of [the three challenged] statutes."). The inquiry into likelihood of success requires Plaintiffs to "make a clear showing that they are likely to succeed . . . [but they] need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Because Plaintiffs have met this burden regarding their procedural due process claim, they have satisfied the first prong of *Winter*.

Plaintiffs assert that § 46.2-395 "is unconstitutional on its face for mandating automatic

license suspension without notice or a hearing," and that "[t]his defect violates the procedural due process rights of every driver whose license is suspended under Section 46.2-395." (Dkt. 90 at 14).[6]  The Fourteenth Amendment provides that no State can "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  For Plaintiffs' motion for preliminary injunction to succeed based on their procedural due process claim, they must demonstrate that, at trial, they are likely to show (1) they have been deprived of life, liberty or property, and (2) that such deprivation occurred without the due process of law.  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

A "driver's license is a property interest protected by the Fourteenth Amendment and, once issued, a driver's license may not be taken away without affording a licensee procedural due process."  *Scott v. Williams*, 924 F.2d 56, 58 (4th Cir. 1991); *Plumer v. Maryland*, 915 F.2d 927, 931 (4th Cir. 1990) ("It is well settled that a driver's license is a property interest that may not be suspended or revoked without due process.").  Accordingly, the Court turns to whether § 46.2-395 provides due process.

"At bottom, procedural due process requires fair notice of impending state action and an opportunity to be heard."  *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mathews*, 424 U.S. at 333).  Notice and hearing are two distinct features of due process, and thus governed by different standards.  *Id.*  Notice is "'an elementary and fundamental

---

[6]     The Court notes that "if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'" *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2306 (2016) (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 333 (2010)).  In *Whole Woman's Health*, the Supreme Court found the district court's award of facial relief appropriate where petitioners asked for as-applied relief, and "such other and further relief as the Court may deem just, proper, and equitable." *Id.* (internal quotations omitted).  In this case, Plaintiffs ask this Court for as-applied relief and "further relief as this Court may deem necessary and/or appropriate in the interests of justice." (Dkt. 84 at 44).  Accordingly, where Plaintiffs' "evidence and arguments convince[] the District Court that the provision [is] unconstitutional across the board," it is within this Court's power to enjoin the enforcement of § 46.2-395.

requirement of due process,' and must be reasonably calculated to convey information concerning a deprivation." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). The hearing prong is governed by the three-step inquiry set forth in *Mathews*, which determines the adequacy of the opportunity to be heard. *Id.* (citing *Mathews*, 424 U.S. at 335). The Court will evaluate each of these elements in turn.

## A. Notice

Notice must be provided in a manner that would be employed by one who was "desirous of actually informing" the affected party of the pending deprivation of property. *Mullane*, 339 U.S. at 657. A "mere gesture" will not suffice. *Id.* The "reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected." *Id.* Ultimately, notice is meant to "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* "Personal service has not in all circumstances been regarded as indispensable to the process due," and "[t]he Supreme Court has routinely recognized that the use of mail satisfies the notice element of due process." *Mullane*, 339 U.S. at 314; *Snider Int'l Corp.*, 739 F.3d at 146. Furthermore, individual notice has not been found necessary where it is "established by published, generally available state statutes and case law." *City of West Covina v. Perkins*, 525 U.S. 234, 241 (1999) (holding individualized notice was not required where generally available statutes contained state-law remedies).

Here, § 46.2-395(C) provides that written notice regarding license suspension upon failure to pay court costs "shall be provided to the person at the time of trial or shall be mailed by first-class mail" to the person's current mailing address. While these forms of notice may comport with due process, *see Snider Int'l Corp.*, 739 F.3d at 148, the evidence presented reveals two substantive problems. First, license suspension is merely a possibility at the time notice is

given.  *See* Section I, ¶ 23.  This is not necessarily a fatal flaw.  For example, in *Snider Int'l Corp.*, a corporation and individual recipients of traffic citations challenged the use of first class mail to deliver notice of violations and associated penalties. 739 F.3d at 143.  The citations carried a civil penalty of no greater than forty dollars, but non-payment and failure to contest liability *could* lead to the suspension of the vehicle's registration.  *Id.*  In the case at hand, license suspension may occur years after the state court's assessment of fines and costs, *see supra* Section I, ¶ 14, and no notice is sent to licensees at the time of default.  *See supra* Section I, ¶ 23. In contrast, the notice at issue in *Snider Int'l Corp.* was provided no more than 30 days after a violation occurred.  739 F.3d at 143, n. 3.  This temporal disconnect makes it at least questionable whether the means of notice employed here are more than a "mere gesture." *Mullane*, 339 U.S. at 315.

Second, for notice to be sufficient, it must not only provide interested parties with information regarding the pendency of the action, but also "afford them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314.  For instance, in *Snider Int'l Corp.*, the Fourth Circuit found that a traffic citation sent by first-class mail provided adequate notice of a recipient's violation where the recipient could elect a trial in lieu of paying a penalty.  739 F.3d 140.  Additionally, in *City of West Covina*, the Supreme Court held that notice was satisfied by the presence of a generally available statute where the owner of seized property could turn to those statutes "to learn about the remedial procedures available to him."  525 U.S. at 241.  In contrast, § 46.2-395 does not give notice to licensees about opportunities to air objections regarding license suspension for failure to pay fines and costs, because no such process is available.  *See infra* Section IV.B.

Again, "[a]n elementary and fundamental requirement of due process in any proceeding

which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action *and afford them an opportunity to present their objections*." *Mullane*, 339 U.S. at 314 (emphasis added). The evidence before the Court suggests that Plaintiffs may succeed on showing notice is deficient in this case. However, the Court need not reach a definitive conclusion on this issue because Plaintiffs have made a clear showing that they are likely to establish that they are not provided an opportunity to be heard.

## B. Hearing

Even if the notice provided here was more than a mere gesture, Plaintiffs are likely to show § 46.2-395 does not provide *any* hearing, much less one that satisfies due process. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotations omitted). A meaningful hearing serves the Due Process Clause's purpose of protecting persons "from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). In making determinations about the sufficiency of process, *Mathews* requires the consideration of three factors: (1) the private interest involved; (2) the risk of erroneous deprivation through the procedures used; and (3) the government's interest. *Id*. at 335. The Court determines that Plaintiffs are likely to succeed because the procedures in place are not sufficient to protect against the erroneous deprivation of the property interest involved. Indeed, § 46.2-395, on its face, provides no procedural hearing at all.

\*

In considering the private interest involved here, the Supreme Court has held "that when a State seeks to terminate an interest such as [a driver's license], it must afford notice and opportunity for hearing appropriate to the nature of the case *before* the termination becomes

effective." *Bell v. Burson*, 402 U.S. 535, 542 (1971) (emphasis added). The Fourth Circuit requires that a licensee be given some sort of opportunity to contest the suspension. *Plumer*, 915 F.2d at 931. In *Plumer*, the Fourth Circuit held that a licensee must "be given a chance to rebut" any evidence against him. *Id.* In this case, the Commissioner enters a suspension based on a failure to pay court fines and costs in full or in part. (Hr'g Tr. at 147). At no time are Plaintiffs given any opportunity to be heard regarding their default, nor do they have the opportunity to present evidence that they are unable to satisfy court debt. This is not sufficient in light of the "degree of potential deprivation that may be created." *Mathews*, 424 U.S. at 341.

**

The Commissioner argues that Plaintiffs are given three opportunities that prevent the "risk of an erroneous deprivation." *Mathews*, 424 U.S. at 333. First, at the time of sentencing or through a petition contesting the assessment of court costs; second, upon an appeal of defendant's criminal conviction; and finally, through "the statutory mechanism that allows the sentencing court to reduce or forgive" court debt. (Dkt. 99 at 15–16). These are not procedures that are tailored "'to the capacities and circumstances of those who are to be heard,'" nor do they ensure that licensees are "given a meaningful opportunity to present their case." *Id.* at 349 (quoting *Golberg v. Kelly*, 397 U.S. 245, 268–69 (1970)).

The first two instances present the same issues: (1) they address the underlying conviction and assessment of costs, not the license suspension; and (2) they occur at a time well before the licensee is in default, a time when the licensee may, in good faith, believe he has the ability to pay. License suspension occurs 40 days after the assessed due date, which can be years after sentencing, *see supra* Section I, ¶ 14, but an appeal must occur within 10 days of a criminal conviction in a general district court, (Va. Code. § 16.1-132), and within 30 days of a conviction

in a circuit court. (Va. Code § 8.01-675.3). Similarly, for those who have their licenses suspended for failure to make payments according to a payment plan, the time to appeal has long since passed. (*See* Hr'g Tr. at 113). At the time of appeal, as at the time of sentencing, license suspension is not a certainty, nor is the licensee aware of unforeseen circumstances that might make him unable to satisfy debt when it is due.

Finally, the statutory mechanism that allows a sentencing court to reduce or forgive court debt addresses the imposition of fines and costs, but does not provide Plaintiffs with an opportunity to be heard on the fact of license suspension. Va. Code § 19.2-354.1. Suspension will still occur if the licensee fails to pay the reduced amount prescribed by the court. Additionally, if the court forgives already-defaulted debt, the licensee would still have to provide the Commissioner with proof of satisfaction and pay DMV's $145 reinstatement fee. There is no evidence that DMV provides a process that allows for waiver of this fee due to inability to pay. Because none of these procedures allow Plaintiffs to be heard on their alleged default and later suspension, the procedures fail to present the necessary opportunity to contest the suspension. Accordingly, Plaintiffs are likely to show the second *Mathews* factor weighs in their favor.[7]

***

The final *Mathews* factor, the government's interest, also weighs in Plaintiffs' favor. The Commissioner argues that "the Commonwealth of Virginia has an interest in continuing to have some enforcement mechanism to go with those fines that have been assessed by the juries." (Hr'g Tr. at 185). There is no indication that a loss of license will incentivize individuals to pay

---

[7] Defendant argues that codification of Supreme Court of Virginia Rule 1:24, requiring courts to give written notice of the availability of deferred and installment payment plans helps to prevent erroneous deprivation. (Dkt. 99 at 5). This is not persuasive. While enrollment in a payment plan does suggest the consideration of financial hardship, an individual who fails to make the established payments will still have her license suspended pursuant to § 46.2-395. This may delay suspension, but it does not prevent, or allow a licensee to object to, a license suspension for failure to pay court fines and costs.

court fines and costs where those individuals simply cannot afford to pay. In practice, the loss of a driver's license adversely affects people's ability to gain and maintain employment, often resulting in a reduction of income. (Hr'g Tr. at 106; 112). This deprives individuals of means to pay their court debt, hindering the fiscal interests of the government. Were procedural due process to be afforded, the Commissioner would be able to ascertain the effectiveness of his chosen enforcement mechanism, *i.e.*, license suspension, and thus establish a more reliable way to ensure the collection of court fines and costs.

"The essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Mathews*, 424 U.S. at 348–49 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). Here, the private interest at stake plainly merits some pre-deprivation process, *Bell*, 402 U.S. at 542, and the evidence presented highlights the importance of a driver's license in Virginia specifically.[8] There are no mechanisms in place that allow individuals to be heard regarding their inability to pay court fines and costs, and the government's stated interest is not supported where license suspension causes a decrease in debtors' income. Accordingly, the Court concludes that § 46.2-395, on its face, does not provide a meaningful opportunity to be heard regarding license suspension. Therefore, Plaintiffs demonstrate a likelihood of success on their claim that § 46.2-395 violates procedural due process.[9]

---

[8] Not only does Plaintiffs' testimony emphasize their need for a driver's license to meet non-economic needs, such as medical care for themselves and their families, (*see, e.g.,* Hr'g Tr. at 17–18; dkt. 90-4 at 2), but evidence also shows that the majority of Virginians rely on cars to travel to work, and that the lack of a license reduces job opportunities. (Hr'g Tr. at 129).

[9] The Court notes that Plaintiffs present a host of constitutional claims, but because it has found Plaintiffs are likely to succeed on the merits of their procedural due process claim, it need not reach those issues. *See Fowler v. Johnson*, No. 17-11441, 2017 WL 6379676 (E.D. Mich. 2017) (granting a preliminary injunction enjoining the Michigan DMV from enforcing an allegedly unconstitutional license suspension scheme based only on the likelihood of success on

## VI.    Other *Winter* Factors

The remaining factors governing a request for a preliminary injunction—irreparable harm, the balance of equities, and the public interest—weigh in favor of Plaintiffs.  First, where Plaintiffs' constitutional rights are being violated, there is a presumption of irreparable harm. *Davis v. District of Columbia*, 158 F.3d 1342, 1343 (4th Cir. 1998) (citing *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)).  Irreparable harm is clearly demonstrated through the facts surrounding Plaintiff Stinnie.  (Dkt. 90-3).  Plaintiff Stinnie received a loan and paid the court debt underlying his initial license suspension.  (*Id.* at 2).  However, before receiving the loan that allowed him to pay his court fines and costs, he drove to essential medical appointments, resulting in a conviction for driving on a suspended license.  (*Id.* at 2–3).  He appealed his conviction, but lost, resulting in his current license suspension, despite the fact that he has paid the initial underlying court debt.  (*Id.*).  Money could not solve the injury Plaintiff Stinnie suffered, the suspension of his license made it impracticable, if not impossible, for him to carry out necessary tasks, and payment of underlying court fines and costs did not alleviate his situation.

The other plaintiffs suffer similar harm.  For example, Plaintiff Johnson testified that she is unable to take her daughter to necessary medical appointments, or attend her son's athletic events, causing stress for both her and her children.  (Hr'g Tr. at 17).  She further testified that, because of her suspended license she has lost a job and been denied another.  (*Id.*).  Similarly, without driving, Plaintiff Adams could not travel to and from work, her chemotherapy appointments, or her son's medical specialist.  (Dkt. 90-4 at 2).  Money alone would not alleviate Plaintiffs' harms or release Plaintiffs from the cycle of hardships caused by § 46.2-395.  The only remedy for Plaintiffs' injury is the restoration of their licenses and the prevention of further suspensions under § 46.2-395.

As for the remaining factors, the balancing of the equities and public interest, Fourth

---

plaintiffs' due process claim).

Circuit precedent "counsels that 'a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (citing *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). The harm § 46.2-395 poses to Plaintiffs outweighs any harm the issuance of a preliminary injunction would cause others. While the Court recognizes the Commonwealth's interest in ensuring the collection of court fines and costs, these interests are not furthered by a license suspension scheme that neither considers an individual's ability to pay nor provides him with an opportunity to be heard on the matter. *See Fowler v. Johnson*, No. 17-11441, 2017 WL 6379676, at *12 (E.D. Mich. Dec. 14, 2017) ("The State's and public's interests may in fact be served by an injunction, as restoring the driver's licenses of individuals unable to pay their traffic debt may enable them to obtain and retain employment, which will make them more likely to pay that debt.").

## VII.     Conclusion

For the reasons discussed, the Court finds it likely that Plaintiffs will succeed in establishing that § 46.2-395 violates procedural due process. The remaining factors relevant to the issuance of a preliminary injunction also weigh in favor of Plaintiffs. Accordingly, Plaintiffs' motion for preliminary injunction will be granted.

An appropriate order will issue, and the Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this 21st day of December, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE