**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| DAMIAN STINNIE, MELISSA ADAMS, and ADRAINNE JOHNSON, individually, and on behalf of all others similarly situated; WILLIEST BANDY, and BRIANNA MORGAN, individually, and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>RICHARD D. HOLCOMB, in his official capacity as the Commissioner of the VIRGINIA DEPARTMENT OF MOTOR VEHICLES,<br><br>    Defendant. | Civ. No: 3:16-cv-00044 |

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant DMV Commissioner Richard Holcomb moved to dismiss by raising arguments nearly indistinguishable from his opposition to Plaintiffs' motion for preliminary injunction. His arguments are no more successful here. For many of the same reasons why the Court properly entered an injunction, the Court should deny the Commissioner's motion to dismiss.

As before, the Commissioner ignores Chief Judge Gregory's dissent in the Fourth Circuit appeal. *Stinnie v. Holcomb*, 734 F. App'x 858, 863 (4th Cir. 2018) (Gregory, C.J., dissenting). Chief Judge Gregory meticulously rejected the Commissioner's procedural arguments. The Fourth Circuit majority did not disagree but simply declined to reach those issues. The Commissioner also fails to acknowledge other courts that declared unconstitutional a driver's license suspension scheme much like Virginia's. *See, e.g.*, *Robinson v. Purkey,* 2018 U.S. Dist. LEXIS 177769 (M.D. Tenn. Oct. 16, 2018); *Hixson v. Haslam*, 2018 U.S. Dist. LEXIS 114622 (M.D. Tenn. July 2,

1

2018); *Fowler v. Johnson*, 2017 U.S. Dist. LEXIS 205363 (E.D. Mich. Dec. 14, 2017).

Aligning with what these other jurists have concluded, Plaintiffs can bring this action. Plaintiffs properly challenge the unconstitutional scheme in which Virginia Code § 46.2-395 punishes Virginia drivers who are *willing but fiscally unable* to pay court debts, and thus treats those poor Virginians differently from the financially well-off with means to satisfy court debts.

The Attorney General recently remarked: "We cannot have a justice system that determines fairness and freedom based on wealth and means. . . . [T]hat [is] wrong and unjust."[1] Yet "wrong and unjust" is precisely the scheme under Virginia Code § 46.2-395. Plaintiffs properly brought claims challenging that scheme. The Court should deny the Commissioner's motion.

## LEGAL STANDARD

**Rule 12(b)(1).** Dismissal for lack of subject matter jurisdiction may occur "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac Railroad Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court accepts the Complaint as "evidence on the issue and may consider evidence outside the pleadings." *Velasco v. Government of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

**Rule 12(b)(6).** A motion to dismiss under Rule 12(b)(6) should only be granted if the Complaint does not "contain sufficient factual matter, accepted as true," to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept the allegations of the Complaint as true and construe them in the light most favorable to the Plaintiffs. *Gladstone Realtors v. Bellwood*, 441 U.S. 91, 109 (1979).

**Rule 12(b)(7).** Rule 12(b)(7) permits dismissal for failure to join a party. "To determine whether a party should be joined, Rule 19 of the Federal Rules of Civil Procedure sets forth a two-step

---

[1] Interview of Mark Herring at 9:39-10:04, *HearSay with Cathy Lewis*, WHRO PUBLIC MEDIA (October 30, 2018), *available at* https://goo.gl/TJ5z1n (last visited January 3, 2019).

inquiry, examining: (1) whether the party is 'necessary' to the action under Rule 19(a); and (2) whether the party is 'indispensable' under Rule 19(b). . . . The burden of proof rests on the party raising the defense." *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005).

## ARGUMENT

## I.    The Amended Complaint is procedurally proper.

The Commissioner puts forward procedural arguments that are—except for an indispensable party argument, *see infra* Section I.D.—lifted almost verbatim from his preliminary injunction papers. Plaintiffs ask the Court to affirm its recent order that rejected these arguments. *See* Doc. 126 (memorandum opinion granting preliminary injunction).

### A.    This case is not the "limited circumstances" in which *Rooker-Feldman* applies.

The Court has rejected the Commissioner's *Rooker-Feldman* doctrine arguments. Doc. 126 at 7-9. It should do so again. The doctrine "applies only in 'limited circumstances,' where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." *Lance v. Dennis*, 546 U.S. 459, 466 (2006). "To emphasize the narrow role that the *Rooker-Feldman* doctrine is to play, the Supreme Court has noted repeatedly that, since the decisions in *Rooker* and *Feldman*, it has *never* applied the doctrine to deprive a district court of subject matter jurisdiction." *Thana v. Bd. of License Comm'rs for Charles Cty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016). "*Rooker-Feldman* is an exceedingly narrow doctrine that has no relevance to the facts of this case." *Stinnie v. Holcomb*, 734 F. App'x 858, 868 (4th Cir. 2018) (Gregory, C.J., dissenting).

First, the Commissioner lends much credence to an outdated *Rooker-Feldman* standard that the Fourth Circuit has rejected. He argues that *Rooker-Feldman* applies when a federal court must "determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual." Doc. 105 at 9 (citing *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997)). But following *Exxon Mobile*, *Lance*, and other Supreme Court

3

decisions emphasizing the narrowness of the doctrine, the Fourth Circuit has rejected this standard as outdated. *Vicks v. Ocwen Loan Servicing, LLC*, 676 F. App'x 167, 168 (4th Cir. 2017) (per curiam) (reversing district court's dismissal of plaintiff's claims under the *Rooker-Feldman* doctrine). As the Fourth Circuit recently clarified, "the mere fact that a ruling favorable to the federal plaintiff may call into question the correctness of a state court judgment has no bearing on the federal court's jurisdiction over the plaintiff's claims under *Rooker-Feldman*." *Id*.

Under the proper standard, *Rooker-Feldman* does not apply here because this case is not an attempt to appeal a decision from a state court to a federal court. Thus, "by definition," the *Rooker-Feldman* doctrine has no application here because Plaintiffs do not ask this Court to exercise appellate jurisdiction over a final state court judgment. *Stinnie*, 734 F. App'x at 870.

Instead, Plaintiffs present an independent claim. "'If a federal plaintiff present[s] [an] independent claim,' it is not an impediment to the exercise of federal jurisdiction that the 'same or a related question' was earlier aired between the parties in state court." *Skinner v. Switzer*, 562 U.S. 521, 532 (2011). The Supreme Court has contemplated the very situation presented here: "[a] state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action." *Id*. In other words, the doctrine does not apply when a party "challenge[s] the validity of statutes or rules governing the state court decision or the constitutionality of the process by which a state court judgment is reached." *Stinnie*, 734 F. App'x at 869 (quoting *Skinner*, 562 U.S. at 532). That is the case here. Plaintiffs do not challenge their underlying "convictions, the applicability of the assessed payments, or their failure to make the required payments." *Id*. at 870. They independently challenge as unconstitutional a Virginia statute that automatically imposes a deprivation without judicial decision-making and that involves action by a state administrative agency. *Skinner*, 562 U.S. at 532.

4

*Rooker-Feldman* does not apply also because this case relates to executive, administrative actions. The Commissioner does not address this argument. Nor can he. "[S]tate administrative and executive actions are not covered by the doctrine." *Thana*, 827 F.3d at 320. "[T]he [*Rooker-Feldman*] doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002). The process challenged by Plaintiffs consists of non-judicial state actors who "simply engage in ministerial action"—which does not trigger the *Rooker-Feldman* bar. *Feldman*, 460 U.S. at 479. Thus, *Rooker-Feldman* has no application here.

**B. Plaintiffs have Article III standing.**

The Commissioner disputes whether Plaintiffs' injury is "causally connected to the complained-of conduct" and "will likely be redressed" if Plaintiffs prevail. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). Plaintiffs have Article III standing, because "the Commissioner is at least partially responsible for Plaintiffs' harms, and Plaintiffs' requested relief would eliminate most, if not all, of the harms caused by [Code] § 46.2-395." Doc. 126 at 9.

*Causal Connection.* To meet causal connection, Plaintiffs "must show that their injuries are 'fairly traceable'" to the Commissioner's conduct. *Stinnie*, 734 F. App'x at 871. Plaintiffs need only show a "genuine nexus" between their injuries and the Commissioner's conduct. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). Plaintiffs can do more than that here: the previous suspension of their licenses, that continued suspension, and the lack of reinstatement without imposing fees are all *directly* traceable to the Commissioner.

The Commissioner's "challenged action" need only be responsible "in part . . . for frustrating [the plaintiff's] attempt to fully assert his or her rights." *Stinnie*, 734 F. App'x at 871 (citation omitted). "[A] defendant's actions need not be the 'very last step in the chain of causation'

5

to establish" traceability." *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). The traceability standard remains true "notwithstanding the presence of another proximate cause" for a plaintiff's injuries. *Stinnie*, 734 F. App'x at 871; *see also Libertarian Party*, 718 F.3d at 315-16 (rejecting "the stringent proximate cause standard, derived from principles of tort law," for an Article III standing analysis).

The Commissioner has such a "genuine nexus" to Plaintiffs' injuries. His assertions about his minor role in the suspension scheme are factually incorrect. License suspensions happen automatically under an algorithm contained within the court and DMV computer systems, with no judicial determination or entry of an order of suspension. Doc. 84-1 (declaration of Llezelle Dugger). The courts use the state's Financial Management System (the "FMS") as part of its Court Automated Information System ("CAIS"), and when a scheduled payment toward court debt is not received within the required time, the CAIS/FMS automatically transmits an electronic record to the DMV showing an individual's account in default. *Id.* at 2 ¶¶ 5-6. The DMV then updates the account holder's license status in its license database to comport with the FMS electronic transmission, thus issuing the suspension for all practical purposes, including for law enforcement, prosecutors, insurance companies, and other government entities. Doc. 84 ¶ 50.

Statutory and common law also belies the Commissioner's protests about his lack of involvement. Without the Commissioner's actions, Plaintiffs would have their licenses. Va. Code § 46.2-395(B) (license reinstatement only after payment to the Commissioner of a fee); *id.* § 46.2-395(D) (Commissioner can return licenses after evidence of payment is submitted); *id.* § 46.2-200 ("The [DMV] shall be responsible for . . . the issuance, suspension, and revocation of driver's licenses . . . ."). That's why Virginia courts have held that *the DMV*, not the courts, is the ultimate party who revokes or suspends the license. *E.g.*, *Plummer v. Commonwealth*, 408 S.E.2d 765, 766

6

(1991) ("The DMV agent agreed that appellant's license remained valid until the DMV order [of suspension] was actually executed."). The Commissioner has a sufficient connection to Plaintiffs' inability to retain their licenses. Doc. 84-1 ¶ 7.

*Redressability.* Redressability is satisfied if "the relief being sought 'would abat[e] current violations and preven[t] future ones,' such as by deterring future violations." *Stinnie*, 734 F. App'x at 872 (quoting *Friends of the Earth*, 528 U.S. at 188). "As the Supreme Court and the [Fourth Circuit] have held, an injury is redressible if a favorable court ruling would frustrate the implementation of the challenged statute or action." *Id.* at 873 (citing cases). A favorable decision is likely to redress Plaintiffs' injuries. "Indeed, the removal of the reinstatement fees alone satisfies the redressability requirement." *Id.* Moreover, granting Plaintiffs' requested injunctive relief would require this Court "to have decided that the suspensions were effectuated pursuant to an unconstitutional process," and so "the suspensions would no longer be valid or enforceable" because they were "obtained through unlawful means." *Id.* at 874.

This relief would thus satisfy redressability because "even in a technical, legal sense, Plaintiffs' licenses would no longer be suspended." *Id.* And because "[t]here is nothing maintained in the court file reflecting that a person's license has been suspended for non-payment," Doc. 90-1 at 3 ¶ 8, a favorable ruling against the Commissioner would "reduc[e] to some extent" the "risk" of Plaintiffs suffering future injury of being charged with driving on unconstitutionally-suspended licenses. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). Plaintiffs have Article III standing.

### C. The Commissioner is not immune to suit because *Ex parte Young* applies.

Eleventh Amendment immunity does not protect the Commissioner from suit because, as the Court held, "*Ex Parte Young* provides an exception, permitting suits challenging state officials who have some duty regarding enforcement of an allegedly unconstitutional act." Doc. 126 at 12.

7

*Ex Parte Young* applies because the Commissioner has a "special relation" to the challenged statute. *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008).

The Commissioner hangs his hat on the "special relation" language, but it is not enough. *See* Doc. 105 at 14. The term "special" is something of a misnomer: the connection "need not be *qualitatively* special." *S.C. Wildlife*, 549 F.3d at 333. "[R]ather, 'special relation' under *Ex parte Young* has served as a measure of *proximity to* and *responsibility for* the challenged state action." *Id.* The "special relation" requirement rarely prevents *Ex Parte Young*'s application. "Primarily," this occurs "where the relationship between the state official sought to be enjoined and the enforcement of the state statute is significantly attenuated." *Id.* at 333.

A sufficient relation exists here. The Commissioner "has specific enforcement obligations under Virginia Code § 46.2-395 pertaining to the suspension and reinstatement of licenses." *Stinnie*, 734 F. App'x at 874. The Commissioner argues that he lacks statutory authority to suspend licenses. But "[t]he DMV . . . effectuat[es] the suspension for all practical purposes, including for law enforcement." *Stinnie*, 734 F. App'x at 863; *see also Plummer*, 408 S.E.2d at 766; Doc. 56 at 27 (describing the Commissioner's role as "overseeing the entry or 'processing' of the court suspension orders into statewide databases"); 11-15-18 Hearing Transcript, attached as Ex. 1, at 145:18-147:5 (Ford testifying that there would be no license suspension for failure to pay court fines and costs if the DMV did not exist).

The Commissioner thus has "proximity to and responsibility for the challenged state action." *S.C. Wildlife*, 549 F.3d at 333. His connection with the challenged statute *is not* "significantly attenuated." *Id.* Thus, *Ex Parte Young* applies to permit suit here.

### D. The clerks are not indispensable parties.

Court clerks are not necessary parties, much less indispensable ones. Civil Rule 12(b)(7) contemplates a motion to dismiss for "failure to join a party under Rule 19." Rule 19, which governs party joinder, "sets forth a two-step inquiry, examining: (1) whether the party is 'necessary' to the action under Rule 19(a); and (2) whether the party is 'indispensable' under Rule 19(b)." *Am. Gen. Life and Acc. Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005). "The burden of proof rests on the party raising the defense—here, [the Commissioner]—to 'show that the person who was not joined is needed for a just adjudication.'" *Am. Gen. Life*, 429 F.3d at 92.

Court clerks meet neither of the Rule 19(a)(1) categories of necessary parties. First, the Court can afford relief in their absence. Plaintiffs can achieve their litigation goal—invalidating an unconstitutional statute—without clerks as parties. The clerks' role is unrelated to the relief of enjoining the Commissioner from enforcing Section 46.2-395 and ordering him to reinstate suspended drivers' licenses without fees. *See* Doc. 84 at Requested Relief ¶¶ e-f.

In fact, joinder of clerks from all 120 Virginia counties would only muddy the issues. Clerks have no discretion at suspension or reinstatement and would have no power to discontinue suspensions or to reinstate licenses. Plaintiffs' claims focus on the Commissioner's acts of suspension and do not relate to any clerk's acts at the time of a conviction or sentence. The Commissioner has not shown that clerks are the other type of necessary party: those who have "claimed an interest." *Am. Gen. Life Ins. Co. v. Wood*, 429 F.3d 83, 92 (Nov. 14, 2005). Thus, court clerks are not necessary parties.

Even if clerks were necessary, they are not indispensable. "As an initial matter, [the Fourth Circuit has] previously admonished that '[d]ismissal of a case is a drastic remedy, . . . which should be employed only sparingly.'" *Trans Energy, Inc. v. EQT Prod. Co.*, 743 F.3d 895, 901 (4th Cir.

9

2014). Before making its ultimate decision, a court should consider certain equitable factors:

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Id.* (quoting *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 552 (4th Cir. 2006)).

An evaluation of these factors makes clear that nonjoinder of the court clerks should not result in the drastic remedy of dismissal. The most obvious factor here is prejudice: there is no prejudice to the clerks or the Commissioner if the clerks are not joined. It is reasonable to assume that, if joined, these court clerks would advance the same position as the Commissioner—that the statute is constitutional and enforceable. And for purposes of the validity of the challenged statute, the interests of court clerks and the Commissioner are "co-extensive." *Jeffries v. Georgia Residential Fin. Auth.*, 678 F.2d 919, 928 (11th Cir. 1982) (finding absent landlords were not an indispensable party to a suit challenging the constitutionality of eviction procedures administered by a state agency because, in part, they had the same interests in the proceeding as the state agency); *accord Delta Fin. Corp. v. Paul D. Comanduras & Assocs.*, 973 F.2d 301, 303 (4th Cir. 1992) (finding a third party to suit was not indispensable because it claimed "no interest different from the interest of the [defendants] that may be impaired by the disposition of this case").

Indeed, the Attorney General of Virginia, who represents the Commissioner, would almost certainly also represent any clerks as well, negating any prejudice to those absent persons. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 134 (2d Cir. 2013) ("[P]rejudice to absent parties approaches the vanishing point when the remaining parties are represented by the same counsel . . . ."); *Ctr. for Individual Freedom, Inc. v. Ireland*, 2008 WL 1837324, at *1 n.1 (S.D. W.Va. Apr. 22, 2008) (finding the State Election Commission not indispensable because the Secretary of

10

State was a defendant and represented by the Attorney General); *Isadaner v. Beyer*, 53 F.R.D. 4, 6 (E.D. Pa. 1971) (finding that "in the practical sense the nonjoined [persons] will have their day in court," because the joined parties' counsel represented them and there is "no conflict" of interests between the joined and nonjoined parties).

In contrast, Plaintiffs would suffer significant prejudice if the case is dismissed—they have no "adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b); *Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 891 (S.D.W. Va. 2011). The Commissioner claims that Plaintiffs do have another remedy because they can challenge, "at the time of conviction, the court orders imposing fines and costs, or by later petition[] those courts for modification." Doc. 105 at 15. This so-called remedy of after-the-fact deprivation hearings is illusory and turns the due process and equal protection claims on their heads. *See infra* Section II.B. And the heart of this matter is that this "remedy" fails to provide due process. Plaintiffs have no alternative remedy to raise their claims if this case is dismissed.

Finally, *National Licorice Co. v. NLRB*, 309 U.S. 350 (1940), created a "public rights" carve out for Rule 19. Litigation over "public rights" includes claims, like those here, about whether the government has taken all legally-mandated prerequisites before acting to affect property interests. *See, e.g.*, *S. Utah Wilderness Alliance v. Kempthorne*, 525 F.3d 966, 967-698, 969 n.2 (10th Cir. 2008) (the "'public rights exception' to joinder rules" applied because plaintiffs' claims challenging the legality of the government awarding oil and gas leases were based on the public right of having the government undertake certain preliminary actions required by law). In other words, Rule 19 does not preclude litigation that seeks to enforce "what are essentially public rights, based upon a failure to join indispensable parties." *Nat. Res. Def. Council, Inc. v. Berklund*, 458 F. Supp. 925, 933 (D.D.C. 1978), *aff'd*, 609 F.2d 553 (D.C. Cir. 1979); *accord Jeffries*, 678

F.2d at 929 (finding action challenging constitutionality of eviction proceedings subject to public right exception); *Washington v. GEO Grp. Inc.*, 2018 WL 1963792, at *5 (W.D. Wash. Apr. 26, 2018); *Guardians v. U.S. Fish & Wildlife Serv.*, 2018 WL 1023104, at *3 (D. Mont. Feb. 22, 2018). Thus, even if court clerks were necessary and indispensable parties, because the plaintiffs seek to enforce a public right, the case should not be dismissed.

## II.     The Amended Complaint pleads viable claims for relief.

The Commissioner's attacks on the legal merits of Plaintiffs' claims—once again mirroring his arguments in the preliminary injunction papers—fare no better than his procedural arguments. Taking as true the Amended Complaint's factual allegations and drawing reasonable inferences in Plaintiffs' favor, Plaintiffs have stated claims upon which relief can be granted. *See Iqbal*, 556 U.S. at 678. The Court should reject the Commissioner's arguments and deny his motion to dismiss.

### A.  Plaintiffs plausibly alleged a facial challenge to the suspension mechanism.

The Commissioner says that Plaintiffs' facial challenge must fail because some circumstances exist when the statute would be valid. Doc. 105 at 18-19. But this Court held that "[Code] § 46.2-395, on its face, does not provide a meaningful opportunity to be heard regarding license suspension." Doc. 126 at 21. "There are no mechanisms in place that allow individuals to be heard regarding their inability to pay court fines and costs, and the government's stated interest is not supported where license suspension causes a decrease in debtors' income." *Id.*

The Commissioner's argument relies heavily—and exclusively—on *United States v. Salerno*, 481 U.S. 739 (1987). This reliance is misguided. First, *Salerno* is a contested standard for facial challenges. *See Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008) ("[S]ome Members of the Court have criticized the *Salerno* formulation.").

Second, the aspects of this case that involve a facial challenge meet the *Salerno* standard. The statute's procedural due process deficiencies affect every application of the statute, because

the statute does not provide notice, a hearing, or an ability to pay determination for anyone. In contrast, in *Salerno*, the Court found that the Bail Reform Act was facially valid under the Due Process Clause because of the Act's "extensive [procedural] safeguards." 481 U.S. at 752. The Court detailed extensively those procedural safeguards. *See id.* at 751-52. The protections in *Salerno* do not exist in Section § 46.2-395. *See* Doc. 126 at 21.

## B. Plaintiffs plausibly alleged a procedural due process claim.

Plaintiffs alleged a plausible procedural due process claim. *See* Doc. 126 at 14-21 ("Plaintiffs demonstrate a likelihood of success on their claim that [Code] § 46.2-395 violates procedural due process.").

The Commissioner concedes that a property or liberty interest exists. Doc. 105 at 17; *see also* Doc. 126 at 15. But he throws in an extraneous argument that this interest is not "vital and essential." Doc. 105 at 18. This assertion is wrong. Plaintiffs' interest in their licenses *is* vital and essential to their subsistence. *E.g.*, Doc. 84 ¶¶ 26-40, 95-290; *see also Stinnie*, 734 F. App'x at 863-64 ("The license suspensions make it difficult, or even impossible, to maintain employment."). The debatable import of the interest is legally irrelevant here. The acceptability of post-deprivation process does not turn on the interest at stake, but on the feasibility of pre-deprivation process. *Zinermon v. Burch*, 494 U.S. 113, 128–29 (1990).

Plaintiffs have properly pleaded the lack of sufficient notice to allege a plausible procedural due process claim. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950). Sufficient notice must be more than a "mere gesture." *Id.* at 315. Plaintiffs received no

13

constitutionally sufficient notice of the suspension of their licenses. Doc. 84 ¶¶ 55-57. Plaintiffs' allegations are plausible enough to survive Rule 12—a conclusion in accord with the Court's holding that Plaintiffs have a likelihood of success in arguing this claim. Doc. 126 at 16-17.

The Commissioner points to five instances he calls "notice," none of which are constitutionally sufficient. Doc. 105 at 18-19. The so-called "notices" relate to a conviction for a substantive offense and provide speculative comment on the potential for license suspension. These so-called notices do not carry concrete facts about any impending suspension and do not occur close in time to those suspensions. These "notices" are not enough. They are not "tailored to the capacities and circumstances of those who are to be heard, nor do they ensure that licensees are given a meaningful opportunity to present their case." Doc. 126 at 19. "Neither the court nor the DMV sends any notice of default or suspension to the driver when a payment becomes overdue and the suspension takes effect. Instead, the state court only informs the driver prospectively, when the fine is first imposed, that her license will be suspended if payment is not made in full." *Stinnie*, 734 F. App'x at 864 n.1. A speculative, prospective notice—that advises only of an option to pay and nothing about an ability-to-pay hearing— is, at best, a "mere gesture" and does not constitute sufficient notice under the Fourteenth Amendment. *Mullane*, 339 U.S. at 315.

Plaintiffs also had no pre-deprivation opportunity to be heard. *E.g.*, Ex. 1 at 16:23-25, 17:1-18 (Johnson testifying to no hearing before license suspension); *id.* at 57:18-58:10 (Dugger testifying about the lack of notice); *see also* Doc. 126 at 19-20. When a state procedure is involved, there is a "root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid government interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original) (footnote omitted); *see Weller v.*

14

*Dep't of Soc. Servs.*, 901 F.2d 387, 396 (4th Cir. 1990) ("[T]here is no requirement of a pre-deprivation hearing under emergency circumstances."). The Commissioner cannot argue that this case presents the kind of emergency that would justify denial of a pre-deprivation hearing.

And there are no post-deprivation mechanisms, either. *See* Doc. 126 at 20. Even if they could provide adequate protections, proceedings such as hearings on a motion for show cause necessarily occur *after* an individual's license is suspended. Va. Code § 19.2-358(A). The individual has no right to request such a hearing, because it may be held only on the motion of a prosecutor or the court *sua sponte*. *Id.* While an individual may avoid *more* fines or imprisonment by showing that his failure to pay was not intentional, the statute expressly provides no opportunity to address whether a current or future license suspension for unpaid court debt was or would be inappropriate. *Id.* § 19.2-358(B).

The Commissioner's references to Virginia Code § 19.2-354.1 and Virginia Rule 1:24 and their contemplation of payment plans do not advance his cause. Even where a payment plan exists, if a person defaults, neither the Commissioner nor any other person or entity examines the reason for default *before* (or after) suspending the license. Moreover, *even if* a Virginia court uses these procedures, an individual's license will be automatically suspended without process upon nonpayment, regardless of reason or intent. *E.g.*, Ex. 1 at 39:18-24 (Johnson testifying that license was automatically suspended when she missed her payment plan without receiving notice or having a hearing); *id.* at 46:15-47:14 (Dugger testifying that there is no court order of suspension); *id.* at 54:18-55:5, 61:14-25, 66:3-22 (testimony that automatic suspension occurs on 41st day after nonpayment across all Virginia counties).

The Commissioner argues that he has no statutory authority to conduct hearings. Doc. 105 at 20. That only bolsters Plaintiffs' case: the statute is constitutionally invalid because it does not

provide the pre-deprivation opportunity to be heard. In sum, Plaintiffs had no opportunity to be heard *on* their accused default and later suspension, before (or even after) their suspensions. Instead, the "state punishes each and every individual who defaults by *automatically suspending* his or her driver's license, regardless of the reason for the default." *Stinnie*, 734 F. App'x at 863 (emphasis added). This scheme violates Plaintiffs' procedural due process rights.

### C. Plaintiffs plausibly alleged that Section 46.2-395 is fundamentally unfair.

In challenging Plaintiffs' fundamental fairness argument, the Commissioner ignores the key line of cases on point. Beginning with *Griffin v. Illinois*, the Supreme Court has repeatedly held that it offends both due process and fundamental fairness for the state to penalize people for the inability to pay state-imposed fines or costs. 351 U.S. 12, 18 (1956) ("Plainly the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence and could not be used as an excuse to deprive a defendant of a fair trial."); *see also Bearden v. Georgia*, 461 U.S. 660, 667-68 (1983); *Tate v. Short*, 401 U.S. 395, 397-98 (1971); *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970); *Mayer v. City of Chicago*, 404 U.S. 189, 196-97 (1971).

Whether a method of punishment is fundamentally unfair turns "on the reasons for non-payment." *Bearden*, 461 U.S. at 668. The distinction between "willful refusal to pay a fine" and inability to pay "is of critical importance." *Id.* On the one hand, "it is fundamentally unfair to revoke probation automatically" where "the probationer has made all reasonable bona fide efforts to pay the fine and yet cannot do so through no fault of his own." *Id.* On the other hand, "[i]f the probationer has willfully refused to pay the fine or restitution when he has the means to pay, the State is perfectly justified in using imprisonment as a sanction to enforce collection." *Id.* The failure to "inquire into the reasons for the failure to pay" is "contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* at 672-73.

Recently, the Middle District of Tennessee correctly followed the *Griffin* line of precedent in challenges to a similar driver's license suspension scheme. The *Robinson* court held that

> a statute that penalizes or withholds relief from a defendant in a criminal or quasi-criminal case, based solely on his nonpayment of a particular sum of money and without providing for an exception if he is willing but unable to pay, is the constitutional equivalent of a statute that specifically imposes a harsher sanction on indigent defendants than on non-indigent defendants.

2018 U.S. Dist. LEXIS 177769, at *13-14. The court also stated that the Constitution

> is not blind to the commonsense fact that, if the government gives defendants the ostensible choice between paying a sum of money or suffering a harsh, non-monetary penalty, then the government is, in effect, propounding a harsher rule for defendants who cannot pay the sum than for those who can.

*Id.* at *14; *see also Hixson*, 2018 U.S. Dist. LEXIS 114622, at *8 (the Supreme Court "is not blind to the commonsense fact that an ultimatum following the formula of 'the money or your ' is a different proposition for someone who has the money than for someone who does not").

This "commonsense fact" described in the *Griffin* line of Supreme Court cases, and applied more recently in *Robinson* and *Hixson*, goes to the heart of fundamental fairness, which is the "touchstone of due process." *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). Yet, except for a discrete footnote citing *Bearden*, the Commissioner fails to address a single one of these cases.

Instead, the only precedent the Commissioner discusses in its fundamental fairness argument is *Mathews v. Eldridge*, 424 U.S. 319 (1976). The Commissioner claims that *Mathews* provides the relevant inquiry here because Plaintiffs challenge "a collateral 'deprivation of property,' rather than a part of the criminal trial itself." Doc. 105 at 23. The Commissioner misses the mark. *Mathews* is about procedural due process, not the fundamental fairness inquiry.

The Commissioner makes "no mention" of *Griffin*, *Williams*, *Tate*, *Mayer*, or *Bearden* in his briefing on fundamental fairness and due process. 2018 U.S. Dist. LEXIS 177769, at *32. "Rather than offering any argument why the Supreme Court's numerous cases about indigent

17

criminal defendants would not apply here, the [defendant] simply chooses to set forth his argument as if those cases never existed." *Id.* "Such an approach does little to undermine the plaintiffs' demonstrated likelihood of success on the merits." *Id.* The Court should hold that Plaintiffs plausibly alleged a claim based on fundamental fairness and deny the Commissioner's motion.

### D. Plaintiffs plausibly alleged an equal protection claim.

Treating a low-income citizen who is willing but unable to pay, differently from a person with means who can and does pay, violates Equal Protection. The Attorney General acknowledged as much in the similar context of Virginia's cash bail system: "disparate treatment of low-income defendants and those with money could raise Equal Protection Concerns." Doc. 103-6 at 3. Similarly, Equal Protection is likely violated here where Virginia's license suspension scheme treats differently "low-income defendants and those with money." *See id.*

In response, the Commissioner disregards facts establishing that Section 46.2-395 treats similarly situated individuals differently. The Commissioner then misconstrues the law in arguing that a successful equal protection claim requires intentional or purposeful discrimination. Additionally, the Commissioner's rational basis review of Section 46.2-395 ignores the difference between being *unable* versus *unwilling* to pay court debt.

### 1. Section 46.2-395 treats indigent people harsher than others similarly situated.

The Commissioner tries to circumvent Plaintiffs' equal protection claim by incorrectly describing the relevant comparison as between those who have complied with court orders and those who are in default. But the relevant comparison is between those who can pay their court debt and those who cannot. *See, e.g.*, *Bearden*, 461 U.S. at 665 (stating that the relevant comparison is between those able and unable to pay a fine). Plaintiffs are willing but *cannot* pay. *E.g.*, Ex. 1 at 15:16-16:22, 17:12-18:25, 33:21-35:5, 39:1-14, 41:4-11 (Johnson); *see also id.* at 60:9-25

18

(payment plans in one county may not be acceptable in another county); *id.* at 79:13-82:5, 84:17-86:2, 86:3-87:23, 89:13-90:4 (testimony about how plaintiffs fall below the self-sufficiency standard and thus cannot pay); *id.* at 109:4-110:4, 111:3-112:14, 119:9-120:19 (testimony about how loss of driver's license makes it harder to pay court debt). The driver's license suspension scheme treats Plaintiffs differently than those who are willing and *can* pay.

Differential treatment based on wealth is impermissible under Fourth Circuit law. The state may not penalize a debtor "as long as his default is attributable to his poverty, not his contumacy." *Alexander v. Johnson*, 742 F.2d 117, 124 (4th Cir. 1984). Furthermore, "[t]he state's initiatives in this area naturally must be narrowly drawn to avoid . . . creating discriminating terms of repayment based solely on the defendant's poverty." *Id.* at 123-24. In carrying out these initiatives, the state "must take cognizance of the individual's resources, the other demands on his own and family's finances, and the hardships he or his family will endure if repayment is required." *Id.* at 124.

The *Robinson* court made similar observations about the disparate treatment of those who are able versus unable to pay fines in the context of a driver's license suspension statute:

> Exacerbating the counterproductive nature of the suspension regime is its tendency to trap drivers in a cycle of repeated violations and ever-mounting debt. A driver may begin by getting a single ticket for a minor traffic violation. If he cannot pay the resulting debt, however, his license will [likely] be suspended . . . . The suspended driver, faced with a need to engage in essential life activities and a paucity of alternative transportation options, may choose to drive, despite his suspension. . . .
>
> A driver who violates his suspension . . . may find himself subject to new fines, new court costs, and new litigation taxes. Because he could not pay the original traffic debt, he will be just as unable to pay the new debt, and the cycle will begin again . . . . The [defendant] has not identified or asserted any legitimate governmental interest in allowing a single traffic ticket to serve as the gateway to a mounting cycle of unpayable debt that keeps a fully qualified driver off of the road and out of productive economic life.

2018 U.S. Dist. LEXIS 177769, at *17-18.

This Court need look no further than *Robinson*. The same cycle identified in *Robinson* is at play under the Virginia license suspension scheme. Plaintiffs have shown that Virginians who

violate the same traffic or criminal laws obtain vastly different outcomes as a direct result of their wealth. Section 46.2-395 is not narrowly drawn as required by *Alexander*, nor does it account for debtors' financial circumstances. Section 46.2-395 treats those willing but unable to pay their court debt more harshly than those willing and able to pay, violating the Equal Protection Clause.

**2. Plaintiffs need not establish intentional or purposeful discrimination.**

To succeed on the equal protection claim, Plaintiffs do not have to establish that different treatment results from intentional or purposeful discrimination. While some equal protection doctrines require a showing of purposeful discrimination, the *Griffin* line of cases involving differential treatment, as here, does not. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 103 (1996) (confirming that the *Griffin* line of cases does not require purposeful discrimination).

The Supreme Court rejected the claim that later cases requiring discriminatory intent—like *Washington v. Davis*, 426 U.S. 229 (1976)—affect the *Griffin* line of cases. *See M.L.B.*, 519 U.S. at 126-27 ("*Washington v. Davis* . . . does not have the sweeping effect respondents attribute to it."). The *M.L.B.* Court reiterated the concern of *Griffin* that the justice system not be "grossly discriminatory in its operation." *Id.* The Court rejected a discriminatory intent requirement in the equal justice arena: "this Court has not so conceived the meaning and effect of our 1976 'disproportionate impact' precedent." *Id.*; *see also Alexander*, 742 F.2d at 125 (analyzing whether the scheme is "narrowly drawn to avoid unfairness and discriminatory *effects*" (emphasis added)).

Even so, Plaintiffs sufficiently allege intentional and purposeful discrimination. Legislative history and historical background are relevant considerations to "whether discriminatory intent motivates a facially neutral law." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016). Plaintiffs extensively alleged that the historical background of Virginia's license-for-payment scheme shows that the General Assembly enacted the current statute knowing that

20

many defendants were unable to pay their debt and still imposed additional punishment on them for failure to do so. *E.g.*, Doc. 84 ¶¶ 59-61; *see also id.* ¶ 345.

Disparate impact is also a relevant consideration about whether discriminatory intent exists. *See McCrory*, 831 F.3d at 220-21 (including disproportionate impact in "a nonexhaustive list of factors to consider" when determining whether "the legislature enact[ed] a law 'because of,' and not 'in spite of,' its discriminatory effect"). The crux of Plaintiffs' argument is that Section 46.2-395 creates a disparate impact between those *want to but cannot* pay their court debt and those who *want to and can* pay that debt. Thus, Plaintiffs have sufficiently alleged discriminatory intent, even though they can succeed on their equal protection claim with no such allegation.

### 3. Section 46.2-395 fails rational basis review.

In the equal protection context, rational basis review requires that there be "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016). Thus, to survive rational basis review, the Commissioner must establish that there is a rational relationship between his goal of getting indigent people to pay their court debt and suspending Plaintiffs' constitutionally protected property interests in their driver's licenses and the attendant liberty interests in being able to drive.

In conducting a rational basis review of the equivalent suspension statute in Tennessee, the *Robinson* court made these findings in determining that the statute was irrational:

> A driver's license suspension cannot coerce an indigent person into paying his traffic debt, because his failure to pay was never voluntary in the first place. What a suspension does do, however, is impose a significant material hardship on the driver that is likely to make him less able to develop the resources and, if possible, the economic self-sufficiency necessary to pay the underlying debt. Suspending the driver's license of an indigent person because he has failed to pay his traffic debt is not only wholly ineffective, but powerfully counterproductive.
>
> . . . .
>
> [Thus,] "the application of [the equivalent suspension statute] to indigent drivers is so

profoundly counterproductive, in light of the centrality of driving to economic life in Tennessee, that it cannot meet the bare minimum standard of rationality; and that no other rational basis exists to sustain the state's policies.

2018 U.S. Dist. LEXIS 177769, at *17, 21.

The *Hixson* court reached the same conclusion:

Revocation [of a license] would not be an effective mechanism for coercing payment from a truly indigent debtor, because no person can be threatened or coerced into paying money that he does not have and cannot get.

. . . .

[A]s applied to indigent drivers, the law is not merely ineffective; it is powerfully counterproductive. If a person has no resources to pay a debt, he cannot be threatened or cajoled into paying it; he may, however, become able to pay it in the future. But taking his license away sabotages that prospect. For one thing, the lack of a driver's license substantially limits one's ability to obtain and maintain employment. Even aside from the effect on employment, however, the inability to drive introduces new obstacles, risks, and costs to a wide array of life activities, as the former driver is forced into a daily ordeal of logistical triage to compensate for his inadequate transportation. In short, losing one's driver's license simultaneously makes the burdens of life more expensive and renders the prospect of amassing the resources needed to overcome those burdens more remote.

Because driving is necessary for so many important life activities, some Tennesseans whose licenses have been revoked continue to drive, despite the state's revocation of their privileges. . . . As a result, a license revocation based on court debt from a single conviction may begin a cycle of subsequent convictions and mounting court debt that renders the driver increasingly unable to amass the resources necessary to get his license back. . . . This propensity to create a debt spiral further exacerbates the counterproductive nature of Tennessee's scheme, as applied to indigent drivers. Not only is the law ineffective at collecting debt; not only is it counterproductive with regard to existing debt; but, in at least some cases, it affirmatively leaves *more* unpayable debt it its wake.

2018 U.S. Dist. LEXIS 114622 at *11, 12-14.

As in *Robinson* and *Hixson*, the Commissioner cannot establish any rational relationship between his goal of getting indigent people to pay their court debt and suspending Plaintiffs' driver's licenses. The Commissioner says that, "[b]y imposing a motivation to accomplish what an individual might otherwise be disinclined to do (*i.e.*, pay money to the court), the suspension of driver's licenses for non-payment of court-imposed fees and costs is rationally-related to these

22

legitimate government purposes." Doc. 105 at 24. This is an irrational, ineffective, and counterproductive argument as applied to indigent people who are willing but unable to pay.

The Commissioner also incorrectly cites *City of Milwaukee v. Kilgore*, 532 N.W.2d 690 (Wis. 1995) and *In the Interest of M.E.G.*, 2002 Tex. App. LEXIS 1948 (Tex. Ct. App. Mar. 14, 2002) to argue that "[s]imilar purposes have been upheld by other courts under rational-basis review." Doc. 105 at 26 & n.104. The statute at issue in *Kilgore* provided that "the suspension will not be enforced against any individual who is able to demonstrate an inability, for good cause *or indigence*, to pay the fine." 532 N.W.2d at 698 (emphasis added). And the *M.E.G.* court never addressed a person's ability or inability to pay a debt. *See* 2002 Tex. App. LEXIS 1948, at *1-2 (upholding the trial court's "order suspending [appellant's] driver's license following his *failure* to pay child support"). Thus, the Commissioner has shown no viable support for his argument.

**E. Plaintiffs plausibly alleged extraordinary collection efforts violate equal protection.**

The Commissioner tries to downplay both the coerciveness of Section 46.2-395 and the Commissioner's role, to claim that the DMV does not engage in extraordinary collection efforts. Doc. 105 at 24. Both assertions are incorrect and the *Robinson* and *Hixson* courts—again, missing from the Commissioner's brief—concluded as much for a similar suspension scheme.

First, the Commissioner cannot shift the blame for the coerciveness of Section 46.2-395 away from the DMV Commissioner and to the state courts. Plaintiffs have already set forth how the DMV plays an integral part in Virginia's license suspension scheme. *See supra* Section I.B. The Commissioner cannot shift responsibility to state courts to erase Plaintiffs' Article III standing or avoid the DMV's role in extraordinary (and unconstitutional) collection efforts.

Second, not only is the Commissioner responsible for implementing suspensions, but the license suspension scheme constitutes extraordinary collection efforts violating *James v. Strange*, 407 U.S. 128 (1972), and the Equal Protection Clause. That Clause ensures (1) that debtors to the

23

state are not treated differently from civil debtors and (2) that debtors have protection for basic necessities and the means of making a living. In *Strange*, the Supreme Court held that a statute violated the Equal Protection Clause because it "strip[ped] from indigent defendants the array of protective exemptions . . . erected for other civil judgment debtors." 407 U.S. at 135; *see also Alexander*, 742 F.2d at 124 (holding that, in accordance with *Strange*, "the [indigent] defendant cannot be exposed to more severe collection practices than the ordinary civil debtor").

Here, by automatically suspending driver's licenses for unpaid court debt, Section 46.2-395 exposes indigent defendants to a penalty that nearly all civil debtors do not face. That alone is unconstitutional under *Strange* and its progeny. *Alexander*, 742 F.2d at 124.[2]

Additionally, driver's license suspension, much like the scheme in *Strange*, fails to afford the indigent defendant basic protections for necessities and livelihood. In Virginia, the "Poor Debtor's Exemption" shields civil debtors from creditors' attempts to claim certain basic belongings, including a motor vehicle of modest value. Va. Code § 34-26. And, unlike Plaintiffs, civil garnishees in Virginia can count on protections against garnishment of minimal income. *See id.* § 34-29(a) (providing that at least $290 per week in income is protected against garnishment); 42 U.S.C. § 407(a) (providing that "none of the moneys paid" under the Social Security Act can be "subject to execution, levy, attachment, garnishment, or other legal process").

Other federal courts have already validated Plaintiffs' reasoning. The *Robinson* court held that the Tennessee license suspension statute violated the Equal Protection Clause because "a state's uniquely harsh treatment of a class of indigent debtors cannot be carried out in 'such a

---

[2] Only unpaid judgments for traffic accidents where the at-fault defendant was uninsured may result in a license suspension. *See* Va. Code § 46.2-417. This rule for a specific sub-variety of civil debtor does not change that Section 46.2-395 exposes the indigent debtor to "more severe collection practices than the *ordinary* civil debtor." *Alexander*, 742 F.2d at 124 (emphasis added).

24

discriminatory fashion' that it 'blight[s] . . . the hopes of indigents for self-sufficiency and self-respect,' merely because the indigent debtor owes a particular type of debt to the government rather than a private party." 2018 U.S. Dist. LEXIS 177769, at *21-22 (quoting *James*, 407 U.S. at 142-43). The court reasoned:

> Traffic debt, like ordinary judgment debt, can be collected through standard civil collection tools, such as garnishment and attachment. . . . Driver's license suspensions amount to an additional, harsh mechanism that is directed not merely at putting resources in the hands of the creditor but in disrupting the life of the debtor, and traffic debtors are made subject to that mechanism, whereas comparable private debtors are not. Under Tennessee law, a financially secure civil judgment debtor who fails to pay what he owes simply out of defiance, greed, or spite faces no risk of losing his license, whereas a person who wishes to, but cannot, pay a minor traffic ticket is likely to have his license suspended. That wide differential in treatment runs afoul of *James v. Strange*, and none of the facts or argument raised by the [defendant] in his most recent briefing undermines such a holding.

*Id.* at *36-37. In sum, "[b]ecause indigent traffic debtors are subject to an exceedingly harsh collection scheme, while other judgment debtors are not, the state's policies violate the constitutional guarantee of equal protection." *Id.* at *22.

The *Hixson* court held similarly. The suspension statute "threaten[ed] serious financial harm to those who run afoul of it," and the court held that "taking a person's driver's license away is . . . a threat to the debtor's basic subsistence." *Hixson*, 2018 U.S. Dist. LEXIS 114622, at *141. The court noted "just how severe a sanction the revocation of a license is and just how greatly it harms the debtor's basic subsistence or ability to build economic self-sufficiency." *Id.*

These courts have held that a similar driver's license suspension statute is *not* "a far cry from the restrictions at issue in *James v. Strange*," as the Commissioner claims. Doc. 105 at 24. Plaintiffs plausibly alleged that Section 46.2-395 violates the Equal Protection Clause.

## CONCLUSION

Plaintiffs ask the Court to deny the Commissioner's motion to dismiss.

Dated: January 8, 2019

By:    /s/ Travis C. Gunn
          Jonathan T. Blank (VSB No.: 38487)
          Travis C. Gunn (VSB No.: 86063)
          Benjamin P. Abel (VSB No.: 88961)
          Brooke A. Weedon (VSB No.: 91164)
          Alyssa M. Pazandak (*pro hac vice*)
          MCGUIREWOODS LLP
          Court Square Building
          310 Fourth Street NE, Suite 300
          Post Office Box 1288
          Charlottesville, VA 22902
          Ph: (434) 977-2509
          Fax: (434) 980-2258
          *jblank@mcguirewoods.com*

          Angela A. Ciolfi (VSB No.: 65337)
          Pat Levy-Lavelle (VSB No.: 71190)
          LEGAL AID JUSTICE CENTER
          1000 Preston Avenue, Suite A
          Charlottesville, VA 22903
          Ph: (434) 529-1810
          Fax: (434) 977-0558
          *angela@justice4all.org*

          David P. Baugh (VSB No.: 22528)
          DAVID P. BAUGH, ESQ., PLC
          2025 E. Main Street, Suite 114
          Richmond, VA 23223
          Ph: (804) 743-8111
          Fax: (804) 225-8035
          *dpbaugh@dpbaugh.com*

          Leslie Kendrick (VSB No.: 90104)
          580 Massie Rd.
          Charlottesville, VA 22903
          Ph: (434) 243-8633
          Fax: (434) 924-7536
          *kendrick@virginia.edu*

          *Counsel for Plaintiffs*

26

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2019, I electronically filed the foregoing instrument with

the Clerk of Court using the CM/ECF System, which will send a notification of such filing to the

following CM/ECF participants:

Janet W. Baugh (VSB No. 44649)
Senior Assistant Attorney General
Margaret Hoehl O'Shea (VSB No. 66611)
Christian A. Parrish (VSB No. 446427)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 786-4596
Fax: (804) 786-4239
E-mail: jbaugh@oag.state.va.us

David M. Parker
Neil K. Gilman
Maya M. Eckstein
Stuart A. Raphael
Trevor S. Cox
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
E-mail: dparker@HuntonAK.com
ngilman@HuntonAK.com
meckstein@HuntonAK.com

By:    /s/ Travis C. Gunn