**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

**DAMIAN STINNIE**, *et al.*,

     **Plaintiffs,**

**v.**

**RICHARD D. HOLCOMB,
in his official capacity as the Commissioner
of the VIRGINIA DEPARTMENT OF
MOTOR VEHICLES,**

     **Defendant.**

**Civil Action No. 3:16-cv-44**

**DEFENDANT'S MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' FEE PETITION**

Mark R. Herring
*Attorney General of Virginia*

Donald D. Anderson
*Deputy Attorney General*

Julie M. Whitlock
*Senior Assistant Attorney General &
Transportation Section Chief*

Janet W. Baugh (VSB #44649)
*Senior Assistant Attorney General*

Christian A. Parrish (VSB #44427)
*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
(804) 786-2071 – Telephone
(804) 786-4239 – Facsimile

Maya M. Eckstein (VSB #41413)
Stuart A. Raphael (VSB #30380)
Trevor S. Cox (VSB #78396)
David M. Parker (VSB # 85619)
HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
sraphael@HuntonAK.com
tcox@HuntonAK.com
dparker@huntonAK.com

Neil K. Gilman (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Ph: (202) 955-1500
Fax: (202) 778-2201
ngilman@HuntonAK.com

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .............................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 3

    A.    Under former Virginia Code § 46.2-395, courts suspended the driving privileges of those who owed court fees and costs. ................................................ 3

    B.    Public and political opposition grow to the license-suspension policy. ................. 4

    C.    Plaintiffs bring suit asserting the unconstitutionality of § 46.2-395 and demanding the restoration of hundreds of thousands of licenses. ............................... 5

    D.    This Court dismisses the case for lack of subject-matter jurisdiction, and the Fourth Circuit dismisses Plaintiffs' appeal for lack of appellate jurisdiction. ......... 6

    E.    Political will to reform Virginia's license-suspension policy grows even as Plaintiffs' suit fails. .............................................................................................. 8

    F.    Plaintiffs file an Amended Complaint; the Court finds jurisdiction and grants a preliminary injunction on a single aspect of Plaintiffs' claims. .............................. 9

    G.    In 2019, Republican members of a House subcommittee again block repeal legislation, but the full General Assembly imposes a temporary suspension of § 46.2-395, and this case is stayed. ...................................................................... 11

    H.    In the 2020 session of the General Assembly, now controlled by Democrats, § 46.2-395 is permanently repealed. .................................................................... 13

    I.    The case is dismissed as moot, leaving Plaintiffs with no enduring relief. .......... 14

LEGAL STANDARDS ............................................................................................... 15

ARGUMENT .............................................................................................................. 16

I.    Controlling authority from the Fourth Circuit demonstrates that Plaintiffs are not prevailing parties. ................................................................................................ 17

    A.    Under *Smyth*, obtaining a preliminary injunction is insufficient to qualify as a prevailing party. ................................................................................................. 17

        1.    Before appeal, this Court awards Smyth prevailing-party status, for the same reasons claimed by Plaintiffs here. .................................................. 17

        2.    On appeal, the Fourth Circuit reverses this Court, finding that Smyth was not entitled to prevailing-party status by virtue of obtaining a preliminary injunction. .......................................................................................... 19

        3.    *Smyth* dictates the outcome here. ............................................................ 20

    B.    Intervening Supreme Court precedent does not call *Smyth* into question. ........... 21

|  |  | 1. | *Winter* did not undermine *Smyth* when it refined the preliminary-injunction standard. | 22 |

|  |  | 2. | *Lefemine* did not introduce any new standard that undercuts *Smyth*. | 23 |

| II. | Plaintiffs' out-of-circuit precedents are irrelevant, inconsistent, and unsupportive of Plaintiffs' position. | | | 25 |

| III. | The Fourth Circuit's approach is the right one. | | | 27 |

|  | A. | Sound policy reasons support *Smyth*'s bright-line rule. | | 27 |

|  | B. | This case shows why *Smyth* was right: the preliminary injunction inquiry, by merely predicting likelihood of success on a single claim, is of limited help in the prevailing-party determination. | | 29 |

CONCLUSION ............................................................................................................. 31

CERTIFICATE OF SERVICE ...................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*,
    550 F.2d 189 (4th Cir. 1977) ...................................................................22

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*,
    532 U.S. 598 (2001)............................................................................ *passim*

*Dearmore v. City of Garland*,
    519 F.3d 517 (5th Cir. 2008) ........................................................... *passim*

*Dupuy v. Samuels*,
    423 F.3d 714 (7th Cir. 2005) ...................................................................27

*Evans v. Jeff D.*,
    475 U.S. 717 (1986)..................................................................................28

*Farrar v. Hobby*,
    506 U.S. 103 (1992)..................................................................................24

*Fowler v. Benson*,
    924 F.3d 247 (6th Cir. 2019) .............................................................29, 30

*Fowler v. Johnson*,
    No. CV 17-11441, 2017 WL 6379676 (E.D. Mich. Dec. 14, 2017)........29

*Hanrahan v. Hampton*,
    446 U.S. 754 (1980) (per curiam)...........................................................15

*Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., LLC*,
    902 F.3d 432 (4th Cir. 2018) ...................................................................22

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..................................................................................29

*Hewitt v. Helms*,
    482 U.S. 755 (1987)..................................................................................15

*Higgins v. E.I. DuPont de Nemours & Co.*,
    671 F. Supp. 1055 (D. Md. 1987)............................................................25

*Higher Taste, Inc. v. City of Tacoma*,
    717 F.3d 712 (9th Cir. 2013) .............................................................23, 25

*Johnson v. Jessup*,
   381 F. Supp. 3d 619 (M.D.N.C. 2019), *appeal pending*, No. 19-1421 (4th Cir.
   filed Apr. 19, 2019) .............................................................................................30

*Kan. Judicial Watch v. Stout*,
   653 F.3d 1230 (10th Cir. 2011) ..........................................................................26

*Key Tronic Corp. v. United States*,
   511 U.S. 809 (1994).............................................................................................15

*Lefemine v. Wideman*,
   568 U.S. 1 (2012)........................................................................... *passim*

*Mathews v. Eldridge*,
   424 U.S. 319 (1976).............................................................................................30

*Mendoza v. Garrett*,
   No. 3:18-CV-01634-HZ, 2019 WL 2251290 (D. Or. May 16, 2019), *appeal
   pending*, No. 19-35506 (9th Cir. filed June 11, 2019)..........................................30

*Motley v. Taylor*,
   No. 2:19-CV-478-WKW, 2020 WL 1540391 (M.D. Ala. Mar. 31, 2020),
   *appeal pending*, No. 20-11688 (11th Cir. filed May 1, 2020) .................................30

*N.A.A.C.P. Labor Comm. of Front Royal, Va. v. Laborers' Int'l Union of N. Am.*,
   902 F. Supp. 688 (W.D. Va. 1993), *aff'd sub nom. Baltimore v. Laborers'
   Int'l Union of N. Am.*, 67 F.3d 293 (4th Cir. 1995) ..............................................25

*People Against Police Violence v. City of Pittsburgh*,
   520 F.3d 226 (3d Cir. 2008)................................................................................27

*Robinson v. Bartlow*,
   2014 WL 2468817 (W.D. Va. June 3, 2014) (Moon, J.) ......................................23

*Robinson v. Long*,
   No. 18-6121, 814 F. App'x 991, 2020 WL 2551889 (6th Cir. May 20, 2020) .......30

*Rogers Grp., Inc. v. City of Fayetteville, Ark.*,
   683 F.3d 903 (8th Cir. 2012) ..............................................................................26

*Select Milk Producers, Inc. v. Johanns*,
   400 F.3d 939 (D.C. Cir. 2005).............................................................................26

*Singer Mgmt. Consultants, Inc. v. Milgram*,
   650 F.3d 223 (3d Cir. 2011) (en banc).................................................................27

*Smyth v. Carter*,
   168 F.R.D. 28 (W.D. Va. 1996).................................................................. *passim*

*Smyth v. Carter*,
  88 F. Supp. 2d 567 (W.D. Va. 2000) ......................................................................................18

*Smyth v. Carter*,
  No. Civ. A 5:96CV00089, 2000 WL 1567168 (W.D. Va. Oct. 17, 2000) ......................*passim*

*Smyth ex rel. Smyth v. Rivero*,
  282 F.3d 268 (4th Cir. 2002) .........................................................................................*passim*

*Sole v. Wyner*,
  551 U.S. 74 (2007)..........................................................................................................*passim*

*Stinnie v. Holcomb*,
  355 F. Supp. 3d 514 (W.D. Va. 2018) ............................................................................*passim*

*Stinnie v. Holcomb*,
  396 F. Supp. 3d 653 (W.D. Va. 2019) .................................................................................12

*Stinnie v. Holcomb*,
  734 F. App'x 858 (4th Cir. 2018) ........................................................................................7

*Stinnie v. Holcomb*,
  No. 3:16-cv-00044, 2017 WL 963234 (W.D. Va. Mar. 13, 2017) .................................*passim*

*Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*,
  489 U.S. 782 (1989).......................................................................................................*passim*

*Veasey v. Wilkins*,
  158 F. Supp. 3d 466 (E.D.N.C. 2016).............................................................................24, 25

*Veasey v. Wilkins*,
  No. 5:14-CV-369-BO, 2015 WL 4622694 (E.D.N.C. July 31, 2015)....................................25

*White v. Shwedo*,
  No. 2:19-CV-3083-RMG, 2020 WL 2315800 (D.S.C. May 11, 2020)..................................30

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................................*passim*

## Statutes

42 U.S.C. § 1988.................................................................................................................*passim*

Va. Code Ann. § 19.2-354.1 ...............................................................................................*passim*

Va. Code Ann. § 19.2-355(A)...................................................................................................4

Va. Code Ann. § 46.2-395 ..................................................................................................*passim*

**Rules**

Fed. R. Civ. P. 23(b)(2)..................................................................................10

Va. Sup. Ct. R. 1:24(d) ..................................................................................8

**Legislative Materials**

2017 Va. Acts chs. 802, 806 ..........................................................................8

2020 Va. Acts ch. 965 ...................................................................................13

H.B. 30, 2020 Session,
    https://budget.lis.virginia.gov/item/2020/1/hb30/introduced/3/3-6.03/ ..................................13

H.B. 1700, 2019 Session,
    https://lis.virginia.gov/cgi-bin/legp604.exe?ses=191&typ=bil&val=HB1700......................12

Judicial Council of Virginia, *Report to the General Assembly and Supreme Court
    of Virginia* (2015),
    http://www.courts.state.va.us/courtadmin/judpolicies/2015_jcv_report.pdf ...........................5

S.B. 1, 2020 Session, https://lis.virginia.gov/cgi-
    bin/legp604.exe?ses=201&typ=bil&val=sb1 ........................................................13

S.B. 181, 2018 Session, https://lis.virginia.gov/cgi-
    bin/legp604.exe?181+sum+SB181 .................................................................9

S.B. 1013, 2019 Session, https://lis.virginia.gov/cgi-
    bin/legp604.exe?ses=191&typ=bil&val=sb1013 ................................................11

S.B. 1280, 2017 Session, https://lis.virginia.gov/cgi-
    bin/legp604.exe?ses=171&typ=bil&val=sb1280 ..................................................9

**Other Authorities**

Dean Seal, *New law doesn't put automatic driver's license suspension issues to
    bed, critics say*, Daily Progress (June 29, 2017), https://tinyurl.com/y3k74239 .....................8

Drive-to-Work, *Advocacy*, https://www.drivetowork.org/info/dtw-advocacy.cfm .......................4

*Governor Terry McAuliffe delivers final State of the Commonwealth Address*,
    WSLS 10 (Jan. 11, 2017), https://www.wsls.com/news/2017/01/11/governor-
    terry-mcauliffe-delivers-final-state-of-the-commonwealth-address/........................................9

Graham Moomaw, *McAuliffe looks to roll back driver's license suspensions as
    part of criminal justice reform package*, Richmond Times-Dispatch (Jan. 3,
    2017) .............................................................................................................9

Katherine Knott, *Northam Proposes End to Driver's License Suspensions Over Court Fees*, Daily Progress (Mar. 26, 2019), https://tinyurl.com/y3wamh5n .................12, 15

Legal Aid Justice Center, *Driven Deeper Into Debt: Unrealistic Repayment Options Hurt Low-Income Court Debtors* (May 2016), https://tinyurl.com/yxo8xve3 .................................................................5

Legal Aid Justice Center, *Our 2018 VA Legislative Priorities* (Jan. 16, 2018), https://www.justice4all.org/2018/01/16/our-2018-va-legislative-priorities/ ...........................9

Letter from Claire Guthrie Gastañaga, ACLU to Governor Terry McAuliffe (Mar. 17, 2017), https://tinyurl.com/y4r4mpxu ...............................................................9

Mario Salas & Angela Ciolfi, LAJC, *Driven by Dollars: A State-by-State Analysis of Driver's License Suspension Laws for Failure to Pay Court Debt* (Fall 2017) .........................................................................5

NBC29.com, *LAJC Continuing Fight to End Driver's License Suspension Due to Fees* (Feb. 13, 2019), https://www.nbc29.com/story/39959526/lajc-drivers-license-fee-fight-02-13-2019 ...................................................11

Paul Collins, *Four Republicans who Comprise Henry/Patrick Legislative Delegation Explain their Successes (Tax Cuts) and their Frustrations (Executive Branch Turmoil),* Martinsville Bulletin (Mar. 11, 2019), https://tinyurl.com/y6t5drt3 .................................................................11

Press Release, Governor Ralph Northam, *Governor Northam Announces Budget Amendment to Eliminate Driver's License Suspensions for Nonpayment of Court Fines and Costs* (Mar. 26, 2019), https://www.governor.virginia.gov/newsroom/all-releases/2019/march/headline-839710-en.html .......................................................12

Press Release, Governor Ralph Northam, *Governor Northam Delivers State of the Commonwealth Address* (Jan. 8, 2020), https://www.governor.virginia.gov/newsroom/allreleases/2020/january/headline-850663-en.html ...............................................................13

Travis Fain, *McAuliffe: Most of my legislative goals met*, Daily Press (Oct. 6, 2016) .........................................................................8

Travis Fain, *McAuliffe signs bill on drivers license suspensions*, Daily Press (May 25, 2017) ........................................................................8

Wright & Miller, 11A Fed. Prac. & Proc. § 2948.3 (3d ed.) ........................................26

## INTRODUCTION

Plaintiffs sought expansive relief in this suit that they never received—not even close. They asked for, among other things:

- a declaratory judgment that now-repealed Virginia Code § 46.2-395, "as written and as implemented," was unconstitutional on its face and as applied;

- a preliminary and permanent injunction against § 46.2-395's enforcement as to the hundreds of thousands of drivers with suspended licenses;

- reinstatement (without fees) of those hundreds of thousands of driver's licenses; and

- certification of a class of drivers whose licenses are suspended, as well as a class of drivers whose licenses will be suspended in the future.

Not only did Plaintiffs not obtain any of this relief, they never received a final determination on the merits of *any* of their claims before Governor Northam and the General Assembly—led by a new political majority and responding to years of growing public opposition to the license-suspension policy—repealed § 46.2-395 altogether. And because Plaintiffs then agreed that repeal had mooted their case, the Court dismissed it.

The only relief Plaintiffs obtained before dismissal was a narrow preliminary injunction ruling based on the Court's prediction that Plaintiffs were "likely to succeed" on one of their five claims. The Court granted a limited injunction, requiring the Commissioner to alter DMV's database to remove the courts' suspensions of only the named Plaintiffs (two of whom did not have suspended licenses anyway) and to not enforce § 46.2-395 against them unless or until notice and hearing were provided.

On the basis of that narrow preliminary relief alone, Plaintiffs now assert that they are "prevailing parties" and therefore entitled to fees under 42 U.S.C. § 1988. But under controlling Fourth Circuit precedent, obtaining a preliminary injunction is not enough to confer prevailing-party status. *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268 (4th Cir. 2002). In *Smyth*, the Fourth

1

Circuit correctly reasoned that "the merits inquiry in the preliminary injunction context is necessarily abbreviated" and, "because of the preliminary, incomplete examination[,] . . . is ill-suited to guide the prevailing party determination." *Id.* at 276, 277 n.8. In so holding, the Court rejected the precise arguments Plaintiffs make here. *Smyth* remains binding and, contrary to Plaintiffs' suggestion, has not been undermined by intervening Supreme Court precedent.

The Court should decline Plaintiffs' invitation to ignore *Smyth* and instead follow the law in ***other*** jurisdictions. Not only are the out-of-circuit decisions cited by Plaintiffs non-binding and irrelevant in light of existing, on-point Fourth Circuit authority, they are inconsistent and, in some cases, reflect standards that would not confer prevailing-party status on Plaintiffs anyway.

Moreover, sound policy reasons support the Fourth Circuit's approach. In addition to promoting judicial administrability and reducing secondary litigation—values the Supreme Court has emphasized in fee-eligibility cases—*Smyth*'s bright-line rule allows government defendants to make more informed litigation and policy decisions in responding to legal challenges, including whether the public interest is best served by amending or repealing challenged laws.

Finally, this case exemplifies why the Fourth Circuit's skepticism about preliminary merits determinations is warranted. Given the Court's necessarily abbreviated inquiry into the merits of Plaintiffs' claims, they were never seriously put to the test—but if they had been, the growing consensus of case law would have supported Defendant's position. The Fourth Circuit's approach recognizes that this Court's good-faith, but ultimately mistaken, prediction about Plaintiffs' probability of success should not confer prevailing-party status.

Plaintiffs' fee petition should be denied.[1]

---

[1] If the Court nonetheless finds that Plaintiffs are entitled to fees as prevailing parties, Defendant reserves all arguments regarding the amount of recoverable fees, including based on the degree of Plaintiffs' success in this litigation. *See* Dkt. 232 (bifurcating briefing accordingly).

## BACKGROUND

The factual and procedural background to this case demonstrates why Plaintiffs are prudent to disclaim the "catalyst" theory in pursuing fees. *See* Pls.' Br. at 22–25. Even if such a theory were available to them—which it is not, *see Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001)—it would be unavailing. Contrary to their assertions, *see, e.g.*, Pls.' Br. at 8–9, the eventual repeal of § 46.2-395 was not a response to Plaintiffs' suit nor an admission that any of their claims had merit. Rather, it was the culmination of years of legislative advocacy, growing public opposition to the license-suspension policy, and the changed political composition of the General Assembly.

### A.   Under former Virginia Code § 46.2-395, courts suspended the driving privileges of those who owed court fees and costs.

Before the General Assembly suspended operation of § 46.2-395 in 2019 and permanently repealed it in 2020, Code § 46.2-395 required that Virginia "court[s] shall forthwith suspend" the driving privileges of those who fail or refuse to pay their court fees and costs. *See* Va. Code Ann. § 46.2-395(B). Following a court's suspension of driving privileges, the clerk of court was responsible for sending the "record of the person's failure or refusal and of the license suspension . . . to the Commissioner" of DMV." *Id.* § 46.2-395(C). While a driver's suspension generally would continue until debts were paid, a suspending court could restore driving privileges by approving a deferred payment agreement, *id.* § 19.2-354(A); community service, *id.* § 19.2-354(C); or a restricted license, which permits driving for a variety of limited purposes, *id.* § 46.2-395(E).

In addition to the public notice of possible suspension provided by § 46.2-395(B) itself, the Code required courts to follow certain notice procedures. The clerk of the court to which a defendant was indebted would "provide or cause to be sent to the person written notice of the

suspension of his license or privilege to drive a motor vehicle in Virginia, effective 30 days from the date of conviction, if the [fines and costs are] not paid prior to the effective date of the suspension as stated on the notice." *Id.* § 46.2-395(C). The notice was mailed within five days of the date of conviction or delivered to the defendant at the time of trial. As long as those procedures were followed, "[n]o other notice shall be required to make the suspension effective." *Id.* Drivers with concerns about their ability to pay had an opportunity to be heard at the time of sentencing, and again if they petitioned the suspending court for a payment plan or a community service alternative, Va. Code Ann. §§ 19.2-354.1, 19.2-355(A), or to reduce or forgive the debt, *id.* §§ 19.2-354, 19.2-354.1.

**B.     Public and political opposition grow to the license-suspension policy.**

Long before this suit or § 46.2-395's repeal, opposition was growing to Virginia's license-suspension policy. As early as 2007, O. Randolph Rollins, a former Virginia Secretary of Public Safety (and retired partner of Plaintiffs' co-counsel McGuireWoods), formed an advocacy organization called Drive-to-Work to help restore drivers' licenses and advocate for changes to license-restoration laws. It claims success in helping pass more than a dozen new laws since 2008 to help drivers, including those whose licenses were suspended for failure to pay court debt. *See* Drive-to-Work, *Advocacy*, https://www.drivetowork.org/info/dtw-advocacy.cfm (last visited Aug. 23, 2020).

Plaintiffs' co-counsel the Legal Aid Justice Center (LAJC) has been among those bringing public attention to the plight of drivers suspended for failure to pay court debt. By the time it issued its report *Driven Deeper Into Debt* in May 2016, it was clear that "growing national attention [was] focusing on court debt and the ways in which assessment and recoupment systems do—or do not—

give adequate attention to indigence and inability to pay."[2] The report cited national license-suspension reform efforts by organizations from the American Association of Motor Vehicle Administrators, *id.* at 6, to the Civil Rights Division of the U.S. Department of Justice, *id.* at 17 n.14. *See also* Mario Salas & Angela Ciolfi, LAJC, *Driven by Dollars: A State-by-State Analysis of Driver's License Suspension Laws for Failure to Pay Court Debt* (Fall 2017) at 1 ("Despite their widespread use, license-for-payment systems are increasingly drawing critical scrutiny from motor vehicle safety professionals, anti-poverty and civil rights advocates, and policymakers.").

In Virginia, reform efforts were underway by the government even before LAJC's report. For instance, in May 2015, the Judicial Council of Virginia submitted to the General Assembly and the Supreme Court of Virginia recommendations for the collection of unpaid fines and court costs. *See* Judicial Council of Virginia, *Report to the General Assembly and Supreme Court of Virginia* (2015) at 2, http://www.courts.state.va.us/courtadmin/judpolicies/2015_jcv_report.pdf. And in March 2016, the General Assembly created a joint committee to study the use of driver's license suspension as a collection method for unpaid court fines and costs. H.J. 69 (Va. 2016).

### C.  Plaintiffs bring suit asserting the unconstitutionality of § 46.2-395 and demanding the restoration of hundreds of thousands of licenses.

Even as reform efforts were underway, and the political will was growing to repeal § 46.2-395, LAJC supplemented its legislative advocacy by helping four plaintiffs bring suit to invalidate it. On July 6, 2016, they filed this putative class action suit against DMV Commissioner Holcomb, challenging the constitutionality of § 46.2-395 as applied to themselves and others who purportedly are unable to pay their court debts. *See, e.g.*, Compl. at 50 ¶ 432, Dkt. 1. They asserted

---

[2] LAJC, *Driven Deeper Into Debt: Unrealistic Repayment Options Hurt Low-Income Court Debtors* (May 2016) at 17, https://tinyurl.com/yxo8xve3 (last visited Aug. 23, 2020).

five counts, alleging a range of due process and equal protection violations. *See generally id.* at 46–62 ¶¶ 399–450.

Plaintiffs demanded a variety of relief, beginning with certification of a class, *id.* at 53, consisting of "all persons whose Virginia driver's licenses are suspended due to unpaid court debt and who, at the time of the suspension, were not able to pay due to their financial circumstances," *id.* at 42 ¶ 373. They requested a declaratory judgment that the Commissioner violated their constitutional rights, and asked the court to enjoin the Commissioner "from issuing or processing orders of driver's license suspension for unpaid court debt against" Plaintiffs and the putative class. *Id.* at 54. They also asked the court to "[p]reliminarily and permanently issue an injunction ordering the Defendant to reinstate the Plaintiffs' and Class Members' driver's licenses (insofar as they are suspended based on unpaid court debt and/or on driving on licenses suspended due to unpaid court debt)" without reinstatement fees. *Id.*

### D.   This Court dismisses the case for lack of subject-matter jurisdiction, and the Fourth Circuit dismisses Plaintiffs' appeal for lack of appellate jurisdiction.

On March 13, 2017, the Court dismissed the case, without prejudice, for lack of subject-matter jurisdiction. *Stinnie v. Holcomb*, No. 3:16-cv-00044, 2017 WL 963234 (W.D. Va. Mar. 13, 2017) [Dkt. 57]. Because "jurisdiction [was] absent from the current iteration of the lawsuit," the Court determined it "lack[ed] the lawful ability to rule on the merits of Plaintiffs' challenge . . . as [it] is currently constituted." *Id.* at *1. After analyzing the "text, structure, and meaning of § 46.2-395," it recognized that "a suspension under § 46.2-395 is done *by the state court*, not the Commissioner, for failure to pay court costs and fines." *Id.*

In light of that analysis, the Court concluded that it lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine, because Plaintiffs lacked standing, and because the suit was barred under the Eleventh Amendment. *Id.* at *11–19. The Court pointed out that Plaintiffs could press

their claims "in the state courts and eventually in the U.S. Supreme Court, and it may be possible to reconstitute them in a form and against a defendant such that a lower federal court would have jurisdiction. For now, though, this Court is empowered only to dismiss this case without prejudice for lack of jurisdiction." *Id.* at *20.[3]

Rather than amend their complaint, file a new lawsuit, or attempt to obtain relief in Virginia state courts, Plaintiffs chose instead to appeal this Court's ruling. That effort also was unsuccessful. On May 23, 2018, the Fourth Circuit issued an unpublished opinion dismissing the appeal for lack of appellate jurisdiction. *Stinnie v. Holcomb*, 734 F. App'x 858 (4th Cir. 2018). The panel majority reasoned that because "Plaintiffs may be able to cure the deficiencies identified by the district court by amending their complaint," the dismissal "was not a final, appealable order." *Id.* at 862. It "express[ed] no opinion as to the correctness of the district court's decision." *Id.*

Chief Judge Gregory dissented, explaining that he would have concluded that this Court's dismissal was an appealable final order. *Id.* at 863 (Gregory, C.J., dissenting). But rather than confining his opinion to that subject, Chief Judge Gregory then proceeded, "unlike the majority, [to] decide whether the dismissal was proper." *Id.* The pages of dicta that followed were replete with criticism of Virginia's license-suspension policy. *See, e.g.*, *id.* at 864 (remarking that "the state traps thousands of Virginians in a nightmarish spiral for which there is no apparent exit"). These critical remarks have featured prominently in Plaintiffs' filings ever since, *see, e.g.*, Pls.' Br. at 1, 3–4, but they are not the law of the case.[4]

---

[3] The Court also denied Plaintiffs' motion for reconsideration and granted Defendant's motion to strike eleven exhibits that Plaintiffs filed in support of their motion. Dkt. 72.

[4] Despite that Chief Judge Gregory's musings—offered in dissent, in an unpublished opinion, on a subject expressly avoided by the majority—lack any legal significance, Plaintiffs continue to assign undue importance to them. *See, e.g.*, Pls.' Br. at 3 (opining that the dissent "strongly hinted at the eventual resolution of this case in Plaintiffs' favor").

### E. Political will to reform Virginia's license-suspension policy grows even as Plaintiffs' suit fails.

While Plaintiffs' suit foundered in the courts, legislative advocacy and reform efforts continued to bear fruit.

In November 2016, the Supreme Court promulgated a new rule requiring courts to give written notice of the availability of deferred and installment payment plans, as well as community-service options, and to ensure that the length of payment agreements and the payment amounts are reasonable in light of a defendant's financial resources and obligations. *See* Va. Sup. Ct. R. 1:24(d). The General Assembly codified that rule the following year, *see* 2017 Va. Acts chs. 802, 806 (adding Code § 19.2-354.1), prompting a leading reform advocate to praise the "shift in mindset" among the legislative leadership.[5]

Not all were content with the pace of reform, though; LAJC leadership, for instance, felt that "a stronger political solution would have been to dump the automatic suspension policy completely."[6] But momentum *was* growing among lawmakers to do just that. By the fall of 2016, Governor McAuliffe was already planning to "make a push . . . for legislation in the 2017 session to change the state's policy of suspending those who don't pay court costs,"[7] and he followed

---

[5] *See* Travis Fain, *McAuliffe signs bill on drivers license suspensions*, Daily Press (May 25, 2017), https://www.dailypress.com/government/dp-nws-mcauliffe-drivers-license-bill-20170525-story.html ("Claire Gastañaga, who lobbies in Richmond for the American Civil Liberties Union, called the bills 'a wonderful step forward.' She also said the philosophical change among state leaders on these issues is also important. . . . 'I really like the shift in mindset,' Gastañaga said.").

[6] Dean Seal, *New law doesn't put automatic driver's license suspension issues to bed, critics say*, Daily Progress (June 29, 2017), https://tinyurl.com/y3k74239.

[7] Travis Fain, *McAuliffe: Most of my legislative goals met*, Daily Press (Oct. 6, 2016), https://www.dailypress.com/government/local/dp-mcauliffe-most-of-my-legislative-goals-met-20161006-post.html ("McAuliffe said he's told Department of Motor Vehicles Commissioner Richard Holcomb to put together a presentation on the issue. 'I'm having Rick and his team

8

through on those plans.[8] Despite support from organizations like the American Civil Liberties Union,[9] repeal efforts were unsuccessful.[10] Again in 2018, legislators sponsored bills to repeal § 46.2-395. For instance, Senator William Stanley's repeal bill was among the LAJC's top legislative priorities,[11] but after passing the Senate it was killed in a House subcommittee.[12]

**F.      Plaintiffs file an Amended Complaint; the Court finds jurisdiction and grants a preliminary injunction on a single aspect of Plaintiffs' claims.**

In September 2018, five Plaintiffs—none original other than Stinnie—filed a First Amended Class Action Complaint asserting that § 46.2-395 was unconstitutional for violations of procedural due process and equal protection. Dkt. 84.[13] Three Plaintiffs alleged that their licenses

---

come over and we will talk about it,' McAuliffe said. . . . 'I do think we need to do something about it.'").

[8] Graham Moomaw, *McAuliffe looks to roll back driver's license suspensions as part of criminal justice reform package*, Richmond Times-Dispatch (Jan. 3, 2017), https://tinyurl.com/y24bg9mg.  *See also Governor Terry McAuliffe delivers final State of the Commonwealth Address*, WSLS 10 (Jan. 11, 2017), https://www.wsls.com/news/2017/01/11/governor-terry-mcauliffe-delivers-final-state-of-the-commonwealth-address/ ("Another step we can take to protect Virginians' economic productivity is to limit the number of people whose driver's licenses are suspended due to unpaid court costs and non-driving related offenses.").

[9] *See* Letter from Claire Guthrie Gastañaga, ACLU to Governor Terry McAuliffe at 3 (Mar. 17, 2017), https://tinyurl.com/y4r4mpxu.

[10]      *See, e.g.*, Va.'s Legislative Info. Sys., 2017 Session, S.B. 1280, https://lis.virginia.gov/cgi-bin/legp604.exe?ses=171&typ=bil&val=sb1280.

[11]      LAJC, *Our 2018 VA Legislative Priorities* (Jan. 16, 2018), https://www.justice4all.org/2018/01/16/our-2018-va-legislative-priorities/.

[12] *See, e.g.*, Va.'s Legislative Info. Sys., 2018 Session, S.B. 181, https://lis.virginia.gov/cgi-bin/legp604.exe?181+sum+SB181.

[13] Plaintiffs' claims were both facial and as-applied. *See id.* at 2 ¶ 5 n.1. "Section 46.2-395 unconstitutionally violates procedural due process on its face by revoking driver's licenses—constitutionally protected property interests—without notice or a hearing. In this regard, every enforcement of the provision is unconstitutional." *Id.*

were suspended for failure to pay court debt, *id.* ¶¶ 96, 140, 177; two alleged that they feared such a suspension in the future, *id.* ¶¶ 253, 257. All told, they alleged that more than 970,000 drivers' licenses were unlawfully suspended under § 46.2-395. *Id.* ¶ 303.

Plaintiffs requested, among other things: class certification; a declaratory judgment that § 46.2-395 is unconstitutional; a declaratory judgment that the Commissioner's actions are unconstitutional; a preliminary and permanent injunction ordering the Commissioner to remove any suspensions imposed under § 46.2-395 and to reinstate suspended licenses without requiring a reinstatement fee; and a preliminary and permanent injunction prohibiting the Commissioner from enforcing § 46.2-395 against Plaintiffs and others in the future. *Id.* at 45.

Plaintiffs also filed motions for class certification and a preliminary injunction. Dkt. 85, 88. On December 21, 2018, the Court granted a preliminary injunction. In its accompanying opinion, it first rejected the jurisdictional arguments that it previously found barred its consideration. *Compare Stinnie*, 2017 WL 963234, at \*11–19, *with Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 523–26 (W.D. Va. 2018). It then applied the four-factor test for a preliminary injunction, 355 F. Supp. 3d at 527–32, and found "it likely that Plaintiffs will succeed in establishing that § 46.2-395 violates procedural due process," *id.* at 532. Specifically, the Court concluded that the hearing procedures provided by § 46.2-395 were "not sufficient to protect against the erroneous deprivation of the property interest involved." *Id.* at 530. Concluding that the other three "factors relevant to the issuance of a preliminary injunction also weigh in favor of Plaintiffs," *id.* at 532, the Court granted a narrow preliminary injunction. The Court limited relief to the named Plaintiffs,[14] and required the Commissioner to "remove" the suspensions (*i.e.*, alter

---

[14] *See* Preliminary Injunction at 1 n.1 ("Until the Court determines 'that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole,' Fed. R. Civ. P. 23(b)(2), this Order applies only to named Plaintiffs . . . ."), Dkt. 127.

DMV's database to hide the courts' suspensions of their licenses) of the three Plaintiffs with suspended licenses, "reinstate" their licenses without fees, and not enforce § 46.2-395 against them unless or until notice and hearing was provided. Dkt. 127.

**G.    In 2019, Republican members of a House subcommittee again block repeal legislation, but the full General Assembly imposes a temporary suspension of § 46.2-395, and this case is stayed.**

In the General Assembly's 2019 regular session, legislators renewed their efforts to revise or repeal § 46.2-395, but these efforts again were blocked. For instance, although Senator Stanley's S.B. 1013 won overwhelming approval in the Senate,[15] Republican members of the House Courts of Justice subcommittee voted to pass by the bill indefinitely.[16] Senator Stanley "guarantee[d]" he would reintroduce repeal legislation in the 2020 session,[17] and LAJC representatives also indicated they would attempt to do so.[18]

Governor Northam, however, proposed an amendment to the 2018–2020 budget that suspended the license-suspension policy in the budget's second year, July 1, 2019 to June 30, 2020.[19] Announcing his proposal on March 26, 2019, Governor Northam explained that the

---

[15] Va.'s Legislative Info. Sys., 2019 Session, S.B. 1013, https://lis.virginia.gov/cgi-bin/legp604.exe?ses=191&typ=bil&val=sb1013.

[16] Va.'s Legislative Info. Sys., 2019 Session, S.B. 1013, February 11, 2019 House Subcommittee Recommendation, http://lis.virginia.gov/cgi-bin/legp604.exe?191+vot+H0801V0134+SB1013.

[17] *See* Paul Collins, *Four Republicans who Comprise Henry/Patrick Legislative Delegation Explain their Successes (Tax Cuts) and their Frustrations (Executive Branch Turmoil)*, Martinsville Bulletin (Mar. 11, 2019), https://tinyurl.com/y6t5drt3.

[18] NBC29.com, *LAJC Continuing Fight to End Driver's License Suspension Due to Fees* (Feb. 13, 2019), https://www.nbc29.com/story/39959526/lajc-drivers-license-fee-fight-02-13-2019.

[19] Consistent with how § 46.2-395 operated, the amendment effectuated that policy shift by disabling the courts from exercising their suspending power. *See* Va.'s Legislative Info. Sys., 2019 Session, H.B. 1700 at Amendment 33,

amendment would also "reinstate driving privileges for the more than 627,000 Virginians who currently have their licenses suspended."[20] Although there is no evidence that this litigation had any impact on the budget amendment,[21] without doubt the legislation had an impact on the litigation. After Governor Northam's announcement, LAJC leaders informed the press that the proposed amendment, if passed, would "render the lawsuit moot."[22] Pass it did, by wide margins: 70 to 29 in the House, and 30 to 8 in the Senate.[23]

In the wake of the amendment's adoption, the Court granted Defendant's motion to stay the case pending the General Assembly's 2020 session. The Court reasoned that, "if the General Assembly fails to repeal § 46.2-395, the Court will have ample time to address the merits of the case, or at the very least class certification and the continued application of the preliminary injunction to class members . . . ." *Stinnie v. Holcomb*, 396 F. Supp. 3d 653, 661 (W.D. Va. 2019).

---

https://budget.lis.virginia.gov/amendment/2019/1/HB1700/Enrolled/GE/ (providing that, "notwithstanding the provisions of § 46.2-395 of the Code of Virginia, no court shall suspend any person's privilege to drive a motor vehicle solely for failure to pay any fines [or] court costs").

[20] Press Release, Governor Ralph Northam, *Governor Northam Announces Budget Amendment to Eliminate Driver's License Suspensions for Nonpayment of Court Fines and Costs* (Mar. 26, 2019), https://www.governor.virginia.gov/newsroom/all-releases/2019/march/headline-839710-en.html.

[21] Plaintiffs speculate that the "General Assembly's passage of the Budget Amendment was undoubtedly influenced by this litigation." Pls.' Br. at 8. But the only supposed evidence they offer is irrelevant—a comment by Delegate Jones about the disposition of funds within the budget to make up revenue lost by DMV and the Trauma Center Fund in the absence of license reinstatement fees. *Id.*

[22] *See, e.g.*, Katherine Knott, *Northam Proposes End to Driver's License Suspensions Over Court Fees*, Daily Progress (Mar. 26, 2019), https://tinyurl.com/y3wamh5n ("[Director of LAJC Angela] Ciolfi said if the General Assembly passes Northam's amendment, then that would render the lawsuit moot.").

[23] Va.'s Legislative Info. Sys., 2019 Session, H.B. 1700, Summary, https://lis.virginia.gov/cgi-bin/legp604.exe?ses=191&typ=bil&val=HB1700.

As it turned out, the Court never did "address the merits of the case."

**H.      In the 2020 session of the General Assembly, now controlled by Democrats, § 46.2-395 is permanently repealed.**

In the November 2019 general election, a sufficient number of Democratic candidates won their elections to form majorities in both the House of Delegates and the Senate, which brought new leadership to committees that previously killed bills to repeal § 46.2-395. Addressing this new General Assembly at the start of its 2020 session in January, Governor Northam identified eliminating the license-suspension requirement as among his top criminal justice priorities. He specifically called on legislators to "mak[e] permanent the temporary policy you passed last year— the one that says no more suspended drivers licenses, just because you owe court fines."[24]

The General Assembly responded, considering at least seven bills to permanently repeal the license-suspension requirement. Senator Stanley's S.B. 1—a version of what he had proposed in 2018 and 2019—emerged as the lead proposal, and both chambers passed it overwhelmingly: 75-25 in the House, and 38-1 in the Senate.[25] Governor Northam signed it into law on April 9, 2020. Effective July 1, 2020, the legislation eliminated § 46.2-395 from the Code of Virginia and required the DMV Commissioner to reinstate, without payment of fees, driving privileges that were suspended by courts under § 46.2-395. *See* 2020 Va. Acts ch. 965.

---

[24] Press Release, Governor Ralph Northam, *Governor Northam Delivers State of the Commonwealth Address* (Jan. 8, 2020), https://www.governor.virginia.gov/newsroom/allreleases/2020/january/headline-850663-en.html. *See also id.* (explaining that "[t]his temporary policy is working. Let's make it permanent."). In his proposed budget for the 2020–2022 biennium, Governor Northam also included language that would extend the temporary elimination of the suspension requirement, which would have provided a backstop if permanent-repeal legislation failed. *See* H.B. 30, Item 3-6.03, https://budget.lis.virginia.gov/item/2020/1/hb30/introduced/3/3-6.03/.

[25] *See* Va.'s Legislative Info. Sys., 2020 Session, S.B. 1, https://lis.virginia.gov/cgi-bin/legp604.exe?ses=201&typ=bil&val=sb1 (last accessed Aug. 25, 2020).

After years of advocacy, reform efforts, and political opposition, Virginia's license-suspension policy had been eliminated. And throughout all those efforts, neither the alleged unconstitutionality of the license-suspension policy nor the Court's entry of a preliminary injunction was the motivating factor behind repeal.[26]

**I.      The case is dismissed as moot, leaving Plaintiffs with no enduring relief.**

In light of § 46.2-395's permanent repeal, the parties on May 7, 2020 jointly filed a stipulation of dismissal "agree[ing] that this case is moot." Dkt. 231 at 2 ¶ 3. Later that day, the Court adopted the stipulation and dismissed the case, but retained jurisdiction to decide, through bifurcated briefing, whether to award attorneys' fees and, if so, in what amount. Dkt. 232.

At the time the case was dismissed, Plaintiffs had received no declaratory judgment about the facial and as-applied constitutionality of § 46.2-395; no preliminary and permanent injunction against § 46.2-395's enforcement as to the hundreds of thousands of drivers with suspended licenses; and no reinstatement of those hundreds of thousands of drivers' licenses. Plaintiffs also had not received a final determination on the merits of ***any*** of their claims. In fact, Defendant moved for summary judgment on the ground that the claims were meritless—a motion that remained pending at dismissal. Plaintiffs' motion for class certification, which Defendant opposed, also remained pending.

Plaintiffs' counsel once expressed that their "greatest wish" was two-fold—"for this practice [of license suspension] to end and for the one million people to get their licenses back."

---

[26] Plaintiffs cite a letter from Commissioner Holcomb to Senator Stanley to show the purported "direct impact this case was having on the legislative process." Pls.' Br. at 9 (quoting Dkt. 221-1 at 2). But the fact that the Commissioner suggested accelerating the effective date of repeal legislation (which, in fact, did not occur) says nothing about the merits of Plaintiffs' claims or his defense against them.

That was "all [they were] really asking for in the lawsuit."[27] While Plaintiffs eventually got their wish, it was not granted by this Court or obtained in this case.

## LEGAL STANDARDS

Under the "American Rule" of fee liability, courts follow "a general practice of not awarding fees to a prevailing party absent explicit statutory authority." *Key Tronic Corp. v. United States,* 511 U.S. 809, 819 (1994). Congress created an exception in 42 U.S.C. § 1988(b), allowing "the prevailing party" in a §1983 suit "a reasonable attorney's fee as part of the costs." But attorney's fees are awarded "only when a party has prevailed on the merits of at least some of his claims." *Hanrahan v. Hampton,* 446 U.S. 754, 758 (1980) (per curiam). *See also Hewitt v. Helms,* 482 U.S. 755, 760 (1987) ("Respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail.").

To confer prevailing-party status, a plaintiff's merits victory must have "the necessary judicial *imprimatur*." *Buckhannon*, 532 U.S. at 604. For instance, "enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989) (punctuation omitted). By contrast, a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur*." *Id.* The term "prevailing party" does not characterize "a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the 'sought-after destination' without obtaining any judicial relief." *Id.* at 606.

---

[27] Katherine Knott, *Northam Proposes End to Driver's License Suspensions Over Court Fees*, Daily Progress (Mar. 26, 2019), https://tinyurl.com/y3wamh5n.

A plaintiff "who secure[s] a permanent injunction but no monetary damages" may be a prevailing party. *Lefemine v. Wideman*, 568 U.S. 1, 2 (2012). But "[p]revailing party status . . . does not attend achievement of a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case." *Sole v. Wyner*, 551 U.S. 74, 83 (2007). Such an "initial victory" is "ephemeral." *Id.* at 86. Thus, a "plaintiff who achieves a transient victory at the threshold of an action can gain no award under [§ 1988(b)] if, at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded." *Id.* at 78. Rather, the "'change in the legal relationship' between [the plaintiff] and the state officials she sued" must be "enduring." *Id.* at 86 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792.

## ARGUMENT

This Court should reject Plaintiffs' request to be deemed prevailing parties for three primary reasons.

*First*, longstanding Fourth Circuit precedent holds that obtaining a preliminary injunction is simply insufficient to confer prevailing-party status. Contrary to Plaintiffs' assertion, no Supreme Court decision calls that result into doubt.

*Second*, the out-of-circuit cases cited by Plaintiffs are irrelevant and inconsistent. Plaintiffs themselves would not be considered prevailing parties under the standards adopted in several other circuits.

*Third*, sound policy reasons show that the Fourth Circuit's approach in *Smyth* is the correct one. Indeed, this case illustrates why courts should be hesitant to rely on a preliminary injunction as determinative of prevailing-party status.

16

I.     **Controlling authority from the Fourth Circuit demonstrates that Plaintiffs are not prevailing parties.**

A.     **Under *Smyth*, obtaining a preliminary injunction is insufficient to qualify as a prevailing party.**

While the Supreme Court has expressly left open "whether, in the absence of a final decision on the merits of a claim for permanent injunctive relief, the success in gaining a preliminary injunction may sometimes warrant an award of counsel fees," *Sole*, 551 U.S. at 86, the Fourth Circuit has addressed that question and answered it in the negative. In *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268 (4th Cir. 2002), a unanimous panel held that obtaining a preliminary injunction does not render a party "prevailing" for purposes of entitlement to fees under 42 U.S.C. § 1988.[28]

That decision is dispositive. And while it is telling that Plaintiffs avoid discussing this binding precedent until late in their brief, *see* Pls.' Br. at 21–22, the Court should consider it first. The following summary shows why.

1.     **Before appeal, this Court awards Smyth prevailing-party status, for the same reasons claimed by Plaintiffs here.**

Like this case, *Smyth* originated in this Court and challenged a Virginia governmental policy. Several recipients of Aid to Families with Dependent Children (AFDC)—a welfare program funded by the federal government and administered by the States—sued the Commissioner of the Virginia Department of Social Services (VDSS) challenging the Commonwealth's policy of requiring recipients to share paternity information for their children. The plaintiffs asserted various violations of the Social Security Act and related regulations, as well as the Supremacy and Equal Protection Clauses of the U.S. Constitution. *See generally Smyth v.*

---

[28] While Plaintiffs disparage the *Smyth* decision as "old," Pls.' Br. at 21, two of the three panel members—then-Chief Judge Wilkinson and Judge Motz—are still sitting.

17

*Carter*, 168 F.R.D. 28 (W.D. Va. 1996); *Smyth v. Carter*, No. Civ. A 5:96CV00089, 2000 WL 1567168, at *1 (W.D. Va. Oct. 17, 2000). This Court granted the plaintiffs a preliminary injunction enjoining the VDSS Commissioner from denying benefits to AFDC applicants or recipients who provided incomplete paternity information or attested under penalty of perjury that they lacked such information. *Smyth*, 168 F.R.D. at 34. In so doing, the Court determined that the "plaintiffs will likely succeed on the merits," *id.* at 31, because VDSS's policy was "impossible to square" with the "clear meaning of the [federal government's] regulations," *id.* at 32. *See also Smyth*, 282 F.3d at 272 (noting the district court's conclusion that the plaintiffs were "likely to succeed on the merits"). "Due to the preliminary injunction, the plaintiffs continued to receive [welfare] benefits [while] VDSS's original paternity identification policy was in effect." *Smyth v. Carter*, 88 F. Supp. 2d 567, 568 (W.D. Va. 2000).

Then the case became moot. "As a result of the plaintiffs' likely success on the merits of [their] argument, the defendant entered into a partial settlement agreement with the plaintiffs one day before the hearing on the plaintiffs' summary judgment motion, and also subsequently changed his policy." 2000 WL 1567168, at *4. Accordingly, the Court dismissed the case. *Smyth v. Carter*, 88 F. Supp. 2d 567 (W.D. Va. 2000). *See also Smyth*, 282 F.3d at 273.

When the plaintiffs later filed a petition for fees and costs, the defendant disputed their entitlement to prevailing-party status, arguing that "preliminary injunctions are not sufficiently final to establish a plaintiff as a prevailing party." *Smyth*, 2000 WL 1567168, at *4. This Court rejected that argument. It held that the defendant had "voluntarily ceased his unlawful behavior in response to the plaintiffs' litigation against him, thereby depriving the plaintiffs of the opportunity to obtain a favorable final judgment on the merits." *Id.* Accordingly, "the plaintiffs [could] be considered prevailing parties by virtue of their success in obtaining the preliminary injunction."

18

*Id.* Putting a fine point on its analysis, the Court distanced itself from the catalyst argument (just as Plaintiffs do here):

> The court makes these observations not to show that the plaintiffs' lawsuit operated as a catalyst for post-litigation changes in the defendant's conduct . . . but to show that, prior to dismissal of the case as moot, the plaintiff obtained a judgment against the defendant (the preliminary injunction), . . . which materially altered the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefitted the plaintiff.

*Id.* at \*5. *Accord* Pls.' Br. at 22–24 ("Plaintiff's theory for entitlement to attorneys' fees is not the catalyst theory. . . . Plaintiffs' Petition asks this Court to determine whether Plaintiffs' success in obtaining the preliminary injunction . . . makes them prevailing parties."). The Court then awarded the plaintiffs fees of $195,074.54. *Smyth*, 2000 WL 1567168, at \*11.

> ## 2. On appeal, the Fourth Circuit reverses this Court, finding that Smyth was not entitled to prevailing-party status by virtue of obtaining a preliminary injunction.

The Fourth Circuit reversed, concluding that this Court "erred in characterizing [the plaintiffs] as prevailing parties and granting them attorney's fees on that basis." 282 F.3d at 285.

On appeal, the plaintiffs argued that "the preliminary injunction they were awarded by the district court . . . effected the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees," 282 F.3d at 274 (quoting *Buckhannon*, 532 U.S. at 604 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792–93)). Under their theory, the preliminary injunction was "sufficient . . . to constitute an 'enforceable judgment[ ] on the merits.'" *Id.* at 275 (quoting *Buckhannon*, 532 U.S. at 604) (punctuation altered).

The Fourth Circuit panel unanimously disagreed. Critical to its conclusion was its observations about the nature of the preliminary injunction inquiry. As it explained, "[w]hile granting such an injunction does involve an inquiry into the merits of a party's claim, and is, like any court order, 'enforceable,' the merits inquiry in the preliminary injunction context is

necessarily abbreviated." *Id.* at 276 (citation omitted). Thus, a "district court's determination that such a showing [of likelihood of success on the merits] has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome." *Id.* "The fact that a preliminary injunction is granted in a given circumstance . . . by no means represents a determination that the claim in question will or ought to succeed ultimately; that determination is to be made upon the 'deliberate investigation' that follows the granting of the preliminary injunction." *Id.* Thus, at bottom, because of "the preliminary, incomplete examination of the merits involved," a preliminary injunction conclusion "is ill-suited to guide the prevailing party determination." *Id.* at 277 n.8.

The Fourth Circuit also rejected the plaintiffs' other arguments and, accordingly, reversed the district court's decision. The plaintiffs petitioned for *certiorari*, but the Supreme Court declined to revisit the Fourth Circuit's decision. 123 S. Ct. 112 (2002).

### 3.    *Smyth* dictates the outcome here.

The strong parallels with *Smyth* underscore why that case is dispositive here.

Just as in *Smyth*, the Court found that Plaintiffs were likely to succeed on a single claim and therefore granted a preliminary injunction. *Compare Smyth*, 168 F.R.D. at 31 ("plaintiffs will likely succeed on the merits"), *with Stinnie*, 355 F. Supp. 3d at 520 ("Plaintiffs are likely to succeed on the merits of their procedural due process claim . . . .").

Just as in *Smyth*, this case was later dismissed as moot, with no further relief having been granted. *Compare Smyth*, 88 F. Supp. 567, *with* Dkt. 232.

Just as in *Smyth*, to seek fees Plaintiffs insist the preliminary injunction is a judgment "on the merits." *Compare Smyth*, 282 F.3d at 275 ("The preliminary injunction entered by the district court is sufficient, they assert, to constitute an enforceable judgment on the merits.") (citation

omitted and punctuation altered), *with* Pls.' Br. at 1, 4 (emphasizing that the Court's determination was "on the merits").

And just as in *Smyth*, Plaintiffs submit that obtaining a preliminary injunction confers on them prevailing-party status. *Compare Smyth*, 2000 WL 1567168, at *5 (preliminary injunction "materially altered the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefitted the plaintiff"), *with* Pls.' Br. at 11 ("Plaintiffs meet the standard for qualifying as prevailing parties for a simple reason—this Court's judicial imprimatur (in the form of a merits-based preliminary injunction) materially altered the relationship among the parties in a way that directly benefited Plaintiffs.").

The outcome the Fourth Circuit ordered in *Smyth* also should be the outcome here.

### B.     Intervening Supreme Court precedent does not call *Smyth* into question.

In the face of this controlling Fourth Circuit authority, Plaintiffs assert that the Court can simply ignore it. According to them, two intervening Supreme Court cases—*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and *Lefemine v. Wideman*, 568 U.S. 1 (2012) (per curiam)—render it "obsolete." *See* Pls.' Br. at 21–22. They are wrong.

Notably, given that the Supreme Court expressly left open in *Sole* the question of whether obtaining a preliminary injunction is sufficient to confer prevailing-party status, *see* 551 U.S. at 86, it is bold to claim that, somehow, *other* "Supreme Court precedent compels this Court to find Plaintiffs are prevailing parties," Pls.' Br. at 21. Moreover, as discussed below, neither case called the Fourth Circuit's decision in *Smyth* into doubt. *Smyth* closed the door on Plaintiffs' argument, and that door remains shut.

      **1.**    ***Winter* did not undermine *Smyth* when it refined the preliminary-injunction standard.**

Plaintiffs correctly state that the Supreme Court in *Winter* altered the test for determining when a preliminary injunction is appropriate. Under *Winter*'s four-part test, a moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20. But, for two reasons, that decision did not render *Smyth*'s prevailing-party analysis "obsolete," Pls.' Br. at 21, or otherwise undermine the Fourth Circuit's skepticism about basing prevailing-party status on a "preliminary" merits inquiry.

First, as Plaintiffs recognize, *see id.*, the primary effect of *Winter* was on the irreparable-injury factor. The *Winter* test superseded the Fourth Circuit's then-prevailing test in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), which, "in certain circumstances, allowed a preliminary injunction to issue based on a showing of "a '*possible*' irreparable injury.'" *Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (quoting with emphasis *Blackwelder Furniture Co.*, 550 F.2d at 196). In *Winter*, the Supreme Court "held that a 'possibility of irreparable injury' factor was 'too lenient' for preliminary equitable relief, thus abrogating the *Blackwelder* test. Instead, *Winter* requires a *likelihood* of irreparable injury, a higher standard." *Id.* (citations omitted). That clarification had no impact on the likelihood-of-***success*** factor that is relevant here.

Second, Plaintiffs find unwarranted support in *Winter*'s articulation of that factor—that a plaintiff must demonstrate "that he is likely to succeed on the merits." 555 U.S. at 20; Pls.' Br. at 13. While Plaintiffs see a "stark contrast to the prior standard" allegedly embraced by *Smyth*, Pls.' Br. at 13 (emphasizing "substantial question"), that mischaracterizes the Fourth Circuit's analysis. While the Fourth Circuit recognized that in ***some*** circumstances, "a plaintiff may . . . need only

establish that his case presents a 'substantial question' to obtain a preliminary injunctive relief," *id.* at 276, the court expressly took the ***higher*** standard into account in deciding *Smyth*:

> At the most, a party seeking a preliminary injunction may have to demonstrate ***a strong showing of a likelihood of success or a substantial likelihood of success by clear and convincing evidence*** in order to obtain relief. A district court's determination that ***such a showing*** has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome.

*Smyth*, 282 F.3d at 276 (internal citation and punctuation omitted) (emphasis added).

Accordingly, *Winter* did not "pull the chair out from under *Smyth*," Pls.' Br. at 22; *Smyth* remains undisturbed. Thus, in a case post-dating *Winter*, this Court correctly relied on *Smyth* to deny prevailing-party status to a plaintiff who failed to obtain a preliminary injunction. *See Robinson v. Bartlow*, 2014 WL 2468817, at *3 (W.D. Va. June 3, 2014) (Moon, J.) (recognizing that in *Smyth* the Fourth Circuit "held that *granting* a preliminary injunction is not sufficient to confer prevailing party status because, despite its enforceability, 'the merits inquiry in the preliminary injunction context is necessarily abbreviated'") (quoting *Smyth*, 282 F.3d at 276).

### 2. *Lefemine* did not introduce any new standard that undercuts *Smyth*.

Plaintiffs are likewise unjustified in claiming support from *Lefemine.* There the Supreme Court reversed a decision that "a plaintiff who secured a ***permanent*** injunction but no monetary damages was not a 'prevailing party' under 42 U.S.C. § 1988, and so could not receive fees." *Id.* at 2 (emphasis added). The case does not conflict with *Smyth* for two reasons.

First, there is nothing remarkable about *Lefemine*'s conclusions that monetary damages are not required to be a prevailing party, and that obtaining permanent injunctive relief confers the same status. *See id.* at 2 (calling that principle "established" and remarking, "we have repeatedly held that an injunction or declaratory judgment, like a damages award, will usually satisfy" the test). The Supreme Court's holding that ***permanent*** injunctive relief is sufficient to confer

23

prevailing-party status does not undermine *Smyth*'s holding that ***preliminary*** injunctive relief is insufficient, due to the "preliminary, incomplete nature of the merits examination . . . in the preliminary injunction inquiry." *Smyth*, 282 F.3d at 277; *see also id.* at 276 ("The fact that a preliminary injunction is granted in a given circumstance, then, by no means represents a determination that the claim in question will or ought to succeed ultimately . . . .").

Second, Plaintiffs are wrong to conclude that *Lefemine* "clarifies and defines when a plaintiff is a prevailing party." Pls.' Br. at 13. After *Lefemine*, they argue, "the focal point of the Court's analysis on a fee petition is the before-and-after situation of the parties." *Id.* at 14. But *Lefemine* introduced no new standard in this regard. The Supreme Court merely recited its previous holding that a "plaintiff 'prevails,' . . . 'when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Lefemine*, 568 U.S. at 4 (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992). But that standard was already well "established" before *Lefemine*. *Id.* Indeed, it was precisely the one applied by the district court in *Smyth*:

> The district court then found that because the plaintiffs had received a "judgment against the defendant (the preliminary injunction)" and a "partial settlement, which materially altered the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefitted the plaintiff," the plaintiffs had "prevailed" for purposes of § 1988(b), and were entitled to attorney's fees.

282 F.3d at 273–74 (internal citation omitted). *See also Smyth*, 2000 WL 1567168, at *2 (quoting *Farrar*, 506 U.S at 111–12). The Fourth Circuit reversed the district court not because it disagreed with the recited standard, but because a preliminary injunction did not constitute actual relief "on the merits." *Lefemine* is not to the contrary.[29]

---

[29] As Plaintiffs point out, the court in the non-binding case *Veasey v. Wilkins*, 158 F. Supp. 3d 466 (E.D.N.C. 2016), found *Lefemine* relevant in finding attorney's fees justified on the facts of that case, which involved the constitutionality of a citizenship requirement for obtaining a

## II.   Plaintiffs' out-of-circuit precedents are irrelevant, inconsistent, and unsupportive of Plaintiffs' position.

Finding no support for their position in the case law of this Court or the Fourth Circuit, Plaintiffs ask the Court to ignore controlling authority and instead to follow decisions by courts in other jurisdictions. *See, e.g.*, Pls.' Br. at 15–21. The Court should decline that request for several reasons.

First, while other circuits have come to conclusions different from the Fourth Circuit, "this court is not bound by decisions of other circuits and [should] not [be] disposed to rely upon them in this instance." *N.A.A.C.P. Labor Comm. of Front Royal, Va. v. Laborers' Int'l Union of N. Am.*, 902 F. Supp. 688, 710 (W.D. Va. 1993), *aff'd sub nom. Baltimore v. Laborers' Int'l Union of N. Am.*, 67 F.3d 293 (4th Cir. 1995). *See also Higgins v. E.I. DuPont de Nemours & Co.*, 671 F. Supp. 1055, 1060 (D. Md. 1987) ("While decisions of the federal courts in other circuits might be persuasive *in the absence of authority within the Fourth Circuit*, this Court is not bound by such decisions.") (emphasis added).

Second, other circuits are hardly unified in their approach to this issue. As the Fifth Circuit put it in *Dearmore v. City of Garland*, 519 F.3d 517 (5th Cir. 2008), "[w]ithout a Supreme Court decision on point, circuit courts considering this issue have announced fact-specific standards that are anything but uniform." *Id.* at 521. Even among the circuits cited by Plaintiffs, there is variation in the standards applied, both as to the quality of preliminary relief required, *compare, e.g., Higher*

concealed carry permit in North Carolina. Pls.' Br. at 17–18. But there, at a hearing on the motion for preliminary injunction, the defendant sheriff "conceded that plaintiffs were likely to succeed," 158 F. Supp. 3d at 470, and "admitted that the law at issue in th[e] case was unconstitutional," *Veasey v. Wilkins*, No. 5:14-CV-369-BO, 2015 WL 4622694, at *3 (E.D.N.C. July 31, 2015). There, any preliminary injunctive relief was tantamount to permanent injunctive relief, as in *Lefemine*. Nonetheless, *Veasey* was wrongly decided under *Smyth*. But because it was not appealed, the Fourth Circuit could not correct the error.

*Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 718 (9th Cir. 2013) (relief was "enduring rather than ephemeral"), *with Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 947 (D.C. Cir. 2005) (relief was "concrete and irreversible"), and the analysis of likelihood of success on the merits, *compare, e.g.*, *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 683 F.3d 903 (8th Cir. 2012) (noting "thorough analysis of the probability that Rogers Group would succeed on the merits"), *with Kan. Judicial Watch v. Stout*, 653 F.3d 1230, 1235 (10th Cir. 2011) (requiring "unambiguous indication of probable success on the merits"). *Cf.* Wright & Miller, 11A Fed. Prac. & Proc. § 2948.3 (3d ed.) (noting that "courts use a bewildering variety of formulations of the need for showing some likelihood of success"). Plaintiffs offer no compelling reason to wade into this thicket and trade *Smyth*'s bright-line rule for any particular circuit's "fact-specific" standard.

Finally, it is instructive that Plaintiffs themselves would not qualify as prevailing parties under the standards adopted by other circuits. For instance, they would fail the Fifth Circuit's test requiring that the preliminary injunction "cause[] the defendant to moot the action," thereby "prevent[ing] the plaintiff from obtaining final relief on the merits." *Dearmore*, 519 F.3d at 524. *See also id.* (explaining that "this test grants prevailing party status only when the defendant moots the plaintiff's action in response to a court order"). Here, there is no evidence that the preliminary injunction caused Defendant (actually, the General Assembly) to moot this action.

Nor would Plaintiffs necessarily have prevailing-party status under the Third Circuit's test. As that court observed:

> [T]he "merits" requirement is difficult to meet in the context of TROs and preliminary injunctions, as the plaintiff in those instances needs only to show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief. . . . As this "probability" ruling is usually the only merits-related legal determination made when courts grant TROs and preliminary injunctions, it follows that parties will not often "prevail" based solely on those events.

*Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc).[30]
Similarly, the rule in the Seventh Circuit—absent from Plaintiffs' survey, along with the First, and
Sixth Circuits—is that a preliminary injunction only yields prevailing-party status if the plaintiff
wins "substantive relief that is not defeasible by further proceedings," *Dupuy v. Samuels*, 423 F.3d
714, 719 (7th Cir. 2005) (citation and punctuation omitted), as when a particular event covered by
the injunction has passed. Here, by contrast, "further proceedings on the merits of the plaintiffs'
claims" were contemplated; Plaintiffs received only a fraction of what they requested, and only on
a temporary basis. *Id.* at 723.

For all these reasons—but especially because they are irrelevant in light of *Smyth*—the
Court need not look beyond the Fourth Circuit.

### III.   The Fourth Circuit's approach is the right one.

In addition to being controlling authority, *Smyth* also has the virtue of being correct.
Multiple policy grounds, as well as the example of this case, show why.

#### A.   Sound policy reasons support *Smyth*'s bright-line rule.

A key advantage of the Fourth Circuit's approach over the "fact-specific standards" of
other circuits, *Dearmore*, 519 F.3d at 521, is the clarity it offers to courts and litigants. This is
consistent with the Supreme Court's longstanding concern for the "judicial administration of §
1988" with respect to "defining the term 'prevailing party.'" *Tex. State Teachers Ass'n v. Garland
Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989). *See also Buckhannon*, 532 U.S. at 610 (criticizing the
"nuanced 'three thresholds' test required by the 'catalyst theory'" as "clearly not a formula for

---

[30] *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226 (3d Cir. 2008) ("*PAPV*"),
cited by Plaintiffs, is not typical of the Third Circuit's approach. The en banc Third Circuit
explained in *Singer Management Consultants* that "*PAPV* provides an example of that rare
situation where a merits-based determination is made at the injunction stage." 650 F.3d at 229.

'ready administrability'"). This clarity promotes worthy policy objectives especially where, as here, government actors and resources are involved.

Fixing plaintiffs' fee eligibility (and defendants' exposure to fee liability) according to *Smyth*'s bright-line rule has numerous salutary effects. First, it helps government defendants make informed decisions about how to respond when laws and policies come under legal challenge, including how to balance their obligations to defend government policies while at the same time preserving public funds that a court may (or may not) award to plaintiffs' attorneys depending on the government's response. Unlike *Smyth*, an unpredictable, context-specific rule would hinder defendants in evaluating the costs and benefits of amending a law or changing a policy. As the Supreme Court recognized in *Buckhannon*, "defendants' potential liability for fees in this kind of litigation can be as significant as, and sometimes even more significant than, their potential liability on the merits," 532 U.S. at 608 (quoting *Evans v. Jeff D.,* 475 U.S. 717, 734 (1986)); understandably, that could affect "a defendant's decision to voluntarily change its conduct, conduct that may not be illegal," *id.* Meanwhile, a clear rule the other way—that always locked in a fee award for plaintiffs who obtain a preliminary injunction—would disincentivize defendants from revising challenged laws or ending litigation. *See id.* (recognizing that "the possibility of being assessed attorney's fees may well deter a defendant from altering its conduct").

Adhering to *Smyth*'s sensible rule also would avoid unnecessary proceedings, such as this one, regarding whether and in what circumstances a plaintiff who obtains only a preliminary injunction yet may be considered a prevailing party. As the Supreme Court warned, "[c]reating such an unstable threshold to fee eligibility is sure to provoke prolonged litigation, thus deterring settlement of fee disputes and ensuring that the fee application will spawn a second litigation of

significant dimension." *Garland*, 489 U.S. at 791. *See also Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.").

       **B.**    **This case shows why *Smyth* was right: the preliminary injunction inquiry, by merely predicting likelihood of success on a single claim, is of limited help in the prevailing-party determination.**

Finally, this case exemplifies the truth of the Fourth Circuit's observation in *Smyth* that the granting of a preliminary injunction "by no means represents a determination that the claim in question will or ought to succeed ultimately." *Id.* at 276. Simply put, Plaintiffs likely would ***not*** have ultimately succeeded on the merits, had this matter not been rendered moot.

This Court granted a preliminary injunction based solely on its conclusion that Plaintiffs were likely to succeed on their procedural due process claim. 355 F. Supp. 3d at 527, 532. In making that prediction, the only analogous case the Court looked to was *Fowler v. Johnson*, No. CV 17-11441, 2017 WL 6379676, at *12 (E.D. Mich. Dec. 14, 2017), in which a court likewise concluded that a due process challenge to Michigan's similar license-suspension statute was likely to succeed, and on that basis granted a preliminary injunction. *See Stinnie*, 355 F. Supp. 3d at 531 n.9, 532. But six months after this Court entered its own preliminary injunction, the Sixth Circuit ***reversed*** the injunction in *Fowler*. *Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019). The Sixth Circuit identified the key issue as "whether state law establishes the entitlement that Plaintiffs' claim in this case—a right of the indigent, who cannot pay court debt, to be exempt from driver's-license suspension on the basis of unpaid court debt. The answer is it has not." *Id.* at 258.

As in this case, the *Fowler* plaintiffs' "central argument" was that state law "mandates suspensions for failure to pay court debt ***with no exception for indigence or non-willfulness***." *Id.* (emphasis added). But the Sixth Circuit reasoned that if the plaintiffs' "indigency is not relevant to the state's underlying decision to suspend their licenses, then giving them a hearing—or any other procedural opportunity—where they can raise their indigency would be pointless. Such a

29

procedure would do nothing to prevent . . . 'the risk of erroneous deprivation.'" *Id.* at 259 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The Sixth Circuit therefore found that the plaintiffs had "***not*** shown that their procedural due process claim is likely to succeed on the merits." *Id.* at 260 (emphasis added). Here, Defendant was pressing that argument—and that conclusion—before this case was dismissed. *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 11–16, Dkt. 196. Among other things, *Fowler* shows why the Court was mistaken in granting a preliminary injunction on the basis that "the procedures in place are not sufficient to protect against the erroneous deprivation of the property interest involved." 355 F. Supp. 3d at 530.

Consistent with Defendant's arguments, Plaintiffs' ***other*** constitutional claims—based on equal protection, fundamental fairness, and other elements of due process—also have been roundly rejected by other courts, including several within the Fourth Circuit. *See, e.g.*, *Fowler*, 924 F.3d 247 (rejecting challenge to Michigan license-suspension statute based on due process, fundamental fairness, and equal protection); *Robinson v. Long*, No. 18-6121, 814 F. App'x 991, 2020 WL 2551889, at *3 (6th Cir. May 20, 2020) (applying *Fowler* because the "rationale for upholding the Michigan scheme applies with equal force to the Tennessee one"); *White v. Shwedo*, No. 2:19-CV-3083-RMG, 2020 WL 2315800, at *5 (D.S.C. May 11, 2020) (finding no likelihood of success on the merits of a fundamental fairness claim); *Motley v. Taylor*, No. 2:19-CV-478-WKW, 2020 WL 1540391, at *28 (M.D. Ala. Mar. 31, 2020) (dismissing due process and equal protection claims), *appeal pending*, No. 20-11688 (11th Cir. filed May 1, 2020); *Johnson v. Jessup*, 381 F. Supp. 3d 619, 631 (M.D.N.C. 2019) (granting defendant judgment on the pleadings on plaintiffs' equal protection and substantive due process claim), *appeal pending*, No. 19-1421 (4th Cir. filed Apr. 19, 2019); *Mendoza v. Garrett*, No. 3:18-CV-01634-HZ, 2019 WL 2251290 (D. Or. May 16, 2019) (dismissing equal protection, due process, and fundamental fairness claims), *appeal pending*, No.

19-35506 (9th Cir. filed June 11, 2019). Along with the existing case law that supported Defendant's arguments, these intervening decisions demonstrate that, contrary to this Court's initial prediction, Plaintiffs are ***unlikely*** to have prevailed on the merits of their claims had the matter proceeded.[31]

The Fourth Circuit's rule properly recognizes that, in light of the "necessarily abbreviated" nature of the preliminary injunction determination, *Smyth*, 282 F.3d at 276, courts (like this one) will not always correctly predict a plaintiff's probability of success. Accordingly, it makes no sense to double-down on that mere prediction—a possibly mistaken one—by finding the plaintiff "prevailed."

## CONCLUSION

In light of binding and well-supported Fourth Circuit authority that obtaining a preliminary injunction alone does not confer prevailing-party status, the Court should find that Plaintiffs are not prevailing parties and deny their fee petition.

August 31, 2020

|  | Respectfully submitted, |
|  | Richard D. Holcomb |
| Mark R. Herring | /s/ *Maya M. Eckstein* |
| *Attorney General of Virginia* | Maya M. Eckstein (VSB #41413) |
|  | Trevor S. Cox (VSB #78396) |
| Donald D. Anderson | David M. Parker (VSB #85619) |
| *Deputy Attorney General* | HUNTON ANDREWS KURTH LLP |
|  | 951 E. Byrd St. |
| Julie M. Whitlock | Richmond, VA 23219 |
| *Senior Assistant Attorney General &* | Ph: (804) 788-8200 |
| *Transportation Section Chief* | Fax: (804) 788-8218 |
|  | meckstein@HuntonAK.com |

---

[31] Defendant also continued to have strong arguments that the Court lacked subject matter jurisdiction, including that evidence revealed in discovery undercut Plaintiffs' representations at the preliminary injunction stage. *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 8–11, Dkt. 196.

31

Janet W. Baugh (VSB #44649)
*Senior Assistant Attorney General*

Christian A. Parrish (VSB #44427)
*Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
(804) 786-2071 – Telephone
(804) 786-4239 – Facsimile

tcox@HuntonAK.com
dparker@HuntonAK.com

Stuart A. Raphael (VSB #30380)
Neil K. Gilman (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Ph: (202) 955-1500
Fax: (202) 778-2201
sraphael@HuntonAK.com
ngilman@HuntonAK.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2020, I electronically filed this brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/Maya M. Eckstein
Maya Eckstein